No. 25-3493

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

THE STATE OF CALIFORNIA AND GOVERNOR GAVIN NEWSOM,
*Plaintiffs-Appellants,*

v.

DONALD J. TRUMP, *et al.*,
*Defendants-Appellees.*

———————————

**On Appeal from the United States District Court
for the Northern District of California**
No. 3:25-cv-03372-JSC
Hon. Jacqueline Scott Corley, District Judge

———————————

## APPELLANTS' OPENING BRIEF

———————————

ROB BONTA
  *Attorney General of California*
MICHAEL J. MONGAN
  *Solicitor General*
HELEN H. HONG
  *Principal Deputy Solicitor General*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*

JULIE VEROFF
  *Deputy Solicitor General*
LARA HADDAD
  *Supervising Deputy Attorney General*
SHIWON CHOE
ZELDA VASSAR
CAROLYN F. DOWNS
  *Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 510-3776
Julie.Veroff@doj.ca.gov
*Attorneys for Plaintiffs-Appellants*

June 30, 2025

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................... 1

Jurisdictional Statement .......................................................... 3

Statement of the Issues............................................................ 3

Addendum of Statutory Provisions .......................................... 3

Statement of the Case.............................................................. 3

    A.    Legal Background ...................................................... 3

    B.    Factual Background.................................................... 7

    C.    Procedural History.................................................. 10

Summary of Argument ........................................................... 12

Standard of Review................................................................ 15

Argument............................................................................... 15

    I.    This Action "Arises Out of" IEEPA, a "Law of the United States"................................................................................ 15

        A.    "Arises Out of" Refers to the Substantive Law Giving Rise to the Claims Alleged—Here, IEEPA ...... 15

        B.    The District Court's Conclusion That the Lawsuit Does Not Arise Out of IEEPA, but Arises Out of the Executive Orders, Is Unpersuasive .............................. 19

    II.    Congress Did Not Delegate the President Authority in IEEPA to Impose Tariffs.......................................................... 22

        A.    IEEPA's Plain Text Does Not Provide for Tariffs ....... 23

        B.    Statutory Context Confirms That IEEPA Does Not Provide for Tariffs........................................................ 29

        C.    Legislative History and Historical Practice Confirm That IEEPA Does Not Provide for Tariffs.................... 35

        D.    Constitutional Principles Support the Conclusion That IEEPA Does Not Provide for Tariffs.................... 39

i

# TABLE OF CONTENTS
## (continued)

**Page**

III.   Defendants' Other Arguments Are Unpersuasive .................. 41

    A.   *Yoshida* Is Not Binding on This Court, Is Not Persuasive on Its Own Terms, and Does Not Resolve the Question Whether IEEPA Provides for Tariffs ........................................................................ 41

    B.   Considerations of Uniformity and Expertise Do Not Support Exclusive Jurisdiction Over This Action in The Court of International Trade ................................. 45

Conclusion ....................................................................................... 47

Statutory Addendum ........................................................................ 48

# TABLE OF AUTHORITIES

**Page**

**C**ASES

*Abramski v. United States*
573 U.S. 169 (2014)....................................................35

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*
594 U.S. 758 (2021)....................................................40

*Barnes v. United States*
No. 1:25-cv-00043, 2025 WL 1483384 (Ct. Int'l Trade
May 23, 2025)...........................................................18

*Biden v. Nebraska*
600 U.S. 477 (2023)....................................................32

*Bolivarian Republic of Venez. v. Helmerich & Payne Int'l
Drilling Co.*
581 U.S. 170 (2017)....................................................15

*Bostock v. Clayton Cnty.*
590 U.S. 644 (2020)....................................................24

*BP P.L.C. v. Mayor & City Council of Balt.*
141 S. Ct. 1532 (2021)................................................44

*Brown v. Gardner*
513 U.S. 115 (1994)...............................................31, 33

*Conchise Consultancy, Inc. v. United States ex rel. Hunt*
587 U.S. 262 (2019)....................................................31

*Consumers Union of U.S., Inc. v. Kissinger*
506 F.2d 136 (D.C. Cir. 1974).......................................23

*Cornet Stores v. Morton*
632 F.2d 96 (9th Cir. 1980) .........................................42

## TABLE OF AUTHORITIES
### (continued)

Page

*DaVinci Aircraft, Inc. v. United States*
   926 F.3d 1117 (9th Cir. 2019) ................................................... 15

*Diginet, Inc. v. Western Union ATS, Inc.*
   958 F.2d 1388 (7th Cir. 1992) ................................................... 27

*Dreyfus v. Von Finck*
   534 F.2d 24 (2d Cir. 1976) ........................................................ 22

*Dutta v. State Farm Mutual Auto. Ins. Co.*
   895 F.3d 1166 (9th Cir. 2018) .................................................... 3

*Earth Island Institute v. Brown*
   28 F.3d 76 (9th Cir. 1994) ................................................. 17, 18

*Emily Ley Paper, Inc. v. Trump*
   No. 3:25-cv-464, 2025 WL 1482771 (N.D. Fla.
   May 20, 2025) ............................................................................. 18

*Fed. Commc'ns Comm'n v. Consumers' Research*, No. 24-354,
   606 U.S. __, 2025 WL 1773630 (U.S. June 27, 2025) ............................. 40

*Gibbons v. Ogden*
   22 U.S. (9 Wheat.) 1 (1824) ...................................................... 27

*Gonzalez v. United States*
   553 U.S. 242 (2008) ................................................................. 40

*Gustafson v. Alloyd Co., Inc.*
   513 U.S. 561 (1995) ................................................................. 32

*Hernandez v. Campbell*
   204 F.3d 861 (9th Cir. 2000) .................................................... 45

*In re Border Infrastructure Env't Litig.*
   915 F.3d 1213 (9th Cir. 2019) .................................................. 18

iv

## TABLE OF AUTHORITIES
### (continued)

Page

*Int'l Lab. Rights Fund v. Bush*
   357 F. Supp. 2d 204 (D.D.C. 2004)..........................................16, 17, 18, 19

*Jama v. Immigr. & Customs Enf't*
   543 U.S. 335 (2005)....................................................................................23

*Jefferson Cnty. v. Acker*
   527 U.S. 423 (1999)....................................................................................27

*Jennings v. Rodriguez*
   583 U.S. 281 (2018)....................................................................................32

*K Mart Corp. v. Cartier, Inc.*
   485 U.S. 176 (1988)..............................................................................20, 45

*Lake v. Ohana Mill Cmtys., LLC*
   14 F.4th 993 (9th Cir. 2021) ......................................................................15

*Learning Res., Inc. v. Trump*
   __ F. Supp. 3d __, No. 1:25-cv-1248, 2025 WL 1525376
   (D.D.C. May 29, 2025).........16, 18-21, 23, 24, 26, 30, 32-35, 38, 40-44, 46

*Loper Bright Enters. v. Raimondo*
   603 U.S. 369 (2024)....................................................................................39

*Marmen Inc. v. United States*
   134 F.4th 1334 (Fed. Cir. 2005) ................................................................46

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*
   595 U.S. 109 (2022)....................................................................................39

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
   567 U.S. 519 (2012)....................................................................................26

*Nebraska v. Su*
   121 F.4th 1 (9th Cir. 2024) .........................................................................39

v

## TABLE OF AUTHORITIES
### (continued)

Page

*Ohno v. Yasuma*
    723 F.3d 984 (9th Cir. 2013) ............................................................ 42

*Orozco-Lopez v. Garland*
    11 F.4th 764 (9th Cir. 2021) ........................................................... 43

*Regan v. Wald*
    468 U.S. 222 (1984) ........................................................................ 37

*TikTok v. Trump*
    507 F. Supp. 3d 92 (D.D.C. 2020) ................................................. 33

*United States v. Patel*
    762 F.2d 784 (9th Cir. 1985) ................................................... 26, 27

*United States v. U.S. Shoe Corp*
    523 U.S. 360 (1998) ........................................................................ 32

*United States v. Williams*
    553 U.S. 285 (2008) ............................................................ 29, 30, 33

*United States v. Yoshida International, Inc.*
    526 F.2d 560 (C.C.P.A. 1975) .......................................... 14, 38, 41, 42, 43

*V.O.S. Selections, Inc. v. United States*
    __ F. Supp. 3d __, No. 1:25-cv-00066, 2025 WL 1514124 (Ct.
    Int'l Trade May 28, 2025) ............................................................... 18

*V.O.S. Selections, Inc. v. United States*
    No. 1:25-cv-00066, Dkt. 63 (Ct. Int'l Trade June 3, 2025) ........... 44

*Webber v. U.S. Dep't of Homeland Sec.*
    __ F. Supp. 3d __, No. 4:25-cv-26, 2025 WL 1207587 (D.
    Mont. April 25, 2025) ..................................................................... 18

*West Virginia v. Env't Prot. Agency*
    597 U.S. 697 (2022) ............................................................ 29, 39, 40

vi

## TABLE OF AUTHORITIES
### (continued)

Page

*Whitman v. Am. Trucking Assns., Inc.*
   531 U.S. 457 (2001)...............................................................32, 40

*Ye v. INS*
   214 F.3d 1128 (9th Cir. 2000) ...................................................15

*Yoshida Int'l, Inc. v. United States*
   378 F. Supp. 1155 (Cust. Ct. 1974) ......................................38, 42

*Youngstown Sheet & Tube Co. v. Sawyer*
   343 U.S. 579 (1952)...................................................1, 4, 22, 23

*Ysleta del Sur Pueblo v. Texas*
   596 U.S. 685 (2022)..............................................................25, 31

*Zukerman v. U.S. Postal Serv.*
   961 F.3d 431 (D.C. Cir. 2020)...................................................45

**STATUTES**

2 U.S.C. § 622(8)(B)(i) ..................................................................27

12 U.S.C. § 5491(a) .......................................................................28

15 U.S.C. § 78k(a)(2)......................................................................28

16 U.S.C.
   § 460bbb-9(a)............................................................................27
   § 1540(f)....................................................................................28

## TABLE OF AUTHORITIES
### (continued)

Page

19 U.S.C.

§ 1338............................................................................4, 28

§ 1671.................................................................................28

§ 1862.......................................................................4, 28, 29

§ 2132(a)......................................................4, 28, 29, 34, 43

§ 2253.......................................................................4, 28, 29

§ 2411-2419...............................................................4, 28

§ 2411(c).............................................................29, 34, 43

§ 2483.................................................................................21

§ 3004(c).....................................................................12, 21

21 U.S.C. § 360bbb-2(a)..................................................28

28 U.S.C.

§ 1331..............................................................................3, 11

§ 1581.....................................................................2-3, 11-22

§ 1631.........................................................................11, 42

