No. 25-3493

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

───────────────

THE STATE OF CALIFORNIA AND GOVERNOR GAVIN NEWSOM,
*Plaintiffs-Appellants*,

v.

DONALD J. TRUMP, *et al.*,
*Defendants-Appellees*.

───────────────

## On Appeal from the United States District Court
## for the Northern District of California
No. 3:25-cv-03372-JSC
Hon. Jacqueline Scott Corley, District Judge

───────────────

## EXCERPTS OF RECORD

───────────────

ROB BONTA
  *Attorney General of California*
MICHAEL J. MONGAN
  *Solicitor General*
HELEN H. HONG
  *Principal Deputy Solicitor General*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*

JULIE VEROFF
  *Deputy Solicitor General*
LARA HADDAD
  *Supervising Deputy Attorney General*
SHIWON CHOE
ZELDA VASSAR
CAROLYN F. DOWNS
  *Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3776
Julie.Veroff@doj.ca.gov
*Attorneys for Plaintiffs-Appellants*

June 30, 2025

# EXCERPTS OF RECORD INDEX

| No. | Document | Date: | ECF No. | ER No. |
|---|---|---|---|---|
| 1 | Judgment Dismissing Action Without Prejudice for Lack of Jurisdiction | 06/02/25 | 63 | 4 |
| 2 | Order Re: Defendants' Motion to Transfer | 06/02/25 | 62 | 5-18 |
| 3 | Defendants' Response to Plaintiffs' Motion for a Preliminary Injunction (Excerpt) | 05/27/25 | 55, at 14-15 | 19-21 |
| 4 | Expert Report and Declaration of Erica York in Support of Plaintiffs' Motion for a Preliminary Injunction (Excerpt) | 05/13/25 | 17, at 1-4, 10-11, 16-19 | 22-31 |
| 5 | Expert Report and Declaration of Professor Kimberly Clausing in Support of Plaintiffs' Motion for a Preliminary Injunction (Excerpt) | 05/13/25 | 16, at 1-7, 19-20 | 32-40 |
| 6 | Defendants' Reply in Support of Motion to Transfer (Excerpt) | 05/08/25 | 14, at 12 | 41 |
| 7 | Defendants' Motion to Transfer (Excerpt) | 04/17/25 | 9, at 1 | 43-44 |
| 8 | Complaint for Declaratory and Injunctive Relief (Excerpt) | 04/15/25 | 1, at 1-3, 19-21 | 45-51 |

i

| No. | Document | Date | ECF No. | ER No. |
|---|---|---|---|---|
| 9 | Plaintiffs' Notice of Appeal | 06/02/25 | 64 | 52-53 |
| 10 | U.S.D.C. Docket Sheet | | | 54-66 |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STATE OF CALIFORNIA, et al.,

      Plaintiffs,

   v.

DONALD J. TRUMP, et al.,

      Defendants.

Case No. 25-cv-03372-JSC

**JUDGMENT**

    By order filed on June 2, 2025, the Court dismissed this action without prejudice for lack of jurisdiction. So, the Court enters judgment in favor of Defendants Donald J. Trump, Kristi Noem, Department of Homeland Security, Pete R. Flores, and U.S. Customs and Border Protection and against Plaintiffs the State of California and Gavin Newsom without prejudice.

    **IT IS SO ORDERED.**

Dated: June 2, 2025

JACQUELINE SCOTT CORLEY
United States District Judge

1

2

3

4                           UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    STATE OF CALIFORNIA, et al.,              Case No.  25-cv-03372-JSC

8                 Plaintiffs,
                                               **ORDER RE: MOTION TO TRANSFER**
9          v.
                                               Re: Dkt. No. 9
10   DONALD J. TRUMP, et al.,

11                Defendants.

12

13         Beginning February 1, 2025, President Trump issued a series of executive orders imposing,

14   pausing, and modifying tariffs.  On April 16, 2025, the State of California—by and through

15   Attorney General Rob Bonta—and Gavin Newsom (together "California") sued the President and

16   several federal agencies (together, "the Government") to enjoin the tariffs and declare them

17   unlawful.  (Dkt. No. 1.)  California contends the tariffs are *ultra vires* because the International

18   Economic Emergency Powers Act ("IEEPA"), which President Trump invokes as statutory

19   authority, does not authorize the tariffs imposed.  And California contends the President violated

20   the separation-of-powers doctrine by usurping the power vested in Congress "[t]o lay and collect

21   Taxes, Duties, Imposts, and Excises."  U.S. Const. art. I, § 8.

22         Pending before the Court is the Government's motion to transfer this case to the U.S. Court

23   of International Trade ("CIT").  The question before the Court is not whether the challenged tariffs

24   are constitutional; instead, the question is whether this action arises out of a law providing for

25   tariffs such that the CIT has exclusive jurisdiction to decide whether the President was authorized

26   to impose tariffs in the manner, and under the circumstances, in which he has.  *See* 28 U.S.C. §

27   1581(i).  Having carefully considered the parties' submissions, and with the benefit of oral

28   argument on May 22, 2025, the Court concludes this action falls within the CIT's exclusive

United States District Court
Northern District of California

1    jurisdiction.  Because this lawsuit arises out of executive orders imposing tariffs, and because

2    those executive orders are "provisions of law for all purposes," 19 U.S.C. § 3004(c), this action

3    arises out of laws providing for tariffs and this Court is divested of jurisdiction.  Because

4    California requests dismissal rather than transfer to the CIT, transfer is not in the interest of

5    justice.  So, the Court DENIES the motion to transfer and DISMISSES the case without prejudice.

**BACKGROUND**

6

7    **I.    THE TARRIF EXECUTIVE ORDERS**

8        **A.    Country-Specific Tariffs**

9        On January 20, 2025, President Trump "declare[d] that a national emergency exists at the

10   southern border of the United States."  Proclamation No. 10,866, *Declaring a National Emergency*

11   *at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 29, 2025) ("Southern Border

12   Proclamation").  Finding the southern border "overrun by cartels, criminal gangs, known

13   terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and

14   illicit narcotics that harm Americans," the President found it "necessary for the Armed Forces to

15   take all appropriate action to assist the Department of Homeland Security in obtaining full

16   operational control of the southern border."  *Id.*

17       On February 1, 2025, the President—citing this Southern Border Proclamation—issued

18   three executive orders imposing tariffs on imports from Mexico, Canada, and China.  *See* Exec.

19   Order No. 14,194, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg.

20   9117 (Feb. 7, 2025) (imposing a 25% tariff on products from Mexico); Exec. Order No. 14,193,

21   *Imposing Duties to Address the Flow of Drugs Across our Northern Border*, 90 Fed. Reg. 9113

22   (Feb. 7, 2025) (imposing a 25% tariff on products of Canada, with the exception of energy

23   resources, subject to a 10% tariff); Exec. Order No. 14,195, *Imposing Duties to Address the*

24   *Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 7,

25   2025) (imposing a 10% tariff on products of the People's Republic of China).

26       Each executive order "expand[ed] the scope of the national emergency declared" in the

27   Southern Border Proclamation.  90 Fed. Reg. at 9118.  That is, the executive order imposing tariffs

28   on Mexico expanded the Proclamation's scope "to cover the failure of Mexico to arrest, seize,

2

detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and illicit drugs." *Id.* The executive order imposing tariffs on Canada expanded the Proclamation's scope to cover the threat posed by Canada's failure "to do more to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and drugs." 90 Fed. Reg. at 9114. And the executive order imposing tariffs on China expanded the Proclamation's scope "to cover the failure of the PRC government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." 90 Fed. Reg. at 9122.

In each executive order, the President invokes IEEPA as the source of authority:

> I have decided to impose, consistent with law, ad valorem tariffs on articles that are products of Mexico as set forth in this order. In doing so, I invoke my authority under section 1702(a)(1)(B) of IEEPA, and specifically find that action under other authority to impose tariffs is inadequate to address this unusual and extraordinary threat.

90 Fed. Reg. at 9118; 90 Fed. Reg. at 9114 (same); 90 Fed. Reg. at 9122 (same). And each executive order instructs the Secretary of Homeland Security to "determine the modifications necessary to the Harmonized Tariff Schedule of the United States (HTSUS) in order to effectuate this order consistent with law and shall make such modifications to the HTSUS through notice in the *Federal Register*." 90 Fed. Reg. at 9118; *see also id.* at 9115 (same); *id.* at 9123 (same).

The President has since issued numerous executive orders pausing the tariffs, exempting certain goods, and adjusting tariff rates. *See, e.g.*, Exec. Order No. 14,198, *Progress on the Situation at Our Southern Border*, 90 Fed. Reg. 26 (Feb. 10, 2025 ("In recognition of the steps taken by the Government of Mexico, and in order to assess whether the threat described in section 1 of this order has abated, the additional 25 percent ad valorem rate of duty shall be paused and will not take effect until March 4, 2025."); Exec. Order No. 14,231, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border,* 90 Fed. Reg. 46 (Mar. 11, 2025) ("In order to minimize disruption to the United States automotive industry and automotive workers, it is appropriate to adjust tariffs imposed on articles of Canada in Executive Order 14193

ER-007

United States District Court
Northern District of California

1   of February 1, 2025."); Exec. Order No. 14,228, *Further Amendment to Duties Addressing the*

2   *Synthetic Opioid Supply Chain in the People's Republic of China* (Mar. 7, 2025) ("In recognition

3   of the fact that the PRC has not taken adequate steps to alleviate the illicit drug crisis, section 2(a)

4   of Executive Order 14195 is hereby amended by striking the words '10 percent' and inserting in

5   lieu thereof the words '20 percent.'").

6           **B.      Universal and Reciprocal Tariffs**

7           On April 2, 2025, the President issued an executive order imposing a 10% tariff on "all

8   imports from all trading partners," with some exceptions.  Exec. Order No. 14,257, *Regulating

9   Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and

10  Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15041 (Apr. 7, 2025).  For

11  certain enumerated countries, the executive order sets tariff rates to increase to a specified rate,

12  ranging from 11% to 50%.  *Id.* at 15049-50.

13          The executive order simultaneously declares a national emergency, stating:

14              I, DONALD J. TRUMP, President of the United States of America,
                find that underlying conditions, including a lack of reciprocity in our
15              bilateral trade relationships, disparate tariff rates and non-tariff
                barriers, and U.S. trading partners' economic policies that suppress
16              domestic wages and consumption, as indicated by large and persistent
                annual U.S. goods trade deficits, constitute an unusual and
17              extraordinary threat to the national security and economy of the
                United States. That threat has its source in whole or substantial part
18              outside the United States in the domestic economic policies of key
                trading partners and structural imbalances in the global trading
19              system. I hereby declare a national emergency with respect to this
                threat.
20

21  *Id.* at 15041.  This executive order, like the executive orders described above, cites IEEPA as the

22  source of authority.  *Id.* ("By the authority vested in me as President by the Constitution and the

23  laws of the United States of America, including the International Emergency Economic Powers

24  Act (50 U.S.C. 1701 et seq.)(IEEPA) . . . .").  And the order explicitly modifies the Harmonized

25  Tariff Schedule of the United States, stating, for example, that "subchapter III of chapter 99 of the

26  Harmonized Tariff Schedule of the United States (HTSUS) is modified by inserting the following

27  new headings in numerical sequence, with the material in the new heading inserted in the columns

28  of the HTSUS . . . ."  90 Fed. Reg. at 15090.

ER-008

The President has since issued executive orders pausing and modifying some of the tariffs. *See*, *e.g.*, Exec. Order No. 14,226, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15625, 15626 (Apr. 15, 2025) ("I have determined that it is necessary and appropriate to address the national emergency declared . . . by modifying the HTSUS to temporarily suspend, for a period of 90 days, except with respect to the PRC, application of" specified tariffs imposed on foreign trading partners).

## II.    THE PRESENT SUIT

California sued "to block the tariffs imposed by President Trump pursuant to IEEPA because they are not authorized by that statute." (Dkt. No. 1 ¶ 12.)[1]  The complaint alleges the "tariffs imposed as of April 2, 2025, are projected to shrink the U.S. economy by $100 billion annually, increase inflation by 1.3%, and cost the average American family $2,100." (*Id.* ¶ 68.) "California, as a leader in global trade, bears an inordinate share of these costs." (*Id.* ¶ 69.)  For example, "California's ports process one-third of all exports and 40% of all containerized imports for the *entire world*, generating an estimated $9 billion in state and local tax revenue annually." (*Id.* ¶¶ 117, 126.)  The tariffs, "if left in place . . . will undoubtedly cause decreased activity at the ports, resulting in untold consequences for the hundreds of thousands of Californians who work there" and impact "the State's tax revenue, which relies on money from the ports to fund various programs." (*Id.* ¶ 127.)

California brings two causes of action.  Count I alleges *ultra vires* conduct in excess of statutory authority. (*Id.* ¶¶ 140-41.)  Count II alleges a violation of the separation-of-powers doctrine on the ground "[t]he Constitution provides that 'Congress shall have the Power To lay and collect Taxes, Duties, Imposts and Excises . . . .'" (*Id.* ¶ 147 (quoting U.S. Const. art. I, § 8).)  California seeks a declaration "that President Trump's IEEPA Tariff Orders are unlawful and void, because they were issued *ultra vires* in excess of statutory authority and/or because they are unconstitutional and violate separation of powers." (*Id.* at 22.)  And California seeks to enjoin the agency defendants (Secretary Noem, DHS, Acting Commissioner Flores, and CBP) "from taking

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

ER-009

1    any action to implement or enforce President Trump's IEEPA Tariff Orders." (*Id.*)

2          The Government moves to transfer this case to the CIT on the ground the CIT has

3    exclusive jurisdiction over California's claims under 28 U.S.C. § 1581(i).

**DISCUSSION**

5          A federal statute, 28 U.S.C. § 1581, provides for the CIT's exclusive jurisdiction of certain

6    civil actions:

> [T]he Court of International Trade shall have exclusive jurisdiction of
> any civil action commenced against the United States, its agencies, or
> its officers, **that arises out of any law of the United States
> providing for—**
>
> (A) revenue from imports or tonnage;
>
> (B) **tariffs**, duties, fees, or other taxes on the importation of
> merchandise **for reasons other than the raising of revenue**;
>
> (C) embargoes or other quantitative restrictions on the importation of
> merchandise for reasons other than the protection of the public health
> or safety; or
>
> (D) **administration and enforcement with respect to the matters
> referred to in subparagraphs (A) through (C)** of this paragraph and
> subsections (a)-(h) of this section.

16   28 U.S.C. § 1581(i) (emphasis added).  So, if this lawsuit "arises out of" a United States law

17   "providing for" tariffs, or the "administration and enforcement" of tariffs, it belongs in the CIT.

18   **I.    THE ACTION ARISES OUT OF A LAW OF THE UNITED STATES**

19         This action arises out of President Trump's executive orders imposing tariffs.  That is, the

20   lawsuit challenging President Trump's imposition of tariffs originates from, grows out of, and

21   flows from the executive orders through which the President imposed tariffs.  *See In re Border*

22   *Infrastructure Env't Litig.*, 915 F.3d 1213, 1220 (9th Cir. 2019) (noting "arising out of" is

23   "ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of' or

24   'flowing from' or in short, 'incident to, or having connection with'").  Those executive orders are

25   laws of the United States.  They modify, or instruct the Department of Homeland Security to

26   modify, the Harmonized Tariff Schedule, which is a statutory provision.  19 U.S.C. §

27   3004(c)(1)(A).  Accordingly, the modifications themselves are statutory provisions.  Section 3004,

28   setting forth the status of the Harmonized Tariff schedule, confirms this:

United States District Court
Northern District of California

6

1

2

3

4

5

**(1) The following shall be considered to be statutory provisions of law for all purposes:**
(A) The provisions of the Harmonized Tariff Schedule as enacted by this chapter.
(B) Each statutory amendment to the Harmonized Tariff Schedule.
**(C) Each modification or change made to the Harmonized Tariff Schedule by the President under authority of law** (including section 604 of the Trade Act of 1974).

6  19 U.S.C. § 3004(c) (emphasis added).  Because the executive orders imposing tariffs are laws of

7  the United States, California's lawsuit challenging those executive orders "arises out of" a "law of

8  the United States providing for . . . tariffs."  So, pursuant to section 1581(i), this matter falls within

9  the CIT's exclusive jurisdiction.

10      California disputes this conclusion in a footnote in its opposition, arguing "President

11  Trump's executive orders are not 'law[s] of the United States.'"  (Dkt. No. 12 at 19 n.4.)  The two

12  cases California cites to support this proposition do not bear on the present case.  In *Leath v.

