No. 25-3493

_____

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

THE STATE OF CALIFORNIA AND GOVERNOR GAVIN NEWSOM,
*Plaintiffs-Appellants,*

v.

DONALD J. TRUMP, et al.,
*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the Northern
District of California,
No. 3:25-cv-03372
The Honorable Jacqueline Scott Corley, District Judge

_____

BRIEF OF AMICI CURIAE GEORGE F. ALLEN, JOSHUA A.
CLAYBOURN, JOHN C. DANFORTH, RICHARD A. EPSTEIN,
CHARLES T. HAGEL, HAROLD HONGJU KOH, GERARD N.
MAGLIOCCA, MICHAEL B. MUKASEY, ALAN O. SYKES, JOHN
DANIEL TINDER, ALEXANDER VOLOKH, PETER J. WALLISON,
AND  PHILIP ZELIKOW IN SUPPORT OF PLAINTIFFS-
APPELLANTS AND REVERSAL

_____

Daniel W. Wolff
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2500
dwolff@crowell.com

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, amici curiae George F. Allen, Joshua A. Claybourn, John C. Danforth, Richard A. Epstein, Charles T. Hagel, Harold Hongju Koh, Gerard N. Magliocca, Michael B. Mukasey, Alan O. Sykes, John Daniel Tinder, Alexander "Sasha" Volokh, Peter J. Wallison, and Philip Zelikow are each individuals, not corporate entities, and are not subject to Rule 26.1.

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT ...............................................i

INTEREST OF AMICI CURIAE ..............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.........................2

ARGUMENT .........................................................................................7

I.     Congress, not the President, has the power to impose
      tariffs...........................................................................................7

II.    IEEPA does not authorize tariffs...............................................11

      A.     IEEPA does not mention tariffs—because it was
           never meant to allow them. ..................................................12

      B.     Congress deliberately rejected tariff authority in
           IEEPA. ...............................................................................18

      C.     The government's contrary arguments lack merit. ............24

      D.     Emergencies—even if real—do not change the
           analysis. .............................................................................28

      E.     These tariffs are permanent policy rather than
           emergency measures. ..........................................................30

      F.     No President has ever used IEEPA this way. ....................32

      G.     The Supreme Court has repeatedly rejected
           Executive Branch efforts to arrogate to itself
           sweeping power in the absence of clear text.......................33

CONCLUSION ...................................................................................37

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Association of Realtors v. HHS,*
    594 U.S. 758 (2021) ....................................................................... 34, 35

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ....................................................................... 32, 34

*INS v. Chadha,*
    462 U.S. 919 (1983) .............................................................. 22, 28, 29

*J.W. Hampton, Jr., & Co. v. United States,*
    276 U.S. 394 (1928) ................................................................................ 36

*Learning Res., Inc. v. Trump,*
    No. 25-1248, 2025 WL 1525376 (D.D.C. May 29, 2025),
    *appeal docketed*, No. 25-5202 (D.C. Cir.) .................................... 24, 33

*Morton v. Mancari,*
    417 U.S. 535 (1974) ................................................................................ 15

*National Federation of Independent Business v. DOL,*
    595 U.S. 109 (2022) ................................................................................ 35

*Posadas v. Nat'l City Bank of N.Y.,*
    296 U.S. 497 (1936) ................................................................................ 16

*Regan v. Wald,*
    468 U.S. 222 (1984) .................................................................................. 4

*United States v. Yoshida Int'l, Inc.,*
    526 F.2d 560 (C.C.P.A. 1975) ........................... 4, 19, 20, 21, 24, 26, 27

*Universal Interpretive Shuttle Corp. v. Washington*
    *Metropolitan Area Transit Commission,*
    393 U.S. 186 (1968) ................................................................................ 15

*Util. Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ............................................................... 32

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ................................................... 34, 36, 37

*Yoshida International, Inc. v. United States,*
  378 F.Supp. 1155 (Cust. Ct. 1974) .................................... 19

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ............................... 2, 5, 6, 20, 25, 30, 35

**Statutes**

19 U.S.C. § 1862(a) .................................................................. 15

19 U.S.C. § 1862(c) .................................................................. 15

19 U.S.C. § 2253(a)(3)(A) ........................................................ 15

19 U.S.C. § 2253(a)(3)(B) ........................................................ 15

19 U.S.C. § 2411(c)(1)(B) ........................................................ 14

50 U.S.C. § 1701(a) ............................................................ 12, 32

50 U.S.C. § 1702(a)(1)(A) ........................................................ 12

50 U.S.C. § 4301 *et seq.* ......................................................... 4

50 U.S.C. § 4302 ................................................................. 4, 22

Pub. L. No. 65-91, 40 Stat. 411 (1917) ............................... 4, 28

Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1988–89 (1975) ...... 20

**U.S. Constitution**

U.S. Const. art. I, § 8 ............................................................... 7

iv

**Other Authorities**

H.R. Rep. No. 95-459 (1977)...............................................5, 23, 24, 25, 28

S. Rep. No. 95-466 (1977) ........................................................................23

## INTEREST OF AMICI CURIAE[1]

Amici are constitutional scholars, legal historians, public lawyers, a retired federal appellate judge, a former United States Attorney General, and three former United States Senators united by a common conviction: the endurance of the American Republic depends not only on elections or policy outcomes, but on the faithful preservation of its constitutional structure. They span the ideological spectrum, joined not by partisanship but by a common concern over the erosion of Congress's Article I authority.

Amici do not appear to defend or oppose any particular trade policy. They file this brief because they believe the Constitution draws bright lines between legislative and executive power—and that those lines are being blurred in ways that threaten democratic accountability itself. Many of the same amici filed a substantially similar brief in the lower court in support of plaintiffs.

