No. 25-3493

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

THE STATE OF CALIFORNIA AND GOVERNOR GAVIN NEWSOM,
*Plaintiffs-Appellants,*

v.

DONALD J. TRUMP, *et al.*,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:25-cv-03372-JSC

## BRIEF OF THE BRENNAN CENTER FOR JUSTICE
## AS AMICUS CURIAE IN SUPPORT OF APPELLANTS

Elizabeth Goitein
Leah J. Tulin
Hannah James
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
1140 Connecticut Avenue NW,
Suite 1150
Washington, DC 20036
Phone: (202) 249-7192
goiteine@brennan.law.nyu.edu

Loren Kieve
KIEVE LAW OFFICES
2121 Broadway Street, Unit 3
San Francisco, CA 94115
Phone: (415) 425-2655 (cell)
lk@kievelaw.com

*Counsel for Amicus Curiae
the Brennan Center for Justice*

July 7, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. ii

INTEREST OF AMICUS CURIAE ................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................2

ARGUMENT .............................................................................................3

I.     Congress Enacted the NEA and IEEPA to Circumscribe Presidential Use of Emergency Powers. ........................................................................3

       A.     Congress's Role in Providing and Regulating Emergency Powers. ......4

       B.     The Origins and Purpose of the NEA. ................................................7

       C.     The Origins and Purpose of IEEPA. ................................................12

II.    Construing IEEPA to Authorize Tariffs Would Contravene Congress's Intent to Circumscribe Presidential Use of Emergency Powers. .................16

       A.     Clear Authorization Should Be Required for Actions Taken Under Statutes, Like IEEPA, that Grant Emergency Powers. ......................17

       B.     Construing IEEPA to Authorize Tariffs Would Enable Circumvention of a Detailed Statutory Scheme in Violation of Congressional Intent. ...........................................................................................21

CONCLUSION ........................................................................................24

i

# TABLE OF AUTHORITIES

**Cases**

*American Broadcasting Cos. v. Aereo, Inc.*, 573 U.S. 431 (2014)............................4

*Biden v. Nebraska*, 600 U.S. 477 (2023) ...............................................................10

*Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020).........................................4

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ...............................................................10

*I.N.S. v. Chadha*, 462 U.S. 919 (1983) ....................................................................9

*Learning Resources v. Trump*, No. 25-1248, 2025 WL 1525376 (D.D.C. May 29, 2025).................................................................................................................18

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .......................................19

*V.O.S. Selections v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) ...12

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)...............................6

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 15....................................................................................6

U.S. Const. art. I, § 9, cl. 2......................................................................................6

U.S. Const. art. I, § 8, cl. 1....................................................................................22

U.S. Const. art. II ....................................................................................................5

**Statutes**

19 U.S.C. § 1338.............................................................................................. 21, 23

50 U.S.C. §§ 1701-10................................................................................ 13,14, 15, 16

Act of Dec. 28, 1977, Pub. L. No. 95-223, 91 Stat. 1625 (1977) (codified as amended at 50 U.S.C. § 4305(b)(1)) .....................................................................14

Emergency Banking Relief Act, Pub. L. No. 73-1, 48 Stat. 1 (March 9, 1933)......13

Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub. L. No. 99-93, § 801, 99 Stat. 405, 448 (1985) (codified at 50 U.S.C. § 1622(a)(1)) ........9, 16

National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601-51) ...................................................................8, 9

National Emergencies Act, S. 977, 94th Cong. (1975) ...........................................11

Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (codified as amended at 19 U.S.C. §§ 2101-2497b) ....................................................................... 18, 20, 21, 23

Trade Expansion Act of 1962, Pub. L. No. 87-794, § 232(b)-(c), 76 Stat. 872, 877 (codified as amended at 19 U.S.C. § 1862(b)-(c)) .................................. 18, 20, 23

Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994).....23

**Legislative Materials**

123 Cong. Rec. 424 (1977) (statement of Rep. Jonathan B. Bingham, Chairman, Subcomm. on Int'l Econ. Pol'y and Trade) ..........................................................14

H.R. Rep. No. 94-238 (1976)..............................................................................22

H.R. Rep. No. 95-459 (1977).......................................................................... *passim*

S. Rep. No. 95-466 (1977) ........................................................................... 16, 18

S. Res. 242, 93rd Cong. (1974)............................................................................7

**Executive Orders and Proclamations**

Exec. Order No. 14257, 90 Fed. Reg. 15041 (Apr. 2, 2025)...................................19

Proclamation No. 2039, 48 Stat. 1689 (March 6, 1933)..........................................13

**Other Authorities**

2A Norman Singer & Shambie Singer, *Sutherland Statutory Construction* (7th ed. & Nov. 2024 update)......................................................................................10

Andrew Boyle, Brennan Ctr. for Just., *Checking the President's Sanctions Powers* (2021), https://perma.cc/V2ZG-573P..................................................................13

Brief of the Brennan Ctr. for Just. & the Cato Inst. as Amici Curiae, *Sierra Club v. Trump*, 977 F.3d 853 (9th Cir. 2020) (Nos. 19-17501, 19-17501, 20-15044)......22

Christopher A. Casey & Cathleen D. Cimino-Isaacs, Cong. Rsch. Serv., IF10038, *Trade Promotion Authority (TPA)* (February 20, 2024), https://perma.cc/NZ59-PQZ9.................................................................................................................23