49 U.S.C. § 40117(j).........................................................27

50 U.S.C.

§ 1582.................................................................................42

§ 1701.......................................................5, 6, 24, 37, 52

§ 1702.................................................................................46

§ 1702(a)(1) .....................5, 6, 14, 23, 24, 30-33, 37

§ 1702(a)(2) .....................................................................34

§ 4305(b)(1) .....................................................................37

Emergency Banking Relief Act, Pub. L. No. 73-1, 48 Stat. 1
(1933)..............................................................................6, 36

First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838 (1941).................6, 36

National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255
(1976)..................................................................................37

Trade Act of 1974, Pub. L. No. 63-618, 88 Stat. 1978 (1975) ......................43

**TABLE OF AUTHORITIES**
**(continued)**

Page

Trading with the Enemy Act
    Pub. L. No. 65-91, 40 Stat. 411 (1917)............................................6, 35, 36
    Pub. L. No. 95-223, 91 Stat. 1625 (1977) ..................................................37

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 8, cl. 1.................................................................1, 3, 23, 39

U.S. Const. art. I, § 9, cl. 5...............................................................................32

**OTHER AUTHORITIES**

Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv.,
    R45618, *The International Emergency Economic Powers Act:*
    *Origins, Evolution, and Use* (Jan. 30, 2024) ..........................................7, 38

Christopher A. Casey & Cathleen D. Cimino-Isaacs, Cong. Rsch.
    Serv., IF 10038, *Trade Promotion Authority* (Feb. 20, 2024).....................4

Christopher A. Casey, Cong. Rsch. Serv., IF 11030, *U.S. Tariff*
    *Policy: Overview* (Jan. 31, 2025) ............................................................25

Exec. Order No. 13,219, *Blocking Property of Persons Who*
    *Threaten International Stabilization Efforts in the Western*
    *Balkans*, 66 Fed. Reg. 34777 (June 26, 2001).............................................7

Exec. Order No. 13,581, *Blocking Property of Transnational*
    *Criminal Organizations*, 76 Fed. Reg. 44757 (July 24, 2011)....................7

Exec. Order No. 14,193, *Imposing Duties to Address the Flow of*
    *Illicit Drugs Across our Northern Border*, 90 Fed. Reg. 9113
    (Feb. 1, 2025).......................................................................................8, 9, 21

Exec. Order No. 14,194, *Imposing Duties to Address the*
    *Situation at Our Southern Border*, 90 Fed. Reg. 9117 (Feb. 1,
    2025) .....................................................................................................8, 9, 21

## TABLE OF AUTHORITIES
### (continued)

Page

Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 1, 2025) .......................................... 8, 9, 21

Exec. Order No. 14,231, *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11785 (Mar. 6, 2025) ................................................................. 9

Exec. Order No. 14,257, *Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15041 (Apr. 2, 2025) .......................................... 8, 9, 21

Exec. Order No. 14,266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15625 (Apr. 9, 2025) .................................................... 8, 9

H.R. 6394, 96th Cong. § 201(a) (2d Sess. 1980) ............................................ 20

H.R. Rep. No. 65-85 (1917) ................................................................. 35

H.R. Rep. No. 95-459 (1977) ............................................................ 37, 38

Proclamation No. 3564, 28 Fed. Reg. 13247 (Dec. 6, 1963) ........................... 5

Proclamation No. 4074, 36 Fed. Reg. 15724 (Aug. 17, 1971) .............. 5, 39, 41

Proclamation No. 4098, 36 Fed. Reg. 24201 (Dec. 22, 1971) ................. 39, 41

Proclamation No. 5631, 52 Fed. Reg. 13412 (Apr. 17, 1987) .......................... 5

*Regulate*, AMERICAN HERITAGE DICTIONARY (1976) ..................................... 25

*Regulate*, BLACK'S LAW DICTIONARY (5th ed. 1979) ..................................... 25

*Regulate*, THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH (6th ed. 1976) ................................................................. 25

x

## TABLE OF AUTHORITIES
### (continued)

Page

*Regulate*, NEW WEBSTER'S DICTIONARY OF THE ENGLISH
LANGUAGE (1975) ..........................................................25

*Regulate*, RANDOM HOUSE COLLEGE DICTIONARY (rev. ed. 1975) ...............25

S. Rep. No. 94-922 (1976) ...............................................37

S. Rep. No. 95-466 (1977) ...............................................38

*Tariff*, THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH
(6th ed. 1976) ...........................................................25

*Tax*, THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH
(6th ed. 1976) ...........................................................26

U.S. Customs & Border Protection, *Entry Summary and Post
Release Processes* (last modified Apr. 10, 2025) .......................33

White House, *Fact Sheet: President Donald J. Trump Restores
Section 232 Tariffs* (Feb. 11, 2025) ...................................8

White House, *Joint Statement on U.S.-China Economic and
Trade Meeting in Geneva* (May 12, 2025) ................................9

**INTRODUCTION**

Under the Constitution, it is Congress that "shall have Power To Lay and collect Taxes, Duties, Imposts and Excises." U.S. Const. art. I, § 8, cl. 1. The President has no independent authority to impose or alter tariffs; any such authority must be delegated by Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Consistent with those principles, Congress has expressly granted the President limited authority to impose tariffs under narrowly circumscribed circumstances through a series of Tariff and Trade Acts. Until recently, Presidents seeking to impose tariffs have always done so pursuant to those clear delegations of authority.

But beginning in February 2025, President Trump issued a series of executive orders imposing sweeping tariffs ranging from 10% to 145% on nearly every trading partner of the United States. Those tariffs threaten to devastate the economy, depriving California alone of $25 billion and more than 64,000 jobs. As substantive authority for his tariffs, President Trump did not invoke any of the statutes delegating the President tariff authority. Instead, the President invoked the International Emergency Economic Powers Act (IEEPA), a statute enacted in 1977 to allow the President to take specified actions in response to a declared national emergency resulting from an unusual and extraordinary foreign threat. Imposing tariffs is not one of those specified actions—IEEPA makes no mention of "tariffs,"

1

"duties," or any similar term.  And in the nearly five decades and eight presidential administrations since its enactment, no President has ever before invoked IEEPA to impose tariffs.

The State of California and Governor Gavin Newsom filed this suit in federal district court, alleging that President Trump's tariff orders are not authorized by IEEPA and are thus *ultra vires* and violate the constitutional separation of powers. District courts regularly exercise jurisdiction over lawsuits that allege that the President exceeded his authority by acting without statutory authorization.  They also regularly exercise jurisdiction over IEEPA cases.  Like those cases, this action belongs in district court.

The district court disagreed, holding that the U.S. Court of International Trade has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1581(i)(1)(B). That provision is inapplicable.  Section 1581(i)(1)(B) confers exclusive jurisdiction on the Court of International Trade only when a civil action against the United States, its agencies, or its officers "arises out of any law of the United States providing for . . . tariffs."  This action "arises out of" IEEPA, and IEEPA does not provide for tariffs.  The Court should reverse the judgment below and remand for further proceedings.

## JURISDICTIONAL STATEMENT

The district court's jurisdiction is at issue in this appeal. Plaintiffs' position is that the district court had jurisdiction under 28 U.S.C. § 1331. The district court disagreed, after exercising "jurisdiction to determine its own jurisdiction." *Dutta v. State Farm Mutual Auto. Ins. Co.*, 895 F.3d 1166, 1171 n.3 (9th Cir. 2018). The district court therefore entered judgment dismissing this action without prejudice for lack of jurisdiction on June 2, 2025. ER-4. Plaintiffs appealed the same day. ER-52–53. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether the district court has jurisdiction over this civil action under 28 U.S.C. § 1331 or whether jurisdiction lies in the U.S. Court of International Trade under 28 U.S.C. § 1581(i)(1)(B) as an action that "arises out of any law of the United States providing for . . . tariffs."

## ADDENDUM OF STATUTORY PROVISIONS

An addendum of pertinent statutory provisions is attached at the end of this brief. *See* Ninth Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### A.   Legal Background

The Constitution assigns the power to impose tariffs exclusively to Congress. U.S. Const. art. I, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes, Duties, Imports and Excises . . ."). The President has no independent

3

authority to impose or alter tariffs. *See Youngstown*, 343 U.S. at 585. Congress

has delegated certain tariff authority to the President in a series of statutory

enactments codified under Title 19 of the U.S. Code, which is denominated

"Customs Duties." *See* 19 U.S.C. §§ 1338, 1862, 2132(a), 2253, 2411-2419.[1]

Those statutes expressly delegate the power to impose tariffs, and then carefully

circumscribe the President's exercise of that power. For instance, Section 338 of

the Tariff Act of 1930 explicitly grants the President the authority to "declare new

or additional duties" on imports from countries that have discriminated against

U.S. products or commerce, but only after a 30-day waiting period and only up to

50 percent ad valorem. 19 U.S.C. § 1338(a), (d), (e). Similarly, Section 122 of the

Trade Act of 1974 explicitly authorizes the President to impose "duties" on

imports in order "to deal with large and serious United States balance-of-payments

deficits," but only for "a period not exceeding 150 days" and only up to "15

percent ad valorem." *Id.* § 2132(a). For decades, Presidents have invoked the

---

[1] The President may also negotiate trade agreements addressing tariff rates on behalf of the United States under a Trade Promotion Authority, but any such agreement only becomes law through implementing legislation. *See* Christopher A. Casey & Cathleen D. Cimino-Isaacs, Cong. Rsch. Serv., IF 10038, *Trade Promotion Authority* 1 (Feb. 20, 2024), https://www.congress.gov/crs-product/IF10038.

tariff statutes in Title 19 and complied with their requirements when imposing tariffs.[2]

Unlike those laws, the International Emergency Economic Powers Act is part of Title 50, denominated "War and National Defense," and contains no mention of tariffs, duties, or taxes. Rather, IEEPA provides that when the President declares a national emergency pursuant to the National Emergencies Act with respect to an "unusual and extraordinary threat" to "the national security, foreign policy, or economy of the United States" from a source outside the United States, the President may use certain powers to "deal with" that threat. 50 U.S.C. § 1701(a). Specifically, IEEPA provides that, in those circumstances, the President may:

> under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—
>
> (A) investigate, regulate, or prohibit—
>
>     (i) any transactions in foreign exchange
>
>     (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
>
>     (iii) the importing or exporting of currency or securities,

---

[2] *See, e.g.*, Proclamation No. 5631, 52 Fed. Reg. 13412 (Apr. 17, 1987) (President Reagan invoking Trade Act of 1974 to impose tariffs); Proclamation No. 4074, 36 Fed. Reg. 15724 (Aug. 17, 1971) (President Nixon invoking Trade Expansion Act of 1962 and Tariff Act of 1930 to impose tariffs); Proclamation No. 3564, 28 Fed. Reg. 13247 (Dec. 6, 1963) (President Johnson invoking Trade Expansion Act of 1962 and Tariff Act of 1930 to impose tariffs).