13  Stetson*, 686 F.2d 769, 771 (9th Cir. 1982), the Ninth Circuit stated an executive order was "not a

14  law of the United States for purposes of giving district courts jurisdiction under the federal

15  question statute."  The *Leath* court said nothing about whether executive orders imposing tariffs

16  are laws of the United States for purposes of section 1581.  California also cites *Sierra Club v.

17  United States Department of Energy*, 134 F.4th 568, 573 (D.C. Cir. 2025), in which the court

18  stated "an executive order is not 'law' within the meaning of the Constitution."  Again, this case

19  says nothing about whether executive orders regarding tariffs are laws within the meaning of

20  section 1581.  Moreover, *Sierra Club*—and *California v. Environmental Protection Agency*, 72

21  F.4th 308, 318 (D.C. Cir. 2023), which it cites—involved executive orders "devoted solely to the

22  internal management of the executive branch."  *California*, 72 F.4th at 318 (involving an executive

23  order requiring agencies to consider environmental effects of their actions on minorities and low-

24  income populations); *Sierra Club*, 134 F.4th at 572 (involving an executive order directing

25  agencies to review "any of the previous administration's regulations, orders and other actions that

26  might affect the environment").  The executive orders at issue are not broad formulations of policy

27  or directions regarding Executive Branch management, but instead modifications to the

28  Harmonized Tariff Schedule set by statute.  To conclude these executive orders are not laws of the

United States District Court
Northern District of California

United States District Court
Northern District of California

1  United States would contradict section 3004, which states "modification[s] . . . to the Harmonized

2  Tariff Schedule by the President under authority of law" "shall be considered to be statutory

3  provisions of law for all purposes."

4       At oral argument, California also argued President Trump's executive orders imposing

5  tariffs fall outside the scope of section 3004 because the executive orders were not made under

6  authority of law.  *See* 19 U.S.C. § 3004(c) (stating modifications made "by the President under

7  authority of law" are statutory provisions).  As an initial matter, section 3004 does not say "under

8  authority of valid law" or something suggesting courts should conduct a threshold review to

9  decide whether the President's modification to the Harmonized Tariff Schedule is lawful.  More to

10  the point, to decide whether the tariffs were authorized by law would require the Court to decide

11  whether IEEPA permits the tariffs President Trump imposed—the very question the CIT recently

12  ruled on.  As discussed below, it would contravene Congressional intent for this Court to

13  separately make that determination.

## II.    CONGRESS INTENDED UNIFORM ADMINISTRATION OF CUSTOMS LAWS

15       Section 1581 was intended to "create[] a comprehensive system of judicial review of civil

16  actions arising from import transactions:"

> The Committee believes that the clarification and expansion of the customs courts' jurisdiction will help to assure access to judicial review of civil actions arising from import transactions.  The customs courts are national courts and their decisions are nationwide in impact.  Thus, a clarification of jurisdiction will eliminate the possibility of conflicting decision on any one point of dispute.  This, coupled with their current expertise in the area, would enable the customs courts to render extremely expeditions decisions in matters which are important both to our country and to our trading partners.

S. Rep. No. 96-466, at 3-4 (1979).  Specifically, subsection (i) of section 1581 was added to

"grant[] broad residual jurisdiction to the United States Court of International Trade."  S. Rep. 96-

1235, at 33 (1980).  While the statute as initially proposed conferred jurisdiction when a civil

action against the government "involve[d]" certain enumerated statutes, legislators were

concerned "that the listing of specific statutes would result in an inadvertent omission of a statute,

thereby creating further confusion in the minds of international trade law litigants."  *Id.* at 33-34.

8

So, "rather than a specific listing of statutes," Congress opted for "a generic approach . . . in an effort to provide greater protection for the rights of persons involved in disputes arising out of import transactions." *Id.* at 34. That is, section 1581 was amended to provide the CIT with "jurisdiction over those civil actions which arise out of a law of the United States pertaining to international trade." *Id.* This action arises out of a law pertaining to international trade—whether that law is the Harmonized Tariff Schedule the executive orders modified, the executive orders themselves, or IEEPA. So, concluding the CIT has exclusive jurisdiction over this matter is consistent with Congressional intent. *See Pentax Corp*, 72 F.3d at 711 (quoting *Conoco, Inc. v. United States Foreign–Trade Zones Bd.,* 18 F.3d 1581, 1589 (Fed Cir.1994)) (an area of law is "within the exclusive jurisdiction of the CIT" when "that area is 'within the parameters of' section 1581 and deals with 'type of issues with which CIT is acknowledged to have expertise'").

That is especially so here, where multiple cases challenging the same executive orders are before the CIT. *See V.O.S. Selections, Inc. v. Trump*, No. 25-cv-66 (Ct. Int'l Trade Apr 14, 2025)*; Oregon v. Trump*, No. 25-cv-66 (Ct. Int'l Trade Apr. 23, 2025); *Princess Awesome, LLC v. United States Customs and Border Protection*, No. 25-cv-78 (Ct. Int'l Trade Apr 24, 2025). In all three cases, the CIT chief judge—"[p]ursuant to 28 U.S.C. §§ 253(c) and 255 and Rule 77(e) of the Rules of this Court"—assigned the cases to a three-judge panel. (Case No. 25-cv-66, Dkt. No. 8; Case No. 25-cv-77, Dkt. No. 6; Case No. 25-cv-78, Dkt. No. 12.) *See* 28 U.S.C. § 255(a) (permitting the CIT chief judge "to designate any three judges of the court to hear and determine any civil action which the chief judge finds: (1) raises an issue of the constitutionality of an Act of Congress, a proclamation of the President or an Executive order; or (2) has broad or significant implications in the administration or interpretation of the customs laws"). On May 28, 2025, the CIT granted the *V.O.S. Selections* and *Oregon* plaintiffs' motions for summary judgment. *V.O.S. Selections, Inc. v. United States*, No. 25-00066, 2025 WL 1514124, at *1 (Ct. Int'l Trade May 28, 2025). In so doing, the CIT stated it "has exclusive jurisdiction to hear this action under 28 U.S.C. § 1581(i)." *Id.* at *8 ("For the purpose of locating jurisdiction under 28 U.S.C. § 1581(i), an action involving a challenge to a presidential action that imposes tariffs, duties, or other import restrictions is one that arises from a 'law providing for' those measures.").

1    Another CIT judge considering a motion to dismiss an action challenging the tariffs

2    imposed by President Trump likewise concluded "it has Section 1581(i) jurisdiction over this

3    case." (Dkt. No. 51-1 at 10.)  Moreover, two district courts granted motions to transfer to the CIT

4    cases challenging the same tariff executive orders.  *Webber v. U.S. Dep't of Homeland Sec.*, No.

5    CV 25-26-GF-DLC, 2025 WL 1207587, at *7 (D. Mont. Apr. 25, 2025) (cleaned up)

6    ("Consolidating tariff matters with the Court of International Trade ensures a necessary degree of

7    uniformity and consistency throughout the United States."); *Emily Ley Paper, Inc., v. Trump*, No.

8    3:25-CV-464-TKW-ZCB, 2025 WL 1482771, at *1 (N.D. Fla. May 20, 2025) (cleaned up) ("The

9    conclusion that this case should be transferred to the CIT furthers § 1581's purpose of ensuring

10   uniformity in the judicial decisionmaking process on trade issues.").

11    It would be inconsistent with Congressional intent for this Court to nevertheless exercise

12   its jurisdiction, as California urges, to decide whether the tariffs are lawful.  That inconsistency

13   becomes apparent when considering a hypothetical scenario in which this Court exercises

14   jurisdiction over California's lawsuit and reaches a different result than the CIT as to whether to

15   enjoin the tariffs.  What, then, of the Harmonized Tariff Schedule?  What duties would be

16   collected on imports?  Such a result would contravene Congress's goal of "ensuring a uniform

17   procedure for the judicial review of international trade disputes."  S. Rep. 96-1235 at 30.

### III.    DISMISSAL IS APPROPRIATE UNDER SECTION 1631

19    Because executive orders modifying the Harmonized Tariff Schedule are laws of the

20   United States, and because the executive orders at issue here indisputably provide for tariffs, this

21   civil action "arises out of [a] law of the United States providing for . . . tariffs."  So, the CIT has

22   exclusive jurisdiction under 28 U.S.C. § 1581(i)(1).  And because the action falls within the CIT's

23   exclusive jurisdiction, this Court lacks jurisdiction.  *See K Mart Corp. v. Cartier, Inc.*, 485 U.S.

24   176, 182–83 (1988) ("The District Court would be divested of jurisdiction . . . if this action fell

25   within one of several specific grants of exclusive jurisdiction to the Court of International

26   Trade."); *see also* 28 U.S.C. § 1340 ("The district courts shall have original jurisdiction of any

27   civil action arising under any Act of Congress providing for internal revenue, or revenue from

28   imports or tonnage except matters within the jurisdiction of the Court of International Trade.").

10

The Government seeks to transfer the case to the CIT pursuant to 28 U.S.C. § 1631, which provides "[w]henever a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court . . . in which the action or appeal could have been brought at the time it was filed or noticed."  At oral argument, California asked the Court, if it concludes it lacks jurisdiction, to dismiss rather than transfer the action to allow California to appeal the decision.  *See* 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States").  As the Government argued in *Webber v. U.S. Department of Homeland Security*—in which the plaintiffs challenging the tariff executive orders appealed a Montana District Court order transferring the case to the CIT—the Ninth Circuit "lacks appellate jurisdiction to review the district court's interlocutory transfer order" because the Ninth Circuit "reviews final orders" and "an order transferring a case under 28 U.S.C § 1631 for litigation to continue in another court is necessarily not final."  (Case No. 25-2717, Dkt. No. 7.)

Under section 1631, transfer is not mandatory upon finding a lack of jurisdiction.  The statute provides the court shall transfer the case *if it is in the interest of justice.*  "Normally transfer will be in the interest of justice because normally dismissal of an action that could be brought elsewhere is time-consuming and justice-defeating."  *Amity Rubberized Pen Co. v. Mkt. Quest Grp. Inc.*, 793 F.3d 991, 996 (9th Cir. 2015) (cleaned up).  The Ninth Circuit applied this rule to transfer cases when the plaintiff was "unaware of or confused about the proper forum in which to file their action," *Munns v. Kerry*, 782 F.3d 402, 415 (9th Cir. 2015) (cleaned up), and when "[t]he statutory period for seeking interlocutory review ha[d] elapsed."  *Kennecott Corp. v. U.S. Dist. Ct. for S. Dist. of California*, 873 F.2d 1292, 1293 (9th Cir. 1989).  As these cases indicate, the "interest of justice" analysis emphasizes the plaintiff's interests.  *See also Amiti*, 793 F.3d at 991 ("[T]ransfer will often serve as a means to prevent the injustice of penalizing a party for an honest procedural mistake"); *In re McCauley*, 814 F.2d 1350, 1352 (9th Cir. 1987) (cleaned up) (stating section 1631 "serves to aid litigants who were confused about the proper forum for review"); *Miller v. Hambrick*, 905 F.2d 259, 262 (9th Cir. 1990) (concluding district court abused its discretion for failing to determine whether prisoner's petition for writ of habitus corpus "could

ER-015

have been brought in the district of [his] 'regular place of incarceration' and whether transfer would have been in the interest of justice" under section 1631). In this case, when California—the party who filed the lawsuit—requests dismissal rather than transfer, it is not in the interest of justice to transfer the case.

At oral argument, the Government could not articulate why transfer over California's objection serves the interests of justice. The Government argued it is in the interest of justice to ensure the correct forum rules on California's claims. The Court agrees, and dismissal facilitates that result by allowing the Ninth Circuit to decide whether this Court has jurisdiction over a lawsuit challenging the President's imposition of tariffs and/or to what extent district courts should consider the merits of a case in deciding if a matter falls within the CIT's exclusive jurisdiction.

The Government also argued Ninth Circuit precedent requires transfer rather than dismissal, noting in *Pentax Corp. v. Myhra*, 72 F.3d 708, 711 (9th Cir. 1995), the Ninth Circuit "conclude[d] the prudent thing to do [was] to direct the district court to transfer the case to the CIT so that the CIT [could] determine the question of its own jurisdiction." In *Pentax*, the plaintiff had argued "the interests of justice require . . . transfer, because if the case is not transferred [the plaintiff's] claim may be barred by the statute of limitations." *Id.* Without expressing an "opinion on the statute of limitations issue or whether the CIT would have had original jurisdiction," the Ninth Circuit transferred the case "so that the CIT [could] determine the question of its own jurisdiction." *Id.* Like the section 1631 cases described above, the *Pentax* court's decision to transfer was based on the plaintiff's interest in resolving its claim. The Court does not understand *Pentax*—or *United States v. Universal Fruits & Vegetables Corp.*, 370 F.3d 829, 836–37 (9th Cir. 2004), which cites *Pentax*—to mean section 1631 requires transfer over the plaintiff's objection. Nor does the Court understand *Pentax* to mean the Court must transfer whenever there is ambiguity about the CIT's jurisdiction. Such interpretation would conflict with the language of section 1631, which requires transfer if it is in the interest of justice "[w]henever . . . a court . . . finds that there is a want of jurisdiction." 28 U.S.C. § 1631. So, section 1631 applies when a court has found jurisdiction lacking, not when a court thinks jurisdiction could be lacking.

Following oral argument, the Government sought leave to file a supplemental brief

ER-016

responding to California's request to dismiss rather than transfer the case.  (Dkt. No. 59.)  The Court granted the request.  (Dkt. No. 61.)  Having reviewed the Government's supplemental brief, the Court is not persuaded transfer is in the interest of justice in this case.  The section 1631 cases the Government cites reinforce transfer as the proper remedy when it advances the plaintiff's interests.  For example, in *Taati v. Cigna Healthcare, Inc.*, No. CV 08-05164 MMM (PLAx), 2008 WL 11423917, at *7 (C.D. Cal. Sept. 19, 2008), the court transferred the case to a forum where all the defendants were subject to personal jurisdiction to "protect [the plaintiff] from any prejudice resulting from her confusion."  The court observed "[n]othing suggest[ed] that [the plaintiff] filed her action in California in bad faith; rather, given that she is pro se, and given the interpretation of the personal jurisdiction rules set out in her pleadings, it is clear that she was confused about the proper forum for review.  *Id.* (quotation marks omitted).  And in *Amerijet International, Inc. v. United States Department of Homeland Security*, 43 F. Supp. 3d 4, 21 (D.D.C. 2014), the court concluded "transfer, not dismissal, [was] the preferable disposition" when it was the plaintiff who sought transfer and the defendants who "firmly reject[ed]" that proposition.  Here, the roles are reversed: California, the plaintiff—whose interest courts seek to protect in evaluating transfer under section 1631—requests dismissal whereas the Government requests transfer.

The Government's other case citations are unpersuasive because they involved different provisions.  *See Dearth v. Mukasey*, 516 F.3d 413, 415-16 (6th Cir. 2008) (considering transfer for improper venue pursuant to sections 1404 and 1406); *Concha v. London*, 62 F.3d 1493, 1506 (9th Cir. 1995) (considering voluntary dismissal under Rule 41(a)(1)).  The Government also argues Congress "decided against making transfer orders immediately appealable" and dismissal here would "create a loophole to appellate jurisdiction."  (Dkt. No. 59-1 at 2.)  But under section 1631, transfer is only required when it is "in the interest of justice."  So, the statute apparently contemplates the present situation—in which the court concludes it lacks jurisdiction and that transfer is not in the interest of justice, leaving dismissal as the proper course of action.

## CONCLUSION

Pursuant to section 1581(i), this action falls within the CIT's exclusive jurisdiction and this Court is without jurisdiction.  Because California opposes transfer and instead requests dismissal,

ER-017

1    transfer is not in the interest of justice under section 1631.  So, the Court DENIES the

2    Government's motion to transfer and DISMISSES the case without prejudice.  A separate

3    judgment order will issue.