---

[1] Amici curiae state that no counsel for any party authored this brief in whole or in part. The Free to Choose Network contributed funding to the preparation of this brief. No person, aside from amici curiae, their members, their counsel, or the Free to Choose Network made any monetary contribution intended to fund the preparation or submission of this brief. All parties consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This dispute is not about the wisdom of tariffs or the politics of trade. It is about who holds the power to tax the American people. May a President, absent a clear delegation from Congress and without guidance that amounts to an intelligible principle, unilaterally impose sweeping tariffs under laws never designed for that purpose? This is not a debate over outcomes but a test of structure. It asks not what should happen, but who decides.

The Constitution gives a clear answer. Article I vests Congress—not the President—with the power to "lay and collect Taxes, Duties, Imposts and Excises," and to "regulate Commerce with foreign Nations." Unless Congress has delegated that authority through a valid and clearly bounded framework, the President may not impose tariffs. As the Supreme Court made plain in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), presidential power must stem from the Constitution or an act of Congress. Here, it does neither.

In early April 2025, President Trump proclaimed a sweeping tariff regime that touches nearly every imported good sold in the United States. The measures included a 10% global tariff on nearly all imports. On April

9, he announced a variable, country-specific tariff ranging as high as 34% for China—which took effect that morning. Later that day, the administration declared a brief pause on some of these higher tariffs— for roughly 60 countries—while retaining the 10% baseline. The exception was China: its tariff rate continued to escalate to between 125 and 145 percent (variously reported, with government sources placing it at 145 percent). These duties were on top of "fentanyl tariffs" levied on Chinese imports under an earlier executive order issued in February 2025, initially at 10% but increased to 20% on March 4. These levies did not arise from legislation. They were not the product of congressional debate or any statutory process. Nor were they supported by specific findings under existing trade laws.

The International Emergency Economic Powers Act ("IEEPA"), the central statute invoked by President Trump as authority for these tariffs, cannot bear this weight. Enacted in 1977 to rein in presidential overreach, IEEPA allows the President to impose sanctions in response to genuine emergencies—not to reorder the economy in response to long-term trends.

The history is revealing. Six months after the United States entered World War I, Congress passed the Trading with the Enemy Act of 1917 ("TWEA"). Pub. L. No. 65-91, 40 Stat. 411 (1917) (codified as amended at 50 U.S.C. § 4301 *et seq.*). In 1971, President Nixon asserted authority to impose import surcharges, which he ended after four months. Although President Nixon had not explicitly invoked the TWEA, the Customs Court and the Court of Customs and Patent Appeals (predecessor to the Federal Circuit) assessed the legality of these tariffs under TWEA, ultimately upholding them. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975).

Congress swiftly responded to curb executive tariff authority. It enacted the landmark Trade Act of 1974, explicitly defining and strictly limiting presidential power to increase tariffs, imposing rigorous procedural, substantive, and temporal constraints. In 1977, Congress further restricted TWEA by explicitly limiting its application "solely to times of war." *Regan v. Wald*, 468 U.S. 222, 227 (1984); *see also* 50 U.S.C. § 4302.

Whereas the Trade Act of 1974 specifically governs tariff authority, IEEPA was deliberately confined to non-tariff economic sanctions. The

4

House committee report accompanying IEEPA explicitly stated that the statute provided emergency powers "*more limited in scope*" than those of TWEA and subjected them to substantial procedural safeguards. H.R. Rep. No. 95-459, at 2 (1977) (emphasis added).

The core principle urged by amici is this: IEEPA does not grant the President the power to impose tariffs. The Constitution places decisions about taxation and commerce in Congress's hands—not as a formality, but as a structure of democratic accountability rooted in the issues that originally led to the creation of the United States.

The President's actions here violate the limits of that structure. His invocation of IEEPA as a short cut to imposing tariffs bypasses bicameralism and presentment—the very processes that make government accountable. If upheld as it is being invoked in this moment—as a fountainhead of open-ended emergency power—nothing would prevent any President from using IEEPA to reshape U.S. economic policy, and indeed the global economy more generally, without involving Congress. This is a perversion of our constitutional order.

This case is not about trade any more than *Youngstown* was about steel. It is about power—who has it, and who must authorize its use. The

5

principle remains: "[t]he President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585.

Separation of powers is not a matter of convenience; it is structural to our Constitution. Under that structure, the authority to set tariffs is vested in Congress, not the President. And even assuming *arguendo* the Constitution allows Congress to delegate aspects of tariff decision-making to the President, to find any such delegation in IEEPA is to seize upon a figment and ignore the constitutional safeguards that separation-of-powers principles guarantee.

This Court should reverse the lower court's dismissal of this case based on the principles that have been reaffirmed time and again: that Congress makes the law, and the Executive enforces it; that major policies in particular require explicit legislation; and that the Constitution does not permit taxation by proclamation. These principles are neither new nor partisan. They are the foundation of the American republic.

ARGUMENT

## I. Congress, not the President, has the power to impose tariffs.

From the founding of the Republic, the power to impose tariffs—like the power to levy taxes—has belonged exclusively to Congress. This is no formality. This nation was born of the slogan "No taxation without representation," which means that the authority to tax, raise revenue, and shape the public's economic obligations must rest with the people's elected representatives.[2]

The Constitution is explicit. Article I, Section 8 grants Congress the power "[t]o lay and collect Taxes, Duties, Imposts and Excises" and "[t]o regulate Commerce with foreign Nations[.]" U.S. Const. art. I, § 8. These provisions were not afterthoughts—they were foundational. As James Madison wrote in *The Federalist No. 58*, vesting control of taxation in the legislature served as a deliberate check on executive power, born of colonial resistance to Crown-imposed duties levied without consent. That structural safeguard ensures that only a geographically diverse and

---

[2] *See* Michael W. McConnell, *The President Who Would Not Be King: Executive Power Under the Constitution* 100–07, 214–20 (2020) (explaining that the Constitution vests the powers to tax and regulate commerce in Congress as part of its core structural design).