Christopher A. Casey, Cong. Rsch. Serv., IF11030, *U.S. Tariff Policy: Overview* (Jan. 31, 2025), https://perma.cc/M35L-NJ8H ..................................................19

Christopher T. Zirpoli, Cong. Rsch. Serv., R48435, *Congressional and Presidential Authority to Impose Import Tariffs* (2025), https://perma.cc/VGD5-SUV7 ...............................................................................................................21

Comparative Constitutions Project, *Constitutions Database*, https://perma.cc/GER8-2YPX (last visited July 7, 2025) ......................................5

Elaine Halchin, Cong. Rsch. Serv., 98-505, *National Emergency Powers* (2019), https://perma.cc/9WB4-HEHD ........................................................................6, 7

*Emergency*, Cambridge Dictionary, https://perma.cc/5RCV-QYCE (last visited June 7, 2025) ...............................................................................4

*Emergency,* Legal Information Institute, https://perma.cc/7EDC-7BTS (last visited May 8, 2025) ...............................................................................4

*Hearing on Restoring Congressional Oversight over Emergency Powers: Exploring Options to Reform the National Emergencies Act Before the S. Comm. on Homeland Sec. and Governmental Affs.*, 118th Cong. (2024) (statement of Elizabeth Goitein, Brennan Center for Justice), https://perma.cc/4TJL-3QTR........ .......................................................................................................5, 10

John Ferejohn and Pasquale Pasquino, *The Law of the Exception: A Typology of Emergency Powers*, 2 Int'l J. Const. L. 210 (2004).................................................5

Saikrishna Prakash, *The Imbecilic Executive*, 99 Va. L. Rev. 1361 (2013) .............6

Scott Lincicome & Inu Manak, *Protectionism or National Security? The Use and Abuse of Section 232,* CATO Inst. (Mar. 9, 2021), https://perma.cc/82UV-LAQS .......................................................................................................20

S. Comm. on Government Operations and the Spec. Comm. on National Emergen-cies and Delegated Emergency Powers, *The National Emergencies Act (Public Law 94-412), Source Book: Legislative History, Text, and Other Documents* (1976) ....................................................................................... *passim*

Tara Suter, *Lutnick: 'We do expect a 10 percent baseline tariff to be in place for the foreseeable future,'* The Hill (May 11, 2025), https://perma.cc/QGD5-RFLA .......................................................................................................19

Thomas E. Cronin, *A Resurgent Congress and the Imperial Presidency*, 95 Pol. Sci. Q. 209 (1980) ...............................................................................7

## INTEREST OF AMICUS CURIAE

Amicus curiae the Brennan Center for Justice at New York University School of Law ("the Brennan Center") files this brief with the written consent of all parties.[1]

Amicus curiae the Brennan Center is a not-for-profit, non-partisan think tank and public interest law institute that seeks to improve systems of democracy and justice. The Brennan Center's interest in this case stems from its extensive research on, analysis of, and public education regarding the National Emergencies Act of 1976 (NEA), the International Emergency Economic Powers Act (IEEPA), and the president's emergency powers more generally. This case involves a challenge to the president's imposition of tariffs pursuant to IEEPA. The president's actions are premised on a novel interpretation of IEEPA that reads powers into the law not clearly provided by Congress and that would enable the president to circumvent a detailed statutory tariffs framework.

The Brennan Center submits this brief to show that the president's interpretation is contrary to the original purpose of both the NEA and IEEPA, which was to carefully circumscribe presidential use of emergency powers and to ensure they would not be used as substitutes for non-emergency laws. Because IEEPA does

---

[1] No counsel for a party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than amicus curiae and counsel made a monetary contribution to its preparation or submission. This brief does not purport to convey the position of New York University School of Law.

1

not authorize the imposition of tariffs, the district court erred in holding that this case must be transferred to the Court of International Trade.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Emergency powers have a narrow and specific function in our constitutional system. They are meant to provide presidents with a temporary boost in power to deal with sudden, unforeseen crises that require immediate action. They present a significant temptation, however, as they offer a potential means to short-circuit the normal policymaking process in non-emergency circumstances. A pattern of such behavior in the mid-twentieth century led Congress to enact the NEA and IEEPA.

The NEA was intended to rein in presidential use of statutory emergency powers. Although Congress did not define "national emergency," the legislative history of the NEA makes clear that Congress did not intend for the law to provide an affirmative grant of limitless discretion, and that it expected the limits contained within specific emergency powers to be scrupulously observed and enforced. Congress similarly enacted IEEPA to rein in the president's authority—in that case, the authority to regulate economic transactions in response to emergencies during peacetime. In addition to predicating the exercise of such powers on a declaration of national emergency, Congress specified that the emergency must constitute an "unusual and extraordinary threat" to the country's national security, foreign policy, or economy, and narrowed the powers available under the law. Congress thus sought

to prevent the use of IEEPA to engage in the type of routine policymaking that is and should be governed by non-emergency authorities.