> by any person, or with respect to any property, subject to the jurisdiction of the United States;
>
> (B) investigate, block during the pendency of an investigation, regulate**,** direct and compel, nullify, void, prevent or prohibit,
>
> any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving,
>
> any property in which any foreign country or a national thereof has any interest
>
> by any person, or with respect to any property, subject to the jurisdiction of the United States[.]

50 U.S.C. § 1702(a)(1) (line breaks added for readability).  In granting the President these specific powers for emergency circumstances, Congress was careful to provide that IEEPA powers "may not be exercised for any other purpose."  *Id.* § 1701(b).

The powers delegated to the President under Section 1702(a)(1)(B) of IEEPA are largely drawn from Section 5(b) of the Trading with the Enemy Act of 1917 (TWEA), which was enacted shortly after the United States entered World War I, and then amended during the Great Depression and World War II.  *See* Pub. L. No. 65-91, § 5(b), 40 Stat. 411 (1917); Emergency Banking Relief Act., Pub. L. No. 73-1, § 2, 48 Stat. 1 (1933); First War Powers Act, Pub. L. No. 77-354, § 301, 55 Stat. 838 (1941).  Like IEEPA, neither Section 5(b)'s text nor the legislative

6

history accompanying its enactment and amendment reference tariffs, duties, or taxes.

Until now, no President has ever invoked TWEA or IEEPA to impose tariffs.[3] When Presidents have historically exercised their authority under Section 5(b) of TWEA and Section 1702(a)(1)(B) of IEEPA, they have instead imposed economic sanctions on foreign countries and persons, including by prohibiting economic relations, blocking access to assets, forbidding utilization of U.S. financial systems, and denying visas. *See* Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* 6, 15 (Jan. 30, 2024), https://www.congress.gov/crs-product/R45618.[4]

### B.    Factual Background

On February 1, 2025, President Trump issued three executive orders imposing a 25% tariff on imports from Canada and Mexico, and a 10% tariff on imports

---

[3] As discussed below, the U.S. Department of Justice invoked Section 5(b) of TWEA as a post hoc, alternative basis to justify certain tariffs President Nixon imposed in response to a lawsuit challenging their validity. But President Nixon himself did not cite TWEA as a basis for his authority in the Proclamations imposing or rescinding the tariffs. *See infra* pp. 41-42.

[4] *See, e.g.*, Exec. Order No. 13,581, *Blocking Property of Transnational Criminal Organizations*, 76 Fed. Reg. 44757 (July 24, 2011); Exec. Order No. 13,219, *Blocking Property of Persons Who Threaten International Stabilization Efforts in the Western Balkans*, 66 Fed. Reg. 34777 (June 26, 2001).

from China.  ER-6.[5]  Two months later, President Trump issued an executive order imposing a "universal tariff" of 10% on nearly "all imports from" virtually "all trading partners."  ER-8.  The order also imposed "reciprocal tariffs" on 57 trading partners, with rates ranging from 11% to 50%, including 34% for China.  ER-8.[6]

President Trump has repeatedly paused, reimposed, modified, and escalated these tariffs, at one point subjecting most goods from China to a total tariff rate of 145%.  ER-7–9; *see, e.g.*, Exec. Order No. 14,266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15625 (Apr. 9, 2025).  As of the date of this filing, pursuant to the challenged tariff

---

[5] *See* Exec. Order No. 14,193, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9113 (Feb. 1, 2025); Exec. Order No. 14,194, *Imposing Duties to Address the Flow of Illicit Drugs Across our Northern Border*, 90 Fed. Reg. 9117 (Feb. 1, 2025); Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 1, 2025).

[6] *See* Exec. Order No. 14,257, *Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15041 (Apr. 2, 2025).  Despite their name, the formula used to determine the "reciprocal tariff" rates "has nothing to do with mirroring tariffs applied by foreign governments on U.S. exports, nor matching any other type of foreign trade barrier."  ER-27.

President Trump has also imposed industry-specific tariffs on steel, aluminum, automobiles, and automobile parts.  ER-27; White House, *Fact Sheet: President Donald J. Trump Restores Section 232 Tariffs* (Feb. 11, 2025), https://www.whitehouse.gov/fact-sheets/2025/02/fact-sheet-president-donald-j-trump-restores-section-232-tariffs/.  He has invoked one of the tariff statutes, Section 232 of the Trade Expansion Act of 1962, not IEEPA, as the source of his authority to impose those tariffs.  They are not challenged in this lawsuit.

orders, a majority of goods from Canada and Mexico are subject to a 25% tariff rate; goods from China are subject to a 30% tariff rate, which will rise to 54% on August 12; and goods from nearly all other U.S. trading partners are subject to a 10% tariff rate, which will rise to rates ranging from 11% to 50% on July 9.[7]

These tariffs are poised to inflict significant and enduring economic harm. ER-39–40. Functionally, they "will be the largest tax increase in more [than] a generation for U.S. consumers," and they "risk pushing the larger macroeconomy into a recession, generating lasting harmful effects on employment, economic growth, and government budgets." ER-34–35, ER-38–40. Analysts project that these tariffs will lower after-tax incomes in 2025 by an average of 0.9 percent; reduce U.S. economic output by 0.6 percent—the "equivalent to more than $178 billion annual output lost in 2024 dollars"; and "reduce the labor supply by 546,000 full-time equivalent jobs." ER-28–29. California alone stands to lose $25 billion and more than 64,000 jobs. ER-31.

---

[7] *See* 90 Fed. Reg. at 9114, 9118, 9122, 15045; Exec. Order No. 14,231, *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11785 (Mar. 6, 2025); Exec. Order No. 14,232, *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Southern Border*, 90 Fed. Reg. 11787 (Mar. 6, 2025); Exec. Order 14,266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15625 (Apr. 9, 2025); White House, *Joint Statement on U.S.-China Economic and Trade Meeting in Geneva* (May 12, 2025), https://www.whitehouse.gov/briefings-statements/2025/05/joint-statement-on-u-s-china-economic-and-trade-meeting-in-geneva/.

Each of the executive orders imposing these tariffs invoked IEEPA as the source of the President's authority to impose tariffs.  ER-7–8.  In the three orders imposing tariffs on Canada, Mexico, and China, President Trump "invoke[d] [his] authority under Section 1702(a)(1)(B) of IEEPA," and "specifically" noted "that action under other authority to impose tariffs is inadequate."  ER-7.  And in the order imposing the universal and reciprocal tariffs, the President invoked the "authority vested in [him] by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act."  ER-8.

### C.    Procedural History

In response to President Trump's executive orders claiming authority under IEEPA to impose tariffs, plaintiffs the State of California and Governor Gavin Newsom (collectively, California) filed suit in the U.S. District Court for the Northern District of California.[8]  California argued that IEEPA does not authorize

---

[8] Several other plaintiffs have filed lawsuits challenging the tariffs in federal district court and the Court of International Trade.  *See Emily Ley Paper, Inc. v. Trump*, No. 3:25-cv-464 (N.D. Fla.), *transferred to* No. 1:25-cv-00096 (Ct. Int'l Trade) (stayed); *Webber v. U.S. Dep't of Homeland Sec.*, No. 4:25-cv-26 (D. Mont.), *appeal docketed*, No. 25-2717 (9th Cir. Apr. 28, 2025); *Learning Res., Inc. v. Trump*, No. 1:25-cv-1248 (D.D.C.) (denying motion to transfer and granting preliminary injunction), *appeal docketed*, No. 25-5202 (D.C. Cir. May 30, 2025), *pet. for cert. before judgment pending*, No. 24-1287 (U.S. June 17, 2025); *Barnes v. United States*, No. 1:25-cv-00043 (Ct. Int'l Trade) (dismissed for lack of standing); *V.O.S. Selections, Inc. v. Trump*, No. 1:25-cv-00066 (Ct. Int'l Trade), *appeal docketed*, No. 25-1812 (Fed. Cir. May 28, 2025); *Oregon v. Trump*, No. 1:25-cv-00077 (Ct. Int'l Trade), *appeal docketed*, No. 25-1813 (Fed. Cir. May 28,

(continued…)

10

the President to impose tariffs, such that the challenged executive orders are *ultra vires* in excess of statutory authority and violate the constitutional separation of powers. ER-49–51. California invoked the district court's jurisdiction under 28 U.S.C. § 1331 because the case presents a federal question. ER-47–48. The State later filed a motion for a preliminary injunction to enjoin the agency defendants from taking any action to implement or enforce the challenged tariff orders. ER-64 (D. Ct. Dkt. 15).

Defendants moved to transfer the case to the Court of International Trade pursuant to 28 U.S.C. § 1631, which provides for transfer of a civil action to cure a want of jurisdiction "in the interest of justice." ER-65 (D. Ct. Dkt. 9). Defendants argued that the Court of International Trade has exclusive jurisdiction over this action under 28 U.S.C. § 1581(i)(1), which provides, in relevant part that:

> [T]he Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue.

28 U.S.C. § 1581(i)(1)(B). California opposed, arguing that this suit "arises out of" IEEPA, and that IEEPA is not a "law . . . providing for . . . tariffs" within the meaning of Section 1581. ER-65 (D. Ct. Dkt. 12).

---

2025); *Princess Awesome, LLC v. U.S. Customs & Border Prot.*, No. 1:25-cv-00078 (Ct. Int'l Trade) (stayed).

The district court issued an order holding that the Court of International Trade has exclusive jurisdiction over this action.  ER-10–14.  The district court reasoned that "this action arises out of President Trump's executive orders imposing tariffs," and "[t]hose executive orders are laws of the United States" because they modify the Harmonized Tariff Schedule, per 19 U.S.C. § 3004(c).  ER-10–12.  At California's request, the district court held that transfer to the Court of International Trade was not "in the interest of justice" and dismissed the case to allow California to appeal the jurisdictional question to this Court.  ER-14–17.  California filed a notice of appeal from the district court's dismissal judgment the same day.  ER-52–53.

Because the district court's dismissal effectively denied California's pending motion for a preliminary injunction, California asked this Court to expedite the appeal as it would a preliminary injunction appeal.  Dkt. 14.  This Court granted the request for expedited treatment of the appeal.  Dkt. 23.

## SUMMARY OF ARGUMENT

The district court, not the Court of International Trade, has jurisdiction over this action.  As relevant, the Court of International Trade has "exclusive jurisdiction" only over civil actions against the United States, its agencies, or officers that "arise[] out of any law of the United States providing for . . . tariffs."  28 U.S.C. § 1581(i)(1)(B).  That jurisdictional requirement is not satisfied here:

12

this *ultra vires* and separation-of-powers action "arises out of" IEEPA, and IEEPA is not a law of the United States "providing for" tariffs.