4          This Order disposes of Docket No. 9.

5          **IT IS SO ORDERED.**

6    Dated: June 2, 2025

7

8

9                                                JACQUELINE SCOTT CORLEY
                                                 United States District Judge

1  YAAKOV M. ROTH
   Acting Assistant Attorney General
2  ERIC J. HAMILTON
   Deputy Assistant Attorney General
3  PATRICIA M. McCARTHY
   Director, National Courts
4  CLAUDIA BURKE
   Deputy Director, National Courts
5  JUSTIN R. MILLER
   Attorney-In-Charge, International Trade Field Office
6  LUKE MATHERS
   Trial Attorney
7
8
9        U.S. Department of Justice
         Civil Division
10       Commercial Litigation Branch
         26 Federal Plaza, Suite 346
11       New York, New York 10278
         Telephone: (212) 264-9236
12       luke.mathers@usdoj.gov

13 Attorneys for Defendants

14              UNITED STATES DISTRICT COURT

15           NORTHERN DISTRICT OF CALIFORNIA

16              SAN FRANCISCO DIVISION

17

18
   STATE OF CALIFORNIA and GAVIN        )  Case No. 3:25-cv-03372-JSC
19 NEWSOM, in his official capacity as Governor )
   of California,                      )  **DEFENDANTS' RESPONSE IN OPPOSITION**
20                                      )  **TO PLAINTIFFS' MOTION FOR A**
          Plaintiffs,                   )  **PRELIMINARY INJUNCTION**
21                                      )
       v.                               )  Date:      June 26, 2025
22                                      )  Time:      10:00 a.m.
   DONALD J. TRUMP, et al.,             )
23                                      )
          Defendants.                   )
24 _____      )

25

26

27

28

DEFS.' RESP. IN OPP. TO PLS.' MOT. FOR PRELIM. INJUNCTION
No. 3:25-cv-03372-JSC

1  in isolation, but rather what "regulate … importation" means—and precedent is clear that it includes

2  imposing tariffs. More generally, though, the verb "regulate" comfortably encompasses imposing fees to

3  discourage or steer consumption. Authorities also commonly "regulate" the examples of conduct that

4  plaintiffs give (like pollution) by imposing monetary exactions.[3]

5      Indeed, Congress understands that tariffs "regulate" importation because that is how it describes

6  tariffs in non-emergency trade statutes. Section 232 of the Trade Expansion Act of 1962, for instance,

7  delegates to the Executive Branch the power to "adjust … imports" to protect national security, 19 U.S.C.

8  § 1862(c), which the Supreme Court has explained includes the power to impose "monetary exactions"

9  like "license fees and duties" on imports, *Algonquin*, 426 U.S. at 562. Section 232 "clearly … grant[ed]

10  [the President] a measure of discretion in determining the method to be used to adjust imports." *Id.* at

11  561.  There was "no support in the language of the statute for [the] contention that the authorization to the

12  President to 'adjust' imports should be read to encompass only … quotas as opposed to monetary

13  methods." *Id.*  And elsewhere in that same Act, as well as in the Trade Act of 1974, Congress defined the

14  phrase "duty or other import restriction" as encompassing not just duties but also "exaction[s] other than

15  dut[ies]" that are "imposed for the *regulation of imports*." 19 U.S.C. §§ 1806(2), 2481(2) (emphasis

16  added). Regulating importation thus includes the power to impose tariffs.

17      Finally, plaintiffs say "regulate … importation" must not include tariff authority because the IEEPA

18  power to "regulate … exportation" cannot include tariff authority. Mot. 11. That makes no sense, which

19  is why no other challenger to these IEEPA tariffs has made the argument. Statutory language must be read

20  in context (as plaintiffs agree, *id.* 9), and the verb "regulate" requires an object "to express a complete

21  thought." *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 103 (D.D.C. 2020); *QBE Syndicate 1036 v. Compass

22  Mins. Louisiana, Inc.*, 95 F.4th 984, 995 (5th Cir. 2024) (transitive verbs "*require* an object to complete

23  the thought"). Thus, there is nothing inconsistent about reading the phrase "regulate importation" to

24  include the power to impose tariffs but reading the phrase "regulate exportation" to convey a different set

25

26  [3] On that note, plaintiffs complain that a plain reading of "regulate" would too broadly permit the President
27  to tax acquisitions, holdings, withholdings, and so forth, Mot. 10, but ignore that IEEPA already authorizes
   the President the more drastic authority to *prohibit* such conduct. It is thus unclear how reading "regulate"
   naturally to include the less economically disruptive power to impose tariffs is somehow "a transformative
28  expansion in presidential authority," *id.*

of authorities. In each case, the object determines the phrase's scope. Because the different phrases can bear different meanings, plaintiffs' attempt to reading based on "regulate … exportation" lacks force.

Even if IEEPA authorizes the President to impose monetary fees on exportation, that would not require a narrow construction of the phrase "regulate … importation." As defendants have explained, and plaintiffs do not deny, fees can be constitutionally imposed on exports under certain circumstances—for example, user fees and sanctions, or taxes on goods exported from territories. Doc. 14 at 13. And that a statute might be unconstitutionally applied in just one hypothetical situation, *see* Mot. 17-18, does not require the Court to discard the normal tools of statutory interpretation. "If constitutional avoidance means anything, it means not reaching out to address hypothetical interpretive or constitutional questions not directly presented." Doc. 14 at 13 (citing *Almendarez-Torres v. United States*, 523 U.S. 224, 237-39 (1998); *Salinas v. United States*, 522 U.S. 52, 60 (1997)). Regardless, avoidance applies "only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). Text, context, history, and purpose show that IEEPA clearly authorizes the President to impose tariffs on imports; plaintiffs' reading is thus "plainly contrary to the intent of Congress" and should not be adopted. *Miller v. French*, 530 U.S. 327, 341 (2000).

**2. History.** IEEPA's history confirms that it authorizes the President to impose tariffs. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *see Tex. Dep't of Housing & Comm. Affairs v. Inclusive Comms. Project, Inc.*, 576 U.S. 519, 536 (2015); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 243 n.11 (2009). Congress drew the relevant language directly from TWEA, and it did so *after* the Federal Circuit's predecessor interpreted that identical language to permit the President to impose tariffs in 1975. During the legislative process for IEEPA, Congress was well aware of the relevant language and the court's decision interpreting the language to authorize the President to impose tariffs but chose to keep the language when it enacted IEEPA in 1977.

The key language in IEEPA, "regulate … importation," was left unaltered from TWEA. *See* First War Powers Act, ch. 593, title III, § 301, 55 Stat. 839 (1941) (authorizing the President to "investigate, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in…" (emphases added));

1   Rob Bonta
    Attorney General of California
2   Thomas S. Patterson
    Senior Assistant Attorney General
3   Lara Haddad
    Supervising Deputy Attorney General
4   Shiwon Choe (SB 320041)
    Carolyn F. Downs (SB 353455)
5   Zelda Vassar (SB 313789)
    Deputy Attorneys General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 510-4400
     Fax:  (415) 703-5480
8    E-mail:  Zelda.Vassar@doj.ca.gov
    *Attorneys for Plaintiffs State of California and Gavin*
9   *Newsom, in his official capacity as Governor of California*

10

11                    IN THE UNITED STATES DISTRICT COURT

12                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| 14   STATE OF CALIFORNIA and GAVIN NEWSOM, in his official capacity as Governor 15   of California, | Case No.: 3:25-cv-03372-JSC |
| 16                                        Plaintiffs, | **EXPERT REPORT AND DECLARATION OF ERICA YORK** |
| 17                       v. | |
| 18 | |
| 19   DONALD J. TRUMP, in his official capacity as President of the United States; KRISTI 20   NOEM, in her official capacity as Secretary of Homeland Security; DEPARTMENT OF 21   HOMELAND SECURITY; PETE R. FLORES, in his official capacity as Acting 22   Commissioner for U.S. Customs and Border Protection; and U.S. CUSTOMS AND 23   BORDER PROTECTION, | |
| 24                                        Defendants | |

25

26

27

28

## EXPERT REPORT AND DECLARATION OF ERICA YORK

I, Erica York, declare under penalty of perjury that the following is true and correct:

1.    I have been asked to provide an expert opinion on the economic impact of the challenged tariffs on the United States economy, with a focus on the impact to California.

2.    This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.    I currently serve as the Vice President of Federal Tax Policy at the Tax Foundation.  I have been employed at the Tax Foundation since November 2017 and have served in multiple roles, including analyst, economist, senior economist, and research and project manager.  Since 2020, I have taught business, microeconomics, and business finance as an adjunct professor at Sterling College.  I have a Master's of Arts in Economic Analysis from Wichita State University and a Bachelor's of Science in Business Administration and Economics from Sterling College.  A true and correct copy of my curriculum vitae is attached as **Exhibit 1** to this declaration.

4.    In my role as Vice President of Federal Tax Policy for the Tax Foundation, I manage and lead a team of nine economists, analysts, and software developers to execute the Tax Foundation's strategy for federal tax policy modeling, research, publication, and external communication.  I also author white papers and blog posts on quantitative and qualitative impacts of federal tax and tariff policy changes.

5.    Tax Foundation is a nonpartisan tax policy 501(c)(3) nonprofit based in Washington, D.C.  Established in 1937, Tax Foundation's mission is to improve lives through tax policies that lead to greater economic growth and opportunity.  Tax Foundation publishes data, research, modeling, and educational materials on tax policy at all levels of government to advance the principles of sound tax policy: simplicity, neutrality, transparency, and stability.

6.    My opinions are based on more than seven years of experience in modeling the impact of federal tax policy changes and analyzing federal tax proposals on federal revenues and the macroeconomy.

Expert Report and Declaration of Erica York
(Case No.: 3:25-cv-03372)

7.    I have given numerous presentations and have provided testimony on federal tax policy, including at the Kansas Chamber of Commerce, Tax Policy Center, Tax Council and Policy Institute, and American Trucking Association.  I have also testified on the topic of tax policy modernization before the Kansas Senate Committee on Assessment and Taxation and the Kansas House Committee on Taxation and on the topic of U.S. tariffs before the U.S. Congress Joint Economic Committee.

8.    I have written several articles on the impact of the effects of tariffs on the United States macroeconomy, as well as on tax reforms and the impact of those reforms.  Since 2018, I have been tracking the United States' tariff policies and publishing on their economic impact.

## RETENTION AND COMPENSATION

9.    I am being compensated for services performed in the above-entitled case at an hourly rate of $300.  I am receiving no other compensation for these services.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

## BASIS FOR OPINIONS AND MATERIALS CONSIDERED

10.  Counsel for Plaintiffs provided me with a copy of the operative complaint, Defendants' Motion to Transfer, Plaintiffs' Opposition to Defendants' Motion to Transfer, and Defendants' Reply in Support of Motion to Transfer in this matter.  Counsel for Plaintiffs also provided me with certain procurement data from the California Department of Public Health.

11.  Otherwise, my report is based on my own independent research and analysis, as well as detailed review of others' relevant research, reports, data, and analyses.  The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

## OPINIONS

### I.    INTRODUCTION[1]

12.  Tariffs are a type of excise tax imposed by governments, generally applied to imported goods.  Tariffs may be assessed as a percentage of the value of an imported item, a fixed

---

[1]  All information and analysis in this declaration is current as of May 11, 2025.  On May 12, the President announced a 90-day temporary reduction in tariffs on Chinese imports from 145 percent to 30 percent (reducing the 125 percent tariff on Chinese imports announced April 2 to 10 percent, and keeping in place the broad 20 percent tariff on Chinese imports announced February

(continued…)

Expert Report and Declaration of Erica York
(Case No.: 3:25-cv-03372)

**ER-024**

1  dollar amount per imported item, or a combination of both.  The legal incidence of tariffs falls on

2  the importer of record, meaning the person or business importing the good is required to submit

3  payment to the government when the good enters the United States.

4      13.  As tariffs fall on the importer of record, tariffs are not paid by foreign governments; if

5  the importer is a U.S. person or company, that U.S. person or company would be the one who has

6  to pay the tariff.

7      14.  While tariffs raise revenue for the imposing country, the revenue raised will be

8  substantially less than what is implied by a simple analysis of multiplying the stated tariff rate by

9  the affected imports, due to behavioral and economic responses.[2]

10     15.  Tariffs may be imposed to achieve varying objectives, including raising tax revenue,

11  protecting domestic industries from import competition, or in response to practices of foreign

12  governments perceived unfair.  In modern, advanced economies, tariffs are not usually imposed

13  for revenue generating purposes, but instead for protection of discrete industries from import

14  competition or in response to other nations' actions.

15     16.  Tariffs, like other types of taxes, affect economic decision-making by changing

16  relative prices.  Tariffs increase the price of imported goods compared to domestically produced

17  goods, making untaxed domestic goods more attractive than taxed foreign goods.  While the legal

18  burden of tariffs falls on the importer of record, the economic burden can fall on a combination of

19  people in the economy, including foreign exporters, domestic businesses and workers, and

20  domestic consumers.

---

23  4 and increased March 4).  The announcement will increase the amount of revenue directly raised
by the tariffs, as a tariff of 125 percent would be prohibitive for many imports but a tariff of 10

24  percent would still allow imports to flow.  Although the temporary pause will defer some of the
more drastic harms from cutting off most trade with China, it leaves a significantly higher tariff

25  burden in place.  The tariffs imposed with purported authority under the International Emergency
Economic Powers Act (IEEPA) of 10 percent on most countries, 30 percent on China, and 25

26  percent on most non-United States-Mexico-Canada-Agreement imports from Canada and Mexico
will more than triple the average tariff rate on all imports in 2025, and result in the highest

27  average tariff rate on all imports since 1946.
[2] Erica York & Alex Durante, *How Much Revenue Can Tariffs Really Raise for the Federal

28  Government?*, Tax Found. (Apr. 10, 2025), https://taxfoundation.org/research/all/federal/
universal-tariff-revenue-estimates/ [hereinafter *How Much Revenue?*].

### 1. China, Mexico, and Canada tariffs

29.  On February 1, 2025, President Trump signed three executive orders to impose 25 percent tariffs on Canada and Mexico and 10 percent tariffs on China in response to concerns over the border and fentanyl.  These tariffs were due to go into effect on February 4.[21]

30.  On February 4, the ten percent tariff on all imports from China went into effect. However, the President paused the 25 percent tariffs on Canada and Mexico for thirty days.

31.  On February 27, the President stated that the 10 percent tariffs on China would increase by another 10 percent beginning March 4.

32.  On March 4, the tariffs on China were increased another 10 percent, resulting in a 20 percent tariff on Chinese imports.  The thirty-day suspension of tariffs on Canada and Mexico expired and the 25 percent tariffs on both Canada and Mexico went into effect.  A day later, the President exempted auto imports from the tariffs until April 2.

33.  On March 6, the President exempted imports covered by the United States Mexico Canada Agreement (USMCA)—approximately 38 percent of imports from Canada and approximately 49 percent of imports from Mexico based on 2024 import values—until April 2, and also lowered tariffs on non-USMCA potash (a fertilizer used in farming) to 10 percent.

34.  On April 2, the exemptions for imports covered by USCMA were extended indefinitely.

### 2. Universal and so-called reciprocal tariffs, including retaliatory tariffs on China

35.  President Trump signed a presidential memorandum on February 13 to develop a plan for increasing U.S. tariffs in response to other countries' tariffs, tariff policies, and other policies, including exchange rates and unfair practices.  The recommendations were due April 1, and an executive order related to the trade deficit was signed on April 2 to impose the tariffs.

---

[21] For the timeline on the President's actions on tariffs, see Erica York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, Tax Found. (May 5, 2025), https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/ [hereinafter York & Durante, *Trump Tariffs*].

Expert Report and Declaration of Erica York
(Case No.: 3:25-cv-03372)

ER-026

36.  These so-called reciprocal tariffs apply to imports from nearly every U.S. trading partner, but do not include goods that face product-specific tariffs like steel, aluminum, autos, and auto parts.[22]  They also exclude a specific list of energy-related goods and electronics.

37.  On April 2, the President announced that the so-called reciprocal tariff policy would involve a universal tariff of 10 percent on all U.S. trading partners (excluding Canada and Mexico as long as they are subject to the IEEPA border security and fentanyl tariffs) and higher rates, reaching as much as 50 percent, for more than 50 specific trading partners, including 34 percent on China, 20 percent on the EU, and 24 percent Japan.  The first 10 percent tariff took effect on April 5, and the higher rates were scheduled to take effect April 9.

38.  In response to China's April 4 retaliation of 34 percent tariffs on all U.S. exports, on April 7, President Trump indicated another 50 percent tariff would apply to China beginning April 9.  This increased the total rate to 84 percent under the "reciprocal" tariffs, leading to a combined rate of 104 percent when accounting for the IEEPA border security and fentanyl tariffs.

39.  On April 9, President Trump announced a 90-day pause on the reciprocal tariffs for all countries except China.  The same day, China retaliated by lifting its tariffs to 84 percent, matching the so-called reciprocal rate imposed by the U.S.  President Trump immediately responded by increasing the so-called reciprocal rate to 125 percent.

40.  On April 10, the White House clarified that the 125 percent tariff on China would apply in addition to the 20 percent IEEPA border security and fentanyl tariff on China, raising the rate on most imports from China to 145 percent.