7

representative Congress—not the Executive—may impose economic burdens on the people.

Tariffs fall squarely within this constitutional design. If the Framers had merely used the term "taxes," this would have encompassed tariffs, which are taxes. But the Framers went out of their way to list "duties" and "imposts" as within the legislative domain. And no wonder: the Framers expected that the "impost," which meant tariffs, would generate sufficient revenue to pay for most of the ordinary operations of the federal government in peacetime. McConnell, *supra* n.2, at 101. Tariffs lay at the core of the taxing power.

Congress historically guarded this authority with care. The Tariff Act of 1789—among the first laws passed under the new Constitution—imposed duties across a broad range of imported goods. It was introduced in the House, debated in both chambers, amended, and enacted through the full machinery of legislative deliberation. For more than a century, tariff policy remained one of the most visible and contested areas of congressional action, often shaping party lines and national elections. Tariffs were the centerpiece of Henry Clay's "American System," and the so-called "Tariff of Abominations" was the impetus for the Nullification

8

Crisis of 1832-33. Whether popular or unpopular, it was Congress—not the President—that decided which goods to tax, at what rates, and for what ends.

From the beginning of the Republic, Congress has distinguished between delegations of authority to impose taxes, including tariffs, which are the core of Congress's power of the purse, and delegations of authority to impose embargoes and other non-tax economic sanctions, which inextricably relate to foreign policy, a largely presidential domain. Both require express congressional delegation, but the President has been given far more latitude to impose and remove embargoes in the service of foreign policy objectives, while tariff authority has invariably been narrowly limited in time, amount, and purpose.

The Trade Act of 1974 and the Trade Expansion Act of 1962 exemplify this approach. They allow the Executive to address unfair trade practices or national security threats, but only within carefully prescribed limits. Even then, these statutes do not—and constitutionally cannot—authorize the President to create by executive fiat a sweeping new tariff regime.

The Framers' decision to allocate lawmaking to a representative body and execution to a single executive serves practical as well as theoretical purposes. Legislatures—especially bicameral legislatures—are by their nature deliberative, and therefore slower to change course, by comparison to the executive, whose singular virtues include "energy" and "dispatch." They well understood what Madison called the "mischievous effects of a mutable government," and sought to guard against it by the bicameral structure of Congress. *The Federalist No. 62.*[3] As Madison explained, "It will be of little avail to the people, that the laws are made by men of their own choice, if the laws . . . be repealed or revised before they are promulgated, or undergo such incessant changes that no man, who knows what the law is to-day, can guess what it will be to-morrow." *Id.* He posed the question: "What prudent merchant will hazard his fortunes in any new branch of commerce when he knows not but that his plans may be rendered unlawful before they can be executed? What farmer or manufacturer will lay himself out for the encouragement given to any particular cultivation or establishment, when he can have

---

[3]    Https://guides.loc.gov/federalist-papers/text-61-70#s-lg-box-wrapper-25493449.

no assurance that his preparatory labors and advances will not render him a victim to an inconstant government?" *Id.* So, too of American merchants and manufacturers today, whose decisions are affected by the cost of imported goods and materials. It is not an argument for one tariff policy over another to observe the wisdom of the Constitution's assignment of these powers to the branch most likely to pursue a consistent and predictable policy.

## II.    IEEPA does not authorize tariffs.

The Administration's reliance on IEEPA is misplaced. Unlike every statute delegating tariff-setting authority, IEEPA makes no mention of tariffs, duties, or imposts. No other President has ever purported to impose tariffs under IEEPA. *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, Cong. Res. Serv. R45618, at 26 (2024). The statute was never meant, and has never been understood, to authorize the President to impose or revise tariffs. IEEPA's text, context, and legislative history point to a different purpose: to empower the President to block or freeze foreign assets and financial transactions in targeted, temporary ways—not to raise revenue or rewrite the core terms of international commerce.

11

The Trade Act of 1974 explicitly authorizes the President to raise, lower, or revise tariffs, subject to detailed substantive and procedural limitations. To read IEEPA as implicitly granting *carte blanche* to the President over tariffs without any such limitations, whenever he declares the existence of an emergency, would render the carefully wrought provisions of the Trade Act pointless.

### A. IEEPA does not mention tariffs—because it was never meant to allow them.

IEEPA grants the President certain defined authorities to regulate international economic transactions upon declaring a national emergency "to deal with any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). Once that condition is met, the statute permits the President to "investigate, regulate, or prohibit . . . transfers of credit or payments . . . involv[ing] any interest of any foreign country or a national thereof, . . . by any person . . . subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(A). The term "emergency" does not extend to every problem that is serious or threatening, but only to those that are "sudden, unexpected, or impending." Black's Law Dictionary (2d ed.). The

12

term "regulate . . . importation" of foreign goods does not extend to imposing taxes; in context, it refers only to the quantitative limitations traditionally part of the President's foreign affairs authority. *See* Tom Campbell, *Presidential Authority to Impose Tariffs*, 83 La. L. Rev. 595, 606-07 (2023). Although Congress may use its plenary taxing power to achieve regulatory ends, the converse is not true: the power to regulate is not the power to tax.

Upon a presidential proclamation of emergency under IEEPA, Section 1702(b) permits the President to "investigate, regulate, direct and compel, nullify, void, prevent or prohibit" the acquisition, use, or transfer of property owned by a foreign nation or individual. This enables the executive branch, in a foreign policy crisis, to block transactions, freeze assets, and seize, or sequester foreign property. *See* Patrick A. Thronson, *Toward Comprehensive Reform of America's Emergency Law Regime*, 46 U. Mich. J.L. Ref. 737, 758 (2013) ("The IEEPA thus grants the Executive Branch the power to freeze the assets of, and prohibit financial transactions involving, individuals designated by Executive Order. This includes the power to prohibit bank payments and transfers of credit insofar as they 'involve' an interest of a designated person,

13

entity, or country, and to prohibit the holding, use, or transfer of property implicating a relevant foreign interest."). Notably, Congress employed seven different verbs to capture the intended types of economic sanction, but did not include the term "tax" or any of its synonyms. If Congress had intended to delegate the power of taxing ordinary commerce, it surely would have said so.