This history establishes that IEEPA and other emergency powers available under the NEA, even while they give the president broad powers, should not be interpreted in a way that allows the president to arrogate to himself powers beyond those Congress has clearly conferred. That is particularly true where Congress has explicitly and extensively legislated in the relevant area and where the use of the claimed power would circumvent that legislation. That is the case here, as several factors—including the text of IEEPA, its legislative history, the contemporaneous enactment of specific tariff legislation, and the unsuitability of tariffs as a response to emergency scenarios—indicate that IEEPA does not authorize tariffs, and construing the statute otherwise would enable presidents to bypass the multiple laws Congress has enacted both authorizing and constraining the president's imposition of tariffs.

## ARGUMENT

### I. Congress Enacted the NEA and IEEPA to Circumscribe Presidential Use of Emergency Powers.

Appellants challenge a raft of executive orders relying on IEEPA, a statute creating a specific set of emergency economic powers, to impose tariffs on every nation in the world. *See* Appellants' Br. 10–11. They argue persuasively that the plain language of IEEPA contains no indication of congressional intent to authorize

3

tariffs. *See* Appellants' Br. 23–29. To the extent there is any ambiguity, however, the legislative history of the NEA and IEEPA strongly favors the same conclusion. *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 674 (2020) ("[M]embers of this Court have consulted legislative history when interpreting ambiguous statutory language."); *American Broadcasting Cos. v. Aereo, Inc.*, 573 U.S. 431, 439–40 (2014) (relying on legislative history to discern congressional intent). That history makes clear that the NEA and IEEPA were enacted to circumscribe the president's use of statutory emergency powers, and it underscores the importance of strictly construing those powers' limits.

**A.     Congress's Role in Providing and Regulating Emergency Powers.**

To understand Congress's intent in passing the NEA and IEEPA, it is necessary to understand more broadly the purpose and history of emergency powers in the United States. Emergency powers play a unique role in our constitutional system. By definition, emergencies are sudden and unexpected, and they require immediate action. *See* Cambridge Dictionary, https://perma.cc/5RCV-QYCE (last visited July 7, 2025) (defining "emergency" as "something dangerous or serious . . . that happens suddenly or unexpectedly and needs fast action in order to avoid harmful results"); Legal Information Institute, https://perma.cc/7EDC-7BTS (last visited May 8, 2025) (defining "emergency" as "an urgent, sudden, and serious event or an unforeseen change in circumstances that necessitates immediate action to

remedy harm or avert imminent danger to life, health, or property"). Because emergencies are sudden and unexpected, Congress may not be able to enact authorities in advance that are tailored to address them. And as a deliberative bicameral body, Congress is ill-suited to act with the necessary immediacy once the emergency has occurred. Emergency powers thus are designed to grant the president extraordinary legal leeway to respond to crises that Congress could not have foreseen and that are moving too fast or too unpredictably for Congress to address after the fact. *See Hearing on Restoring Congressional Oversight over Emergency Powers: Exploring Options to Reform the National Emergencies Act Before the S. Comm. on Homeland Sec. and Governmental Affs.*, 118th Cong. 3–5 (2024) (statement of Elizabeth Goitein, Brennan Center for Justice), https://perma.cc/4TJL-3QTR; *see generally* John Ferejohn and Pasquale Pasquino, *The Law of the Exception: A Typology of Emergency Powers*, 2 Int'l J. Const. L. 210 (2004).

Unlike most other countries' constitutions,[2] the U.S. Constitution does not provide the president with any express emergency powers. *See generally* U.S. Const. art. II. Those powers that could be considered "emergency powers" are given to Congress, such as the power to suspend *habeas corpus* "when in Cases of Rebellion

---

[2] A review of current constitutions reveals that at least 165 countries' constitutions have provisions for emergency rule. *See* Comparative Constitutions Project, *Constitutions Database*, https://perma.cc/GER8-2YPX (last visited July 7, 2025) (search database of constitutions for keyword "emergency" and filter for "in force").

or Invasion the public Safety may require it," U.S. Const. art. I, § 9, cl. 2, and to provide for "calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," U.S. Const. art. I, § 8, cl. 15. Accordingly, from the time of the country's founding, presidents have relied on Congress to provide them with enhanced authorities for emergency situations.[3] Throughout the eighteenth and early nineteenth centuries, Congress periodically enacted laws giving presidents standby authorities that they could use in their discretion during military, economic, or labor crises. *See* Elaine Halchin, Cong. Rsch. Serv., 98-505, *National Emergency Powers* 1 (2019), https://perma.cc/9WB4-HEHD.

Beginning in World War I, a new procedure for invoking statutory emergency powers evolved. Presidents would declare a national emergency, and this declaration would give them access to statutory authorities that would otherwise lie dormant. *See id.* at 5. This system continues to this day. Before the enactment of the NEA, however, there was no overarching statute regulating it. *See id.* at 3. There was little transparency or congressional oversight with respect to presidents' use of emergency powers, and nothing to prevent states of emergency from lingering indefinitely.

---

[3] Presidents have, on occasion, claimed that the Constitution gives them broad *inherent* powers to take emergency action without congressional authorization. The Supreme Court has not endorsed such a reading, *see, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–89 (1952) (rejecting President Truman's claim of inherent constitutional authority to seize control of steel mills during the Korean War), and it finds little support in constitutional history, *see* Saikrishna Prakash, *The Imbecilic Executive*, 99 Va. L. Rev. 1361, 1366–68, 1425 (2013).