1.  The phrase "arises out of" as used in Section 1581(i)(1) refers to the substantive law giving rise to the claims alleged.  This action arises out of IEEPA, not, as the district court wrongly held, President Trump's executive orders imposing tariffs.  IEEPA is the substantive law under which the President acted to impose the challenged tariff orders; California's action stems from the President's reliance on IEEPA to impose tariffs; the sole merits question in the case is whether IEEPA provides the President with authority to impose tariffs; and resolving California's claims turns on the meaning of IEEPA, not the meaning of the President's executive orders.  The executive orders, including their resulting modifications to the Harmonized Tariff Schedule of the United States, also cannot be the basis for jurisdiction under Section 1581(i)(1) because they are not "law[s] of the United States."  Executive orders that lack statutory authority are not laws of the United States; likewise for modifications to the Harmonized Tariff Schedule. Because IEEPA does not authorize the President to impose tariffs, the challenged executive orders and their modifications to the Harmonized Tariff Schedule do not constitute laws of the United States for purposes of Section 1581(i)(1).

2.  As the U.S. District Court for the District of Columbia held in a similar case, IEEPA is not a "law of the United States providing for . . . tariffs."  28 U.S.C.

13

§ 1581(i)(1)(B).  That conclusion follows from the plain text of IEEPA, which makes no mention of "tariffs," "duties," or any similar term.  Section 1702(a)(1)(B) of IEEPA grants the President a set of enumerated powers to "deal with" certain national emergencies, including the power to "regulate . . . importation," but that phrase is properly understood to allow the President to set rules controlling the frequency, location, quantity, and quality of imports.  It does not encompass the power to impose tariffs.  The power to regulate and the power to tariff or tax are distinct, as reflected in contemporaneous dictionary definitions, court decisions, statutes, and administrative practice.  Statutory context, including the comprehensive statutory scheme in Title 19 expressly authorizing tariffs and carefully circumscribing the tariff authority delegated to the President, as well as legislative history, historical practice, and constitutional principles each also confirms that IEEPA is not a law "providing for" tariffs.

3.  Other arguments to the contrary that defendants advanced below lack merit.  The Court of Customs and Patent Appeals' decision in *United States v. Yoshida International, Inc.*, 526 F.2d 560 (C.C.P.A. 1975), is not binding on this Court, is not persuasive on its own terms, and does not resolve the question of whether IEEPA provides for tariffs.  And considerations of uniformity and expertise counsel in favor of jurisdiction in the district court, which is equipped to address (and routinely considers) the type of *ultra vires* and separation of powers

14

claims asserted here.  In contrast, the Court of International Trade does not have any expertise with respect to IEEPA cases or the sort of abuse of authority claims presented in this case; it has expertise in trade law, which is not implicated in this action.  The judgment below should be reversed.

## STANDARD OF REVIEW

The Court reviews de novo "questions of statutory construction" and dismissals for lack of subject-matter jurisdiction.  *Lake v. Ohana Mill Cmtys., LLC*, 14 F.4th 993, 1000 (9th Cir. 2021); *see also, e.g.*, *DaVinci Aircraft, Inc. v. United States*, 926 F.3d 1117, 1122 (9th Cir. 2019).  Where jurisdictional questions and the merits are "intertwined," the Court can "decide some, or all, of the merits issues" to "answer the jurisdictional question."  *Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 178 (2017); *see also, e.g.*, *Ye v. INS*, 214 F.3d 1128, 1131 (9th Cir. 2000).

## ARGUMENT

### I.  THIS ACTION "ARISES OUT OF" IEEPA, A "LAW OF THE UNITED STATES"

#### A.  "Arises Out of" Refers to the Substantive Law Giving Rise to the Claims Alleged—Here, IEEPA

Under 28 U.S.C. § 1581(i)(1)(B), the Court of International Trade has "exclusive jurisdiction" over any civil action against the United States, its agencies, or officers that "arises out of any law of the United States providing for . . . tariffs."  The phrase "arises out of" as used in Section 1581(i)(1) refers to the

"substantive law giving rise to [the] claims" alleged in the civil action—that is, the

substantive law pursuant to which the executive branch took the challenged action.

*Int'l Lab. Rights Fund v. Bush*, 357 F. Supp. 2d 204, 208 (D.D.C. 2004);

*Learning Res., Inc. v. Trump*, __ F. Supp. 3d __, No. 1:25-cv-1248, 2025 WL

1525376, at *6, *7 n.4 (D.D.C. May 29, 2025), *prelim. inj. stayed pending appeal*,

No. 25-5202 (D.C. Cir.).

Cases interpreting the meaning of "arises out of" as used in Section

1581(i)(1), as well as similar language in other jurisdictional statutes, are

instructive.  In *International Labor Rights Fund*, for example, a group of advocacy

organizations brought a claim under the Administrative Procedure Act to compel

agency action unlawfully withheld, alleging that the government had failed "to

commence an investigation and enforcement action" that the plaintiffs believed

was required under Section 307 of the Tariff Act of 1930 and its implementing

regulations.  357 F. Supp. 2d at 206.  The district court dismissed for lack of

subject-matter jurisdiction, holding that it was "obvious" that the plaintiffs' suit

"ar[ose]" out of Section 307, which is a law "'providing for . . . embargoes,'" and

the Court of International Trade has exclusive jurisdiction over "'any civil action

. . . arising out of any law of the United States providing for . . . embargoes.'"  *Id.*

at 207-08.  Although plaintiffs maintained that their action arose under the APA,

the district court held otherwise because Section 307 was "the substantive law

16

giving rise to their claims." *Id.* at 208. "Indeed," the court noted, "the 'statutory and regulatory framework' section of the plaintiffs' Amended Complaint focuse[d] solely on Section 307 and its implementing regulations," and "any determination of the government's liability under the APA for failure to engage in an investigation or enforcement action would require an interpretation of the scope and application of Section 307 and its regulations." *Id.* at 208.

This Court similarly construed "arises out of" as used in Section 1581(i)(1) in *Earth Island Institute v. Brown*, 28 F.3d 76, 76-77 (9th Cir. 1994). The Court there considered whether the Court of International Trade had exclusive jurisdiction over a suit alleging that the government had failed to implement tuna importation bans as required by the Marine Mammal Protection Act. *Id.* at 76-77. In analyzing whether the plaintiffs' suit to enforce the import ban "ar[ose] out of a law 'providing for embargoes,'" the Court recognized that the suit arose out of the Marine Mammal Protection Act, as that was the substantive law the plaintiffs argued required the government to act (and pursuant to which the government had failed to act) and so was the substantive law giving rise to the plaintiffs' claims. *Id.* at 77. The Court then proceeded to ask whether that Act was "a statute providing for an embargo" and held that it was. *Id.* at 78-79. Because the plaintiffs' suit arose out of the Marine Mammal Protection Act, and because that Act provided for embargoes, the Court concluded that the plaintiffs' "suit under the

17

[Marine Mammal Protection Act]" was "an action arising under a law providing for embargoes" and so belonged in the Court of International Trade. *Id.* at 78-79. *See also, e.g.*, *In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1220 (9th Cir. 2019) (holding that "arising from"—a phrase "related" to "arising out of"— means "*originates or stems from*," not "*related to* or *concerned with*").

Applying that understanding of "arises out of" as used in Section 1581(i)(1), "[t]his is undisputably a civil action against agencies and officers of the United States that 'arises out of' IEEPA." *Learning Res.,* 2025 WL 1525376, at *6.[9] IEEPA is the "'substantive law giving rise to [the] claims'" alleged in this civil action—it is "the substantive law under which the President acted," and it is therefore the basis for California's claims that the President's actions were in excess of statutory authority and therefore in violation of the separation of powers. *Id.* at *6, *7 n.4 (quoting *Int'l Lab. Rights Fund*, 357 F. Supp. 2d at 208). Whether

---

[9] Several courts considering similar challenges to President Trump's tariff orders have also held that a civil action challenging an executive order as unauthorized by IEEPA "arises out of" IEEPA. *See Learning Res.*, 2025 WL 1525376, at *6; *Barnes v. United States*, No. 1:25-cv-00043, 2025 WL 1483384, at *3 (Ct. Int'l Trade May 23, 2025); *Emily Ley Paper, Inc. v. Trump*, No. 3:25-cv-464, 2025 WL 1482771, at *4 (N.D. Fla. May 20, 2025), *transferred to* No. 1:25-cv-00096 (Ct. Int'l Trade); *Webber v. U.S. Dep't of Homeland Sec.*, __ F. Supp. 3d __, No. 4:25-cv-26, 2025 WL 1207587, at *5 (D. Mont. April 25, 2025), *appeal docketed*, No. 25-2717 (9th Cir. Apr. 28, 2025). *But see V.O.S. Selections, Inc. v. United States*, __ F. Supp. 3d __, No. 1:25-cv-00066, 2025 WL 1514124, at *8 (Ct. Int'l Trade May 28, 2025) (holding that any "action involving a challenge to a presidential action that imposes tariffs . . . is one that arises from a 'law providing for' those measures").

IEEPA authorizes the President to impose tariffs is the only question a court needs to answer to resolve the merits in this case, and IEEPA is the only law a court needs to interpret to answer that question. *See id.* at *6; *Int'l Lab. Rights Fund*, 357 F. Supp. 2d at 208.

**B.    The District Court's Conclusion That the Lawsuit Does Not Arise Out of IEEPA, But Arises Out of the Executive Orders, Is Unpersuasive**

The district court concluded that California's action "arises out of President Trump's executive orders imposing tariffs," not IEEPA, and that the executive orders are laws of the United States providing for tariffs. ER-10. Each element of that conclusion lacks merit.

The district court reasoned that "the lawsuit challenging President Trump's imposition of tariffs originates from, grows out of, and flows from the executive orders through which the President imposed tariffs." ER-10 (citing *In re Border Infrastructure*, 915 F.3d at 1220). But that analysis confuses the executive actions challenged in the lawsuit with the "substantive law giving rise" to California's claims. The origin of California's claims—i.e., the law this action "arises out of"—is not the executive orders that are being challenged; the origin is IEEPA, because IEEPA is the law the President claimed as his source of authority to issue the challenged orders, and which California alleges does not confer such authority. *See supra* pp. 15-19.