---

[22] The formula to determine the so-called reciprocal tariff rates has nothing to do with mirroring tariffs applied by foreign governments on U.S. exports, nor matching any other type of foreign trade barrier.  The White House formula does not measure foreign tariff rates, currency practices, discriminatory taxes, or non-tariff barriers to trade.  Instead, the formula applies the greater of a 10 percent tariff or the result of dividing the U.S. 2024 trade deficit in goods with a given country by the total quantity of U.S. imports from that country.  The tariffs calculated by the U.S. are invented out of a formula based on trade aggregates, not on any implicit or explicit measure of actual foreign policies.  *See* Kevin Corinth & Stan Veuger, *President Trump's Tariff Formula Makes No Economic Sense. It's Also Based on an Error*, Am. Enter. Inst. (Apr. 4, 2025), https://www.aei.org/economics/president-trumps-tariff-formula-makes-no-economic-sense-its-also-based-on-an-error/; Alan Cole, *Trump's Reciprocal Tariff Calculations Are Nonsense, Will Punish Mutually Beneficial Trade*, Tax Found. (Apr. 3, 2025), https://taxfoundation.org/blog/trump-reciprocal-tariffs-calculations/.

Expert Report and Declaration of Erica York
(Case No.: 3:25-cv-03372)

50.  Tariffs may affect bilateral trade deficits and surpluses, but they do not alter the overall trade deficit.  Bilateral trade deficits are not themselves indicative of an economic problem; even in the absence of trade barriers, bilateral trade balances can naturally arise between countries due to different endowments of resources and different comparative advantages and specializations.  Nevertheless, tariffs can distort bilateral trading patterns, without altering the overall trade deficit.  For example, a high tariff on Chinese imports would be expected to reduce the bilateral trade deficit with China through a combination of reduced imports and increased trans-shipment through third countries, such as Vietnam, leading to higher bilateral trade deficits with those other trading partners.  Distorting bilateral trade with tariffs imposes economic costs; both the fixed costs of searching for new suppliers and moving supply chains, and the ongoing efficiency losses from selecting less productive suppliers, with higher tariffs implying larger costs.[37]

### D.    Tariffs will shrink the U.S. economy

51.  Using the Tax Foundation General Equilibrium Model to simulate the effect of the U.S.-imposed IEEPA tariffs on China, Canada, Mexico, and the rest of the world as of April 18, 2025, indicates the tariffs will reduce U.S. economic output by 0.6 percent in the long-run, equivalent to more than $178 billion of annual output lost in 2024 dollars, and reduce the labor supply by 546,000 full-time equivalent jobs.[38]

52.  The reduction in economic output occurs because tariffs introduce a permanent tax on the U.S. economy, imposing a wedge between incomes that workers and business owners produce and after-tax incomes workers and business owners receive.  Permanently lower returns to labor lead to a permanent reduction in both labor supply and the capital stock, reducing total economic output and incomes in the U.S. economy.

53.  Workers and business owners will bear the burden of higher tariffs in the form of lower real, after-tax incomes.  The Tax Foundation General Equilibrium Model estimates that in

---

[37] Gene M. Grossman & Elhanan Helpman, *When Tariffs Disturb Global Supply Chains* 23–24 (Nat'l Bureau of Econ. Rsch., Working Paper No. 27722, Aug. 2020), https://www.nber.org/system/files/working_papers/w27722/w27722.pdf.
[38] These figures isolate the impact of the IEEPA tariffs.  For a discussion of the data on all 2025 tariffs from which these figures are derived, see York & Durante, *Trump Tariffs*, *supra* note 21.

Expert Report and Declaration of Erica York
(Case No.: 3:25-cv-03372)

1    2025, after-tax incomes will be lower by 0.9 percent on average due to the IEEPA tariffs imposed

2    as of April 19, 2025.  In reality, the loss of after-tax income is likely higher.  These estimates

3    reflect only the reduction in income due to higher tax costs, and do not include the additional

4    losses due to loss of consumer choice or higher prices for domestic alternatives, so these

5    calculations underestimate the totality of the real economic losses workers and business owners

6    will face.

7            54.   Other models using completely different approaches, data sources, and methodologies

8    likewise estimate that U.S. imposed tariffs will reduce the size of economic output and incomes in

9    the United States.[39]  For example, the International Monetary Fund recently downgraded its

10   global growth outlook because of the tariffs imposed through April 2025.[40]  Prior to the

11   announcement and imposition of new U.S. tariffs in 2025, the U.S. Congressional Budget Office

12   simulated that a hypothetical 10 percent universal tariff and additional 50 percent tariff on all

13   imports from China would reduce U.S. GDP by 0.6 percent (and by nearly twice as much before

14   accounting for the economic benefits of the assumed reduction in the federal government's

15   budget deficit).[41]

16
     **E.     Tariffs will effectively be a $117 billion tax increase by the federal
17           government**

18           55.   If left in place, the country-specific tariffs imposed as of April 18, 2025, would raise

19   $117 billion in higher tax revenue for the federal government in 2025 and $1.5 trillion over the

20   10-year congressional budget period from 2025 through 2034, before accounting for the negative

21   economic feedback.[42]  Over the budget window, the tariffs would raise revenues by 0.43 percent

22   of GDP on average, larger than the average of the 1984 Deficit Reduction Act and of the Patient

23

24   [39] Erica York, *How Will Trump's Universal and China Tariffs Impact the Economy?*, Tax Found.
     (Nov. 8, 2024), https://taxfoundation.org/blog/trump-tariffs-impact-economy/.
25   [40] Pierre-Olivier Gourinchas, *The Global Economy Enters a New Era*, Int'l Monetary Fund (Apr.
     22, 2025), https://www.imf.org/en/Blogs/Articles/2025/04/22/the-global-economy-enters-a-new-
26   era#:~:text=Many%20emerging%20market%20economies%20could,effects%20of%20tariffs%20
     and%20uncertainty.
27   [41] CBO Tariffs Letter, *supra* note 20.
     [42] These figures isolate the impact of the IEEPA tariffs.  For a discussion of the data on all 2025
28   tariffs from which these figures are derived, see York & Durante, *Trump Tariffs*, *supra* note 21.

Expert Report and Declaration of Erica York
                                                                (Case No.: 3:25-cv-03372)

                                                                                  **ER-029**

Protection and Affordable Health Care Act; Health Care and Education Reconciliation Act of 2010, both revenue-raising laws enacted by Congress.[43]

56.  These higher taxes are not being borne by foreign governments.  Rather, they are initially paid by persons and businesses in the U.S. importing the goods.  As people and businesses respond to the higher prices on imports, the ultimate economic burden may be passed to others in the economy, like final consumers through higher prices, workers through lower wages and fewer employment opportunities, and business owners through lower profits.  Foreign businesses and governments will also be harmed, though neither will directly remit the tax to the U.S. government; but fewer sales into the U.S. economy reduce incomes for foreign workers and business owners and tax revenues for foreign governments.

## V.    IMPACT OF TARIFFS ON THE CALIFORNIA ECONOMY

### A.    Drop in import volumes will negatively affect port workers and related transportation and logistics jobs

57.  Ultimately, the burden of higher tariffs will be felt throughout the United States, but some of the first industries to experience the impact will be transportation and logistics workers affected by a drop in trade volumes.  In 2024, the U.S. imported $3.3 trillion of goods in total including $430 billion from China.  California's three customs districts (Los Angeles, San Diego, and San Francisco) accounted for $564.5 billion of total imports (17 percent of U.S. imports), including $149 billion from China (35 percent of U.S. imports from China).  Across California's three import districts, imports from China accounted for a quarter of all import volume in 2024.[44]  Tax Foundation estimates that if the IEEPA tariffs in place as of April 18, 2025, remain in effect, they will reduce U.S. imports nearly 18 percent in 2025, with the most significant drop in percentage and dollar terms occurring from China.  One study, based on 2023 data, suggests that

---

[43] *Id.*
[44] U.S. Int'l Trade Comm'n, U.S. ITC DataWeb, https://dataweb.usitc.gov/ (search "Summable Measure" for Data to Report, "Customs Value," and full year "2024." Then select "individual Countries," then add "China," and repeat with "Use All Countries." Finally, in "Select Individual Districts," include "Los Angeles, CA," "San Diego, CA," and "San Francisco, CA.").

Expert Report and Declaration of Erica York
(Case No.: 3:25-cv-03372)

ER-030

a 1 percent decline in cargo volume at the Ports of Los Angeles and Long Beach would eliminate more than 2,700 jobs and threaten up to 4,000 more indirect jobs.[45]

**B.    U.S. Imposed Tariffs Will Reduce California's Output and Labor Supply**

58.  Tariffs will increase production costs, including for technology firms, by raising the price of key inputs like electrical components and computers.  The combination of higher costs for inputs and higher costs for consumer goods will reduce business revenues and force either price increases, reduced wages and hiring, less investment, or a combination of all those responses.

59.  California accounted for 14 percent of U.S. GDP in 2024 ($4.1 trillion of $29.2 trillion), suggesting that the national loss of U.S. GDP of more than $178 billion estimated by the Tax Foundation would represent a $25 billion loss to California's economy in 2024 terms. California accounted for nearly 12 percent of total U.S. employment in 2023, suggesting that labor supply losses due to the U.S. imposed tariffs would represent a job loss of more than 64,000 for California's economy as estimated by the Tax Foundation.

**C.    Higher Prices Will Increase Costs for the State of California**

60.  Tariffs will increase prices for goods purchased by the state of California, including office supplies and computer equipment.

61.  Counsel for Plaintiffs provided me with the data below, which they assert represents two products manufactured outside the United States that the California Department of Public Health (CDPH) purchased prior to February 4, 2025.  They asked me to simulate potential increased costs to these goods due to tariffs.

//

//

---

[45] John Martin, *The Dire Economic Consequences of Continued Market Share Declines at the Ports of Los Angeles and Long Beach*, Pac. Mar. Ass'n (2024), https://www.pmanet.org/wp-content/uploads/2025/03/Executive-Summary-John-Martin-2024.pdf.

Expert Report and Declaration of Erica York
(Case No.: 3:25-cv-03372)

ER-031

1   ROB BONTA
    Attorney General of California
2   THOMAS S. PATTERSON
    Senior Assistant Attorney General
3   LARA HADDAD
    Supervising Deputy Attorney General
4   SHIWON CHOE (SB 320041)
    CAROLYN F. DOWNS (SB 353455)
5   ZELDA VASSAR (SB 313789)
    Deputy Attorneys General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 510-4400
     Fax:  (415) 703-5480
8    E-mail:  Zelda.Vassar@doj.ca.gov
    *Attorneys for Plaintiffs State of California and Gavin*
9   *Newsom, in his official capacity as Governor of California*

10

11                  IN THE UNITED STATES DISTRICT COURT

                    FOR THE NORTHERN DISTRICT OF CALIFORNIA
12

13

14  **STATE OF CALIFORNIA and GAVIN**        Case No.: 3:25-cv-03372-JSC
    **NEWSOM, in his official capacity as**
15  **Governor of California,**              **EXPERT REPORT AND**
                                             **DECLARATION OF PROFESSOR**
16                            Plaintiffs,    **KIMBERLY CLAUSING**

17              v.

18
    **DONALD J. TRUMP, in his official**
19  **capacity as President of the United States;**
    **KRISTI NOEM, in her official capacity as**
20  **Secretary of Homeland Security;**
    **DEPARTMENT OF HOMELAND**
21  **SECURITY; PETE R. FLORES, in his**
    **official capacity as Acting Commissioner for**
22  **U.S. Customs and Border Protection; and**
    **U.S. CUSTOMS AND BORDER**
23  **PROTECTION,**

24                            Defendants

25

26

27

28

## EXPERT REPORT AND DECLARATION OF KIMBERLY CLAUSING

I, Kimberly Clausing, declare under penalty of perjury that the following is true and correct:

1. I have been asked to provide an expert opinion on the economic impact of the challenged tariffs on the United States economy, with a focus on the impact to California.

2. This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3. I currently serve as the Eric M. Zolt Professor of Tax Law and Policy at the University of California, Los Angeles (UCLA) School of Law and have served in this position since 2021 (with a leave from early 2021 until mid-2022 for government service). I have a master's degree and a Ph.D. in Economics, both from Harvard University. I teach classes on federal income taxation, U.S. international taxation, and policy challenges in tax law. Prior to my time at UCLA, I was the Thurmond A. Miller and Walter Mintz Professor of Economics at Reed College from 2007-2015. A true and correct copy of my curriculum vitae is attached as **Exhibit 1** to this declaration.

4. In addition to my position at UCLA, I currently have the following affiliations: nonresident senior fellow at the Peterson Institute for International Economics (since 2022); research associate at the National Bureau of Economic Research (since 2023); and member of the Council on Foreign Relations (since 2023). In these affiliated roles, I write and discuss issues related to international economic policy.

5. My opinions are based on over three decades of experience in economics, taxation, and international trade policy, including my time serving as the Deputy Assistant Secretary for Tax Analysis at the U.S. Department of the Treasury from 2021-2022.

6. I have given numerous invited lectures, presented papers and reports, and participated in conferences on international tax, international trade, and economic policy more generally, including at the World Economic Forum, International Monetary Fund, Tax Policy Center, National Tax Association, Columbia University, Georgetown Law Center, Stanford Institute for

Expert Report and Declaration of Professor
Kimberly Clausing (Case No.: 3:25-cv-03372)

1   Economic Policy Research, and Harvard Kennedy School, among many others.  I have testified

2   before Congressional committees on tax policy on seven occasions, including before the Senate

3   Committee on the Budget, the Senate Committee on Finance, the Joint Economic Committee, and

4   the House Ways and Means Committee.

5        7.   I have written dozens of articles and shorter pieces on the United States' international

6   tax policy and international trade, including pieces on the tariffs challenged in this litigation.  I

7   also authored a book on international trade, immigration, and international capital flows.

8                          **RETENTION AND COMPENSATION**

9        8.   I am being compensated for services performed in the above-entitled case at an

10  hourly rate of $1,000.  My compensation is not contingent on the results of my analysis or the

11  substance of any testimony.

12                  **BASIS FOR OPINIONS AND MATERIALS CONSIDERED**

13       9.   Counsel for Plaintiffs provided me with the operative complaint in this matter as well

14  as Defendants' Motion to Transfer, Plaintiffs' opposition to Defendants' Motion to Transfer, and

15  Defendants' reply in support of their Motion to Transfer.  Otherwise, my report is based on my

16  own independent research and analysis, as well as detailed review of others' relevant research,

17  reports, data, and analyses.  The opinions contained herein are made pursuant to a reasonable

18  degree of professional certainty.

19                                       **OPINIONS**

20  **I.  INTRODUCTION**

21       10.   In the last several months, the Trump Administration has taken a number of

22  unprecedented tariff actions, including an across-the-board 10 percent tariff on nearly all U.S.

23  trading partners as well as numerous other actions, some of which have been paused or

24  increased.[1]  If continued, the tariffs would generate enormous economic damage to both the U.S.

25  _____

    [1] All information and analysis in this declaration is current as of May 11, 2025.  On May 12, the
26  President announced a 90-day temporary reduction in tariffs on Chinese imports from 145 percent
    to 30 percent (reducing the 125 percent tariff on Chinese imports announced April 2 to 10
27  percent, and keeping in place the broad 20 percent tariff on Chinese imports announced February
    4 and increased March 4).  According to the Budget Lab at Yale, the damage posed by tariffs in
28  place after this 90-day reduction is still about 60 percent of the damage forecasted prior to the
                                                                          (continued…)

Expert Report and Declaration of Professor
                                                  Kimberly Clausing (Case No.: 3:25-cv-03372)

1    economy and the California economy.[2]  The typical household would face a tax increase of

2    thousands of dollars due to these tariffs, which would reduce household real income or

3    purchasing power.  Low- and middle-income households would face a larger burden from these

4    taxes (as a share of their income) than higher-income householders.  Both household and business

5    purchasers of imports will face increased costs as well as possible shortages.  Supply chain

6    disruption and cost increases will hamper the competitiveness of United States businesses as

7    many U.S. producers rely on imported intermediate goods.  Retaliatory tariffs by other nations

8    additionally threaten market access for U.S. exporters.  On a broad scale, the tariffs risk pushing

9    the larger macroeconomy into a recession, generating lasting harmful effects on employment,

     economic growth, and government budgets.