Moreover, all the permitted presidential actions have their effects abroad; IEEPA did not authorize the President to tax or regulate the domestic activities or property of Americans. Tariffs, unlike the foreign sanctions explicitly authorized under IEEPA, are taxes paid by Americans. They fall squarely within Congress's taxing power and, under the Constitution, require the explicit consent of the people's representatives.

The absence of tariff language in IEEPA stands in sharp contrast to statutes where Congress has affirmatively granted such power. When Congress intends to authorize duties, it says so. Section 301 of the Trade Act of 1974 allows the President to "impose duties or other import restrictions[.]" 19 U.S.C. § 2411(c)(1)(B). Under Section 201 of that same Act, the President is empowered to "proclaim an increase in, or the

14

imposition of, any duty on the imported article" or to "proclaim a tariff-rate quota[.]" 19 U.S.C. § 2253(a)(3)(A), (B). Similarly, Section 232 of the Trade Expansion Act authorizes the adjustment of "duties" on imports, 19 U.S.C. § 1862(a), and grants authority to "adjust the imports." *Id.* § 1862(c). In each case, Congress spoke with clarity when it intended to delegate authority over tariffs and it encumbered the grant of authority with procedural and substantive conditions and prerequisites.

As interpreted by the Administration, IEEPA authorizes the President to impose, revoke, or change tariffs for essentially any reason he describes as an emergency, without complying with any of the limitations that Congress attached to every statute actually delegating tariff authority. According to this argument, IEEPA silently repealed all those limits, without any member of Congress seeming to notice. That interpretation is contrary to the time-honored rule that absent "a clearly expressed congressional intention," *Morton v. Mancari*, 417 U.S. 535, 551 (1974), "repeals by implication are not favored," *Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit Commission*, 393 U.S. 186, 193 (1968). An implied repeal will only be found where provisions in two statutes are in "irreconcilable conflict," or where the

15

latter Act covers the whole subject of the earlier one and "is clearly intended as a substitute." *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936). Nor should the court find that the generalized language of IEEPA, which does not even mention tariffs, supersedes the specific language of laws granting the executive branch only circumscribed authority to impose tariffs.

The more specific tariff-authorizing statutes do not support the President's current action either. The President has not specifically invoked the authority of Trade Act of 1974 or the Trade Expansion Act in support of his April 2 tariffs, and for good reason. Section 122 of the Trade Act authorizes import surcharges of 15% for no more than 150 days "to deal with large and serious United States balance-of-payments deficits." President Trumps's tariffs exceed that limit and would last far longer. Section 201 is even farther afield. It allows targeted tariff increases upon a finding by the United States International Trade Commission that increased imports of a product are causing substantial injury to the domestic industry producing that product.

There have been no such findings here. Indeed, across-the-board tariffs of 10% on all imports—including nations where the United States

enjoys a trade surplus—bear no resemblance to the targeted tariff increases contemplated by this provision. Section 301 of the Act authorizes "duties or other import restrictions" on foreign nations that have been found—after notice and investigation—to have committed unfair trade practices or violated trade agreements with the United States. There have been no such investigations, and no notice to the nations involved.

In any event, this provision has largely been superseded by investigations and proceedings under the World Trade Organization framework. Section 232 of the Trade Expansion Act concerns national security threats, yet no plausible finding has been made—or could be made—that every product from every nation in the world poses such a threat. The Administration has not even invoked these statutes in support of the tariffs at issue. Their existence, however, makes it even more implausible that IEEPA silently conveys limitless powers that these statutes convey only through express, narrow limits and accompanied by procedural safeguards.[4]

_____

[4] Notably, many items critical to national security are exempt from the tariffs. Indeed, categories which do pose a national security interest—
(Continued…)

17

### B. Congress deliberately rejected tariff authority in IEEPA.

The context of the enactment of IEEPA makes clear that Congress did not intend to delegate tariff authority to the President. On the contrary, Congress enacted IEEPA in 1977 in response to President Richard Nixon's unprecedented assertion of the authority to increase tariffs, which courts reviewed under the TWEA. The TWEA, a World War I–era statute that originally applied only in wartime, gave the President authority to impose economic sanctions against other nations whose actions threaten our national security. The TWEA did not mention tariffs, and until 1971 was never invoked by any President to impose them.

In that year, President Nixon declared a national emergency and imposed a 10% import surcharge (an extra tariff), which was subsequently justified under the authority of the TWEA. Nixon asserted

---

various energy products, critical minerals (including rare earth minerals), pharmaceuticals, and certain semiconductors and copper products—are exempt from the tariffs at issue. *Annex II to Exec. Order No. 14257, Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, The White House (Apr. 2, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/04/Annex-II.pdf.

that language in the TWEA allowing the executive to "regulate . . . imports . . . by means of instructions, licenses, or otherwise" was broad enough to permit him to add a 10% surcharge to the existing tariffs that had been imposed by Congress. This surcharge lasted less than five months; it was withdrawn in December 1971. A zipper importer, Yoshida International, filed a lawsuit challenging the legality of the surcharge and seeking a refund of taxes paid. By the time a court could render a decision, the import surcharge had lapsed. Although a three-judge panel of the Customs Court concluded that the tariff surcharge was illegal, *Yoshida International, Inc. v. United States*, 378 F.Supp. 1155 (Cust. Ct. 1974), the Court of Customs and Patent Appeals later reversed, upholding Nixon's action. It found that TWEA's "express delegation" of power to the President "is broad indeed," such that the power to impose tariffs could be inferred from the power to "regulate" imports during a crisis, in the absence of any statute "'providing procedures' for dealing with a national emergency involving a balance of payments problem such as that which existed in 1971." *Yoshida*, 526 F.2d at 573–78; *id.* at 570 ("legislation delegating restrictive regulatory authority cannot operate, merely upon the declaration of an emergency, to the exclusion of other