**B.      The Origins and Purpose of the NEA.**

In the 1970s, several scandals involving executive branch overreach—including Watergate, the bombing of Cambodia, and domestic spying by the CIA—prompted Congress to investigate the exercise of executive power in national security matters, and to enact several laws aimed at reasserting Congress's role as an equal branch of government and a check on executive authority. *See generally* Thomas E. Cronin, *A Resurgent Congress and the Imperial Presidency*, 95 Pol. Sci. Q. 209 (1980). It was in this context that a special Senate committee, which eventually came to be named the Special Committee on National Emergencies and Delegated Emergency Powers, was formed to examine presidential use of emergency powers. *See* S. Res. 242, 93rd Cong. (1974); Halchin, *supra*, at 7–8.

The committee was alarmed by what it found. In the course of the committee's investigation, it came to light that several clearly outdated emergency declarations remained on the books, in effect creating "virtually permanent states of emergencies." 120 Cong. Rec. S. 15784-94 (daily ed. Aug. 22, 1974) (statement of Sen. Frank Church), *reprinted in* S. Comm. on Government Operations and the Spec. Comm. on National Emergencies and Delegated Emergency Powers, *The National Emergencies Act (Public Law 94-412), Source Book: Legislative History, Text, and Other Documents* 73 (1976) [hereinafter *NEA Source Book*]. The committee noted that "[l]egislation intended for use in crisis situations is by its nature not well suited

to normal, day-to-day government operations." 121 Cong. Rec. H8325-H8341 (daily ed. Sept. 4, 1972) (statement of Rep. Peter W. Rodino), *reprinted in NEA Source Book*, *supra*, at 244. In fact, the committee warned that the proliferation of emergency powers with insufficient limits or congressional oversight had created a "dangerous state of affairs." S. Rep. No. 94-922, at 1 (1976), *reprinted in NEA Source Book*, *supra*, at 33. It counted more than 470 statutory provisions that delegated extraordinary authority to the executive branch in times of national emergency. These included provisions allowing the president to:

> seize property and commodities, organize and control the means of production, call to active duty 2.5 million reservists, assign military forces abroad, seize and control all means of transportation and communication, restrict travel, and institute martial law, and, in many other ways, manage every aspect of the lives of all American citizens.

S. Rep. No. 93-1170, at 2 (1974), *reprinted in NEA Source Book*, *supra*, at 20.

The committee's work culminated in the introduction and passage of the NEA, which took effect in 1978. *See* National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601–51). The purpose of the law, evident in every facet of its legislative history, was to limit presidential use of emergency powers. As summarized by the committee in urging passage of the Act:

> While much work remains, none of it is more important than passage of the National Emergencies Act. Right now, hundreds of emergency statutes confer enough authority

> on the President to rule the country without reference to normal constitutional process. Revelations of how power has been abused by high government officials must give rise to concern about the potential exercise, unchecked by the Congress or the American people, of this extraordinary power. The National Emergencies Act would end this threat and insure that the powers now in the hands of the Executive will be utilized only in time of genuine emergency and then only under safeguards providing for Congressional review.

S. Rep. No. 94-922, at 18, *reprinted in NEA Source Book*, *supra*, at 50; *see also* S. Rep. No. 94-1168, at 2 (1976), *reprinted in NEA Source Book*, *supra*, at 291 ("At a time when governments throughout the world are turning with increasing desperation to an all-powerful executive, this legislation is designed to ensure that the United States travels a road marked by carefully constructed legal safeguards."). The law included several provisions designed to assert a stronger and more active role for Congress in deciding whether states of emergency should continue. Most notably, it allowed Congress to terminate states of emergency at any time through a concurrent resolution (commonly referred to as a "legislative veto" because it would take effect without the president's signature). *See* National Emergencies Act § 202, 90 Stat. at 1255.[4]

---

[4] The Supreme Court subsequently held that legislative vetoes are unconstitutional. *See I.N.S. v. Chadha*, 462 U.S. 919, 954–55 (1983). Congress thus replaced the concurrent resolution mechanism with one for joint resolutions, which must be signed into law by the president. *See* Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub. L. No. 99-93, § 801, 99 Stat. 405, 448 (1985) (codified

The NEA does not include a definition of "national emergency." Appellees, relying on statements by the special committee's co-chairs in a hearing, claimed below that this omission was intended to avoid constraining the president's discretion. *See* Defs.' Mot. to Transfer at 2–3, ECF No. 9. The relevant committee report, however—a more salient indicator of congressional intent—tells a very different story. *See Eldred v. Ashcroft*, 537 U.S. 186, 209 n.16 (2003) (noting that committee reports on a bill are "the authoritative source for finding the Legislature's intent," because they "'represen[t] the considered and collective understanding of those [Members of Congress] involved in drafting and studying proposed legislation'" (alterations in original) (quoting *Garcia v. United States*, 469 U.S. 70, 76 (1984))); 2A Norman Singer & Shambie Singer, *Sutherland Statutory*