19

Under the district court's reasoning, any challenge to an executive order providing for tariffs would satisfy Section 1581(i)(1)'s "arise out of" requirement, regardless of the nature of the challenge. But "Congress did not commit to the Court of International Trade's exclusive jurisdiction *every* suit against the Government challenging customs-related laws and regulations." *K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 188 (1988); *see also Learning Res.*, 2025 WL 1525376, at *7. Indeed, Congress considered and rejected language that would have granted the Court of International Trade jurisdiction over a civil action that merely "involves a provision of . . . an Executive order of the President, which directly and substantially involves international trade." H.R. 6394, 96th Cong. § 201(a) (2d Sess. 1980); *see also K Mart Corp.*, 485 U.S. at 188 (interpreting Section 1581(i) in light of Congress's decision to reject such a broad jurisdictional grant).

But even if the district court were correct that this civil action "arises out of" the challenged executive orders, those orders are not "laws of the United States" as required by Section 1581(i)(1). The district court reached a contrary conclusion, observing that the executive orders "modify, or instruct the Department of Homeland Security to modify, the Harmonized Tariff Schedule [of the United

20

States]." ER-10.[10]  And pursuant to 19 U.S.C. § 3004(c), a "'modification or change made to the Harmonized Tariff Schedule by the President under authority of law (including Section 604 of the Trade Act of 1974) . . . shall be considered to be statutory provisions of law for all purposes.'" ER-10–11 (quoting 19 U.S.C. § 3004(c)(1)(C)).  Taken together, the district court concluded that the modifications to the Harmonized Tariff Schedule in the executive orders operate as "laws of the United States" under Section 1581.[11]

But the district court's analysis misses the requirement in Section 3004(c) that a modification is considered a "statutory provision[] of law" only if a President's modifications to the Harmonized Tariff Schedule are made "under authority of law." 19 U.S.C. § 3004(c)(1)(C).  "Executive Orders issued without statutory authority providing for presidential implementation are generally held not to be

---

[10] The Harmonized Tariff Schedule sets out the tariff rates for all merchandise imported into the United States.  It was modified to reflect the tariff rates imposed by the executive orders pursuant to Section 604 of the Trade Act of 1974, 19 U.S.C. § 2483, which directs the President to periodically update the Harmonized Tariff Schedule to reflect tariffs imposed pursuant to other laws.  *See* 90 Fed. Reg. at 9113, 9115, 9117, 9119, 9121, 9123, 15041, 15047.

[11] Just as California's civil action does not "arise[] out of" the executive orders, it does not "arise[] out of" the modifications to the Harmonized Tariff Schedule effectuated by the tariff orders.  *See Learning Res.*, 2025 WL 1525376, at *7 n.4.  Those modifications are the incidental, downstream result of any executive action imposing tariffs, and this action does not challenge the Harmonized Tariff Schedule itself or the modification process.  IEEPA, "not the [Harmonized Tariff Schedule]," is "the substantive law under which the President acted." *Id.*

21

'laws' of the United States." *Dreyfus v. Von Finck*, 534 F.2d 24, 29 (2d Cir. 1976) (collecting cases). The question of whether the tariff orders, and the modifications made to the Harmonized Tariff Schedule to reflect them, are "under authority of law" necessarily requires resolution of the scope of the President's authority under IEEPA. If IEEPA does not authorize the President to impose tariffs, then the challenged tariff orders and corresponding Harmonized Tariff Schedule modifications were not made "under authority of law" and cannot constitute "laws of the United States" that would vest the Court of International Trade with exclusive jurisdiction under 28 U.S.C. § 1581(i)(1). *See, e.g.*, *Youngstown*, 343 U.S. at 585 ("The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself.").

The district court did not conduct any analysis of whether IEEPA authorizes the tariffs. As explained further below, IEEPA does not, and neither the challenged executive orders nor the resulting Harmonized Tariff Schedule modifications confer the Court of International Trade with jurisdiction over California's claims, even if one were to accept that the case arises out of the executive orders rather than IEEPA.

## II.    CONGRESS DID NOT DELEGATE THE PRESIDENT AUTHORITY IN IEEPA TO IMPOSE TARIFFS

This action arises out of IEEPA, *see supra* pp. 15-19, and IEEPA is not a statute "providing for . . . tariffs," as required under Section 1581(i)(1). That

conclusion is compelled by IEEPA's plain text, and is confirmed by statutory context, legislative history, historical practice, and constitutional principles.

### A.   IEEPA's Plain Text Does Not Provide for Tariffs

The power to impose tariffs is a core legislative power.  *See* U.S. Const. art. I, § 8, cl. 1.  "The President has no independent discretion to impose or alter tariffs. Any Presidential tariffing authority must be delegated by Congress." *Learning Res.*, 2025 WL 1525376, at *9 (citation omitted); *see also Youngstown*, 343 U.S. at 585; *Consumers Union of U.S., Inc. v. Kissinger*, 506 F.2d 136, 142-43 (D.C. Cir. 1974).  In stark contrast to the several laws where Congress has expressly granted the President authority to impose tariffs, subject to important constraints, IEEPA— which is part of Title 50, denominated "War and National Defense"—does not reference "tariffs," "duties," or any other similar term, such as "'customs,' 'taxes,' or 'imposts.'" *Learning Res.*, 2025 WL 1525376, at *8; *see Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply.").

Instead, IEEPA provides that during a certain type of declared national emergency, the President is authorized to take eight enumerated actions with respect to twelve enumerated activities involving foreign persons, goods, or property.  Specifically, the President may: (1) "investigate," (2) "block during the

23

pendency of an investigation," (3) "regulate," (4) "direct and compel," (5) "nullify," (6) "void," (7) "prevent," and (8) "prohibit."  50 U.S.C. § 1702(a)(1)(B). And the President may do so with respect to an: (1) "acquisition," (2) "holding," (3) "withholding," (4) "use," (5) "transfer," (6) "withdrawal," (7) "transportation," (8) "importation," (9) "exportation," (10) "dealing," (11) "exercis[e] of "any right, power, or privilege," and (12) "transaction[ ]" involving "any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States."  50 U.S.C. § 1702(a)(1)(B).  There is no residual clause providing the President any additional powers.  And IEEPA provides that the President's powers "may not be exercised for any other purpose" other than "to deal with an unusual and extraordinary [foreign] threat with respect to which a national emergency has been declared."  *Id.* § 1701(b).

Defendants contend that the authority under IEEPA to "regulate . . . importation" encompasses the power to impose tariffs.  ER-44.  But as a matter of plain meaning, the power to "regulate" is fundamentally different from, and does not encompass, the power to tax or tariff.  *See Learning Res.*, 2025 WL 1525376, at *8; *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020) ("[Courts] normally interpret[ ] a statute in accord with the ordinary public meaning of its terms at the time of its enactment.").

24

To "regulate" is to "[c]ontrol by rule" or "subject to restrictions." *Regulate*, THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH 943 (6th ed. 1976); *see also Ysleta del Sur Pueblo v. Texas*, 596 U.S. 685, 697 (2022) ("[T]o *regulate* something is usually understood to mean to 'fix the time, amount, degree, or rate' of an activity 'according to the rule[s].'" (quoting *Regulate*, WEBSTER'S THIRD INTERNATIONAL DICTIONARY 1913 (1986))).[12]  Accordingly, regulations on importation might include limiting the quantity of a particular good that may be imported into the United States, imposing safety inspections on certain goods, and permitting imports to enter the United States only at certain times.

Regulating imports does not include tariffing or taxing imports.  "A tariff is a tax levied on imported goods and services."  Christopher A. Casey, Cong. Rsch. Serv., IF 11030, *U.S. Tariff Policy: Overview* 1 (Jan. 31, 2025), https://www.congress.gov/crs-product/IF11030; *see also Tariff*, THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH 1183-84 (6th ed. 1976) ("List of duties or customs to be paid on imports or exports; such duties collectively; law imposing

_____

[12] *See also, e.g.*, *Regulate*, BLACK'S LAW DICTIONARY 1156 (5th ed. 1979) ("fix, establish or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws"); *Regulate*, NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE 1264 (1975) ("[t]o adjust by rule or established mode; to govern by or subject to certain rules or restrictions"); *Regulate*, RANDOM HOUSE COLLEGE DICTIONARY 1112 (rev. ed. 1975) ("to control or direct by a rule, principle, method, etc."); *Regulate*, AMERICAN HERITAGE DICTIONARY 1096 (1976) ("[t]o control or direct according to a rule").

these; duty on particular class of goods."); *United States v. Patel*, 762 F.2d 784, 791 (9th Cir. 1985) ("'[D]uty' is commonly defined as 'a tax imposed by law on the import or export of goods.'"). And a tax is a "[c]ontribution levied on . . . persons, property, or business, for support of national or local government." *Tax*, THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH 1186 (6th ed. 1976); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564 (2012) ("[T]he essential feature of any tax" is that "[i]t produces at least some revenue for the Government.").

In short, then, "[t]o regulate is to establish rules governing conduct; to tariff is to raise revenue through taxes on imports or exports." *Learning Res.*, 2025 WL 1525376, at *8. "Those are not the same." *Id.* Tariffs do not control or otherwise govern the importation process or the imported goods and services themselves. They may indirectly affect the behavior of market participants, but their only actual operation is to require the importer (not the foreign country from which the import originated) to pay the government a percentage of the value of the imported property. *See id.* (citing Tom Campbell, *Presidential Authority to Impose Tariffs*, 83 La. L. Rev. 595, 598 (2023) ("tariffs are economically different from quantitative import restraints")); ER-25, ER-37–38.

Courts in a variety of contexts have recognized that the power to regulate does not encompass the power to tax absent specific authorization. *See, e.g.*,

26

*Jefferson Cnty. v. Acker*, 527 U.S. 423, 440 (1999) (explaining that imposing a tax on federal officials does "no[t] in any way regulate[ ] them in the performance of their duties"); *Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1399 (7th Cir. 1992) (noting that "[t]he legal power to regulate is not necessarily the legal power to tax" and holding that a municipality's "power to regulate" did not include the power to "generate revenues" through taxation "without explicit authority from the state"); *Patel*, 762 F.2d at 791 (relying on "common meanings of the words 'duty' and 'quota'" to reject argument that quota restrictions on coffee imports were a type of duty). As Chief Justice Marshall explained in a foundational case, "the power to regulate commerce is . . . entirely distinct from the right to levy taxes and imposts." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 201 (1824) (Marshall, C.J.). The Constitution treats the power to regulate and the power to impose tariffs separately because they are not substitutes. *See id.* at 198-99 (describing the power to tax and the power to regulate as "not . . . similar in their terms or their nature").

Congress has likewise demonstrated its awareness of the distinction between the power to "regulate" and the power to "tax." It has repeatedly used "regulate" and "tax" as separate powers when discussing the delegation of those powers in the context of a single statute. *See, e.g.*, 49 U.S.C. § 40117(j) ("tax, regulate, or prohibit"); 16 U.S.C. § 460bbb-9(a) (power "to tax . . . or to regulate"); 2 U.S.C. § 622(8)(B)(i) ("power to tax or to regulate interstate commerce"); *cf.* 16 U.S.C.