10       11.    At a base level, tariffs are taxes on imports.  Historically, tariffs were used to help

11   fund the U.S. government, especially in the era prior to the federal income tax (which originated

12   in 1913).[3]  After World War II, the use of tariffs steadily diminished in many richer countries,

13   including the United States, as it was widely recognized that there were more efficient ways to

     raise revenue.[4]

14       12.    While tariffs are not considered by economists to be a good tax instrument for

15   funding the government because of the inefficiencies associated with tariffs, they do have some

16   limited purposes.  For example, the use of tariffs to counter certain unfair trade practices abroad,

17   or to allow a domestic industry time to adjust to import surges, may be justified under some

     narrow circumstances.  Under U.S. trade law, these types of extraordinary circumstances are

18   handled under the rules of section 201 (safeguards) and section 301 (unfair trade practices) of the

19   Trade Act of 1974; these rules envision relatively narrow circumstances under which tariffs

20

21   May 12 pause.  *State of U.S. Tariffs: May 12, 2025*, The Budget Lab at Yale Univ. (May 12,
     2025), https://budgetlab.yale.edu/research/state-us-tariffs-may-12-2025.  The general conclusions
22   of this declaration remain unchanged given the scale, scope, uncertainty, and unpredictability of
     the ever-evolving state of tariffs, as described herein.  Future harms from the tariffs may be
23   higher or lower than those discussed here if tariff pauses expire or if tariffs are increased or
     negotiated downward.
24   [2] There are so many tariff policy changes that it can be difficult to keep track.  For a useful
     timeline, see Chad P. Bown, *Trump's Trade War Timeline 2.0: An Up-To-Date Guide*, Peterson
25   Inst. for Int'l Econ. (Apr. 29, 2025), https://www.piie.com/blogs/realtime-
     economics/2025/trumps-trade-war-timeline-20-date-guide.
26   [3] For a historical treatment of the transition from tariffs to the income tax, see Steven R.
     Weisman, *The Great Tax Wars: Lincoln to Wilson—The Fierce Battles Over Money and Power
27   That Transformed the Nation* (2002).
     [4] For a discussion of the history of U.S. trade policy, see Douglas A. Irwin, C*lashing Over
28   Commerce: A History of U.S. Trade Policy* (2017).

Expert Report and Declaration of Professor
Kimberly Clausing (Case No.: 3:25-cv-03372)

would be employed.

13.     The broad and unprecedented use of tariffs by the Trump Administration far exceeds these narrow rationales, invoking instead the notion of an "emergency" with respect to every nation of the world due to trade deficits and foreign trade practices, including insufficient "reciprocity" in U.S. bilateral trading relationships.  President Trump also cited immigration, crime, and illicit drugs with respect to the North American and Chinese tariffs.

14.     It seems abundantly clear that there is no emergency that applies to every other country in the world.  As of January 2025, when the President was inaugurated, the U.S. economy was strong by most economic measures; GDP growth was strong at 2.8 percent, inflation had come down to 3 percent (after higher levels in 2022 and 2023), and employment levels were low (near 4 percent over 2022-2024, well below historical averages).[5]

15.     Further, trade deficits—cited by the Trump Administration as the emergency rationale for the broadest tariffs imposed—are widely recognized by economists as a normal feature of the U.S. economy in recent decades, and indeed a feature that comes with several benefits for U.S. consumers and borrowers.  For example, consumers gain access to more goods (imports) at a low cost, and borrowers benefit from lower interest rates (due to international capital flows from abroad); indeed, the U.S. economy often experiences higher trade deficits in times of economic strength.[6]  Further, even if trade deficits were deemed problematic, tariffs are unlikely to help the situation, and the government has much better levers at its disposal, including reducing the federal budget deficit, which directly affects international borrowing and thus the trade deficit.[7]

---

[5] *The Conference Board Economic Forecast for the U.S. Economy*, The Conf. Bd. (Apr. 4, 2025), https://www.conference-board.org/research/us-forecast (comparing 2024 to subsequent forecasts for 2025 and beyond).  *See Gross Domestic Product, 4th Quarter and Year 2024 (Third Estimate), GDP by Industry, and Corporate Profits*, Bureau of Econ. Analysis (Mar. 27, 2025), https://tinyurl.com/44se5nj8 (2024 GDP growth rates); *Inflation, Consumer Prices for the United States*, Fed. Rsrv. Bank of St. Louis, https://fred.stlouisfed.org/series/FPCPITOTLZGUSA (last updated Apr. 16, 2025, 1:53 PM CDT) (inflation data); *Unemployment Rate*, Fed. Rsrv. Bank of St. Louis, https://fred.stlouisfed.org/series/UNRATE (last updated May 2, 2025, 7:46 AM CDT) (unemployment data).

[6] For a lengthy treatment of this point, see Maurice Obstfeld, *The U.S. Trade Deficit: Myths and Realities*, Brookings Papers on Econ. Activity, Spring 2025 (Mar. 13, 2025).  *See also* Jason Furman, Opinion, *Trump Is About to Bet the Economy On a Theory That Makes No Sense*, N.Y. Times (Mar. 31, 2025), https://www.nytimes.com/2025/03/31/opinion/trump-tariffs-economy.html (discussing the benefits to running a trade deficit and that there is no correlation between a country's tariff levels and its overall trade balance).

[7] International borrowing is the "flip side" of the trade deficit; simply put, if a country wants to consume more than it produces (borrowing), it must get the extra consumption from somewhere,

(continued…)

Expert Report and Declaration of Professor Kimberly Clausing (Case No.: 3:25-cv-03372)

16.     There is also no evidence that countries throughout the world have unfair trading practices with respect to their bilateral trading relationships with the United States.  Indeed, many countries that were tariffed already have free trade areas—agreements that allow most trade between partners to occur absent any tariffs—with the United States, allowing U.S. firms nearly unfettered access to those foreign markets.[8]  Many other countries have quite low barriers to U.S. exporters.  Further, many foreign policy actions that have drawn the attention of the Trump Administration are sovereign tax policy decisions that are completely independent of trade and frequently nondiscriminatory.[9]

17.     Further, the International Emergency Economic Powers Act of 1977 envisions Presidential action through mechanisms like economic sanctions, prohibitions, and regulations. Tariffs, in contrast, are not a regulatory solution, but rather a tax.  Taxes are used for multiple purposes: the primary purpose is to raise revenue, and a secondary purpose may be to discourage an activity through market incentives (by making an activity more expensive) without placing a complete ban on the activity.  For example, a tax on cigarettes may help discourage smoking by making smoking more expensive.

18.     In contrast, a regulation seeks to control something, not merely tax it.  For example, a regulation may prohibit children from smoking or may allow smoking only in some sections of restaurants but not others.  A tax is different in that a tax does not determinatively control the activity—in the cigarette example, a tax on cigarettes would still allow those willing to pay the tax to smoke just as they could if no tax were imposed.

19.     Similarly, a tariff on imports does not determinatively control imports.  It will discourage imports through incentives that make imports more expensive, but it does not prohibit imports.  As long as importers are willing to pay the added costs, tariffs allow importers to

so it runs a trade deficit.  These basic identities are covered in international economics textbooks, such as Paul R. Krugman et al., *International Economics Theory and Policy* 324–50 (12th ed. 2021).  For more on why tariffs will not necessarily help the trade deficit, see Joseph E. Gagnon, *Why Higher Tariffs Won't Shrink the Trade Deficit*, Peterson Inst. for Int'l Econ. (Feb. 24, 2025), https://www.piie.com/blogs/realtime-economics/2025/why-higher-tariffs-wont-shrink-trade-deficit, and Obstfeld, *supra* note 6.

[8] The U.S. has comprehensive free trade agreements with 20 jurisdictions.  *Free Trade Agreements*, U.S. Trade Rep., https://ustr.gov/trade-agreements/free-trade-agreements (last visited May 12, 2025).

[9] *See* Kimberly Clausing, *Reciprocity and Discrimination: When Are Tariffs Useful Remedies?*, Peterson Inst. for Int'l Econ. (Mar. 31, 2025), https://www.piie.com/blogs/realtime-economics/2025/reciprocity-and-discrimination-when-are-tariffs-useful-remedies (discussing the concept of "so called reciprocity" in use by the Trump Administration and its lack of coherent rationale).

continue to import goods just as they could if no tariff were imposed.

20.     The United States government is also a member of the World Trade Organization (WTO), which administers the rules-based international trading system.  As a member of the WTO, the U.S. government typically seeks to abide by its prior commitments on tariffs, as well as the principles of national treatment and most-favored-nation treatment.[10]  This rules-based system generates stability and predictability in international commerce, providing benefits akin to the traffic signs and signals that help govern vehicular traffic on roads.  The tariffs discussed in the complaint are not compliant with the United States' WTO obligations.

## II.    TARIFFS WILL RESULT IN A LARGE ECONOMIC LOSS TO CALIFORNIA CONSUMERS, DISPROPORTIONATELY AFFECTING THOSE IN LOW-INCOME HOUSEHOLDS

### A.    The average tax increase for a typical household will be in the thousands of dollars.

21.     For American consumers, President Trump's tariffs (as of mid-April 2025 levels) are the largest tax increase in more than a generation.  Effective tariff rates averaged about 1.5 percent of the value of imports before the first Trump Administration and rose to about 3 percent of the value of imports during the first Trump Administration.  While the exact new effective tax rate is difficult to calculate, due to a steady stream of new policies, exemptions, and rule changes, most outside estimates put the new average tariff rate at or above 25 percent.[11]  An average tariff levy of that magnitude implies a huge tax increase for the typical household.  By the methodology I employed in earlier work, I calculate that it would entail an additional $1,700 in tariff costs for a typical household.[12]

22.     This methodology is just a useful start to calculating tariff costs on households.

---

[10] Most-favored-nation treatment means that all members agree to provide other members with equally favorable treatment (with exceptions for free trade area and customs union members). National treatment means that all products are treated in a nondiscriminatory fashion relative to domestic goods within a country's market.

[11] This figure is from work done in April.  For example, the Budget Lab at Yale found an effective tariff rate of 28 percent in an April 15 calculation; they also provide historical data on effective tax rates.  *State of U.S. Tariffs: April 15, 2025*, The Budget Lab at Yale Univ. (Apr. 15, 2025), https://budgetlab.yale.edu/research/state-us-tariffs-april-15-2025 [hereinafter *April 15, 2025*, Budget Lab].  The Tax Foundation found an effective tariff rate of 25.5 percent in a May 5 calculation.  Erica York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, Tax Found. (May 5, 2025), https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/.  Both of these figures are weighted averages, before accounting for behavioral response.

[12] *See* Kimberly Clausing & Mary E. Lovely, *Why Trump's Tariff Proposals Would Harm Working Americans*, Peterson Inst. for Int'l Econ. (May 2024) at 2, https://www.piie.com/publications/policy-briefs/2024/why-trumps-tariff-proposals-would-harm-working-americans.

Expert Report and Declaration of Professor
Kimberly Clausing (Case No.: 3:25-cv-03372)

ER-038

programs and unemployment insurance (as more people qualify). For state and local governments with more strict budgeting requirements (as most states, including California, are prohibited from running budget deficits), these budget pressures can also mean abrupt curtailment of spending in areas of pressing need, such as public safety, education, and disaster preparedness.[55]

46.     These pressures occur amidst an already fragile financial picture, with long-term deficits and debt nearing unsustainable levels.[56] Recent movements in the bond market and the U.S. dollar exchange rate also indicate serious financial fragilities.[57] Finally, both Social Security and Medicare trust funds face looming insolvency, which will force benefit cuts unless Congress takes prudent action. Unfortunately, Congress is instead planning to enact large *increases* in budget deficits in the months ahead; the Committee for a Responsible Federal Budget has chronicled the impact of Congressional plans for the nation's unsustainable fiscal path.[58]

## CONCLUSIONS

47.     The scope, impact, and swiftness of the Trump Administration's 2025 tariffs are unprecedented in my career as an economist and will have lasting impacts on the California economy, as well as on the national and global economy. These tariffs will be the largest tax increase in more a generation for U.S. consumers; they will also do lasting damage to employment and economic growth. Tariffs are also inefficient, since they encourage the production of items that we could have otherwise purchased at lower cost from abroad, while

---

[55] For a discussion of state budget limits, see *NCSL Fiscal Brief: State Balanced Budget Provisions*, Nat'l Conf. of State Legislatures (Oct. 2010), https://docs.house.gov/meetings/JU/JU00/20170727/106327/HHRG-115-JU-20170727-SD002.pdf.
[56] The Congressional Budget Office long-term deficit and debt projections are very worrisome. *The Long-Term Budget Outlook: 2025 to 2055*, Cong. Budget Off. (Mar. 2025), https://www.cbo.gov/publication/61270 (projecting slower economic growth over the next three decades, increase in the federal deficit to 7.3% of GDP).
[57] For commentary on recent market movements, see Shawn Tully, *Top Economist Larry Summers: U.S. Treasuries Were Trading 'Like Those of an Emerging Market Nation'*, Yahoo! Fin. (Apr. 11, 2025), https://finance.yahoo.com/news/top-economist-larry-summers-highly-114104116.html; Nellie Liang, *What's Going On in the U.S. Treasury Market, and Why Does It Matter?*, BROOKINGS (Apr. 14, 2025), https://www.brookings.edu/articles/whats-going-on-in-the-us-treasury-market-and-why-does-it-matter/; Greg Ip, *The Dollar and the Bond Market's Ominous Message for Trump*, Wall St. J. (Apr. 10, 2025), https://www.wsj.com/economy/trade/us-dollar-treasury-bonds-trade-war-028e8765.
[58] For one example of their analysis, see C*omparing the House vs. Senate on FY 2025 Reconciliation*, Comm. for a Responsible Fed. Budget (Apr. 17, 2025), https://www.crfb.org/blogs/comparing-house-vs-senate-fy-2025-reconciliation. The Committee for a Responsible Federal Budget tracks these developments on an ongoing basis.

19                                          Expert Report and Declaration of Professor
                                            Kimberly Clausing (Case No.: 3:25-cv-03372)

1    hampering U.S. production of export goods, goods where the United States enjoys a comparative

2    advantage.

3         48.    I am not alone in this assessment; nearly every serious economist agrees that this is

4    a bewilderingly misguided set of tariff policies.[59] Unless the tariffs are swiftly and completely

5    reversed, the economy is facing a big, self-induced shock that will harm U.S. consumers, U.S.

     workers, and international relations with key partners and allies.

6

7         I declare under penalty of perjury under the laws of the United States of America that the

8    foregoing is true and correct.

9         Executed on ___5/13/25___, at Portland, Oregon.

10

11                                                    _K. A. Clausing_

12                                                    Kimberly Clausing

13

14

15

16

17

18

19

20

21

22

23

24
     _____
25   [59] As former Treasury Secretary Lawrence Summers put it on April 30th, "This has probably been
     the least successful first hundred days of a presidency [] on the economy in the last century. We
26   have seen the stock market go down, the dollar go down, forecasts of unemployment go up,
     forecasts of inflation go up, forecasts on the odds of a recession go up. We've seen consumer
27   confidence collapse. We've seen businesses take back all their previous earnings projections. So,
     this has been a disastrous hundred days for the U.S. economy." Lawrence H. Summers
28   (@LHSummers), X (Apr. 30, 2025, 6:48 AM),
     .

1 YAAKOV M. ROTH
Acting Assistant Attorney General
2 ERIC J. HAMILTON
Deputy Assistant Attorney General
3 PATRICIA M. McCARTHY
Director, National Courts
4 CLAUDIA BURKE
Deputy Director, National Courts
5 JUSTIN R. MILLER
Attorney-In-Charge, International Trade Field Office
6 LUKE MATHERS
Trial Attorney
7
8
U.S. Department of Justice
9 Civil Division
Commercial Litigation Branch
10 26 Federal Plaza, Suite 346
New York, New York 10278
11 Telephone: (212) 264-9236
luke.mathers@usdoj.gov
12
13 Attorneys for Defendants

14                    UNITED STATES DISTRICT COURT

15                  NORTHERN DISTRICT OF CALIFORNIA

16                        SAN FRANCISCO DIVISION

17

18

19 STATE OF CALIFORNIA and GAVIN      )  Case No. 3:25-cv-03372-JSC
NEWSOM, in his official capacity as Governor )
20 of California,                      )  **DEFENDANTS' REPLY IN SUPPORT OF**
                                      )  **THEIR MOTION TO TRANSFER TO THE U.S.**
21       Plaintiffs,                  )  **COURT OF INTERNATIONAL TRADE**
                                      )
22    v.                              )  Date:    May 22, 2025
                                      )  Time:    10:00 a.m.
23 DONALD J. TRUMP, et al.,           )
                                      )
24       Defendants.                  )
   _____)

25

26

27

28

DEFS.' REPLY IN SUPPORT OF MOT. TO TRANSFER TO CT. INT'L TRADE
No. 3:25-cv-03372-JSC

1   power," Opp. 14, the President's imposition of tariffs under IEEPA flows from the same language in

2   TWEA that authorized the imposition of tariffs five decades ago. *Yoshida*, 526 F.2d at 576.

3         Even if the major-questions doctrine applied, the challenged orders would still be supported by

4   "clear congressional authorization." *West Virginia*, 597 U.S. at 723.  The major-questions doctrine is

5   not a magic-words requirement and is satisfied when the authorization is couched in clear but broad

6   language.  *See Florida v. HHS*, 19 F.4th 1271, 1288 (11th Cir. 2021) (major-questions doctrine did not

7   apply because "a broad grant of authority" that "plainly encompasses the [agency's] actions . . . does not

8   require an indication that specific activities are permitted"); *Biden v. Nebraska*, 600 U.S. 477, 511

9   (2023) (Barrett, J., concurring) (unlike true "clear-statement" rules, major-questions doctrine does not

10  require "an 'unequivocal declaration' from Congress authorizing the precise agency action under

11  review"); *West Virginia*, 597 U.S. at 723 ("something more than a merely *plausible* textual basis for the

12  agency action is necessary" (emphasis added)).  That is the case here.  As previewed here and explained

13  at length in other briefing, text, history, and context all show that IEEPA clearly authorizes the President

14  to impose tariffs on imports.  Indeed, the Ninth Circuit has held the relevant language here to be

15  "*unambiguous*" and to "*clearly* show[] that the President's actions [imposing tariffs] were in accordance

16  with the power Congress delegated." *United States v. Spawr Optical Rsch., Inc.*, 685 F.2d 1076, 1081

17  n.10 (9th Cir. 1982) (emphases added).