19

legislative acts providing procedures prescribed by the Congress for the accomplishment of the very purpose sought to be attained by Presidential Proclamation 4074" (citing *Sawyer*, 343 U.S. 579)).[5]

While the *Yoshida* litigation was still pending, Congress passed just such a statute. It repealed the TWEA, replacing it with the Trade Act of 1974, Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1988–89 (1975) (codified at 19 U.S.C. § 2132), which for the first time gave the executive explicit authority to revise tariffs in response to trade deficits—the very power President Nixon had asserted, subject to strict substantive and procedural guardrails. The Trade Act allowed the President to increase tariffs through an emergency import surcharge, but capped such surcharges at 15% and permitted them to last no more than 150 days in the absence of "affirmative authorization" by Congress. *Id.* Moreover, the

---

[5] In *Yoshida*, the court upheld President Nixon's import surcharge precisely because it adhered to previously established congressional tariff limits. Nixon's surcharge applied only to goods already benefiting from tariff reductions, and crucially, rates could never exceed Congress's original statutory maximum. By contrast, President Trump's tariffs far exceed any previously authorized congressional tariff ceilings, are not limited to goods previously receiving tariff concessions, and impose new duties broadly and independently from any prior legislative framework. This difference underscores why the *Yoshida* precedent does not support the Administration's expansive interpretation of executive tariff power here.

20

Act required specific findings of unfair trade practices by the nations subject to the surcharges. Congress thus made clear that if a President is to have any emergency tariff power, it must come from a specifically tailored statute with clear parameters, not an open-ended mandate.

Only after Congress passed the Trade Act did the Court of Customs and Patent Appeals reverse the trial court's holding that the TWEA did not authorize presidential tariff increases. By that time, Congress had already enacted a carefully limited tariff authority, which superseded the TWEA.

Congress then enacted IEEPA. Having just enacted an explicit, and tightly limited, tariff authority through the Trade Act, Congress did not incorporate any tariff language into IEEPA. Congress's decision in 1977 to retain TWEA's general language ("regulate importation") in IEEPA without adding any tariff-specific provision strongly suggests that lawmakers did not regard IEEPA as a vehicle for import taxes. Congress had already "provided procedures" for emergency tariffs. *Yoshida*, 526 F.2d at 578, and those procedures—not IEEPA—would govern future imposition of tariffs "dealing with a national emergency involving a balance of payments problem[.]" *Id.* IEEPA was meant for other tools of

21

economic sanctions (like freezing assets or embargoing particular transactions), not for across-the-board duties.

Congress further cut back on the power previously imparted by the TWEA in two ways. First, it confined the original TWEA power to wartime, as had been the case between 1917 and 1933. *See* 50 U.S.C. § 4302. In peacetime, the President was permitted to impose regulations (with no mention of tariffs) on imports only upon a declaration of emergency under the Emergencies Act, which would be subject to fast-track review and invalidation by Congress. *See* Thronson, 46 U. Mich. J.L. Ref. at 743–53. This effectively barred any future action of the sort taken by President Nixon, unless it was approved by Congress.

Over a decade later, the Supreme Court declared legislative vetoes (like the one employed in the Emergencies Act) unconstitutional, which stripped Congress of the central safeguard it had enacted in 1977. *INS v. Chadha*, 462 U.S. 919 (1983). It is nonetheless a fallacy to impute to Congress the intention to give the President unilateral tariff authority, when Congress voted specifically to subject any such decisions to congressional review.

22

The House Committee Report leaves no ambiguity: IEEPA was designed to provide "a new set of authorities for use in time of national emergency which are *both more limited in scope than those of [TWEA] and subject to various procedural limitations*[.]" H.R. Rep. No. 95-459, at 2 (emphasis added). The Report expressed Congress's view that President Nixon's tariffs had been upheld under the TWEA for purposes "which would not be contemplated in normal times." *Id.* at 5. The Senate Committee Report similarly emphasized that "the purpose of" IEEPA was "to revise and delimit the President's authority" in response to earlier presidential uses of TWEA. S. Rep. No. 95-466, at 2 (1977).

Nothing in IEEPA's legislative history suggests that Congress intended to give the President tariff-making power. The House Report accompanying the bill identified the key powers carried over from TWEA that were deemed necessary for emergencies: controls on foreign exchange transactions, banking transfers, and securities; regulation of property in which foreign nationals have an interest; vesting (seizing) foreign-owned property; and handling or liquidating such property for the United States' benefit. *See* H.R. Rep. No. 95-459, at 1–2. Notably absent from that list is any power to raise import duties or impose new tariffs.

23

In fact, tariffs are only addressed in a historical discussion of past uses of TWEA, not as a contemplated feature of IEEPA. *See id.* at 5–6.

### C.    The government's contrary arguments lack merit.

The slender thread on which the government bases its reliance on IEEPA is that Congress used the same the term, "regulate . . . imports," in IEEPA that had been present in the TWEA, and which *Yoshida* held had supported Nixon's tariff surcharges. The government asks this court to infer that IEEPA has the same meaning as the TWEA and that Congress must have embraced the broad interpretation of that language in *Yoshida*. There are multiple reasons to reject that argument.