---

at 50 U.S.C. § 1622(a)(1)). This development greatly weakened the effectiveness of the NEA as a check on presidential authority, as Congress in most cases will need a veto-proof supermajority to terminate an emergency declaration. *See Hearing on Restoring Congressional Oversight over Emergency Powers*, *supra*, at 8 (statement of Elizabeth Goitein, Brennan Center for Justice). The lack of a ready means for Congress to terminate emergency declarations, as originally envisioned in the law, makes it all the more important for the judiciary to fulfill its own role as a check against executive overreach by rejecting overbroad readings of the powers such declarations unlock. Notwithstanding Appellees' claim below that "Congress gave itself the exclusive oversight authority over a President's national emergency declaration," Defs.' Mot. to Transfer at 3, ECF No. 9, courts can and do review whether a president's exercise of power pursuant to a national emergency declaration is authorized by the power invoked. *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 477 (2023) (holding that the HEROES Act, an emergency power invoked by President Joe Biden pursuant to the COVID-19 national emergency declaration, does not authorize the forgiveness of student loan debt).

*Construction* § 48:6 (7th ed. & Nov. 2024 update) (collecting cases and noting that "courts generally view committee reports as the most persuasive indicia of legislative intent" (internal quotation marks omitted)). Under an earlier draft of the legislation, the president was authorized to declare a national emergency "[i]n the event the President finds that a proclamation of a national emergency is essential to the preservation, protection and defense of the Constitution or to the common defense, safety, or well-being of the territory or people of the United States." National Emergencies Act, S. 977, 94th Cong. § 201(a) (1975). One committee report noted that this definition was "deliberately cast in broad terms that makes it clear that a proclamation of a state of national emergency requires a grave national crisis." S. Rep. No. 93-1193, at 2 (1974), *reprinted in NEA Source Book*, *supra*, at 96. The Senate Committee on Government Operations removed this language, not because it was too limiting, but because the committee believed it to be too broad. As stated in the committee's report:

> [F]ollowing consultations with several constitutional law experts, the committee concluded that section 201(a) is overly broad, and might be construed to delegate additional authority to the President with respect to declarations of national emergency. In the judgment of the committee, the language of this provision was unclear and ambiguous and might have been construed to confer upon the President statutory authority to declare national emergencies, other than that which he now has through various statutory delegations.

11

> The Committee amendment clarifies and narrows this language. The Committee decided that *the definition of when a President is authorized to declare a national emergency should be left to the various statutes which give him extraordinary powers*. The National Emergencies Act is not intended to enlarge or add to Executive power. Rather the statute is an effort by the Congress to establish clear procedures and safeguards for the exercise by the President of emergency powers conferred upon him by other statutes.

S. Rep. No. 94-1168, at 3, *reprinted in NEA Source Book*, *supra*, at 292 (emphasis added). In other words, Congress viewed the specific criteria and limitations within the various emergency authorities that the president may invoke in a national emergency as key constraints on the executive power presidents retained under the NEA. The legislative history of the NEA thus underscores the importance of strictly interpreting and enforcing those criteria and limitations.

## C. The Origins and Purpose of IEEPA.

Enacted one year after the NEA and in response to the same concerns over executive branch overreach, IEEPA was Congress's attempt to rein in presidential power to take economic action in emergencies. In particular, Congress was responding to abuses of the Trading With the Enemy Act of 1917 (TWEA). *See V.O.S. Selections v. United States*, 772 F. Supp. 3d 1350, 1360–61, 1374 (Ct. Int'l Trade 2025). That statute was originally enacted in World War I to give the president powers to take economic measures against enemy nations, such as blocking enemy property, during times of war. *See* Andrew Boyle, Brennan Ctr. for Just., *Checking*

*the President's Sanctions Powers* 5 (2021), https://perma.cc/V2ZG-573P. In 1933, however, after President Franklin Delano Roosevelt invoked the law to declare a bank holiday in the United States, *see* Proclamation No. 2039, 48 Stat. 1689 (Mar. 6, 1933), Congress hastily amended it to apply during national emergencies as well as wartime, *see* Emergency Banking Relief Act, Pub. L. No. 73-1, 48 Stat. 1 (Mar. 9, 1933).[5] In doing so, "Congress recognized that it was conferring unusual powers on the President which were justified by the gravity of the situation which the country faced, but which should not normally be available to Presidents in peacetime." H.R. Rep. No. 95-459, at 4 (1977).

The NEA originally exempted TWEA from its ambit. Because a small number of emergency powers, including TWEA, were in regular use, Congress decided to temporarily exclude them "to allow for a careful study of how to revise them in accordance with the intent of the National Emergencies Act without disrupting policies currently in effect under their authority." H.R. Rep. No. 95-459, at 6. The resulting inquiry into TWEA, conducted by the committees of jurisdiction in both chambers, confirmed that "[s]uccessive Presidents [had] . . . seized upon" TWEA's

---

[5] Appellees state that Congress amended TWEA to extend to national emergencies in 1941. *See* ER-21 (citing First War Powers Act, ch. 593, title III, § 301, 55 Stat. 839 (1941)). In fact, the 1941 amendment retained the "national emergency" language first added in 1933 and added additional authority to take many of the specific economic actions that are now a part of IEEPA. *See* 50 U.S.C. § 1702(a)(1)(B).