27

§ 1540(f) (differentiating the authority "to promulgate such regulations as may be appropriate to enforce" the Endangered Species Act from the authority to "charge reasonable fees for expenses to the Government connected with [authorized] permits or certificates").

And Congress has granted agencies the power to "regulate" in many statutes that have never been understood to also grant the power to tax.  The Food and Drug Administration, for instance, has never claimed the power to tax a "drug, biological product, device, or . . . combination product" based on its authority to "regulate" those products.  21 U.S.C. § 360bbb-2(a).  Nor has the Securities and Exchange Commission ever used its power to "regulate" certain "transactions on a national securities exchange" to tax those transactions, 15 U.S.C. § 78k(a)(2).  *See also, e.g.*, 12 U.S.C. § 5491(a) (granting Consumer Financial Protection Bureau power to "regulate the offering and provision of consumer financial products or services").

Moreover, when Congress has authorized the President or an agency to impose tariffs, it has done so expressly, using the terms "duties" or "tariffs."  *See* 19 U.S.C. §§ 1338, 1862, 2132(a), 2253, 2411-2419.  Thus, Section 1338(a) grants the President the authority to "declare new or additional duties on imports," in specified circumstances; Section 1671 provides for "countervailing duties"; Section 2132(a) authorizes the President to impose an "import surcharge . . . in the

28

form of duties . . . on articles imported into the United States" in narrow circumstances; Section 1862(a) prohibits actions taken "to decrease or eliminate the duty . . . on any article if the President determines that such reduction or elimination would threaten to impair the national security"; Section 2411(c)(1)(B) authorizes the United States Trade Representative to "impose duties" on a foreign country's goods under specified circumstances; and Section 2253(a)(3)(A) authorizes the President to "proclaim an increase in, or the imposition of, any duty on the imported article" when the U.S. International Trade Commission finds that a domestic industry is at risk of serious injury.  Section 1702(a)(1)(B) of IEEPA does not include any such language.

## B.    Statutory Context Confirms That IEEPA Does Not Provide for Tariffs

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022).  Under "the commonsense canon of *noscitur a sociis*[,] . . . a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008).  Reading the phrase "regulate . . . importation" in the context of Section 1702(a)(1)(B) in its entirety confirms that the phrase does not confer the power to impose tariffs.

29

*First*, Section 1702(a)(1)(B) grants the President eight emergency powers with respect to "importation": (1) "investigate," (2) "block during the pendency of an investigation," (3) "regulate," (4) "direct and compel," (5) "nullify," (6) "void," (7) "prevent," and (8) "prohibit."  50 U.S.C. § 1702(a)(1)(B).  Those powers all concern the ability to control the quantity or quality of imports; none encompass the ability to tariff, tax, or otherwise generate revenue.  *See Learning Res.*, 2025 WL 1525376, at *9.  "Even if regulate may take a broad meaning in other contexts, the words immediately surrounding it" in Section 1702(a)(1)(B) "'cabin the contextual meaning of that term' here."  *Id.* (quoting *Yates v. United States*, 574 U.S. 528, 543 (2015)); *see also, e.g.*, *Williams*, 553 U.S. at 294 (applying *noscitur a sociis* to interpret the meaning of two verbs in a list of five).  Accordingly, when read alongside the seven other powers with which it is listed, "[n]ot one of [which] deals with the power to raise revenue," the power to "'regulate' is appropriately read to refer to the President's power to issue economic sanctions, not to tariff."  *Learning Res.*, 2025 WL 1525376, at *9.

*Second*, Section 1702(a)(1)(B) of IEEPA provides that each of the eight emergency powers can be applied to twelve different activities concerning "property in which any foreign country or a national thereof has any interest": (1) "acquisition," (2) "holding," (3) "withholding," (4) "use," (5) "transfer," (6) "withdrawal," (7) "transportation," (8) "importation," (9) "exportation,"

30

(10) "dealing," (11) the "exercis[e] of "any right, power, or privilege," and

(12) "transactions."  50 U.S.C. § 1702(a)(1)(B).  "Regulate" must have a consistent

meaning as to all twelve of the activities Congress saw fit to enumerate in the list.

*See Conchise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268

(2019) ("In all but the most unusual situations, a single use of a statutory phrase

must have a fixed meaning."); *Brown v. Gardner*, 513 U.S. 115, 118-20 (1994)

(noting that "a given term is used to mean the same thing throughout a statute" and

rejecting interpretation of statutory term that could not be applied to all items in a

list without "incongruity").  There is no reasonable way to construe "regulate" to

encompass the power to tariff or tax all twelve of these activities.

To start, such a construction would be nonsensical.  Consider, for example,

the phrase "regulate . . . use."  As a matter of plain English, no one would say that

to "regulate use" of pesticides in organic food, confidential trade secrets in product

design, medical records outside patient care, or steroids in sporting events includes

the power to tariff or tax such use.  Instead, "regulate use" is naturally understood

to mean to control or fix the time, amount, or degree of use.  *See Ysleta del Sur

Pueblo*, 596 U.S. at 697; *supra* p. 25.

In addition, construing "regulate" to authorize the President to tariff or tax all

twelve of the enumerated activities—including acquisitions, holdings,

withholdings, and uses of property—would mean that Congress obliquely granted

31

the President an immense and unheralded taxing power.  But Congress does not

"hide elephants in mouseholes."  *Whitman v. Am. Trucking Assns., Inc.*, 531 U.S.

457, 468 (2001).  If Congress had intended to grant the President such

extraordinary authority, it would have had to say so.  *See Biden v. Nebraska*, 600

U.S. 477, 506 (2023); *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995)

(cautioning courts "to avoid ascribing to one word a meaning so broad that it is

inconsistent with its accompanying words, thus giving 'unintended breadth to the

Acts of Congress'").

Such a construction of "regulate" would also render IEEPA unconstitutional

in certain applications.  IEEPA grants the President authority to "regulate . . .

importation *or exportation*."  50 U.S.C. § 1702(a)(1)(B) (emphasis added).  And

under defendants' view that "regulate" includes the power to tariff and tax, IEEPA

would authorize the President to impose tariffs on exportation.  But the

Constitution expressly bars tariffs on exports.  U.S. Const. art. I, § 9, cl. 5; *see*

*United States v. U.S. Shoe Corp*, 523 U.S. 360, 363 (1998).  The doctrine of

constitutional avoidance thus counsels against interpreting "regulate" to encompass

the power to impose tariffs or taxes, as that interpretation would "raise[] serious

constitutional doubts."  *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018); *see also*

*Learning Res.*, 2025 WL 1525376, at *11 ("If the term 'regulate' were construed to

encompass the power to impose tariffs, it would necessarily empower the President

32

to tariff exports, too.  The Court cannot interpret a statute as unconstitutional when any other reasonable construction is available.").

Perhaps in light of these many interpretive problems, defendants took the position below that "regulate" "need not carry the same meaning" as to each activity enumerated in Section 1702(a)(1)(B) because "regulate" is a "transitive verb."  ER-42; *see also* ER-20–21.  Defendants proffered no support for that approach, and it is at odds with fundamental precepts of statutory construction. *See, e.g.*, *Brown*, 513 U.S. at 118; *cf. Williams*, 553 U.S. at 294-95 (interpreting meaning of transitive verbs without any suggestion that meaning fluctuates based on their object); *TikTok v. Trump*, 507 F. Supp. 3d 92, 103 (D.D.C. 2020) (noting that "regulate" is a transitive verb that "require[s] an object . . . to express a complete thought," and proceeding to interpret "regulate" as used in another IEEPA provision to mean "control," without regard to the particular objects being regulated).[13]

---

[13] One further tension between defendants' interpretation and the statutory context:  Section 1702(a)(1)(B) of IEEPA applies only to "property in which any foreign country or a national thereof *has* any interest," 50 U.S.C. § 1702(a)(1)(B) (emphasis added).  Yet tariffs are often paid on property in which a foreign country or national no longer has any interest because the property has already entered the United States and been taken under the full control of the U.S. importer at the time the U.S. importer pays the tariff.  *See, e.g.*, U.S. Customs & Border Protection, *Entry Summary and Post Release Processes*, https://www.cbp.gov/trade/programs-administration/entry-summary (last modified Apr. 10, 2025); *Learning Res.*, 2025 WL 1525376, at *10.  Congress knew how to refer to property in which a foreign
(continued…)

*Finally*, IEEPA does not include any of the "procedural, substantive, and temporal limits" found in statutes where Congress expressly delegated the President the authority to impose tariffs. *Learning Res.*, 2025 WL 1525376, at *9. Section 122 of the Trade Act of 1974, for example, permits the President to impose tariffs to "deal with large and serious United States balance-of-payment deficits," but only up to 15 percent and only for up to 150 days absent congressional approval. 19 U.S.C. § 2132(a). Section 301 of the same Act permits an executive officer serving under the President to "impose duties or other import restrictions" on a foreign country's goods, but only after notice, investigation, and a finding that the foreign country engaged in unfair trade practices or violated trade agreements with the United States. *Id.* § 2411(c). And Section 338 of the Tariff Act of 1930 allows the President to "declare new or additional duties" on imports from countries that have discriminated against the United States in trade, but only up to 50 percent and only after a 30-day waiting period. *Id.* § 1338(a), (d), (e). The President invoked IEEPA precisely because these carefully reticulated tariff schemes would not allow his country-specific tariff orders. *See* ER-7.

---

country or national previously had an interest—the same subsection of IEEPA provides that the President can require individuals to keep records of property in which a foreign country or national "*has or has had* any interest." 50 U.S.C. § 1702(a)(2) (emphasis added).

The absence of similar limits on the President's authority to impose or alter tariffs further indicates that IEEPA does not authorize tariffs. "'It would be anomalous,' to say the least, 'for Congress to have so painstakingly described the [President's] limited authority' on tariffs in other statutes, 'but to have given him, just by implication,' nearly unlimited tariffing authority in IEEPA." *Learning Res.*, 2025 WL 1525376, at *9 (quoting *Gonzales v. Oregon*, 546 U.S. 243, 262 (2006)).

### C. Legislative History and Historical Practice Confirm That IEEPA Does Not Provide for Tariffs

The legislative history of TWEA and IEEPA, as well as historical practice associated with both statutes, further confirm that IEEPA does not provide for tariffs. *See, e.g.*, *Abramski v. United States*, 573 U.S. 169, 179 (2014) ("[Courts] must . . . interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose,'" as well as "common sense.").