18        Plaintiffs' contention that IEEPA must be construed so as not to provide for tariffs, "to avoid the

19  significant constitutional issues that would otherwise arise," Opp. 18-19, fares no better.  Plaintiffs assert

20  that if "regulate . . . importation" covers tariffs on imports, then it must also permit tariffs on exports,

21  which the Constitution forbids.  *Id.*  Defendants have not argued that the verb "regulate" alone

22  authorizes tariffs; instead, the argument is that the *phrase* "regulate . . . importation" authorizes tariffs.

23  The object—here, "importation"—is key.  "Regulate" is a transitive verb and "require[s] an object—like

24  an activity, process, or action—to express a complete thought." *TikTok Inc. v. Trump*, 507 F. Supp. 3d

25  92, 103 (D.D.C. 2020); *see, e.g.*, *QBE Syndicate 1036 v. Compass Mins. Louisiana, Inc.*, 95 F.4th 984,

26  995 (5th Cir. 2024) ("The subsequent verbs . . . are clearly transitive and *require* an object to complete

27  the thought.").  The same verb paired with different object—say, "exportation"—need not carry the

28  same meaning, contrary to plaintiffs' premise.

1   YAAKOV M. ROTH
    Acting Assistant Attorney General
2   ERIC J. HAMILTON
    Deputy Assistant Attorney General
3   PATRICIA M. McCARTHY
    Director, National Courts
4   CLAUDIA BURKE
    Deputy Director, National Courts
5   JUSTIN R. MILLER
    Attorney-In-Charge, International Trade Field Office
6   LUKE MATHERS
    Trial Attorney
7

8        U.S. Department of Justice
9        Civil Division
         Commercial Litigation Branch
10       26 Federal Plaza, Suite 346
         New York, New York 10278
11       Telephone: (212) 264-9236
         luke.mathers@usdoj.gov
12

13  Attorneys for Defendants

14               UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16                 SAN FRANCISCO DIVISION

17

18

19  STATE OF CALIFORNIA and GAVIN    )  Case No. 3:25-cv-03372-JSC
    NEWSOM, in his official capacity as Governor  )
20  of California,                   )  **DEFENDANTS' NOTICE OF MOTION AND**
                                     )  **MOTION TO TRANSFER TO THE U.S. COURT**
21          Plaintiffs,              )  **OF INTERNATIONAL TRADE**
                                     )
22      v.                           )  Date:    May 22, 2025
                                     )  Time:    10:00 a.m.
23  DONALD J. TRUMP, et al.,         )
                                     )
24          Defendants.              )
    _____)

25

26

27

28

DEFS.' MOT. TO TRANSFER TO CT. INT'L TRADE
No. 3:25-cv-03372-JSC

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on May 22, 2025, at 10:00 a.m. or as soon thereafter as the matter may be heard, defendants will appear before the Honorable Jacqueline Scott Corley and move to transfer this case to the U.S. Court of International Trade under 28 U.S.C. § 1631, because that court has exclusive jurisdiction over plaintiffs' claims.

## ISSUE TO BE DECIDED

Should the Court, under 28 U.S.C. § 1631, transfer this civil action challenging the imposition of tariffs to the Court of International Trade, a specialized Article III court with nationwide jurisdiction that, under 28 U.S.C. § 1581, possesses exclusive jurisdiction to hear civil actions challenging the imposition of tariffs?

## MEMORANDUM OF POINTS AND AUTHORITIES

In the International Economic Emergency Powers Act of 1977 (IEEPA), Congress confirmed the President's power to, among other things, "regulate importation" of foreign goods to deal with a national emergency. The President, acting under IEEPA, has regulated imports by imposing tariffs on goods from most countries through a series of Executive Orders, to deal with unusual and extraordinary threats to the United States's national security, foreign policy, and economy.

Plaintiffs challenge the President's authority to impose tariffs under IEEPA, on both constitutional and statutory grounds. But all of plaintiffs' arguments concern the imposition of tariffs— over which the Court of International Trade has *exclusive* jurisdiction. 28 U.S.C. § 1581(i) . Section 1631 of Title 28 of the U.S. Code requires transfer when there is "a want of jurisdiction" in the original court and where the action could have been brought in another court. Because the Court of International Trade has exclusive jurisdiction over the subject matter in plaintiffs' complaint, the case should be transferred to that court for any further proceedings, including any threshold challenges. The Ninth Circuit has held cases involving tariffs under IEEPA's materially identical predecessor statute cannot be litigated in federal district courts. In addition, exercising jurisdiction over this case would place this Court at odds with the Court of International Trade, which is presently exercising jurisdiction over two cases challenging President Trump's tariffs issued under IEEPA.

1   ROB BONTA
    Attorney General of California
2   THOMAS S. PATTERSON
    Senior Assistant Attorney General
3   LARA HADDAD
    Supervising Deputy Attorney General
4   SHIWON CHOE (SB 320041)
    CAROLYN F. DOWNS (SB 353455)
5   ZELDA VASSAR (SB 313789)
    Deputy Attorneys General
6     455 Golden Gate Avenue, Suite 11000
      San Francisco, CA  94102-7004
7     Telephone:  (415) 510-4400
      Fax:  (415) 703-5480
8     E-mail:  Zelda.Vassar@doj.ca.gov
    *Attorneys for Plaintiffs State of California and*
9   *Gavin Newsom, in his official capacity as Governor*
    *of California*

10

IN THE UNITED STATES DISTRICT COURT

11

FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13

14

| | |
|---|---|
| **STATE OF CALIFORNIA and GAVIN NEWSOM, in his official capacity as Governor of California,**<br><br>Plaintiffs,<br><br>v.<br><br>**DONALD J. TRUMP, in his official capacity as President of the United States; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; DEPARTMENT OF HOMELAND SECURITY; PETE R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and U.S. CUSTOMS AND BORDER PROTECTION,**<br><br>Defendants. | Case No. 25-cv-_____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

1.      President Donald J. Trump has launched an unprecedented tariff regime by relying on the International Economic Emergency Powers Act (IEEPA) and a purported national emergency arising from persistent trade deficits.

2.      In just the last two weeks, President Trump has imposed a universal 10% tariff on virtually all imported goods and sweeping "reciprocal" tariffs on dozens of countries, before pausing the reciprocal tariffs for 90 days, and then increasing retaliatory tariffs on China to 145% in response to its countermeasures.

3.      President Trump also invoked IEEPA and a purported national emergency arising from the trafficking of drugs and persons to impose, then pause, then re-impose, and then partially exempt, tariffs of up to 25% on Canada and Mexico, all in just over a month in February and March 2025.

4.      Tariffs, however, are not among the numerous actions that IEEPA authorizes the President to take under a declared emergency; indeed, the word "tariff" does not appear in the relevant statute at all.  *See* 50 U.S.C. § 1702.  And no President has previously relied on IEEPA to impose tariffs in the half a century since its enactment.

5.      The United States Constitution vests the authority to impose tariffs in Congress, *see* U.S. Const. art. I, § 8, and Congress has enacted numerous statutes delegating tariff authority to the President that expressly authorize imposition of tariffs, generally following required process and notice.

6.      Rather than comply with the process and notice requirements set forth in those statutes, President Trump issued over a dozen executive orders invoking IEEPA, under the view that IEEPA grants him unilateral authority to impose unprecedented tariffs.

7.      President Trump's new tariff regime has already had devastating impacts on the economy, creating chaos in the stock and bond markets, wiping out hundreds of billions of dollars in market capitalization in hours, chilling investment in the face of such consequential Presidential action with no notice or process, and threatening to push the country into recession. These harms will only continue to grow, as President Trump's tariffs are projected to shrink the

1

1   economy by $100 billion annually.[1]

2       8.      As the fifth largest economy in the world, the State of California, along with its

3   residents and small businesses, is directly harmed by the tariffs.  All will face higher costs due to

4   the 10% universal tariffs now in effect on virtually all imported goods and the substantial

5   additional tariffs imposed on Chinese, Mexican, and Canadian goods, with even higher costs

6   threatened by the still-looming reciprocal tariffs.  And certain industries and businesses, including

7   agriculture and entertainment, now face retaliatory tariffs imposed by China and threatened by

8   other countries.

9       9.      Under our constitutional system, the President may not rule by fiat.  Instead, "[t]he

10  President's power, if any, to issue [an] order must stem either from an act of Congress or from the

11  Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

12      10.     And where the economic and political significance is as staggering, and the power

13  asserted is so novel and transformative as it is with the unprecedented tariffs that President Trump

14  has imposed here, the President must have "clear congressional authorization" to justify his

15  executive actions.  *Biden v. Nebraska*, 600 U.S. 477, 506 (2023).

16      11.     IEEPA provides no such clear congressional authorization for President Trump's

17  tariffs, nor the vast expansion of Presidential power to tax all goods entering the United States on

18  a whim.

19      12.     Through this action, the State of California and California Governor Gavin Newsom

20  seek declaratory and injunctive relief to block the tariffs imposed by President Trump pursuant to

21  IEEPA because they are not authorized by that statute.

22              **JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

23      13.     This Court has jurisdiction under 28 U.S.C. § 1331 (action arising under the

24  Constitution or laws of the United States).  An actual controversy exists between the parties

25  within the meaning of 28 U.S.C. § 2201(a), and the Court may grant declaratory relief, injunctive

26  _____

27  [1] *Where We Stand: The Fiscal, Economic, and Distributional Effects of All U.S. Tariffs Enacted in 2025 Through April 2*, THE BUDGET LAB AT YALE UNIV. (Apr. 2, 2025), https://budgetlab.

28  yale.edu/research/where-we-stand-fiscal-economic-and-distributional-effects-all-us-tariffs-enacted-2025-through-april.

1    relief, and other relief against Defendants pursuant to 28 U.S.C. §§ 2201–02 and the Court's

2    equitable powers.

3           14.    Venue is proper in this District under 28 U.S.C. § 1391(e) because this is a judicial

4    district in which the State of California resides.

5           15.    Under Civil Local Rules 3-2(c) and 3-5(b), Plaintiffs allege that there is no basis for

6    assignment of this action to any particular location or division of this Court.

7                                              **PARTIES**

8           16.    Plaintiff State of California, by and through Attorney General Rob Bonta, brings this

9    action as a sovereign state in the United States of America.  The Attorney General is the chief law

10   officer of the State and has the authority to file civil actions in order to protect public rights and

11   interests.  Cal. Const. art. V, § 13; Cal. Gov't Code § 12511.  This challenge is brought under the

12   Attorney General's independent constitutional, statutory, and common-law authority to bring suit

13   and obtain relief on behalf of the State.

14          17.    Plaintiff Gavin Newsom is the Governor of California.  Governor Newsom brings this

15   challenge in his official capacity.

16          18.    Defendant Donald J. Trump is the President of the United States.  He is sued in his

17   official capacity.

18          19.    Defendant Kristi Noem is the Secretary of Homeland Security.  She is sued in her

19   official capacity.

20          20.    Defendant Department of Homeland Security (DHS) is an independent federal

21   agency.

22          21.    Defendant Pete R. Flores is the Acting Commissioner for U.S. Customs and Border

23   Protection (CBP).  He is sued in his official capacity.

24          22.    Defendant U.S. Customs and Border Protection is an independent federal agency.

25          23.    Defendants Noem, DHS, Flores, and CBP are collectively referred to as Agency

26   Defendants.

27

28

Complaint (No. 25-cv-_____)

129.   Corporate taxes are California's third-largest source of revenue—for 2024–2025, the State expects almost 15% of its $228.2 billion budget to be funded by corporate taxes.  As President's Trump's tariffs are projected to shrink the U.S. economy by $100 billion annually, millions of California's businesses will see their profits decline, translating to diminished revenue to fund the State's budget.

130.   Additionally, projections also show the average American family will face increased costs of $2,100 on average, translating to a population with significantly decreased income and purchasing power.  These losses would in turn decrease personal-income-tax revenue, the State's largest source of revenue, and sales and use taxes, the State's second largest source of revenue, drastically impacting the State's budget.

131.   The projected financial impacts from President Trump's tariffs are also likely to raise the cost of State economic-assistance programs, such as unemployment and similar benefits.

132.   Finally, the tariffs also impede the Governor's policy goals and his ability to effectuate the Legislature's priorities.

133.   All told, President Trump's tariffs will transform the State of California's economic situation, put at risk its position as the fifth largest economy in the world, and directly impact Governor Newsom's ability to deliver on his policy goals for all Californians.

## **CLAIMS FOR RELIEF**

### **COUNT I**
### ***Ultra Vires* - Conduct in Excess of Statutory Authority**
### **(Against All Defendants)**

134.   Plaintiffs incorporate each and every one of the preceding allegations as if alleged herein.

135.   President Trump has claimed a wholly unconstrained authority to unilaterally impose unprecedented tariffs on every single trading partner of the United States.

136.   The President does not have the authority to act unilaterally.

137.   Rather, "[t]he President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself."  *Youngstown*, 343 U.S. at 585.

138.   President Trump cites IEEPA as the statutory authority for his tariffs.

139. IEEPA does not authorize President Trump to issue the IEEPA Tariff Orders.

140. Accordingly, President Trump's conduct in issuing the IEEPA Tariff Orders has been *ultra vires*.

141. Agency Defendants' conduct in implementing the tariffs that President Trump has imposed has been *ultra vires*.

142. Defendants' *ultra vires* conduct has caused and will continue to cause ongoing, irreparable harm to California, its Governor, and its residents.

143. Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the IEEPA Tariff Orders are unlawful, void, and of no effect.

144. Pursuant to 28 U.S.C. §§ 2201–02, Plaintiffs are entitled to injunctive relief, enjoining all Defendants (other than the President) and their officers, employees, agents, servants, attorneys, and others acting in concert with them or subject to their control or direction, from implementing or enforcing the IEEPA Tariff Orders.

**COUNT II**
**Separation of Powers – Usurping Legislative Authority**
**(Against All Defendants)**

145. Plaintiffs incorporate the preceding allegations as if alleged herein.

146. The separation-of-powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies." *Seila Law LLC v. CFPB*, 591 U.S. 197, 227 (2020).

147. The Constitution provides that "Congress shall have the Power To lay and collect Taxes, Duties, Imposts and Excises . . . ." U.S. Const. art. I, § 8.

148. Congress's power in this area is exhaustive. *Brushaber*, 240 U.S. at 12 ("the authority conferred upon Congress by § 8 of article 1 'to lay and collect taxes, duties, imposts and excises' is exhaustive and embraces every conceivable power of taxation").

149. "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585.

150. Where, as here, the President or the Executive Branch usurps and exercises a power that the Constitution has vested in Congress that Congress has not validly granted them, it

20

1  violates the separation-of-powers doctrine.

2      151.  Accordingly, President Trump's conduct in issuing the IEEPA Tariff Orders violates

3  the separation-of-powers doctrine.

4      152.  Agency Defendants' conduct in implementing the tariffs that President Trump has

5  imposed violates the separation-of-powers doctrine.

6      153.  Defendants' unconstitutional conduct has caused and will continue to cause ongoing,

7  irreparable harm to California, its Governor, and its residents.