First, as explained above, by its plain text, IEEPA provides the President with emergency powers for the regulation of imports, not their taxation, and the two are not the same. The U.S. District Court for the District of Columbia said just this in rejecting the government's identical argument, stating that "the power to regulate is not the power to tax." *Learning Res., Inc. v. Trump*, No. 25-1248, 2025 WL 1525376, at *8 (D.D.C. May 29, 2025), *appeal docketed*, No. 25-5202 (D.C. Cir.). The D.C. District Court got it right.

24

Second, the Court should interpret IEEPA in light of its language, and not according to speculation that Congress might have accepted the interpretation given by one court to a different statute, now repealed. That is especially clear because we know that Congress explicitly set out to cabin that authority, and substitute authorities "which are both more limited in scope than those of [TWEA] and subject to various procedural limitations[.]" H.R. Rep. No. 95-459, at 2. It would turn the congressional intention on its head to read IEEPA as preserving the same unbridled power that Nixon had asserted.

Third, the Court should not read IEEPA as giving the President sweeping tariff powers when Congress had just enacted the Trade Act, which subjected presidential tariff authority to strict substantive and procedural limits. The government's interpretation would amount to an implied repeal of the Trade Act and virtually every other tariff-specific delegation of power. As Justice Frankfurter noted in *Youngstown*, "It is quite impossible, however, when Congress did specifically address itself to a problem, as Congress did to that of seizure, to find secreted in the interstices of legislation the very grant of power which Congress consciously withheld." 343 U.S. at 609 (Frankfurter, J., concurring).

25

Fourth, the *Yoshida* court expressly repudiated the notion that the TWEA empowered the President to "impos[e] whatever tariff rates he deems desirable," which is the power claimed by the government in this case. *Yoshida*, 526 F.2d at 578. The court emphasized the narrow and time-limited nature of the Nixon tariff surcharge, and limited its holding accordingly. The court noted that Nixon's Executive Order "was limited to articles which had been the subject of prior tariff concessions" and that the total tariff, with the surcharge, could not exceed the amount Congress had enacted in "column 2 of the Tariff Schedules of the United States[.]" *Id.* at 577. The surcharge lasted less than five months. "Far from attempting, therefore, to tear down or supplant the entire tariff scheme of Congress, the President imposed a limited surcharge, as 'a temporary measure' calculated to help meet a particular national emergency[.]" *Id.* at 577–78 (internal citation omitted). Indeed, the court suggested that such a broad interpretation might render the statute unconstitutional. *Id.* at 580–83. To make this point crystal clear, the court declared that "[t]he declaration of a national emergency is not a talisman enabling the President to rewrite the tariff schedules[.]" *Id.* at 583. Thus, even if this court were to conclude that Congress somehow incorporated the *Yoshida*

26

court's interpretation of the TWEA into the new IEEPA statute, this would not support the government's extravagant claim of an unlimited power to set tariffs in any declared emergency.

The *Yoshida* court further emphasized, no fewer than four times in its opinion, that the generalized provisions of the TWEA could be read to authorize President Nixon's action only because there then existed no statute containing "procedures prescribed by the Congress for the accomplishment of the very purpose sought to be attained by [the presidential order]." *Id.* at 570, 578. A specific statute would govern instead of the TWEA. Congress thus knew that its enactment of precisely such procedures in the Trade Act of 1974 would preclude a finding of generalized tariff authority under the TWEA, under the logic and holding of *Yoshida*.

The government simply ignores the congressional opposition to the Nixonian tariffs, the enactment of time-limited and procedurally limited tariff authority in the Trade Act, and the elimination of unilateral presidential emergency authority through the fast-track congressional disapproval mechanism of the Emergency Act. To be sure, the congressional disapproval procedure was rendered ineffective by the

27

*Chadha* decision, but that decision came a decade later, and it defies reason to impute to Congress the intention to give to the President precisely the unilateral authority it so carefully (if ineffectually) curtailed.

### D.   Emergencies—even if real—do not change the analysis.

The government argues that the existence of an emergency—which it says is a political question the courts cannot review—permits tariff authority under IEEPA. Under this logic, the President could invoke unbridled tariff authority at will.

As emphasized in the House Report accompanying IEEPA, "emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems." H.R. Rep. No. 95-459, at 10. Congress explicitly curtailed executive economic powers following President Nixon's 1971 import surcharge, clarifying through the TWEA that even substantial economic concerns like balance-of-payments deficits do not justify emergency measures beyond narrowly defined, temporary actions. Pub. L. No. 65-91, 40 Stat. 411. In short, IEEPA is properly invoked only for unforeseen, urgent circumstances where

immediate presidential action is indispensable. The power to tariff is not within the scope of those emergency powers.

Adherence to the Constitution is not a choice. The Founders deliberately vested taxing authority in the legislative branch to ensure broad deliberation and democratic legitimacy. *Federalist No. 58* reminds us that this arrangement was intentional, carefully crafted to prevent the unilateral executive actions this administration now seeks. As the Supreme Court also emphasized, even procedures that are "efficient, convenient, and useful" cannot override constitutional principles; "[c]onvenience and efficiency are not the primary objectives—or the hallmarks—of democratic government[.]" *Chadha*, 462 U.S. at 944. Simply put, IEEPA is not a shortcut for a President who finds the standard legislative process too cumbersome or slow.

Even assuming for the sake of argument that a qualifying emergency exists, that does not change the meaning or scope of IEEPA. Emergencies do not generate new constitutional powers nor expand authority explicitly withheld. The Constitution remains binding even during emergencies. As Justice Jackson warned, sweeping emergency powers with "no beginning or . . . no end" and that "submit to no legal

29

restraint" are fundamentally incompatible with our constitutional

order. *Youngstown*, 343 U.S. at 653–54 (Jackson, J., concurring).