13

open-ended language to turn it "through usage, into something quite different from what was envisioned in 1917." H.R. Rep. No. 95-459, at 8–9. Indeed, TWEA had "become essentially an unlimited grant of authority for the President to exercise, at his discretion, broad powers in both the domestic and international economic arena, without congressional review." H.R. Rep. No. 95-459, at 7. Its emergency authorities had "in effect become routine authorities used to conduct the day-to-day business of the Government." 123 Cong. Rec. 424 (1977) (statement of Rep. Jonathan B. Bingham, Chairman, Subcomm. on Int'l Econ. Pol'y and Trade).

In response to these findings and concerns, Congress amended TWEA in 1977 to limit the law's reach to instances where Congress had declared war, as had originally been intended. Act of Dec. 28, 1977, Pub. L. No. 95-223, § 101, 91 Stat. 1625 (1977) (codified as amended at 50 U.S.C. § 4305(b)(1)); *see* H.R. Rep. No. 95-459, at 10. At the same time, Congress promulgated a new statute—IEEPA—to provide for a more constrained set of economic powers that would be available during national emergencies in peacetime. International Emergency Economic Powers Act, Pub. L. No. 95-223, §§ 201–08, 91 Stat. 1625, 1626–29 (1977) (codified as amended at 50 U.S.C. §§ 1701–10).

Congress intended the powers it was conferring under IEEPA to be subject to significant "substantive restrictions." H.R. Rep. No. 95-459, at 10. The first such restriction was the high bar to invoking the statute. Congress perceived the

14

requirement of declaring a national emergency to be a significant limitation, given that "emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems." *Id.* Even so, Congress added a further constraint, providing that IEEPA's authorities may be used only to deal with an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a).

In addition, the authorities provided under IEEPA were "limited to the regulation of international economic transactions" and were "more restricted than those available during time of war." H.R. Rep. No. 95-459, at 10–11. IEEPA sets forth a detailed list of powers that the president may exercise over property or transactions under U.S. jurisdiction in which a foreign nation or person has any interest. *See* 50 U.S.C. § 1702(a)(1)(B); Appellants' Br. 23–24 (listing powers authorized under IEEPA). Neither that list nor the legislative history includes any mention of the imposition of tariffs or duties. To the contrary, Congress described the powers it was granting in IEEPA as involving regulation of financial transactions (foreign exchange and banking, currency, and securities transactions) and controlling or freezing foreign property, H.R. Rep. No. 95-459, at 14–15; S. Rep. No. 95-466, at 5 (1977), and actually cited expert testimony *contrasting* these

powers with "other congressionally authorized controls on U.S. foreign economic policy such as import and export controls," H.R. Rep. No. 95-459, at 8.

Finally, IEEPA includes procedural requirements to facilitate a strong congressional oversight role. The president must consult with Congress "in every possible instance" before invoking IEEPA and must submit reports to Congress on a regular basis. 50 U.S.C. § 1703(a)–(c). Moreover, because the powers granted by IEEPA are exercised pursuant to a national emergency declaration, Congress may block the use of IEEPA powers by terminating the national emergency declaration on which the IEEPA invocation relies. 50 U.S.C. § 1622(a)(1).

In short, the legislative history of IEEPA—like that of the NEA—reflects a resolute focus on restricting presidential use of emergency powers and ensuring that the law would not be used as a substitute for non-emergency legislation.

## II. Construing IEEPA to Authorize Tariffs Would Contravene Congress's Intent to Circumscribe Presidential Use of Emergency Powers.

The legislative histories of the NEA and IEEPA bear directly on the proper interpretation of IEEPA's scope. Congress's manifest intent to circumscribe presidential use of emergency powers and reverse decades of "mission creep" counsels in favor of construing these powers strictly and not inferring powers beyond those clearly granted. In addition, given Congress's intent to prevent presidents from using emergency powers as a substitute for non-emergency laws, emergency powers that do not clearly displace applicable non-emergency laws should not be construed

to have that effect. Interpreting IEEPA to authorize tariffs would violate both of these interpretive principles.

### A. Clear Authorization Should Be Required for Actions Taken Under Statutes, Like IEEPA, that Grant Emergency Powers.

Appellants cite the Supreme Court's admonition that executive actions with major political or economic significance must be clearly authorized by Congress. *See* Appellants' Br. 39–40. There is an independent reason, however, to require clear authorization by Congress when the president takes action under the NEA and IEEPA—laws designed to ensure that emergency powers would be used sparingly and in accordance with their limitations. As Congress recognized in passing the NEA and IEEPA, the powers expressly granted to the president during a national emergency are extremely potent and vulnerable to exploitation or abuse. Allowing a president to expand these powers beyond their already sweeping scope by inferring powers not clearly conferred would create exactly the kind of danger that Congress sought to mitigate. The fact that the powers expressly granted by IEEPA are broad, as Appellees observed below, *see* Defs.' Mot. to Transfer at 2, ECF No. 9, merely underscores the importance of resisting efforts to broaden them even further beyond their textual limits.