Section 1702(a)(1) of IEEPA evolved from Section 5(b) of the Trading With the Enemy Act. *See* Pub. L. No. 65-91, 40 Stat. 411 (1917); *supra* p. 6. As originally enacted in 1917, TWEA prohibited trade with "enemy" nations and their allies and permitted the seizure of "enemy property" within the United States. H.R. Rep. No. 65-85, at 1-2 (1917); Pub. L. No. 65-91, §§ 3(a), 6. Section 5(b) granted the President authority to restrict foreign financial transactions during times of war—specifically, to "investigate," "regulate," and "prohibit" transactions

35

in foreign exchange, gold, and silver, and transfers of credit, evidence of indebtedness (e.g., bonds), and evidence of ownership (e.g., stocks) between the United States and foreign countries. *Id.* § 5(b). "Regulate" as used in Section 5(b) could not have encompassed the power to impose tariffs, because Congress did not include imports as one of the enumerated things that the President could "regulate."

During the Great Depression, Congress amended Section 5(b) to authorize the President to exercise his powers during national emergencies, not just wartime, and to do so with respect to purely domestic financial transactions. *See* Emergency Banking Relief Act, Pub. L. No. 73-1, § 2, 48 Stat. 1 (1933). Days after the attack on Pearl Harbor, Congress further amended Section 5(b), adding much of the language that now appears in Section 1702(a)(1)(B) of IEEPA, including the power to "regulate . . . importation" of foreign property. *See* First War Powers Act, Pub. L. No. 77-354, § 301, 55 Stat. 838 (1941) (adding seven powers as applied to twelve activities).

At no point did any version of Section 5(b) of TWEA ever mention tariffs, taxes, or revenue. Nor did the congressional reports accompanying the original enactment or any of the amendments contain any such reference.

IEEPA's legislative history likewise contains no indication that Congress intended to grant the President authority to impose tariffs. Congress enacted

36

IEEPA as part of a series of reforms in response to concerns that Presidents were misusing declarations of national emergency to exercise "extraordinary powers," particularly with respect to foreign policy. S. Rep. No. 94-922, at 1 (1976); *Regan v. Wald*, 468 U.S. 222, 245 (1984) (Blackmun, J., dissenting) (discussing history). First, in 1976, Congress passed the National Emergencies Act to terminate all existing declarations of national emergencies and place new restrictions on the President's ability to declare a national emergency in the future. *See* Pub. L. No. 94-412 § 101, 90 Stat. 1255 (1976). Then, in 1977, Congress amended Section 5(b) of TWEA to limit its application only to times of war. Act of Dec. 28, 1977, Pub. L. No. 95-233, § 101, 91 Stat. 1625 (1977); *see* 50 U.S.C. § 4305(b)(1). And at the same time, Congress enacted IEEPA to grant the President certain authority to "deal with" a declared national emergency resulting from "an[ ] unusual and extraordinary threat" outside the United States. 50 U.S.C. § 1701(a); *see* Pub. L. No. 95-223, §§ 201-08, 91 Stat. 1625 (1977).

The emergency powers set out in Section 1702(a)(1)(B) of IEEPA are largely those that previously were set out in Section 5(b) of TWEA, but are limited to transactions involving foreign countries and nationals. 50 U.S.C. § 1702(a)(1)(B); *see* H.R. Rep. No. 95-459, at 2 (1977) (describing the President's powers under Section 1702(a)(1)(B) as "more limited in scope than those of [TWEA] and subject to various procedural limitations"). The Senate and House Reports described these

37

powers as the ability to regulate foreign exchange and banking transactions, "to

control or freeze property transactions where a foreign interest is involved," and to

require recordkeeping.  S. Rep. No. 95-466, at 5 (1977); *see also* H.R. Rep. No.

95-459, at 14-15 (similar).  But legislators never expressed their view that IEEPA

would authorize the President to impose taxes, tariffs, or otherwise generate

revenue.

Against this backdrop, it is hardly surprising that in the more than 100 years

since TWEA's enactment, no President ever before invoked TWEA or IEEPA to

impose tariffs.  *See Learning Res.*, 2025 WL 152376, at *10; *supra* p. 7.[14]   Instead,

Presidents invoked Section 5(b) of TWEA to impose economic sanctions on

foreign countries; regulate foreign exchange, credit transfers, and coin and

currency exports; control gold hoarding; and limit direct foreign investment by

U.S. companies.  *See* Casey & Elsea, *supra*, at 6.  And they relied on IEEPA to

impose targeted sanctions on a range of persons and countries.  *See id.* at 15;

*Learning Res.*, 2025 WL 152376, at *10; *supra* p. 7.  That "'longstanding practice

---

[14] The U.S. Department of Justice once argued in response to litigation that Section 5(b) of TWEA authorized President Nixon's 1971 tariff action.  *See Yoshida Int'l, Inc. v. United States*, 378 F. Supp. 1155, 1157 (Cust. Ct. 1974), *rev'd*, 526 F.2d 560 (C.C.P.A. 1975).  But President Nixon did not invoke or even mention Section 5(b) in the Proclamation imposing or rescinding the tariffs; he relied solely on the Trade Expansion Act of 1962 and the Tariff Act of 1930.  *See* Proclamation No. 4074, 36 Fed. Reg. 15724 (Aug. 17, 1971); Proclamation No. 4098, 36 Fed. Reg. 24201 (Dec. 22, 1971); *infra* pp. 41-42.

of the government . . . can inform [the] [C]ourt's determination of what [IEEPA provides].'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (internal quotation marks omitted).  And the "'lack of historical precedent,' coupled with the breadth of authority that the [President] now claims, is a 'telling indication' that" imposing tariffs under IEEPA "extends beyond the [President's] legitimate reach." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 119 (2022) (per curiam).

### D.   Constitutional Principles Support the Conclusion That IEEPA Does Not Provide for Tariffs

Finally, the major-questions and nondelegation doctrines counsel strongly in favor of the conclusion that IEEPA does not provide for tariffs.  In imposing sweeping tariffs pursuant to IEEPA, the President "'claim[ed] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in . . . authority" with "'vast economic and political significance.'" *West Virginia*, 597 U.S. at 716, 724; *see also Nebraska v. Su*, 121 F.4th 1, 14 (9th Cir. 2024).  Courts "'expect Congress to speak clearly'" in such circumstances.  *West Virginia*, 597 U.S. at 716.  The notion that Congress delegated the power to impose tariffs— a power so core to Congress that the Founders listed it first among Congress's powers, *see* U.S. Const. art. I, § 8, cl. 1—through use of the phrase "regulate . . . importation," in the context of a list of seven other verbs and eleven other objects, cannot be squared with the major-questions doctrine (or any other interpretive

principle).  *See West Virginia*, 597 U.S. at 723 ("Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'"); *id.* at 732 ("Such a vague statutory grant is not close to the sort of clear authorization required."); *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764-65 (2021) (per curiam) (rejecting government's broad interpretation of statute as "a wafer-thin reed on which to rest such sweeping power"); *see also Whitman*, 531 U.S. at 468 (Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions.").

Moreover, holding that IEEPA provides for tariffs would raise serious doubts about whether IEEPA is an unconstitutional delegation of legislative power.  *See Learning Res.*, 2025 WL 1525376, at *9.  When Congress delegates legislative power to the Executive Branch, it must "lay down by legislative act an intelligible principle to which [the Executive] is directed to conform."  *Whitman*, 531 U.S. at 472; *see also Fed. Commc'ns Comm'n v. Consumers' Research*, No. 24-354, 606 U.S. __, 2025 WL 1773630, at *8 (U.S. June 27, 2025).  On the President's view, IEEPA lacks any such intelligible principle with respect to tariffs—the President may impose, revise, or rescind tariffs on any goods, from any country, at any rate, at any time, to address any situation he declares to be a national emergency.  The

Court should construe IEEPA to avoid these doubts. *See Gonzalez v. United States*, 553 U.S. 242, 251 (2008).

## III. DEFENDANTS' OTHER ARGUMENTS ARE UNPERSUASIVE

In the proceedings below, defendants argued that *United States v. Yoshida International, Inc.*, 526 F.2d 560 (C.C.P.A. 1975), an out-of-circuit opinion from fifty years ago, as well as a need for uniformity and judicial expertise, support the Court of International Trade's exclusive jurisdiction over this action. *See* D. Ct. Dkt. 9 at 9-11; D. Ct. Dkt. 14 at 4-6, 8-10; D. Ct. Dkt. 55 at 12, 16-18. Those arguments are no "reason for this Court to reject IEEPA's plain meaning." *Learning Res.*, 2025 WL 1525376, at *12.

### A. *Yoshida* Is Not Binding on This Court, Is Not Persuasive on Its Own Terms, and Does Not Resolve the Question Whether IEEPA Provides for Tariffs

*Yoshida* concerned the legality of President Nixon's imposition of a surcharge on certain imported goods that were subject to tariff rates set by Congress but had previously been subject to tariff concessions. *See* 562 F.2d at 567. The surcharge increased the tariff rates for those goods, but only up to (and not above) the rates set by Congress. *Id.* at 568, 677.

When announcing and later rescinding the tariffs, President Nixon invoked the Tariff Act of 1930 and the Trade Expansion Act of 1962 as his sources of authority. *See Yoshida*, 562 F.2d at 569; 36 Fed. Reg. 15724; 36 Fed. Reg. 24201.

41

But when an importer filed a refund action in the U.S. Customs Court (the predecessor to the Court of International Trade), alleging that the tariffs had been imposed without authorization, the U.S. Department of Justice argued that the tariffs were also authorized under Section 5(b) of TWEA. *Yoshida*, 378 F. Supp. at 1157.[15] A three-judge panel of the Customs Court held that Section 5(b) did not authorize the imposition of tariffs, but the Court of Customs and Patent Appeals (the predecessor to the Federal Circuit) reversed, concluding that Section 5(b) authorized President Nixon's particular import surcharge, though did not authorize an "unlimited" exercise of tariff power. *Yoshida Int'l, Inc. v. United States*, 378 F. Supp. 1155, 1171-72 (Cust. Ct. 1974), *rev'd*, 526 F.2d at 576, 583.

That decision is not binding on this Court.[16] It is also unpersuasive on its own terms. The Court of Customs and Patent Appeals did not undertake any analysis of the plain meaning of the words "regulate . . . importation" or their place in the statutory provision. Instead, the court considered only "the intent of Congress"

---

[15] Congress later disallowed post hoc invocations of statutory authority to exercise emergency powers when it enacted the National Emergencies Act. *See* 50 U.S.C. § 1631.