8      154.  Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the IEEPA

9  Tariff Orders are unlawful, void, and of no effect.

10      155.  Pursuant to 28 U.S.C. §§ 2201–02, Plaintiffs are entitled to injunctive relief,

11  enjoining all Defendants (other than the President) and their officers, employees, agents, servants,

12  attorneys, and others acting in concert with them or subject to their control or direction, from

13  implementing or enforcing the IEEPA Tariff Orders.

14  **PRAYER FOR RELIEF**

15      WHEREFORE, Plaintiffs State of California, by and through Attorney General Rob Bonta,

16  and Gavin Newsom, in his official capacity as Governor of California, respectfully request that

17  this Court:

18      1.    Declare that President Trump's IEEPA Tariff Orders are unlawful and void, because

19  they were issued *ultra vires* in excess of statutory authority and/or because they are

20  unconstitutional and violate separation of powers, pursuant to the Declaratory Judgment Act,

21  28 U.S.C. §§ 2201–02;

22      2.    Enjoin Agency Defendants (and all of their officers, employees, agents, servants,

23  attorneys, and others acting in concert with them or subject to their control or direction) from

24  taking any action to implement or enforce President Trump's IEEPA Tariff Orders;

25      3.    Award Plaintiffs costs, expenses, and reasonable attorney's fees, pursuant to the

26  Equal Access to Justice Act, 28 U.S.C. § 2412; and

27      4.    Grant such other relief as the Court deems just and proper.

28

1  ROB BONTA
   Attorney General of California
2  THOMAS S. PATTERSON
   Senior Assistant Attorney General
3  LARA HADDAD
   Supervising Deputy Attorney General
4  SHIWON CHOE (SB 320041)
   CAROLYN F. DOWNS (SB 353455)
5  ZELDA VASSAR (SB 313789)
   Deputy Attorneys General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 510-4400
     Fax:  (415) 703-5480
8    E-mail:  Shiwon.Choe@doj.ca.gov
             Carolyn.Downs@doj.ca.gov
9            Zelda.Vassar@doj.ca.gov
   *Attorneys for Plaintiffs State of California and*
10 *Gavin Newsom, in his official capacity as Governor*
   *of California*

11

12                 IN THE UNITED STATES DISTRICT COURT

13                FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                        SAN FRANCISCO DIVISION

15

16

17  **STATE OF CALIFORNIA and GAVIN**        Case No. 3:25-cv-03372-JSC
    **NEWSOM, in his official capacity as**
18  **Governor of California,**

19                          Plaintiffs,       **PLAINTIFFS' NOTICE OF APPEAL**

20          v.

21
    **DONALD J. TRUMP, in his official capacity**
22  **as President of the United States, et al.,**

23                          Defendants.

24

25

26

27

28

1     PLEASE TAKE NOTICE that Plaintiffs State of California and Gavin Newsom, in his

2 official capacity as Governor of California, hereby appeal to the United States Court of Appeals

3 for the Ninth Circuit from this Court's Order re: Motion for Transfer (ECF No. 62) and Judgment

4 (ECF No. 63).

5

6 Dated:  June 2, 2025                              Respectfully submitted,

7                                                   ROB BONTA
                                                    Attorney General of California
8                                                   THOMAS S. PATTERSON
                                                    Senior Assistant Attorney General
9                                                   LARA HADDAD
                                                    Supervising Deputy Attorney General
10
                                                    *s/Shiwon Choe*
11                                                  SHIWON CHOE
                                                    ZELDA VASSAR
12                                                  CAROLYN F. DOWNS
                                                    Deputy Attorneys General
13                                                  *Attorneys for Plaintiffs State of California*
                                                    *and Gavin Newsom, in his official capacity*
14                                                  *as Governor of California*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

ADRMOP,APPEAL,CLOSED

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:25–cv–03372–JSC

State of California et al v. Trump et al
Assigned to: Judge Jacqueline Scott Corley
Case in other court:  USCA for Ninth Circuit, 25–03493
Cause: 28:2201 Declaratory Judgement

Date Filed: 04/16/2025
Date Terminated: 06/02/2025
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**State of California**                     represented by  **Carolyn Downs**
California Department of Justice
300 S. Spring Street
Suite 1702
Los Angeles, CA 90013
213–269–6720
Fax: 916–731–2124
Email: carolyn.downs@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Lara Haddad**
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269–6250
Email: lara.haddad@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Shiwon Choe**
California Attorney General's Office
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
415–510–3835
Email: shiwon.choe@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Zelda Rose Vassar**
Attorney General's Office
California Department of Justice
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
415–510–3875
Email: zelda.vassar@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gavin Newsom**                            represented by  **Carolyn Downs**
*in his official capacity as Governor of*                   (See above for address)
*California*                                                *ATTORNEY TO BE NOTICED*

**Lara Haddad**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shiwon Choe**
(See above for address)
*ATTORNEY TO BE NOTICED*

ER-054

**Zelda Rose Vassar**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**Donald J. Trump**
*in his official capacity as President of the United States*

represented by **Luke Mathers**
DOJ–Civ
26 Federal Plaza
Ste 346
New York, NY 10278
212–264–9236
Email: luke.mathers@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric J Hamilton**
DOJ–Civ
950 Pennsylvania Avenue NW
Washington, DC 20530
202–514–3301
Email: eric.hamilton@usdoj.gov
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Kristi Noem**
*in her official capacity as Secretary of Homeland Security*

represented by **Luke Mathers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric J Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Department of Homeland Security**

represented by **Luke Mathers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric J Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Pete R. Flores**
*in his official capacity as Acting Commissioner for U.S. Customs and Border Protection*

represented by **Luke Mathers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric J Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**U.S. Customs and Border Protection**

represented by **Luke Mathers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Eric J Hamilton
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**America First Legal Foundation**          represented by     **Scott James Street**
JW Howard/Attorneys
201 South Lake Avenue
Suite 303
Pasadena, CA 91101
213–205–2800
Email: sstreet@jwhowardattorneys.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**George F Allen**          represented by     **Warrington S. Parker , III**
Crowell & Moring LLP
3 Embarcadero Center, 26 Fl.
San Francisco, CA 94111
415–986–2800
Fax: 415–986–2827
Email: wparker@crowell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W McConnell**
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304
650–493–9300
Email: mmconnell@wsgr.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Steven Calabresi**          represented by     **Warrington S. Parker , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W McConnell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Joshua A Clabourn**          represented by     **Warrington S. Parker , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W McConnell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**John C. Danforth**          represented by     **Warrington S. Parker , III**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Michael W McConnell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Richard A. Epstein**          represented by  **Warrington S. Parker , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W McConnell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Charles T. Hagel**          represented by  **Warrington S. Parker , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W McConnell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Harold Hongju Koh**          represented by  **Warrington S. Parker , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W McConnell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Gerard N. Magliocca**          represented by  **Warrington S. Parker , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W McConnell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Michael W. McConnell**          represented by  **Warrington S. Parker , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W McConnell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**ER-057**

**Amicus**

**Michael B. Mukasey**                    represented by   **Warrington S. Parker , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W McConnell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Alan Sykes**                    represented by   **Warrington S. Parker , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W McConnell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**John Daniel Tinder**                    represented by   **Warrington S. Parker , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W McConnell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Peter Wallison**                    represented by   **Warrington S. Parker , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W McConnell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Philip Zelikow**                    represented by   **Warrington S. Parker , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W McConnell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Brennan Center for Justice at NYU**
**School of Law**                    represented by   **Leah Tulin**
Brennan Center for Justice at NYU School
of Law
1140 Connecticut Avenue NW
Suite 1150

Washington, DC 20036
202–650–6397
Email: tulinl@brennan.law.nyu.edu
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Loren Kieve**
Kieve Law Offices
2121 Broadway
Ste Unit 3
San Francisco, CA 94115
415–425–2655
Email: lk@kievelaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Goitein**
Brennan Center for Justice at NYU School
of Law
1140 Connecticut Ave NW
Ste 1150
Washington, DC 20036
202–249–7192
Email: goiteine@brennan.law.nyu.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hannah James**
Brennan Center for Justice
1140 Connecticut Ave
Ste 1150
Washington, DC 20036
310–955–7304
Email: jamesh@brennan.law.nyu.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Consumer Watchdog**                     represented by **William Pletcher**
Consumer Watchdog
6330 San Vicente Blvd.
Suite 250
Los Angeles, CA 90048
310–392–0522
Email: will@consumerwatchdog.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan Butler Morrison**
George Washington Law School
2000 H Street NW
Washington, DC 20052
202–994–7120
Email: abmorrison@law.gwu.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Donald Cameron**
Morris, Manning & Martin, LLP
1333 New Hampshire Avenue, NW
Suite 800
Washington, DC 20036
202–216–4811

Email: dcameron@mmmlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edward John Thomas , III**
Morris, Manning & Martin LLP
1333 New Hampshire Avenue NW
Suite 800
Washington, DC 20036
202–216–4110
Email: ethomas@mmmlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Harvey Jay Rosenfield**
Consumer Watchdog
6330 San Vicente Blvd.
Suite 250
Los Angeles, CA 90048
310–392–0522
Email: harvey@consumerwatchdog.org
*ATTORNEY TO BE NOTICED*

**R. Will Planert**
Morris, Manning & Martin, LLP
1333 New Hampshire Avenue, NW
Suite 800
Washington, DC 20036
202–216–4819
Email: wplanert@mmmlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Consumer Watchdog**      represented by    **William Pletcher**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Harvey Jay Rosenfield**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/05/2025 | 67 | Transcript Designation Form for proceedings held on May 27, 2025 before Judge Jacqueline Scott Corley, (Choe, Shiwon) (Filed on 6/5/2025) (Entered: 06/05/2025) |
| 06/03/2025 | 66 | USCA for Ninth Circuit case number 25–3493 for 64 Notice of Appeal to the Ninth Circuit, filed by State of California, Gavin Newsom. (kxo, COURT STAFF) (Filed on 6/3/2025) (Entered: 06/04/2025) |
| 06/03/2025 | 65 | Statement *(9th Circuit Form 6 Representation Statement)* by State of California, Gavin Newsom. (Choe, Shiwon) (Filed on 6/3/2025) (Entered: 06/03/2025) |
| 06/02/2025 | 64 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by State of California, Gavin Newsom. Appeal of Order on Motion to Transfer Case 62 , Judgment 63 (Appeal fee of $605 receipt number ACANDC–20743708 paid.) (Choe, Shiwon) (Filed on 6/2/2025) (Entered: 06/02/2025) |
| 06/02/2025 | 63 | **JUDGMENT. Signed by Judge Jacqueline Scott Corley on 6/2/2025. (ahm, COURT STAFF) (Filed on 6/2/2025) (Entered: 06/02/2025)** |

| | | |
|---|---|---|
| 06/02/2025 | 62 | **ORDER by Judge Jacqueline Scott Corley denying 9 Motion to Transfer Case. (ahm, COURT STAFF) (Filed on 6/2/2025) (Entered: 06/02/2025)** |
| 05/30/2025 | 61 | **ORDER by Judge Jacqueline Scott Corley granting 59 Motion for Leave to File Supplemental Brief. (ahm, COURT STAFF) (Filed on 5/30/2025) (Entered: 05/30/2025)** |
| 05/30/2025 | 60 | Transcript of Proceedings held on May 27, 2025, before Judge Jacqueline Scott Corley. Stenographic Court Reporter Ana Dub, RDR, CRR, telephone number 415–290–1651/ana_dub@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date, it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 56 Transcript Order ) Release of Transcript Restriction set for 8/28/2025. (Related documents(s) 56 ) (amd, COURT STAFF) (Filed on 5/30/2025) (Entered: 05/30/2025) |
| 05/30/2025 | 59 | MOTION for Leave to File *Supplemental Brief* filed by Donald J. Trump, Kristi Noem, Department of Homeland Security, Pete R. Flores, U.S. Customs and Border Protection. (Attachments: # 1 Proposed Supplemental Brief, # 2 Declaration in Support of Administrative Motion, # 3 Proposed Order)(Mathers, Luke) (Filed on 5/30/2025) (Entered: 05/30/2025) |
| 05/29/2025 | 58 | STATEMENT OF RECENT DECISION pursuant to Civil Local Rule 7–3.d filed byState of California, Gavin Newsom. (Attachments: # 1 V.O.S. Selections, Inc. v. United States and Oregon v. U.S. Dep't of Homeland Sec., # 2 Learning Res., Inc. v. Trump)(Choe, Shiwon) (Filed on 5/29/2025) (Entered: 05/29/2025) |
| 05/28/2025 | 57 | **ORDER by Judge Jacqueline Scott Corley granting 52 Motion to File Amicus Curiae Brief.**<br><br>The Court grants the unopposed motion of Consumer Watchdog for leave to file an amicus brief. The Court accepts as filed the amicus brief at Docket No. 52.<br><br>**(This is a text–only entry generated by the court. There is no document associated with this entry.)**<br><br>(ahm, COURT STAFF) (Filed on 5/28/2025) (Entered: 05/28/2025) |
| 05/27/2025 | 56 | TRANSCRIPT ORDER for proceedings held on 5/27/2025 before Judge Jacqueline Scott Corley by State of California, Gavin Newsom, for Court Reporter Ana Dub. (Choe, Shiwon) (Filed on 5/27/2025) (Entered: 05/27/2025) |
| 05/27/2025 | 55 | OPPOSITION/RESPONSE (re 15 MOTION for Preliminary Injunction ) filed byDonald J. Trump, Kristi Noem, Department of Homeland Security, Pete R. Flores, U.S. Customs and Border Protection. (Attachments: # 1 Exhibit V.O.S. Selections, Inc. v. Trump (CIT) – Transcript of Hearing, # 2 Declaration of Secretary of State Marco Rubio, # 3 Declaration of Secretary of the Treasury Scott K. H. Bessent, # 4 Declaration of Secretary of Commerce Howard W. Lutnick, # 5 Declaration of United States Trade Representative Jamieson Lee Greer)(Mathers, Luke) (Filed on 5/27/2025) (Entered: 05/27/2025) |
| 05/27/2025 | 54 | **Minute Entry for proceedings held before Judge Jacqueline Scott Corley: Motion Hearing held on 5/27/2025 re 9 Defendants' Motion to Transfer Case to the U.S. Court of International Trade. The motion was argued, submitted, and taken under submission.**<br><br>Court Reporter: Ana Dub/Time 10:30 – 11:21<br><br>Attorneys for Plaintiff: Shiwon Choe/Carolyn Downs/ Zelda Vassar<br>Attorneys for Defendant: Eric J. Hamilton/Kelsey Helland<br><br>**(This is a text–only entry generated by the court. There is no document associated with this entry.)**<br><br>(ahm, COURT STAFF) (Date Filed: 5/27/2025) (Entered: 05/27/2025) |

| | | |
|---|---|---|
| 05/23/2025 | 53 | ERRATA re 15 MOTION for Preliminary Injunction by State of California, Gavin Newsom. (Vassar, Zelda) (Filed on 5/23/2025) (Entered: 05/23/2025) |
| 05/23/2025 | 52 | MOTION to File Amicus Curiae Brief *and Proposed Amicus Brief* filed by Consumer Watchdog. Responses due by 6/6/2025. Replies due by 6/13/2025. (Attachments: # 1 Exhibit Addendum)(Pletcher, William) (Filed on 5/23/2025) (Entered: 05/23/2025) |
| 05/23/2025 | 51 | STATEMENT OF RECENT DECISION pursuant to Civil Local Rule 7–3.d filed by Donald J. Trump, Kristi Noem, Department of Homeland Security, Pete R. Flores, U.S. Customs and Border Protection. (Attachments: # 1 U.S. Court of International Trade Jurisdictional Ruling)(Mathers, Luke) (Filed on 5/23/2025) (Entered: 05/23/2025) |
| 05/22/2025 | 50 | NOTICE of Appearance filed by Harvey Jay Rosenfield on behalf of Consumer Watchdog (Rosenfield, Harvey) (Filed on 5/22/2025) (Entered: 05/22/2025) |
| 05/22/2025 | 49 | NOTICE of Appearance filed by William Pletcher on behalf of Consumer Watchdog (Pletcher, William) (Filed on 5/22/2025) (Entered: 05/22/2025) |
| 05/22/2025 | 48 | NOTICE of Appearance filed by Eric J Hamilton on behalf of Donald J. Trump, Kristi Noem, Department of Homeland Security, Pete R. Flores, U.S. Customs and Border Protection (Hamilton, Eric) (Filed on 5/22/2025) (Entered: 05/22/2025) |
| 05/22/2025 | 47 | **ORDER by Judge Jacqueline Scott Corley granting 43 Motion for Pro Hac Vice as to Alan Morrison. (ahm, COURT STAFF) (Filed on 5/22/2025) (Entered: 05/22/2025)** |
| 05/22/2025 | 46 | **ORDER by Judge Jacqueline Scott Corley granting 42 Motion for Pro Hac Vice as to Donald B. Cameron, Jr. (ahm, COURT STAFF) (Filed on 5/22/2025) (Entered: 05/22/2025)** |
| 05/22/2025 | 45 | **ORDER by Judge Jacqueline Scott Corley granting 41 Motion for Pro Hac Vice as to R. Will Planert. (ahm, COURT STAFF) (Filed on 5/22/2025) (Entered: 05/22/2025)** |
| 05/22/2025 | 44 | **ORDER by Judge Jacqueline Scott Corley granting 40 Motion for Pro Hac Vice as to Edward Thomas. (ahm, COURT STAFF) (Filed on 5/22/2025) (Entered: 05/22/2025)** |
| 05/21/2025 | 43 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC−20705898.) filed by Consumer Watchdog. (Morrison, Alan) (Filed on 5/21/2025) (Entered: 05/21/2025) |
| 05/21/2025 | 42 | MOTION for leave to appear in Pro Hac Vice *for Donald B. Cameron, Jr.* ( Filing fee $ 328, receipt number ACANDC−20705531.) filed by Consumer Watchdog. (Attachments: # 1 Certificate of Good Standing)(Cameron, Donald) (Filed on 5/21/2025) (Entered: 05/21/2025) |
| 05/21/2025 | 41 | MOTION for leave to appear in Pro Hac Vice *for R. Will Planert* ( Filing fee $ 328, receipt number ACANDC−20705511.) filed by Consumer Watchdog. (Attachments: # 1 Certificate of Good Standing)(Planert, R. Will) (Filed on 5/21/2025) (Entered: 05/21/2025) |
| 05/21/2025 | 40 | MOTION for leave to appear in Pro Hac Vice *for Edward J. Thomas III* ( Filing fee $ 328, receipt number ACANDC−20705327.) filed by Consumer Watchdog. (Attachments: # 1 Certificate of Good Standing)(Thomas, Edward) (Filed on 5/21/2025) (Entered: 05/21/2025) |
| 05/21/2025 | 39 | **ORDER by Judge Jacqueline Scott Corley granting 31 Motion for Pro Hac Vice as to Leah Tulin. (ahm, COURT STAFF) (Filed on 5/21/2025) (Entered: 05/21/2025)** |
| 05/21/2025 | 38 | **ORDER by Judge Jacqueline Scott Corley granting 30 Motion for Pro Hac Vice as to Elizabeth Goitein. (ahm, COURT STAFF) (Filed on 5/21/2025) (Entered: 05/21/2025)** |
| 05/21/2025 | 37 | **ORDER by Judge Jacqueline Scott Corley granting 29 Motion for Pro Hac Vice as to Hannah James. (ahm, COURT STAFF) (Filed on 5/21/2025) (Entered: 05/21/2025)** |

| | | |
|---|---|---|
| 05/21/2025 | 36 | **ORDER by Judge Jacqueline Scott Corley granting 26 Motion for Pro Hac Vice as to Michael McConnell. (ahm, COURT STAFF) (Filed on 5/21/2025) (Entered: 05/21/2025)** |
| 05/21/2025 | 35 | STATEMENT OF RECENT DECISION pursuant to Civil Local Rule 7–3.d filed byDonald J. Trump, Kristi Noem, Department of Homeland Security, Pete R. Flores, U.S. Customs and Border Protection. (Attachments: # 1 Order Granting Transfer to the U.S. Court of International Trade, # 2 Order Denying Stay Pending Appeal of Transfer Order)(Mathers, Luke) (Filed on 5/21/2025) (Entered: 05/21/2025) |
| 05/21/2025 | 34 | **ORDER by Judge Jacqueline Scott Corley granting 33 Motion to File Amicus Curiae Brief.**<br><br>The Court grants the unopposed motion of The Brennan Center for Justice at New York University School of Law for leave to file an amicus brief. The Court accepts as filed the amicus brief at Docket No. 33–1.<br><br>**(This is a text–only entry generated by the court. There is no document associated with this entry.)**<br><br>(ahm, COURT STAFF) (Filed on 5/21/2025) (Entered: 05/21/2025) |
| 05/20/2025 | 33 | MOTION to File Amicus Curiae Brief filed by Brennan Center for Justice at NYU School of Law. Motion Hearing set for 5/27/2025 10:30 AM in San Francisco, Courtroom 08, 19th Floor before Judge Jacqueline Scott Corley. Responses due by 6/3/2025. Replies due by 6/10/2025. (Attachments: # 1 Brief of Proposed Amicus Curiae Brennan Center for Justice)(Tulin, Leah) (Filed on 5/20/2025) (Entered: 05/20/2025) |
| 05/20/2025 | 32 | NOTICE of Appearance filed by Loren Kieve on behalf of Brennan Center for Justice at NYU School of Law (Kieve, Loren) (Filed on 5/20/2025) (Entered: 05/20/2025) |
| 05/20/2025 | 31 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC–20701535.) filed by Brennan Center for Justice at NYU School of Law. (Tulin, Leah) (Filed on 5/20/2025) (Entered: 05/20/2025) |
| 05/20/2025 | 30 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC–20700828.) filed by Brennan Center for Justice at NYU School of Law. (Goitein, Elizabeth) (Filed on 5/20/2025) (Entered: 05/20/2025) |
| 05/20/2025 | 29 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC–20700529.) filed by Brennan Center for Justice at NYU School of Law. (James, Hannah) (Filed on 5/20/2025) (Entered: 05/20/2025) |
| 05/20/2025 | 28 | **ORDER by Judge Jacqueline Scott Corley granting 25 Motion to File Amicus Curiae Brief.**<br><br>The Court grants the unopposed motion of George F. Allen, Steven G. Calabresi, Joshua A. Claybourn, John C. Danforth, Richard A. Epstein, Charles T. Hagel, Harold Hongju Koh, Gerard N. Magliocca, Michael W. McConnell, Michael B. Mukasey, Alan O. Sykes, Judge John Daniel Tinder, Peter J. Wallison, and Philip Zelikow for leave to file an amicus brief. The Court accepts as filed the amicus brief at Docket No. 25–1.<br><br>**(This is a text–only entry generated by the court. There is no document associated with this entry.)**<br><br>(ahm, COURT STAFF) (Filed on 5/20/2025) Modified on 5/21/2025 (ahm, COURT STAFF). (Entered: 05/20/2025) |
| 05/20/2025 | 27 | NOTICE of Appearance filed by Lara Haddad on behalf of State of California, Gavin Newsom (Haddad, Lara) (Filed on 5/20/2025) (Entered: 05/20/2025) |
| 05/19/2025 | 26 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC–20694961.) filed by Gerard N. Magliocca, Michael W. McConnell, Michael B. Mukasey, Alan Sykes, John Daniel Tinder, Peter Wallison, Philip Zelikow, George F Allen, Steven Calabresi, Joshua A Clabourn, John C. Danforth, Richard A. Epstein, Charles T. Hagel, Harold Hongju Koh. (McConnell, Michael) (Filed on |

| | | 5/19/2025) (Entered: 05/19/2025) |
|---|---|---|
| 05/19/2025 | 25 | MOTION to File Amicus Curiae Brief filed by George F Allen, Steven Calabresi, Joshua A Clabourn, John C. Danforth, Richard A. Epstein, Charles T. Hagel, Harold Hongju Koh, Gerard N. Magliocca, Michael W. McConnell, Michael B. Mukasey, Alan Sykes, John Daniel Tinder, Peter Wallison, Philip Zelikow. Motion Hearing set for 6/26/2025 10:00 AM in San Francisco, Courtroom 08, 19th Floor before Judge Jacqueline Scott Corley. Responses due by 6/2/2025. Replies due by 6/9/2025. (Attachments: # 1 Exhibit 1 – Joint Brief of Amici Curiae in Support of Plaintiffs' Motion for Preliminary Injunction, # 2 Proposed Order)(Parker, Warrington) (Filed on 5/19/2025) (Entered: 05/19/2025) |
| 05/15/2025 | | Set/Reset Deadlines as to 9 MOTION to Transfer Case *to the U.S. Court of International Trade*. Motion Hearing reset for 5/27/2025 at 10:30 a.m. in San Francisco, Courtroom 08, 19th Floor before Judge Jacqueline Scott Corley. (ahm, COURT STAFF) (Filed on 5/15/2025) (Entered: 05/15/2025) |
| 05/15/2025 | 24 | **ORDER by Judge Jacqueline Scott Corley granting as modified 23 Stipulation to Continue Hearing on Defendants' Motion to Transfer to the U.S. Court of International Trade. The hearing is continued to May 27, 2025 at 10:30 a.m. in San Francisco.** (This is a text–only entry generated by the court. There is no document associated with this entry.) (ahm, COURT STAFF) (Filed on 5/15/2025) (Entered: 05/15/2025) |
| 05/14/2025 | 23 | STIPULATION WITH PROPOSED ORDER *to continue hearing on defendants' motion to transfer to May 29, 2025,* filed by Donald J. Trump, Kristi Noem, Department of Homeland Security, Pete R. Flores, U.S. Customs and Border Protection. (Mathers, Luke) (Filed on 5/14/2025) (Entered: 05/14/2025) |
| 05/13/2025 | 22 | Declaration of Colby White in Support of 15 MOTION for Preliminary Injunction filed byState of California, Gavin Newsom. (Related document(s) 15 ) (Vassar, Zelda) (Filed on 5/13/2025) (Entered: 05/13/2025) |
| 05/13/2025 | 21 | Declaration of Dr. Somjita Mitra in Support of 15 MOTION for Preliminary Injunction filed byState of California, Gavin Newsom. (Related document(s) 15 ) (Vassar, Zelda) (Filed on 5/13/2025) (Entered: 05/13/2025) |
| 05/13/2025 | 20 | Declaration of Jesse Bignami in Support of 15 MOTION for Preliminary Injunction filed byState of California, Gavin Newsom. (Related document(s) 15 ) (Vassar, Zelda) (Filed on 5/13/2025) (Entered: 05/13/2025) |
| 05/13/2025 | 19 | Declaration of Lori Bradley in Support of 15 MOTION for Preliminary Injunction filed byState of California, Gavin Newsom. (Related document(s) 15 ) (Vassar, Zelda) (Filed on 5/13/2025) (Entered: 05/13/2025) |
| 05/13/2025 | 18 | Declaration of Angela Shell in Support of 15 MOTION for Preliminary Injunction filed byState of California, Gavin Newsom. (Related document(s) 15 ) (Vassar, Zelda) (Filed on 5/13/2025) (Entered: 05/13/2025) |
| 05/13/2025 | 17 | Declaration of Erica York in Support of 15 MOTION for Preliminary Injunction filed byState of California, Gavin Newsom. (Attachments: # 1 Exhibit 1)(Related document(s) 15 ) (Vassar, Zelda) (Filed on 5/13/2025) (Entered: 05/13/2025) |
| 05/13/2025 | 16 | Declaration of Dr. Kimberly Clausing in Support of 15 MOTION for Preliminary Injunction filed byState of California, Gavin Newsom. (Attachments: # 1 Exhibit 1)(Related document(s) 15 ) (Vassar, Zelda) (Filed on 5/13/2025) (Entered: 05/13/2025) |
| 05/13/2025 | 15 | MOTION for Preliminary Injunction filed by State of California, Gavin Newsom. Motion Hearing set for 6/26/2025 10:00 AM in San Francisco, Courtroom 08, 19th Floor before Judge Jacqueline Scott Corley. Responses due by 5/27/2025. Replies due by 6/3/2025. (Attachments: # 1 Proposed Order)(Vassar, Zelda) (Filed on 5/13/2025) |

| | | (Entered: 05/13/2025) |
|---|---|---|
| 05/08/2025 | 14 | REPLY (re 9 MOTION to Transfer Case *to the U.S. Court of International Trade* ) filed byDonald J. Trump, Kristi Noem, Department of Homeland Security, Pete R. Flores, U.S. Customs and Border Protection. (Mathers, Luke) (Filed on 5/8/2025) (Entered: 05/08/2025) |
| 05/07/2025 | 13 | CERTIFICATE OF SERVICE by State of California, Gavin Newsom re 7 Summons Issued, 1 Complaint, 6 Initial Case Management Scheduling Order with ADR Deadlines,, (Choe, Shiwon) (Filed on 5/7/2025) (Entered: 05/07/2025) |
| 05/01/2025 | 12 | OPPOSITION/RESPONSE (re 9 MOTION to Transfer Case *to the U.S. Court of International Trade* ) filed byState of California, Gavin Newsom. (Choe, Shiwon) (Filed on 5/1/2025) (Entered: 05/01/2025) |
| 04/23/2025 | 11 | **ORDER issued by Judge Jacqueline Scott Corley on 4/23/2025.** The Court grants America First Legal Foundation's unopposed motion for leave to file an amicus curiae brief. The Court accepts as filed the amicus brief at Docket No. 10−1.<br><br>**(This is a text−only entry generated by the court. There is no document associated with this entry.)**<br><br>(ahm, COURT STAFF) (Filed on 4/23/2025) (Entered: 04/23/2025) |
| 04/23/2025 | 10 | MOTION to File Amicus Curiae Brief *Unopposed Motion for Leave to File Amicus Curiae Brief ISO Defendants' Motion to Transfer* filed by America First Legal Foundation. Responses due by 5/7/2025. Replies due by 5/14/2025. (Attachments: # 1 Brief of Amicus Curiae America First Legal Foundation ISO Defendants' Motion to Transfer)(Street, Scott) (Filed on 4/23/2025) (Entered: 04/23/2025) |
| 04/17/2025 | 9 | MOTION to Transfer Case *to the U.S. Court of International Trade* filed by Donald J. Trump, Kristi Noem, Department of Homeland Security, Pete R. Flores, U.S. Customs and Border Protection. Motion Hearing set for 5/22/2025 10:00 AM in San Francisco, Courtroom 08, 19th Floor before Judge Jacqueline Scott Corley. Responses due by 5/1/2025. Replies due by 5/8/2025. (Attachments: # 1 Proposed Order)(Mathers, Luke) (Filed on 4/17/2025) (Entered: 04/17/2025) |
| 04/17/2025 | 8 | NOTICE of Appearance filed by Luke Mathers on behalf of Donald J. Trump, Kristi Noem, Department of Homeland Security, Pete R. Flores, U.S. Customs and Border Protection (Mathers, Luke) (Filed on 4/17/2025) (Entered: 04/17/2025) |
| 04/17/2025 | 7 | Summons Issued as to Department of Homeland Security, Pete R. Flores, Kristi Noem, Donald J. Trump, U.S. Customs and Border Protection. (kxo, COURT STAFF) (Filed on 4/17/2025) (Entered: 04/17/2025) |
| 04/16/2025 | 6 | **Initial Case Management Scheduling Order with ADR Deadlines: Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order 65 and cand.uscourts.gov/cameras. Case Management Statement due by 7/9/2025. Initial Case Management Conference set for 7/16/2025 02:00 PM in San Francisco, – Videoconference Only. (Attachments: # 1 Notice of Eligibility for Video Recording)(kxo, COURT STAFF) (Filed on 4/16/2025) (Entered: 04/17/2025)** |
| 04/16/2025 | 5 | Case assigned to Judge Jacqueline Scott Corley.<br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E−Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening.<br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. (amf, COURT STAFF) (Filed on 4/16/2025) (Entered: 04/16/2025) |

| 04/16/2025 | 4 | NOTICE of Appearance filed by Carolyn Downs on behalf of State of California, Gavin Newsom (Downs, Carolyn) (Filed on 4/16/2025) (Entered: 04/16/2025) |
|---|---|---|
| 04/16/2025 | 3 | Proposed Summons. (Vassar, Zelda) (Filed on 4/16/2025) (Entered: 04/16/2025) |
| 04/16/2025 | 2 | NOTICE of Appearance filed by Shiwon Choe on behalf of State of California, Gavin Newsom (Choe, Shiwon) (Filed on 4/16/2025) (Entered: 04/16/2025) |
| 04/16/2025 | 1 | COMPLAINT *For Declaratory and Injunctive Relief* against All Defendants ( Filing fee $ 405, receipt number ACANDC–20572147.).<br><br>Injunction against the US government/official or APA vacatur requested. Filed by State of California, Gavin Newsom. (Attachments: # 1 Civil Cover Sheet)(Vassar, Zelda) (Filed on 4/16/2025) (Entered: 04/16/2025) |