### E. These tariffs are permanent policy rather than emergency measures.

IEEPA was enacted to enable short-term, targeted responses to genuine, extraordinary threats—not to authorize permanent alterations to the nation's trade regime. It was designed to grant the Executive narrow powers to act swiftly during unforeseen emergencies. It is not a tool for addressing long-standing policy concerns or for implementing structural reforms that require legislative debate.

The tariffs imposed by the President in April 2025 are plainly at odds with that purpose. They are not tied to a discrete or time-sensitive emergency. Nor are they temporary. On the contrary, they are designed to remain in effect indefinitely and to respond to broad, persistent conditions—such as global supply chain realignment, foreign industrial policy, and chronic trade imbalances—that the Administration claims threaten American economic security in a general and enduring way.

President Trump has made no effort to conceal this long-term intent. He has explicitly defended his tariff policy as a corrective to economic trends spanning more than two decades. The official White

House Fact Sheet explains that the President invoked IEEPA to address "the national emergency posed by the large and persistent trade deficit." It claims that "[f]or generations, countries have taken advantage of the United States," and cites the loss of "around 5 million manufacturing jobs" from 1997 to 2024—a 27-year period.[6] It also references Chinese trade practices "[b]etween 2001 and 2018"—conduct that began nearly a quarter century ago and concluded seven years prior. *Id.* These are not unforeseen emergencies. They are longstanding policy grievances, best addressed by Congress—not by emergency proclamation.

The Administration has also touted these tariffs as a means of generating long-term revenue. On April 2, President Trump predicted that the tariffs would generate "trillions and trillions of dollars to reduce our taxes and pay down our national debt." The Chair of the Council of Economic Advisors echoed this aim, stating that "tariffs will help pay for

---

[6] *See Fact Sheet: President Donald J. Trump Declares National Emergency to Increase Our Competitive Edge, Protect Our Sovereignty, and Strengthen Our National and Economic Security*, The White House (Apr. 2, 2025), https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-declares-national-emergency-to-increase-our-competitive-edge-protect-our-sovereignty-and-strengthen-our-national-and-economic-security/.

31

both tax cuts and deficit reduction."[7] But tax cuts and budget deficits—
however important—are not "unusual and extraordinary threat[s]"
under IEEPA. 50 U.S.C. § 1701(a). They are routine subjects of political
debate and legislative negotiation. Their invocation here confirms that
these tariffs are not temporary emergency measures, but a shift in fiscal
and trade policy pursued through unilateral executive action.

### F.    No President has ever used IEEPA this way.

The Supreme Court has cautioned that "[w]hen an agency claims to
discover in a long-extant statute an unheralded power to regulate 'a
significant portion of the American economy,' . . . we typically greet its
announcement with a measure of skepticism." *Util. Air Regul. Grp. v.
EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson
Tobacco Corp.*, 529 U.S. 120, 159 (2000)). That skepticism is warranted
here. In the nearly five decades since its enactment, IEEPA has never
been used to impose a general tariff. Presidents have invoked it to freeze
assets, block financial transfers, and impose targeted sanctions on hostile

---

[7] CEA Chairman Steve Miran, *Hudson Institute Event Remarks*, The
White House (Apr. 7, 2025), https://www.whitehouse.gov/briefings-
statements/2025/04/cea-chairman-steve-miran-hudson-institute-event-
remarks/.

regimes and individuals. But never to levy broad-based duties on imports. *See Learning Res.*, 2025 WL 1525376, at *10 (finding support in ruling against the government that "[i]n the five decades since IEEPA was enacted, no President until now has ever invoked the statute—or its predecessor, TWEA—to impose tariffs"). That settled practice confirms what the statute's text and legislative record already show: Congress did not grant tariff authority.

### G. The Supreme Court has repeatedly rejected Executive Branch efforts to arrogate to itself sweeping power in the absence of clear text.

In matters of vast political and economic consequence, the Supreme Court insists on unmistakable legislative authority before allowing the Executive Branch to act. It is not a novel doctrine but a longstanding interpretive principle: it is improbable (and constitutionally dubious to assume) that Congress would intend to transfer vast swaths of its constitutional power without saying so directly.

That principle applies with full force here. The President has proclaimed a fundamental reordering of U.S. trade policy without new legislation or specific congressional approval. The asserted authority

rests on statutory language not enacted for this purpose and never before used in this way. That, under binding precedent, is not enough.

The Court applied this principle decades ago in *Brown & Williamson*. There, it rejected the FDA's attempt to regulate tobacco under broad statutory language, noting that Congress had legislated extensively in the area without granting that power. "Congress could not have intended to delegate a decision of such economic and political significance . . . in so cryptic a fashion." 529 U.S. at 160. The Court refused to assume that Congress had granted sweeping authority without saying so. Put simply, Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

In *Alabama Association of Realtors v. HHS*, 594 U.S. 758 (2021), the Court struck down the CDC's attempt to extend a nationwide eviction moratorium under general public health authority. The relevant statute allowed measures to prevent disease transmission, but none of the enumerated measures bore any resemblance to moratorium on evictions. That mattered. The Court emphasized that sweeping economic actions require unmistakable legislative approval—particularly where Congress

34

had considered and declined to extend the policy itself. The CDC's reliance on broad language was not enough.

Similarly, *National Federation of Independent Business v. DOL*, 595 U.S. 109 (2022), invalidated OSHA's nationwide vaccine-or-test mandate, holding that such a significant policy required explicit congressional authorization. Though OSHA invoked its general authority to regulate workplace safety, the Court found that such sweeping measures could not rest on generalized statutory terms. The Executive may not transform a broad statute into a blank check for nationwide regulation—particularly when fundamental personal and economic rights are at stake.

The situation here is analogous to these cases. Like the CDC, the President relies on a few generalized words ("regulate" and "importation") in a statute designed for narrow, targeted emergencies to justify a dramatic, long-term economic intervention. And as in *Alabama Association*, Congress has not merely failed to speak clearly—it has expressly declined to authorize the action now claimed. *Cf. Youngstown*, 343 U.S. at 586 (noting that Congress had considered and declined to grant the President authority to seize private property in response to

35

labor disputes). When faced with Richard Nixon's unprecedented assertion of a unilateral tariff power under the TWEA, Congress repealed the TWEA and replaced it with the Trade Act, which allowed adjustment of tariffs under strict procedural, substantive, and temporal limitations, enacted IEEPA to address non-tariff economic sanctions, and subjected all emergency declarations to direct congressional control. That history cannot be rewritten by implication or executive interpretation.

Interpreting IEEPA to authorize tariffs would invite a grave nondelegation problem. The statute supplies no intelligible principle to guide the President in determining when, how, or to what extent duties should be imposed. If construed to allow the imposition of tariffs without meaningful limits or standards, IEEPA would amount to an open-ended delegation of legislative power—precisely what the nondelegation doctrine forbids. In *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928), the Court upheld a tariff delegation only because it was governed by an "intelligible principle" and narrowly confined. As the Court explained in *Whitman*, Congress must "lay down by legislative act an intelligible principle to which the person or body authorized to [act] is

directed to conform." 531 U.S. at 472 (citation omitted). That principle is absent here with respect to trade duties.

## CONCLUSION

IEEPA cannot reasonably be construed to authorize tariffs. The Court should reverse.

/s/ Daniel W. Wolff
Daniel W. Wolff
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2500
dwolff@crowell.com

Counsel for Amici Curiae

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-3493

I am the attorney or self-represented party.

**This brief contains** | 6,994 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ☐ it is a joint brief submitted by separately represented parties.

    ☐ a party or parties are filing a single brief in response to multiple briefs.

    ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [                    ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Daniel W. Wolff | **Date** | 07/07/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                                     *Rev. 12/01/22*

## ADDENDUM: LIST OF AMICI

The undersigned amici join this brief in their individual capacities. They do not represent any party to this matter. Institutional affiliations are provided for identification only and do not reflect the views or endorsements of their employers.

**George F. Allen** served as Governor of Virginia from 1994 to 1998 and as a United States Senator from 2001 to 2007. Earlier in his career, he represented Virginia in the U.S. House of Representatives and served in the Virginia House of Delegates.

**Joshua A. Claybourn** is an attorney who advises public-sector clients—including legislative bodies—on constitutional and administrative law. His legal and historical scholarship focuses on the separation of powers and the constitutional legacy of the early Republic and Abraham Lincoln.

**John C. Danforth** served as a United States Senator from Missouri and as U.S. Ambassador to the United Nations. Prior to his Senate tenure, he was Attorney General of Missouri for eight years. He currently serves on the national advisory board of the John C. Danforth Center on Religion and Politics at Washington University.

**Richard A. Epstein** is the Laurence A. Tisch Professor of Law at New York University School of Law, the Peter and Kirsten Bedford Senior Fellow at the Hoover Institution at Stanford University, and the James Parker Hall Distinguished Service Professor Emeritus and Senior Lecturer at the University of Chicago Law School.

**Charles T. Hagel** represented Nebraska in the United States Senate from 1997 to 2009, where he served on the Foreign Relations and Intelligence Committees. He served as the 24th United States Secretary of Defense from 2013 to 2015 and as co-chairman of the President's Intelligence Advisory Board from 2009 to 2013.

**Harold Hongju Koh** is Sterling Professor of International Law and former Dean at Yale Law School. From 2009 to 2013, he served as Legal Adviser to the United States Department of State, and from 1998-2001, he served as Assistant Secretary of State for Democracy, Human Rights and Labor.

**Gerard N. Magliocca** is a Distinguished Professor and the Lawrence A. Jegen III Professor at the Indiana University Robert H. McKinney School of Law. A leading scholar of constitutional law and constitutional history, he is the author of five books and dozens of articles exploring the evolution of American constitutional thought, with a focus on the Founding era and Reconstruction.

**Michael B. Mukasey** was Attorney General of the United States from 2007 to 2009. Earlier, he sat on the U.S. District Court for the Southern District of New York from 1988 to 2006, serving the last six years as Chief Judge. Before joining the bench, he tried complex cases as an Assistant U.S. Attorney in that district and later handled commercial litigation in private practice. Today he advises clients and speaks and writes on national-security and constitutional law.

**Alan O. Sykes** is a Professor at Stanford Law School, where he serves as Director of the LL.M. Program in International Economic Law, Business and Policy. He is also a Senior Fellow at the Stanford Institute for Economic Policy Research. He is co-author of Legal Problems of International Economic Relations (7th ed. 2021), a leading casebook in the field.

**Judge John Daniel Tinder** (Ret.) served as a judge on the United States Court of Appeals for the Seventh Circuit from 2007 to 2015, and on the United States District Court for the Southern District of Indiana from 1987 to 2007. Prior to his judicial service, he was the United States Attorney for the Southern District of Indiana from 1984 to 1987.

**Alexander "Sasha" Volokh** is professor of law at Emory University School of Law. He teaches, writes, and blogs about constitutional law, administrative law, and related legal issues, and he has an interest in the sound development of these fields.

**Peter J. Wallison** is a Senior Fellow Emeritus at the American Enterprise Institute. He previously served as General Counsel of the U.S. Department of the Treasury and as White House Counsel to President Ronald Reagan.

**Philip Zelikow** is the Botha-Chan Senior Fellow at Stanford University's Hoover Institution and formerly held a chaired professorship in history at the University of Virginia, where he directed the nation's foremost center for the study of the presidency. He served as Counselor of the U.S. Department of State under President George W. Bush, was a member of the National Security Council staff during the George H.W. Bush administration, and directed the 9/11 Commission. He also served on the President's Intelligence Advisory Board under both Presidents George W. Bush and Barack Obama.