As set forth extensively in Appellants' opening brief, IEEPA does not clearly authorize the imposition of tariffs. The long list of presidential actions that it authorizes does not include imposing tariffs or leveling taxes or duties. Construing

the word "regulate" to encompass the imposition of tariffs is a strained reading of the term that would render it an outlier from the other actions on the list, all of which relate to requiring or prohibiting transactions rather than taxing them. *See Learning Resources v. Trump*, No. 25-1248, 2025 WL 1525376, at *8–9 (D.D.C. May 29, 2025). The extensive legislative history of IEEPA, which describes intended uses for the law, is similarly devoid of any mention of tariffs. *See* H.R. Rep. No. 95-459, at 14–15; S. Rep. No. 95-466, at 5. The notion that Congress intended to create a sweeping new emergency tariff power *sub silentio* is all the more unlikely given that Congress had recently enacted broad tariff legislation, *see* Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (codified as amended at 19 U.S.C. §§ 2101–2497b), and there was already a statute in place specifically authorizing the adjustment of imports to protect national security, *see* Trade Expansion Act of 1962, Pub. L. No. 87-794, § 232(b)–(c), 76 Stat. 872, 877 (codified as amended at 19 U.S.C. § 1862(b)–(c)). Until now, no president had ever used IEEPA for tariffs in its nearly 50-year history, itself a powerful sign that the law does not authorize such a measure. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("'[T]he longstanding practice of the government'—like any other interpretive aid—'can inform [a court's] determination of what the law is.'" (second alteration in original) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014))).

Additionally, tariffs are an unlikely subject for emergency powers. Emergencies are, by the very term, "rare and brief, and are not to be equated with normal, ongoing problems." H.R. Rep. No. 95-459, at 10. Emergency powers are intended to authorize short-term actions to address these rare and brief occurrences. Tariffs, by contrast, are a type of tax generally used to effectuate longer term policies like protecting domestic industries, advancing foreign policy goals, or providing leverage in trade negotiations. *See* Christopher A. Casey, Cong. Rsch. Serv., IF11030, *U.S. Tariff Policy: Overview* 1 (2025), https://perma.cc/M35L-NJ8H. Indeed, in this case, the majority of the tariffs at issue are intended to address "structural imbalances in the global trading system"—by President Trump's own admission, a longstanding and widespread state of affairs, Exec. Order No. 14257, 90 Fed. Reg. 15041 (Apr. 2, 2025), and one that will ostensibly require baseline tariffs to remain in place "for the foreseeable future," *see* Tara Suter, *Lutnick: 'We do expect a 10 percent baseline tariff to be in place for the foreseeable future,'* The Hill (May 11, 2025), https://perma.cc/QGD5-RFLA (quoting Secretary of Commerce Howard Lutnick).

It is thus unsurprising that, when Congress has authorized the president to impose tariffs, it has generally done so under conditions that facilitate some degree of deliberation and advance notice, enabling domestic manufacturers and distributers to plan ahead and adjust their practices. *See, e.g.*, Trade Expansion Act of 1962

§ 232(b)–(c), 76 Stat. at 877 (codified as amended at 19 U.S.C. § 1862(b)–(c)) (authorizing presidential action only after Secretary of Commerce conducts an investigation, notifies and consults with the Secretary of Defense and other appropriate officers of the United States, provides, as appropriate, for public hearings, and issues a report concluding that a good is imported in quantities or under circumstances that threaten national security);[6] Trade Act of 1974 §§ 201–03, 88 Stat. at 2011–18 (codified as amended at 19 U.S.C. §§ 2251–55) (authorizing tariffs only after the U.S. International Trade Commission conducts an investigation, holds public hearings, affords interested parties an opportunity to present evidence and submit comments, and concludes that importation is "a substantial cause of serious injury, or the threat thereof, to the domestic industry producing" the good); *id.* §§ 301–02, 88 Stat. at 2041–43 (codified as amended at 19 U.S.C. §§ 2411–20) (authorizing tariffs only after the U.S. Trade Representative conducts an investigation, provides opportunity for public input, and determines that a foreign

---

[6] Section 232 of the Trade Expansion Act, which authorizes the president to "adjust the imports of an article and its derivatives," does not use the term "tariffs" or "duties," raising the question of whether this provision may be construed as a tariff authority. There are notable differences between this provision and IEEPA, however, including the fact that Section 232 was enacted as part of the "Trade Expansion Act," is codified in Title 19 ("Customs Duties"), was not part of legislation designed to rein in presidential power, and has previously been interpreted and applied as a tariff authority. *See* Scott Lincicome & Inu Manak, *Protectionism or National Security? The Use and Abuse of Section 232*, CATO Inst. (Mar. 9, 2021), https://perma.cc/82UV-LAQS.

country is violating a trade agreement).[7] This approach reflects Congress's understanding of tariffs as a long-term policy tool with significant, widespread domestic impacts rather than a swift, targeted response to an urgent crisis. It thus further supports the conclusion that Congress did not intend for IEEPA, a law that may be invoked only to address emergencies, to authorize tariffs.

**B.      Construing IEEPA to Authorize Tariffs Would Enable Circumvention of a Detailed Statutory Scheme in Violation of Congressional Intent.**

In passing the NEA and IEEPA, Congress emphasized that emergency powers should not be used as a stand-in for regular, non-emergency legislation.[8] *See* H.R.

---

[7] While Congress has provided for some limited circumstances where a president may impose tariffs without any such procedural barriers (although with restrictions on the amount and, in one case, duration of the tariffs), these authorities have tellingly never been used. *See* 19 U.S.C. § 1338 (authorizing tariffs in response to discrimination by other countries against U.S. commerce); 19 U.S.C. § 2132 (authorizing tariffs in response to balance-of-payments problems); *see also* Christopher T. Zirpoli, Cong. Rsch. Serv., R48435, *Congressional and Presidential Authority to Impose Import Tariffs* 23 (April 23, 2025), https://perma.cc/VGD5-SUV7 (summarizing requirements under various authorities and noting that 19 U.S.C. § 1338 and 19 U.S.C. § 2132 have "[n]ever [been] used to impose tariffs").

[8] Congress did contemplate that IEEPA might be used, as a last resort, to control exports in the event of a lapse in non-emergency export control legislation. *See* H.R. Rep. No. 95-459, at 13. There are no such gaps to fill when it comes to non-emergency tariff legislation, as discussed herein. Similarly, while "Congress has for decades acquiesced in the use of IEEPA as a substitute for ordinary *sanctions* legislation," *see* Brief of the Brennan Ctr. for Just. & the Cato Inst. as Amici Curiae at 17, *Sierra Club v. Trump*, 977 F.3d 853 (9th Cir. 2020) (Nos. 19-17501, 19-17501, 20-15044) (emphasis added), there is no such history of acquiescence with respect to the imposition of tariffs under IEEPA because no previous president has used IEEPA for that purpose.

Rep. No. 94-238, at 2 (1976) (noting that the NEA "will make it possible for our Government to function in accordance with regular and normal provisions of law rather than through special exceptions and procedures which were intended to be in effect for limited periods during specific emergency conditions"); H.R. Rep. No. 95-459, at 11 (directing that "authority for routine, nonemergency regulation of international economic transactions which has heretofore been conducted under [TWEA] should be transferred to other legislation"). By the same token—and even more importantly—emergency powers should never be used to circumvent restrictions or prohibitions included in non-emergency legislation absent clear authorization to do so.

Here, Congress has established a detailed and extensive statutory scheme for tariffs. The authority to impose tariffs is expressly committed to Congress under the Constitution, as the first of its powers. *See* U.S. Const. art. I, § 8, cl. 1 (conferring on Congress the power to "lay and collect Taxes, Duties, Imposts and Excises"). Pursuant to that authority, Congress has passed multiple statutes explicitly authorizing tariffs in a range of circumstances. *See, e.g.*, Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994); Trade Act of 1974, 19 U.S.C. §§ 2101–2497b. These laws give the president and U.S. trade representative significant discretion to impose or adjust tariffs in response to specified circumstances, including national security threats (19 U.S.C. § 1862(b)–(c)); injury

22

to domestic industry (19 U.S.C. §§ 2251–55); trade agreement violations by other nations (19 U.S.C. §§ 2411–20); discrimination against U.S. commerce (19 U.S.C. § 1338); and balance-of-payments problems, including "large and serious United States balance-of-payments deficits" (19 U.S.C. § 2132). Where presidents have sought to raise or lower tariffs under other circumstances, they have availed themselves of Trade Promotion Authority laws, which provide for expedited congressional approval of trade agreements that meet specified negotiating objectives and consultation/notification requirements. *See* Christopher A. Casey & Cathleen D. Cimino-Isaacs, Cong. Rsch. Serv., IF10038, *Trade Promotion Authority (TPA)* 1 (2024), https://perma.cc/NZ59-PQZ9.

Construing IEEPA to implicitly authorize the imposition of tariffs without any of the procedural and substantive restrictions of these laws would allow the president to bypass an elaborate legislative scheme in an area of plenary congressional authority. Although Congress may intend to release the president from otherwise applicable restrictions during emergencies, courts should require that such intent—in this case, the intent to authorize tariffs under IEEPA—be clear on the face of the statute. As discussed in Part II.A, IEEPA falls far short of providing such clear authorization.

# CONCLUSION

For the reasons set forth above, interpreting IEEPA to authorize tariffs would contravene Congress's intent in enacting both the NEA and IEEPA. Because IEEPA is not a statute that provides for tariffs, the district court erred in transferring this case to the Court of International Trade.

Dated:  July 7, 2025

Respectfully submitted,

*/s/ Elizabeth Goitein*
Elizabeth Goitein
Leah J. Tulin
Hannah James
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
1140 Connecticut Avenue NW,
Suite 1150
Washington, D.C. 20036
(202) 249-7192 (telephone)
(202) 223-2683 (fax)
goiteine@brennan.law.nyu.edu
tulinl@brennan.law.nyu.edu
jamesh@brennan.law.nyu.edu

Loren Kieve
KIEVE LAW OFFICES
2121 Broadway Street, Unit 3
San Francisco, California 94115
Telephone: (415) 425-2655 (Cell)
lk@kievelaw.com

*Counsel for Amicus Curiae the*
*Brennan Center for Justice*

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause it to be served on all parties and counsel of record.


*/s/ Elizabeth Goitein*
Elizabeth Goitein

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** _____ 25-3493 _____

I am the attorney or self-represented party.

**This brief contains** ____ **5,905** _____ **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ **x** ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [  ] it is a joint brief submitted by separately represented parties.

    [  ] a party or parties are filing a single brief in response to multiple briefs.

    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____ /s/ Elizabeth Goitein _____ **Date** ___ 7/7/2025 _____

*(use "*s/[typed name]*" to sign electronically-filed documents)*