[16] This Court recounted the holding of *Yoshida* in its decision in *Cornet Stores v. Morton*, a case about the Customs Court's jurisdiction under the pre-1980 version of 50 U.S.C. § 1582, but did not adopt its reasoning. *See Cornet Stores v. Morton*, 632 F.2d 96, 97, 99 (9th Cir. 1980); *see also, e.g.*, *Ohno v. Yasuma*, 723 F.3d 984, 999 n.17 (9th Cir. 2013) (citing decisions from other courts does not automatically "adopt or sanction any of their specific holdings").

and "the broad purposes of [TWEA]." *Id.* at 583. "That is no longer how courts approach statutory interpretation." *Learning Res.*, 2025 WL 1525376 at *12 (collecting cases); *see, e.g.*, *Orozco-Lopez v. Garland*, 11 F.4th 764, 776 (9th Cir. 2021). And as detailed above, the plain meaning of "regulate . . . importation" does not encompass the power to impose tariffs. *See supra* pp. 25-29.

Moreover, the court took the wrong signal from the lack of any legislative history indicating congressional intent to delegate tariff authority to the President. *See Yoshida*, 526 F.2d at 572-73, 576. The court considered such silence to authorize the imposition of tariffs. But that silence offers strong evidence that Congress did not delegate such authority to the President. *See supra* pp. 35-38.

The court also failed to adequately account for congressional action in the wake of President Nixon's surcharge order. While *Yoshida* was pending, Congress passed Section 122 of the Trade Act of 1974, which specifically authorized (and also circumscribed) the very kind of tariffs that President Nixon had imposed. Pub. L. No. 63-618, 88 Stat. 1978 (1975); 19 U.S.C. §§ 2132(a), 2411(c)(1)(B). The court noted this development and acknowledged that any future surcharge "must comply" with the Trade Act, though it declined to consider the Act's relevance to the interpretive question before it. *See Yoshida*, 526 F.2d at 582 n.33. But Congress would have had no reason to enact Section 122 if it thought that

43

Section 5(b) allowed President Nixon to impose his tariffs.  *See Learning Res.*,

2025 WL 1525376, at *12.

In any event, *Yoshida* does not resolve the question on appeal here, because it

was about Section 5(b) of TWEA, not Section 1702(a)(1)(B) of IEEPA.

Defendants suggested below that Congress incorporated *Yoshida*'s construction of

"regulate . . . importation" when it enacted IEEPA, *see* D. Ct. Dkt. 14 at 9; D. Ct.

Dkt. 55 at 2, 16-17, but they pointed to nothing in the legislative history of IEEPA

that suggests anything beyond Congress's mere awareness of the decision.  A

single lower-court opinion does not "represent the sort of judicial consensus so

broad and unquestioned that [courts] must presume Congress knew of and

endorsed it."  *BP P.L.C. v. Mayor & City Council of Balt.*, 141 S. Ct. 1532, 1541

(2021).  "And it certainly cannot do so where, as here, the text and structure of the

statute are to the contrary."  *Id.*; *see also Learning Res.*, 2025 WL 1525376, at *12.

Indeed, even judges on the Court of International Trade—which is bound by

decisions from the Federal Circuit and its predecessor court—do not regard

*Yoshida* as resolving the question whether IEEPA grants the President authority to

impose tariffs.  *See V.O.S. Selections, Inc. v. United States*, No. 1:25-cv-00066,

Dkt. 63 (Ct. Int'l Trade June 3, 2025), slip. op. 3 (explaining it was leaving open

the question "whether IEEPA authorizes tariffs as a categorical matter").

**B.**   **Considerations of Uniformity and Expertise Do Not Support Exclusive Jurisdiction Over This Action in the Court of International Trade**

To the extent considerations of uniformity and expertise are relevant to the jurisdictional analysis under Section 1581(i)(1), *but see Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 445 (D.C. Cir. 2020) (holding district court "erred in looking to 'practical considerations'" in declining to exercise its jurisdiction), they weigh in favor of allowing this case to proceed in federal district court, not the Court of International Trade.

Congress's interest in the "uniform administration of customs laws" does not support defendants' view that the Court of International Trade has exclusive jurisdiction over this action. *Contra* ER-12. The district court suggested that it "would be inconsistent with Congressional intent" for the district court to decide whether the tariff orders are authorized by IEEPA when the Court of International Trade had held that it has exclusive jurisdiction to hear other cases challenging the same executive orders. ER-13–14. But "[f]ederal courts are always 'under an independent obligation to examine their own jurisdiction.'" *Hernandez v. Campbell*, 204 F.3d 861, 865 (9th Cir. 2000). Even if that means a possible conflict in the courts, such conflict is unremarkable; the U.S. Supreme Court has previously resolved a circuit split over the meaning and application of a different provision of Section 1581(i). *See K Mart Corp.*, 485 U.S. at 182-83, 191

45

(resolving split between D.C. Circuit and Federal Circuit by holding jurisdiction was proper in district court).

Furthermore, the Court of International Trade has "'unique and specialized expertise in trade law,'" not in adjudicating IEEPA matters. *Marmen Inc. v. United States*, 134 F.4th 1334, 1338 (Fed. Cir. 2005). For the last half-century, federal district courts have been handling IEEPA cases, citing Sections 1701 and 1702 hundreds of times. *See Learning Res.*, 2025 WL 1525376, at *10 (collecting cases). But as far as California is aware, other than the current actions challenging the President's IEEPA tariff orders, publicly available decisions from the Court of International Trade have never once cited IEEPA's provisions, nor has the federal government ever moved to transfer an IEEPA case from district court to the Court of International Trade. *Id.* If anything, it is the conclusion that the Court of International Trade has exclusive jurisdiction over IEEPA actions that will hinder the utilization of judicial expertise by suddenly shunting cases to the Court of International Trade that until now have been heard by district courts.

Federal district courts routinely handle suits alleging that that the executive branch abused or exceeded its statutory authority, and they are well equipped to do so. California's present action, like those other lawsuits, is properly heard in district court.

# CONCLUSION

The judgment of the district court should be reversed.


Dated:  June 30, 2025                Respectfully submitted,

  *s/ Julie Veroff*
_____

ROB BONTA
  *Attorney General of California*
MICHAEL J. MONGAN
  *Solicitor General*
HELEN H. HONG
  *Principal Deputy Solicitor General*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
JULIE VEROFF
  *Deputy Solicitor General*
LARA HADDAD
  *Supervising Deputy Attorney General*
SHIWON CHOE
ZELDA VASSAR
CAROLYN F. DOWNS
  *Deputy Attorneys General*

  *Attorneys for Plaintiffs-Appellants*

47

# STATUTORY ADDENDUM

**28 U.S.C. § 1581.  Civil actions against the United States and agencies and officers thereof**

**(a)** The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930.

**(b)** The Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516 of the Tariff Act of 1930.

**(c)** The Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516A or 517 of the Tariff Act of 1930.

**(d)** The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review--

> **(1)** any final determination of the Secretary of Labor under section 223 of the Trade Act of 1974 with respect to the eligibility of workers for adjustment assistance under such Act;

> **(2)** any final determination of the Secretary of Commerce under section 251 of the Trade Act of 1974 with respect to the eligibility of a firm for adjustment assistance under such Act;

**(3)** any final determination of the Secretary of Commerce under section 273 of the Trade Act of 1974 with respect to the eligibility of a community for adjustment assistance under such Act; and

**(4)** any final determination of the Secretary of Agriculture under section 293 or 296 of the Trade Act of 1974 (19 U.S.C. 2401b) with respect to the eligibility of a group of agricultural commodity producers for adjustment assistance under such Act.

**(e)** The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review any final determination of the Secretary of the Treasury under section 305(b)(1) of the Trade Agreements Act of 1979.

**(f)** The Court of International Trade shall have exclusive jurisdiction of any civil action involving an application for an order directing the administering authority or the International Trade Commission to make confidential information available under section 777(c)(2) of the Tariff Act of 1930.

**(g)** The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review--

**(1)** any decision of the Secretary of the Treasury to deny a customs broker's license under section 641(b)(2) or (3) of the Tariff Act of 1930, or to deny a customs broker's permit under section 641(c)(1) of such Act, or to revoke a license or permit under section 641(b)(5) or (c)(2) of such Act;

49

**(2)** any decision of the Secretary of the Treasury to revoke or suspend a customs broker's license or permit, or impose a monetary penalty in lieu thereof, under section 641(d)(2)(B) of the Tariff Act of 1930; and

**(3)** any decision or order of the Customs Service to deny, suspend, or revoke accreditation of a private laboratory under section 499(b) of the Tariff Act of 1930.

**(h)** The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review, prior to the importation of the goods involved, a ruling issued by the Secretary of the Treasury, or a refusal to issue or change such a ruling, relating to classification, valuation, rate of duty, marking, restricted merchandise, entry requirements, drawbacks, vessel repairs, or similar matters, but only if the party commencing the civil action demonstrates to the court that he would be irreparably harmed unless given an opportunity to obtain judicial review prior to such importation.

**(i)**

**(1)** In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)-(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United

50

States, its agencies, or its officers, that arises out of any law of the United

States providing for--

> **(A)** revenue from imports or tonnage;

> **(B)** tariffs, duties, fees, or other taxes on the importation of
> merchandise for reasons other than the raising of revenue;

> **(C)** embargoes or other quantitative restrictions on the importation of
> merchandise for reasons other than the protection of the public health
> or safety; or

> **(D)** administration and enforcement with respect to the matters
> referred to in subparagraphs (A) through (C) of this paragraph and
> subsections (a)-(h) of this section.

**(2)** This subsection shall not confer jurisdiction over an antidumping or
countervailing duty determination which is reviewable by--

> **(A)** the Court of International Trade under section 516A(a) of the
> Tariff Act of 1930 (19 U.S.C. 1516a(a)); or

> **(B)** a binational panel under section 516A(g) of the Tariff Act of 1930
> (19 U.S.C. 1516a(g)).

**(j)** The Court of International Trade shall not have jurisdiction of any civil action
arising under section 305 of the Tariff Act of 1930.

51

**50 U.S.C. § 1702(a)(1).  Presidential authorities**

**(a) In general**

**(1)** At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise--

**(A)** investigate, regulate, or prohibit--

**(i)** any transactions in foreign exchange,

**(ii)** transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

**(iii)** the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the jurisdiction of the United States;

**(B)** investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a

52

national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and.

**(C)** when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.

. . .

## STATEMENT OF RELATED CASES

The following related case is pending:  *Webber v. U.S. Dep't of Homeland Sec.*, No. 4:25-cv-26 (D. Mont.), *appeal docketed*, No. 25-2717 (9th Cir. Apr. 28, 2025).

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   ☐ it is a joint brief submitted by separately represented parties.
   ☐ a party or parties are filing a single brief in response to multiple briefs.
   ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated                    .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                                          **Date**
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov