No. 25-3493

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

THE STATE OF CALIFORNIA AND GOVERNOR GAVIN NEWSOM,

*Plaintiffs-Appellants,*

v.

DONALD J. TRUMP, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
Northern District of California
No. 3:25-cv-03372-JSC
Hon. Jacqueline Scott Corley, District Judge

BRIEF OF *AMICUS CURIAE* CONSUMER WATCHDOG IN SUPPORT OF
PLAINTIFFS-APPELLANTS

ALAN B. MORRISON
**GEORGE WASHINGTON
UNIVERSITY LAW SCHOOL**
2000 H Street NW
Washington, DC 20052
Tel. (202) 994-7120
abmorrison@law.gwu.edu

HARVEY ROSENFIELD
WILLIAM PLETCHER
BENJAMIN POWELL
**CONSUMER WATCHDOG**
6330 San Vicente Blvd. Ste. 250
Los Angeles, CA 90048
Tel. (310) 392-0522
Fax: (310) 392-8874
will@consumerwatchdog.org

**July 7, 2025**

*Attorneys for Amicus Curiae Consumer
Watchdog*

## CORPORATE DISCLOSURE STATEMENT

Amicus curiae Consumer Watchdog is a non-profit, non-partisan public interest organization. No publicly traded entity holds any form of ownership interest in Consumer Watchdog.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................. iii

IDENTITY AND INTEREST OF THE AMICUS CURIAE ................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 2

ARGUMENT ............................................................................... 4

  I.   IEEPA Does Not Confer Unambiguous Authority to Impose Tariffs. ........... 4

  II.  If IEEPA Authorizes the President to Impose Tariffs, It Would Constitute an Unconstitutional Delegation of Legislative Authority........................................ 7

    A.   IEEPA's Sweeping Grant of Discretion Lacks Any Meaningful Guardrails. ........................................................................ 8

    B.   *FCC v. Consumers' Research* Clarifies that a Statute Like IEEPA Must Contain Enforceable Limits to Survive a Non-Delegation Challenge. ........... 11

    C.   The Supreme Court's Other Non-Delegation Cases Are Consistent with the Requirement that the Applicable Statute Must Contain Limits.................. 19

    D.   *Yoshida* Was Wrongly Decided............................................... 25

CONCLUSION ............................................................................ 27

# TABLE OF AUTHORITIES

## <u>Cases</u>

*A. L. A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935) ..................................................................23

*Am. Inst. for Int'l Steel v. United States*,
806 Fed. Appx. 982 (Fed. Cir),
*cert. denied*, 141 S. Ct. 133 (2020)......................................24

*Am. Inst. for Int'l Steel v. United States*,
376 F. Supp.3d 1335, (2019) .................................................25

*Am. Power & Light Co. v. SEC*,
329 U.S. 90 (1946) ..................................................................12

*Biden v. Nebraska*, 600 U.S. 477 (2023)................................7

*FCC v. Consumers' Research*,
U.S. Supreme Court, Nos. 24-354 and 24-422,
2025 WL 1773630 (June 27, 2025)..............................*passim*

*Federal Energy Administration v. Algonquin SNG, Inc.*,
426 U.S. 548 (1976) ..................................................23, 24, 25

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ................................................................13

*Gundy v. United States*,
588 U.S. 128 (2019) .............................................17, 19, 22, 23

*INS v. Chadha*,
462 U.S. 919 (1983) ................................................................13

*J.W. Hampton, Jr., & Co. v. United States*,
276 U.S. 394 (1928) ..........................................................19, 20

*Learning Res., Inc. v. Trump*,
No. CV 25-1248 (RC), 2025 WL 1525376
(D.D.C. May 29, 2025) ............................................................8

*Marshall Field & Co. v. Clark*,
143 U.S. 649 (1892) ................................................................20

*Michael Simon Design, Inc. v. United States*,
609 F.3d 1335 (Fed. Cir. 2010)..............................................18

*Mistretta v. United States*,
    488 U.S. 361 (1989) ...............................................................15, 21

*OPP Cotton Mills, Inc. v. Administrator of Wage and Hour Div., Dep't of Labor*,
    312 U.S. 126, (1941) ...................................................................13

*Paul v. United States*,
    140 S. Ct. 342 (2019) ..................................................................23

*Robertson v. Seattle Audubon Society*,
    503 U.S. 429 (1992) .......................................................................8

*State of California v. Trump*,
    Northern District of California, No. 3:25-cv-03372 ...................5, 25

*United States v. Yoshida International, Inc.*,
    526 F.2d 560 (CCPA 1975) .............................................25, 26, 27

*V.O.S. Selections, Inc. v. Trump*,
    Court of International Trade, No 25-00066......................................18

*V.O.S. Selections, Inc. v. United States*,
    772 F. Supp. 3d 1350 ......................................................................8

*West Virginia v. Environmental Protection Agency*,
    597 U.S. 697 (2022) .......................................................................7

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ........................................................11, 22, 26

*Yakus v. United States*,
    321 U.S. 414 (1944) .....................................................................17

## Statutes

18 U.S.C. § 3551 .............................................................................21

19 U.S.C. § 1336 ...............................................................................4

19 U.S.C. § 1862 .................................................................4, 24, 25

19 U.S.C. § 2251 ...............................................................................4

19 U.S.C. § 2253 ...............................................................................5

19 U.S.C. § 2411 ...............................................................................4

42 U.S.C. § 7408 .............................................................................22

42 U.S.C. § 7409 .............................................................................22

47 U.S.C. § 254 ..................................................................................14

47 U.S.C. § 402 ..................................................................................13

50 U.S.C. § 1701 ........................................................................1, 5, 18

50 U.S.C. § 1702 .........................................................................*passim*

## Other Authorities

Article I, Constitution of the United States ..................................6, 10, 13

Executive Order 14245 (March 24, 2025)...........................................9

Lowell, Michael J., Philippe Heeren, Justin Angotti, Lizbeth Rodriguez-Johnson, Kirsten Lowell, and Courtney E. Fisher, "Trump 2.0 tariff tracker," (June 27, 2025) ..............................................................................10

Mishkin, Shaina, *Trump Reaffirms Tariffs in Truth Social Post. It Will Be an Uneasy Weekend for Investors,* Barron's (Apr. 5, 2025) ...................................7

Proclamation No. 9705, 83 Fed. Reg 11625 (Mar. 15, 2018)................................24

Stein, Jeff, Natalie Allison**,** and David J. Lynch, "White House eased China tariffs after warnings of harm to 'Trump's people,'" *The Washington Post* (May 15, 2025).................................................10

Trump, Donald (@realDonaldTrump), Truth Social (Apr. 5, 2025, 5:34 A.M.)..... 7

## IDENTITY AND INTEREST OF THE AMICUS CURIAE[1]

Amicus curiae Consumer Watchdog is a non-profit, non-partisan public interest organization dedicated to protecting consumers from economic harm caused by unlawful and unfair market practices, corporate abuses, and improper governmental actions. Consumer Watchdog has a special interest in this case because the challenged tariffs function as a regressive tax that disproportionately burdens working families and economically vulnerable consumers. Tariffs of the magnitude at issue here inevitably raise consumer prices and threaten the economic security of working families and small businesses. Amicus also intends to file the substance of this brief in the other cases making identical challenges to these tariffs that are pending in the United States Courts of Appeals for the Federal and District of Columbia Circuits.

With the consent of the parties, amicus filed a brief in the District Court for the Northern District of California, supporting the challenge brought there by the State of California. Its primary argument there and in this brief is that the principle of constitutional avoidance is a further basis for the Court not to interpret the

---

[1] All parties have consented to the filing of this amicus curiae brief. Fed. R. App. Proc. Rule 29(a)(2). No person other than amicus or its counsel authored this brief in whole or in part or contributed money that was intended to support the preparation or submission of this brief. Fed. R. App. Proc. Rule 29(a)(4)(E).

International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–1710 (IEEPA), to empower the President to impose the tariffs at issue here. The constitutional objection to authorizing these tariffs is that the statute, as so construed, would violate the non-delegation doctrine. In addition to the arguments made in its prior brief on that question, this brief will rely on the Supreme Court's June 27, 2025 decision in *Federal Communications Commission v. Consumers' Research*, Nos. 24-354 and 24-422, 2025 WL 1773630 (June 27, 2025). While upholding the delegation there, the Court clarified and amplified the non-delegation doctrine in ways that underscore why construing IEEPA as Defendants urge would raise the most serious of constitutional questions.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The question on this appeal is not whether the tariffs are good or bad policy, but whether any President has the legal authority to do what this President did. Amicus agrees with the Plaintiffs-Appellants that the President lacks the statutory authority under IEEPA (or any other law) to impose the tariffs at issue here. It is submitting this brief to offer an additional reason why this Court should adopt a narrow reading of IEEPA.

If IEEPA is read as the President does, it would require a court to decide whether IEEPA would violate the prohibition against Congress delegating legislative power to the President. As this brief explains, there are no explicit or

implied limits or guardrails in IEEPA that prevent the President from doing whatever he pleases with tariffs, including imposing them on any or all countries, raising them as high as 145 percent, and stacking them on top of other existing tariffs. A Congressional delegation of authority to impose tariffs without limits or guardrails would violate the Constitution, as the Supreme Court acknowledged in *Consumers' Research*. The doctrine of constitutional avoidance thus provides an important additional reason to construe IEEPA as the Plaintiffs-Appellants do and to hold that the challenged tariffs are not authorized as a matter of statutory construction, without having to reach very substantial questions about the constitutionality of the delegation here.

President Trump has imposed tariffs on imports into the United States from the nation's three largest trading partners and ordered other universal and reciprocal tariffs on imports from most (but not all) other countries. It is not simply that these tariffs were imposed once and have remained constant; there have been almost constant on-again, off-again changes for selected tariffs and countries, which is the epitome of a lawless and capricious regime—one for which IEEPA provides no statutory justification. To illustrate the uncertainty that this back and forth has produced, and to further assist the Court and the parties, amicus has prepared a chart, contained in the Addendum to this brief, that sets forth the most significant of the

unilateral decrees by the President imposing, revising, reducing, or suspending these tariffs as of July 1, 2025.

## ARGUMENT

**THE COURT SHOULD CONSTRUE IEEPA TO PRECLUDE THE PRESIDENT FROM USING IT TO ISSUE ANY TARIFFS, THEREBY AVOIDING HAVING TO DECIDE WHETHER THE DELEGATION OF THAT POWER WOULD BE UNCONSTITUTIONAL.**

## I.    IEEPA Does Not Confer Unambiguous Authority to Impose Tariffs.

Section 1702(a)(1)(B) is the operative portion of IEEPA on which the President relies to impose the challenged tariffs. Neither the noun "tariff" nor the verb "impose" appears anywhere in section 1702. Conversely, there is a whole volume of the U.S. Code—Title 19—that deals exclusively with tariffs and other trade related subjects, including provisions that expressly delegate to the President the power to impose new tariffs or adjust existing ones, subject to various statutory conditions.

Sometimes, the authorization applies only on a product-by-product basis, 19 U.S.C. § 1862 ("section 232"). For others, the tariff can be applied only to the imports from a particular country that has engaged in particularly unfair trade practices, 19 U.S.C. § 2411 ("section 301"). In some cases, the new tariffs can only apply to products for which there are existing tariffs (19 U.S.C. § 1336(a)), and even then, with a cap of one kind or another, although others (*e.g.*, section 232) have no such limits. Finally, under 19 U.S.C. § 2251 ("section 201"), tariffs may be imposed

if "an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury . . . to the domestic industry producing" that article, subject to the limitations in durations and amounts set by 19 U.S.C. § 2253(e). The point is that Congress knows very well how to authorize the President, or those agencies subject to his control, to impose new tariffs or alter existing ones. In every case, there are conditions that must be met before the President or an agency can act, and there is no statute in Title 19 that remotely resembles the open-ended grant of power in terms of the products or countries covered that Defendants claim exists for IEEPA.

The relevant text of section 1702(a)(1) also provides no help to Defendants. Subparagraph (B) begins with a string of seven verbs (or combinations of verbs), of which the only one cited by Defendants that would establish tariff-setting authority is "regulate." Defendants' Response in Opposition to Motion for Preliminary Injunction at 24–25, *State of California v. Trump*, Northern District of California, No. 3:25-cv-03372, Dkt. No. 55, May 27, 2025. This would be an unusual way to authorize the imposition of tariffs. The text then follows with a similar series of nouns, and of these, Defendants rely on "importation." *Id.* To be sure, a person that seeks to import a product must pay any amounts owed, but a tariff is normally referred to as a duty, tax, or levy. A "regulation" is normally concerned with what may be imported into this country, and under what conditions, but not how much the

Government will tax the importer of the article. Indeed, Article I, section 8 of the Constitution differentiates between "regulation," as in the power to "Regulate commerce with foreign nations" in clause 3, and the power in clause 1 "To lay and collect taxes, Duties, Imposts and Excises," which is how tariffs are imposed. Absent evidence to the contrary, it is reasonable to assume that, in delegating power to the President through IEEPA, Congress did not intend to use "regulate" as a shorthand for "impose tariffs."

Moreover, section 1702(a) as a whole applies only where there is "property in which any foreign country or any national thereof has any interest." This excludes at least two common scenarios where these tariffs might otherwise be thought to apply: (1) a U.S. importer buys products abroad and owns them outright upon arrival in the United States, so that the property is owned entirely by a United States citizen or entity, not a foreign person or nation; and (2) a U.S. automaker operates a foreign plant—for example, in Mexico—that manufactures car parts that it ships to the United States, so that no foreign person has an interest in the imported parts. Even though there are cases in which a foreign national owns the property being imported, it would surely be a strange way to grant the President broad-based tariff authority, with an exception for U.S.-owned imports that significantly swallows the rule and that would be almost impossible to administer. No other U.S. tariff statute operates in this manner.

As Plaintiffs-Appellants have argued, there are many additional reasons why Defendants' reading of section 1702 is mistaken or, at the very least, ambiguous as to whether it authorizes the President to use it to impose tariffs at all. This ambiguity brings into play the Supreme Court's "major question" doctrine. *See*, *e.g.*, *Biden v. Nebraska*, 600 U.S. 477 (2023); *West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022). Under it, the courts should presume that Congress did not intend to delegate to an agency (or the President) a power to make significant rules unless Congress clearly so provides, which Congress has not done in section 1702 for tariffs. One presidential posting on Truth Social accurately characterizes the impact of these tariffs and definitively establishes that the President's actions on tariffs fall in the major question category: they are what he described as an "economic revolution."[2]

## II.   If IEEPA Authorizes the President to Impose Tariffs, It Would Constitute an Unconstitutional Delegation of Legislative Authority.

If this Court were inclined to accept Defendants' reading of section 1702, it would then require the Court to decide whether Congress had unconstitutionally delegated to the President the power to make laws that only Congress may make.

---

[2] Donald Trump (@realDonaldTrump), Truth Social (Apr. 5, 2025, 5:34 A.M.), https://truthsocial.com/@realDonaldTrump/posts/114285375813275308; *see also* Shaina Mishkin, *Trump Reaffirms Tariffs in Truth Social Post. It Will Be an Uneasy Weekend for Investors,* Barron's (Apr. 5, 2025), https://www.barrons.com/articles/trump-tariffs-news-truth-social-66efbf8c.

Utilizing the principle of constitutional avoidance, the Court should read section 1702 as the Plaintiffs-Appellants, the Court of International Trade (*V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350), and the District of Columbia District Court (*Learning Res., Inc. v. Trump*, No. CV 25-1248 (RC), 2025 WL 1525376 (D.D.C. May 29, 2025)) did, and in that way avoid the need to rule on the constitutional issue. "As between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, [a court's] plain duty is to adopt that which will save the act." *Robertson v. Seattle Audubon Society*, 503 U.S. 429, 441 (1992) (brackets and citation omitted).

## A. IEEPA's Sweeping Grant of Discretion Lacks Any Meaningful Guardrails.

Although the Supreme Court has not struck down a statute on delegation grounds since 1935, it also has never encountered a law like IEEPA as applied to the imposition of tariffs. Before turning to the case law on delegation, including the recent decision in *FCC v. Consumers' Research*, it is essential to understand that if Congress granted the President the authority in IEEPA to impose tariffs, it put no constraints whatsoever on that authority:

- There is no investigation, report, or other process that the President or an agency that reports to him must follow or perform before the President decides to impose a tariff.

- There are no limits in terms of dollars or percentage increases for new or additional tariffs.

- Tariffs may be imposed on goods for which there are no tariffs or for which Congress already has fixed tariffs.

- There is no requirement for an expiration date for any tariff.

- Tariffs may be imposed on a single product or on as many products as the President desires.

- The President may impose a tariff for any reason or no reason, as long as he identifies them in the declaration of emergency, on which he has the final word.

- The President may turn a tariff off at any time and then turn it back on, solely within his discretion.

- The President may exempt whole countries entirely (as he has done for Russia) or from some tariffs and not others.

- The President may impose higher tariffs for some countries for the same products than for others and may exempt some countries for a specific product only.

- The President may override the United States–Mexico–Canada Agreement that was approved by Congress in December 2019 and that was signed and negotiated by President Trump himself during his prior term as President.

- The President may set up an exception process by which importers may obtain exemptions or reduced tariffs based on criteria solely determined by the President or an agency to which he has delegated exemption authority.[3]

- The tariffs may be made effective immediately, even though as a practical matter, for both the exporter and the importer, those tariffs

---

[3] For example, Section 2(b) of Executive Order 14245 (Mar. 24, 2025) authorizes the Secretary of State, in consultation with other Cabinet officers, to "determine in his discretion whether the tariff of 25 percent will be imposed on goods from any country that imports Venezuelan oil, directly or indirectly, on or after April 2, 2025."

have a retroactive effect for those products for which contracts are already in place.

- There is no substantive judicial review of any of the foregoing determinations provided by any statute, a position that Defendants embrace. And if there were, there is nothing in IEEPA that would enable a court to determine whether the President has complied with its non-existent directives or limitations.

If Congress had enacted these tariffs, there would be no constitutional objection, both because Congress has the constitutional authority to make all of these policy choices, and because, as provided in Article I, section 7 of the Constitution, such a law would have been passed by both Houses of Congress and either signed by the President or approved by two-thirds of both Houses if he vetoed it. But none of that happens when, as with these tariffs, the President acts unilaterally and promulgates them on his own, solely based on his views of what the tariff policy of the United States should be on any given day.[4] Therefore, if the Court concludes that

---

[4] Since the date of the first tariff announcement on February 1, 2025, and as of July 1, 2025, President Trump has modified, paused, amended, or revoked those tariffs multiple times in significant ways. *See* Addendum to this brief. In addition, the law firm Reed Smith has a Tariff Tracker that provides a more complete report on the "on-again, off-again" approach of President Trump to the imposition of tariffs. Michael J. Lowell, Philippe Heeren, Justin Angotti, Lizbeth Rodriguez-Johnson, Kirsten Lowell, and Courtney E. Fisher, "Trump 2.0 tariff tracker," (June 27, 2025), available at https://www.tradecomplianceresourcehub.com/2025/05/14/trump-2-0-tariff-tracker/; *see also* Jeff Stein, Natalie Allison, and David J. Lynch, "White House eased China tariffs after warnings of harm to 'Trump's people,'" *The Washington Post* (May 15, 2025), available at https://www.washingtonpost.com/business/2025/05/14/trump-tariffs-china-trade/ (recounting how "[the] president has backtracked repeatedly on his tariff policies").

section 1702 authorizes the President to do what he did here, the Court would have to confront the question of whether Congress has essentially ceded the entirety of its legislative power to raise tariffs to the President. If so, that would be a violation of Article I of the Constitution, which provides that "all legislative power" shall be vested in the Congress. As amicus now shows, if section 1702 is read as Defendants urge, it would run afoul of the non-delegation doctrine as enunciated by the Supreme Court, most recently in its *Consumers' Research* ruling.

### B. *FCC v. Consumers' Research* Clarifies that a Statute Like IEEPA Must Contain Enforceable Limits to Survive a Non-Delegation Challenge.

The Supreme Court has decided scores of non-delegation cases since 1935, but its recent ruling in *FCC v. Consumers' Research*, *supra*, makes clear that IEEPA's unbounded grant of power to impose tariffs on any product, in any amount, for any duration, and with any exceptions the President decides, is unconstitutional. To be sure, the law at issue in *Consumers' Research* was upheld against a non-delegation challenge, but the six-Justice majority's careful restatement of the doctrine establishes that, if IEEPA is read to allow the President to impose these tariffs, the statute must be held to be unconstitutional.

The key portion of the opinion is on page 11. The Court there explains the well-established "intelligible principle" test that guides the Court in non-delegation cases. Quoting *Whitman v. American Trucking Assn's, Inc.*, 531 U.S. 457, 475

(2001), the Court stated that "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred" and that the "guidance needed is greater …when an agency action will 'affect the entire national economy' than when it addresses a narrow technical issue (*e.g.*, the definition of 'country [grain] elevators')." By any measure, the "economic revolution" that the President produced under IEEPA is surely on the greater side of the need for guidance.

The Court continued by amplifying its intelligible principle test: "we have generally assessed whether Congress has made clear *both* 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.' *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)" (emphasis added). As for the general policy of imposing tariffs under IEEPA, the statute fails even that quite open-ended requirement because it does not mention tariffs. More significantly, IEEPA fails the "boundaries" requirement because there are no substantive limits of any kind, as amicus showed above. While there are several modest procedural requirements, including certain required reports to Congress, those requirements do not limit what the President can do, and there is no enforcement mechanism if Congress disagrees with the substance of these tariffs, except to pass another law, which the President would surely veto.

The third prong of the restated intelligible principle test relates to judicial review: "we have asked if Congress has provided sufficient standards to enable both 'the courts and the public [to] ascertain whether the agency' has followed the law." *Consumers' Research* at 11 (quoting *OPP Cotton Mills, Inc. v. Administrator of Wage and Hour Div., Dep't of Labor*, 312 U.S. 126, 144 (1941)). All aspects of the FCC program at issue in that case were fully reviewable under 47 U.S.C. § 402, but there is no provision for judicial review in IEEPA, and the Administrative Procedure Act (APA) is unavailable because the President is not an agency subject to the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 800–801 (1992).

Perhaps more significantly, even if the APA or some other law authorized judicial review of whether the President's actions conformed to the law, that task would be impossible because there is no "law," *i.e.*, boundaries or limits in IEEPA, that tell the President either what he must do or what he may not do. Judicial review is not a constitutional requirement per se, but rather a means of assuring that there are limits that satisfy the principle behind the non-delegation doctrine that Article I vests the legislative power in Congress and "that assignment of power to Congress is a bar on its further delegation: Legislative power, we have held, belongs to the legislative branch, and to no other." *Consumers' Research* at 10.[5]

---

[5] In his concurring opinion at page 4, Justice Kavanaugh made the same point about judicial review, quoting from *INS v. Chadha*, 462 U.S. 919, 953–954 (1983):

The challengers in *Consumers' Research* argued that, because there were no numerical limits on the amount that the FCC could require the affected entities and ultimately consumers to pay, the statute violated the non-delegation doctrine. *Id.* at 12. The Court rejected that argument and instead concluded, after a detailed analysis of the many express conditions and limitations included in the statute, that Congress has "sufficiently" confined the agency's discretion to meet the constitutional delegation standards. *Id.* at 19–30. No similar analysis would be possible for IEEPA. It has none of the features of the FCC statute, 47 U.S.C. § 254, that persuaded the majority in *Consumers' Research* to uphold the law because it provided the meaningful "boundaries" that prevent an unconstitutional delegation of legislative power: "Congress made clear the parameters of the programs, and the FCC has operated within them." *Id.* at 25–26. In the course of that discussion, the Court brought in its judicial review point: "the Commission's [statutory] mandate is to raise what it takes to pay for universal-service programs; if the Commission raises much beyond, as if it raises much below, it violates the statute." *Id.* at 20.

The importance of boundaries and judicial review in *Consumers' Research* was not resisted by the Government. To the contrary, its counsel agreed that the

---

"Executive action under legislatively delegated authority … is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review as well as the power of Congress to modify or revoke the authority entirely."

intelligible principle doctrine places real limits on the authority that Congress may confer on the executive branch. "Distinguishing lawful conferrals of discretion from unlawful delegations requires more than just asking 'in the abstract whether there is an 'intelligible principle.'' Congress must delineate both the 'general policy' that the agency must pursue and the 'boundaries of th[e] delegated authority.'" Reply Brief of Federal Petitioners at 3, *FCC v. Consumers' Research*, 606 U.S. __ (2025) (Nos. 24-354 and 24-422), 2025 WL 1773630 (citations omitted) ("Reply Brief"). At oral argument, the Acting Solicitor General, in response to a question from Justice Gorsuch asking whether "in distinguishing between lawful delegations, that … requires more than asking in the abstract whether there is an intelligible principle," replied affirmatively: "We think the -- to the extent the Court is interested in looking to past precedents to tighten their reins, the better approach is not just say, you know, there is kind of mush for the intelligible principle, look to past cases, but to look at the parameters I talked about." Transcript of Oral Argument at 21–22, *FCC v. Consumers' Research*, 606 U.S. __ (2025) (Nos. 24-354 and 24-422) ("*Consumers' Research* Tr."). The problem with the intelligible principle standard alone is that it can always be met at a sufficiently high level of generality. For example, in *Mistretta v. United States*, 488 U.S. 361 (1989), the decision to shift from a system in which judges decided the appropriate sentence on their own, to one with mandatory guidelines, is an "intelligible principle." But the Court did not end its

discussion there, and without the pages of other limitations, the law would have authorized the Sentencing Commission, not Congress, to make scores of policy decisions with no guard posts to restrain it.

The Government was even more specific on the need for statutory limits where the Government is assessing payments from others. The opening to its reply brief answered respondents' charge that the law created "[u]nbounded" power to levy taxes, subject at most to "precatory" standards and "'aspirational' principles" in this way: "If the Universal Service Fund really worked that way, the government would not defend its constitutionality. *Congress may not vest federal agencies with an unbounded taxing power*." Reply Brief at 1–2 (emphasis added). In response to respondents' allegation that the FCC statute is "too 'hazy' or 'contentless,'" the FCC replied: "Were these provisions contentless, the government would not defend their constitutionality." *Id.* at 11. This was followed by the Government's detailed refutation of the claim that the statute lacks boundaries, in which it pointed to the many specific ways in which the agency's ability to impose assessments was constrained. *Id.* at 12–15. At oral argument, counsel emphasized this point over and over, referring to various provisions as "a real limit," *Consumers' Research* Tr. at 7, and asserting that "we are not arguing for a no limits at all approach where you can just raise whatever revenue we feel like … there are qualitative limits that are baked into the statutory scheme, not raise whatever amount of money; you know, a trillion

dollars." *Id*. at 7. The Acting Solicitor General did not argue that the non-delegation doctrine requires rigid lines because "obviously there is a judgment line on how much discretion is too much, but at a minimum Congress is obviously having to provide parameters that you can tell, yes or no, did the agency transgress the boundaries?" *Id.* at 61.

Perhaps most significant of all, the Government recognized the constitutional significance of judicial review in the non-delegation analysis. After reiterating the importance of statutory guidance to the agency, it stated that "the guidance must be 'sufficiently definite' to permit meaningful judicial review of agency action. *Gundy* [*v. United States*, 588 U.S. 128, 158 (2019)] (Gorsuch, J., dissenting) (quoting *Yakus v. United States*, 321 U.S. 414, 426 (1944))." Reply Brief at 4. And in defending the delegation in the FCC statute, the Reply Brief (at 13) emphasized that "Courts have invalidated FCC action that violates those requirements. See Gov't Br. 34." As the Acting Solicitor General explained, "one of the most important" parameters to comply with the non-delegation doctrine asks: "is there sufficiently definite and precise language in the statute to enable Congress, *the courts,* and the public to ascertain whether Congress's rules are followed?" *Consumers' Research* Tr. at 22 (emphasis added).

Justice Gorsuch followed up by asking whether judicial review is "possible," to which counsel replied "Absolutely." Later on, Justice Gorsuch returned to the

same point, asking if there was judicial review where a party objected to the use of money as unauthorized by the statute, and the response was that "would be something that someone could challenge." *Id.* at 42–43. And if someone objected to the way that the FCC is interpreting the statute, "you can bring a challenge to exceeding the scope of the statutory authority." *Id.* at 43.

Despite these representations to the Court, the President and his lawyers have long contended that his decisions, under both IEEPA and other trade statutes generally, are not subject to judicial review because they are discretionary and the President is not bound by the applicable statute. In April 2025, the Government reiterated its position that the means chosen to combat a national emergency under IEEPA is not a matter for the courts:

> IEEPA, by using 'may,' 50 U.S.C. § 1701, and authorizing a variety of actions, *id.* § 1702(a)(1)(B), gives the President discretion over how to deal with the relevant threat. How the President uses that discretion is, again, not subject to judicial review and is instead a matter for the political branches to work out. *See, e.g.*, *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1342–44 (Fed. Cir. 2010) (use of 'may' in statutory authorization to the President meant that 'the President's exercise of his discretion is not subject to judicial review').

Defendants' Response in Opposition to Motion for Preliminary Injunction and Summary Judgment, *V.O.S. Selections, Inc. v. Trump*, Court of International Trade, No 25-00066, April 30, 2025. The Government may be correct that these determinations by the President are not subject to judicial review, but if so, that is a near fatal blow to its effort to save IEEPA from a non-delegation challenge.

**C.    The Supreme Court's Other Non-Delegation Cases Are Consistent with the Requirement that the Applicable Statute Must Contain Limits.**

Rather than attempting to review and reconcile all of the many Supreme Court non-delegation cases, amicus will focus on two tariff cases and two regulatory cases, followed by a discussion of *Gundy v. United States*, 588 U.S. 128 (2019), which signaled an imminent tightening of the Court's non-delegation jurisprudence.

The basic test that the Court uses to determine whether a delegation is excessive asks whether there is an "intelligible principle" provided by Congress to guide the executive; if there is, the statute passes constitutional muster. That test is derived from *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 401 (1928), which, like the instant case, involved the imposition of import duties by the President. However, the statute under review in *Hampton* placed signficant limits on the President's authority. Duties could only be imposed in order to "equalize the . . . differences in costs of production in the United States and the principal competing country" for the product at issue. *Id.* Production costs are a verifiable fact, which provide a clear, objective limit on when duties may be increased under the statute. And even then, additional duties could be imposed only to "equalize" those costs, not in any amount that the President chose. Moreover, those duties could be applied only with respect to imports from "the principal competing country" to the United States, which further limited the statute's reach. Most significantly, the law also

expressly provided that any increase may not exceed "50 per centum of the rates specified in" existing law. *Id.* Further, those requirements were enforceable through judicial review in the United States Customs Court and eventually in the Supreme Court. Based on those significant limits, the Court concluded that Congress had provided an intelligible principle to guide the executive. The IEEPA statute at issue here contains no similar limitations. To the contrary, the President contends that the IEEPA statute delegates to him the authority to impose tariffs in any amount, at any time, against imports from any source, and of indefinite duration.

*Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892) illustrates how Congress can provide meaningful limits on the President's powers without having to write a law that eliminates his discretion entirely. The statute at issue there was applicable only to countries that produced any of five enumerated duty-free products. *Id.* at 680. If such a country imposed "duties or other exactions upon the agricultural or other products of the United States," and if the President concluded that those duties were "reciprocally unequal and unreasonable," his only remedy was to suspend the duty-free status of the imported products from the offending country. *Id.* Moreover, the President had no discretion as to the remedy: if he made the requisite findings, he was required to re-impose the suspended duties, but he could not impose new or additional duties on his own. *Id.* at 693.

At issue in *Mistretta v. United States*, 488 U.S. 361 (1989) was the constitutionality of the Sentencing Reform Act of 1984, 18 U.S.C. §§ 3551–3586, in which Congress established the Sentencing Commission within the judicial branch. Congress assigned the Commission the responsibility to create guidelines that district judges would be required to follow in imposing sentences for persons found guilty of federal crimes. The Court rejected a dual challenge on delegation and separation of powers grounds, with only Justice Scalia dissenting. The most legally significant boundaries in that Act were the statutory maximums (and in some cases minimums) that Congress had enacted and continued to enact and amend for every federal crime. In addition to those limits and the fact that the guidelines only applied to those convicted of a federal crime, the Court summarized in over four pages in the U.S. Reports the many other prohibitions and requirements that Congress included in the statute. 488 U.S. at 374–77. Those provisions did not provide answers to every question, nor completely eliminate the Commission's discretion. Thus, as Justice Scalia noted in his dissent, the law left open "decisions [that] . . . . are far from technical, but are heavily laden (or ought to be) with value judgments and policy assessments." 488 U.S. at 414. Those guidelines, which are now only advisory, would probably survive *Consumers' Research* because, unlike section 1702 of IEEPA, there were significant limits on what the Commission could do there.

Finally, the Clean Air Act at issue in *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) directed "the EPA to set 'ambient air quality standards … which in the judgment of the Administrator, based on [the] criteria [documents of § 108] and allowing an adequate margin of safety, are requisite to protect the public health'" (quoting 42 U.S.C. § 7409(b)(1)). Those standards, which had to be reviewed every five years, could be issued only for air pollutants found on a public list promulgated by the agency under 42 U.S.C. § 7408. *Id.* at 462. The opinion for the Court, written by Justice Scalia who had dissented in *Mistretta*, read the statute to require that these standards must "reflect the latest scientific knowledge," that "EPA must establish uniform national standards," and that the agency must set them "at a level that is requisite to protect public health from the adverse effects of the pollutant in the ambient air," where requisite "mean[s] sufficient, but not more than necessary." *Id.* at 473. In upholding the delegation, the Court concluded that "we interpret [the law] as requiring the EPA to set air quality standards at the level that is 'requisite'—that is, not lower or higher than is necessary—to protect the public health with an adequate margin of safety," and that, as so construed, the Clean Air Act "fits comfortably within the scope of discretion permitted by our precedent." *Id.* at 475–76.

The Supreme Court's decision in *Gundy v. United States*, 588 U.S. 128 (2019) is also consistent with amicus' position that the delegation in IEEPA is

unconstitutional. The four-Justice plurality construed the statute in a way that avoided the delegation question. Three Justices disagreed with that reading of the law at issue and, in a lengthy dissent, expressed dissatisfaction with the intelligible principle test, concluding that the test sustained too many laws in which they believed the delegation to be excessive. *Gundy*, 588 U.S. at 149–179 (Gorsuch, J.; Roberts, C.J.; and Thomas, J., dissenting). Justice Alito voted to uphold the law there, while agreeing that he would be open to reconsidering the non-delegation doctrine in an appropriate case. *Gundy*, 588 U.S. at 148–149 (Alito, J., concurring). And, as anticipated by his concurrence in *Gundy*, Justice Alito joined the dissent in *Consumers' Research.* Justice Kavanaugh, who had not been confirmed when *Gundy* was argued, did not participate in that decision, but, in a subsequent case, indicated his willingness to reconsider the applicable test. *Paul v. United States*, 140 S. Ct. 342 (2019) (statement respecting denial of rehearing).

Although not discussed in either *Consumers' Research* or *Gundy*, the decision in *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548 (1976), is an example of how the intelligible principle test was misused to uphold a statute that effectively delegated to the President the power in the field of international trade "to exercise an unfettered discretion to make whatever laws he thinks may be needed or advisable for the rehabilitation and expansion of trade or industry." *A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537–38 (1935). The statute

at issue in *Algonquin* was section 232 of the Trade Expansion Act of 1962, *supra,* which gave the President power to "adjust imports" when the national security of the United States was threatened. In *Algonquin* he had chosen to impose license fees, rather than tariffs or import quotas. *Algonquin* contended that the statute did not include license fees as an option, and, to support that position, it argued that if section 232 were read to permit the use of license fees, it would be an unconstitutional delegation of legislative authority. In that posture, with no other claim of excess presidential discretion, this Court upheld section 232 as providing the necessary intelligible principle and rejected the limited challenge made there.

Forty-two years later, President Trump exercised his authority under section 232 to impose a 25% tariff on all imported steel from all countries with temporary exemptions for Canada and Mexico. Proclamation No. 9705, 83 Fed. Reg. 11,625 (Mar. 15, 2018). A consortium of importers and users of steel products challenged the tariffs on delegation grounds, but their claims were rejected by the lower courts, which concluded that they were bound by *Algonquin*, and the Supreme Court denied review. *Am. Inst. for Int'l Steel v. United States*, 806 Fed. Appx. 982 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 133 (2020). Unlike IEEPA, there is no doubt that section 232 authorized the President to impose tariffs. For non-delegation purposes, *Algonquin*'s ruling extends only to section 232 and it almost certainly is inconsistent with the careful scrutiny that the Court gave the statute at issue in *Consumers' Research.*

Indeed, as the concurring judge in the Court of International Trade made clear in *Am. Inst. for Int'l Steel*, but for *Algonquin*, he would have found section 232 to be unconstitutional. 376 F. Supp. 3d 1335, 1345–52 (2019) (Katzman, J., dubitante).

### D. *Yoshida* Was Wrongly Decided.

The Government relies on *United States v. Yoshida International, Inc.,* 526 F.2d 560 (C.C.P.A. 1975), both to sustain its claim that IEEPA allows the President to impose tariffs (Defendants' Response in Opposition to Motion for Preliminary Injunction at 12-17, *State of California v. Trump*, Northern District of California, No. 3:25-cv-03372, Dkt. No. 55, May 27, 2025) and, as raised in other cases, to respond to the argument that the delegation to the President is unconstitutional. Amicus agrees with the Plaintiffs-Appellants that the Court of Customs and Patent Appeals erred in *Yoshida* in concluding that the similarly-worded predecessor of IEEPA permitted the President to use it to impose even those very limited tariffs. Because this Court is not bound by *Yoshida*, it is free to decline to apply it to its statutory interpretation of IEEPA, and it should do so.

The *Yoshida* court was also in error in its constitutional analysis as evidenced by the following statement which formed the core of its reasoning:

> presidential actions must be judged in the light of what the President actually did, not in the light of what he could have done. To this we would add, 'and not in the light of what he might do.' Each Presidential proclamation or action under § 5(b) must be evaluated on its own facts and circumstances. To uphold the specific surcharge imposed by Proclamation 4074 is not to approve in advance any future surcharge of

a different nature, or any surcharge differently applied or any surcharge not reasonably related to the emergency declared.

526 F.2d at 577.

Under that approach, it was not surprising that the CCPA did not find the delegation there to be excessive. The tariff was only 10% on "all dutiable items," but if that "would cause the total duty or charge payable to exceed the total duty charge payable at the rate prescribed in column 2 of the Tariff Schedule of the United States, then the column 2 rate shall apply." *Id.* at 568. Moreover, the additional duties lasted only from August 15, 1971, to December 20, 1971, and they were imposed because of a decline in the United States' monetary reserves, producing a balance of payments problem, which appears to be at the core of IEEPA's predecessor. *Id.* at 567, 569. Whatever may be said about those tariffs, they did not constitute an "economic revolution."

The Supreme Court has since made clear in *Whitman v. Am. Trucking Ass'ns* that the CCPA got its delegation analysis wrong in a very important respect. The Court there ruled that courts must resist the temptation to answer the delegation question by focusing solely on what the agency did, rather than on the breadth of the statutory delegation:

> In a delegation challenge, the constitutional question is whether the statute has delegated legislative power to the agency. … The idea that an agency can cure an unconstitutionally standardless delegation of power by declining to exercise some of that power seems to us internally contradictory. The very choice of which portion of the power

to exercise—that is to say, the prescription of the standard that Congress had omitted—would *itself* be an exercise of the forbidden legislative authority. Whether the statute delegates legislative power is a question for the courts, and an agency's voluntary self-denial has no bearing upon the answer.

531 U.S. at 472–73 (emphasis in original). Stated another way, the court in *Yoshida* erred by asking whether the actual tariffs were excessive, rather than asking whether the statute would permit the President to impose the kind and extent of tariffs that President Trump did here. Accordingly, *Yoshida* is not a proper basis to reject a claim that IEEPA, if construed as conferring tariff authority of the sort at issue here, would be an unconstitutional delegation of legislative power to the President, and its approach, and hence its value as precedent, should be rejected by this Court.

## CONCLUSION

For the foregoing reasons, and those advanced by the Plaintiffs–Appellants, this Court should hold that the President lacked authority under IEEPA to impose the tariffs at issue. Such a holding would appropriately avoid the serious constitutional questions raised by the President's actions—questions that, if reached, would compel the conclusion that IEEPA, as interpreted by Defendants, violates the Constitution's non-delegation doctrine. However, if this Court does reach the constitutional non-delegation question, it should hold the delegation in IEEPA is unconstitutional. Under either analysis, the Court should reject this sweeping and dangerous assertion of executive power.

Respectfully submitted,

July 7, 2025 /s/ Alan B. Morrison

ALAN B. MORRISON
**GEORGE WASHINGTON
UNIVERSITY LAW SCHOOL**
2000 H Street NW
Washington, DC 20052
Tel. (202) 994-7120
Fax (202) 994-5157
abmorrison@law.gwu.edu

HARVEY ROSENFIELD
WILLIAM PLETCHER
BENJAMIN POWELL
**CONSUMER WATCHDOG**
6330 San Vicente Blvd. Ste. 250
Los Angeles, CA 90048
Tel. (310) 392-0522
Fax: (310) 392-8874
will@consumerwatchdog.org

Attorneys for Amicus Curiae Consumer
Watchdog

# ADDENDUM

**Presidential Actions Taken Pursuant to the International Emergency Economic Powers Act from January 20, 2025 to July 1, 2025**

| Date | Exec. Order No. | Amount of Tariff | Rationale | Exclusions |
|---|---|---|---|---|
| 2/1/2025 | 14193 (Canada) | 25% on Canadian Goods 10% on Canadian Energy/Energy Resources | Reduce the flow of imported drugs from cartels through the Northern border. | Products described in 50 U.S.C. § 1702(b) |
| 2/1/2025 | 14194 (Mexico) | 25% on Mexican Goods | Reduce the flow of imported drugs from cartels through the Southern border. | Products described in 50 U.S.C. § 1702(b). |
| 2/1/2025 | 14195 (China) | 10% on all Chinese Goods | National emergency posed by "failure of the PRC to" stop the flow of illicit precursors of illegal drugs | Products described in 50 U.S.C. § 1702(b). |
| 2/5/2025 | 14200 (Amends 14195 and allows for de minimis treatment) | Allows for de minimis treatment | No independent rationale given for change | |
| 3/2/2025 | 14226 (Canada) (Amends 14193 and allows for de minimis treatment) | Amends EO 14193 to allow for de minimis treatment | None given | |
| 3/2/2025 | 14227 (Mexico) (Amends 14143 and allows for de minimis treatment) | Amends EO 14194 to allow for de minimis treatment | None given | |

**Presidential Actions Taken Pursuant to the International Emergency Economic Powers Act from January 20, 2025 to July 1, 2025**

| | | | | |
|---|---|---|---|---|
| 3/3/2025 | 14228 (Amends 14195 to 20% from 10%) | 20% on all Chinese Goods | National emergency posed by "failure of the PRC to" stop the flow of illicit precursors of illegal drugs | Products described in 50 U.S.C. § 1702(b). |
| 3/6/2025 | 14231 (Canada) | Reduction to 0% tariff for all products of Canada which meet the USMCA's rules of origin | Automotive industry is critical to American economic and national security. | |
| | | Reduction to 10% tariff from 25% for non-USMCA compliant potash | No potash rationale included | |
| 3/6/2025 | 14232 (Mexico) | Reduction to 0% tariff from 25% for all products of Mexico which meet the USMCA's rules of origin | Automotive industry is critical to American economic and national security. | |
| | | Reduction to 10% tariff from 25% for non-USMCA compliant potash | No rationale included for lower tariffs on potash | |

**Presidential Actions Taken Pursuant to the International Emergency Economic Powers Act from January 20, 2025 to July 1, 2025**

| 3/24/2025 | 14245 | 25% on all goods from countries importing Venezuelan Oil that Sec'y State (in consultation with Sec Commerce, Sec Homeland Security, and US Trade Representative) determines should have the tariff applied to. | National Security threat posed by Venezuelan regime and international criminal organizations | The only criteria is a finding from Sec'y Commerce that a country imports the oil, then Sec'y State can apply this tariff to that country. There is no finding required on the part of Sec'y State. It is "at his discretion" whether to apply the tariff. | |

**Presidential Actions Taken Pursuant to the International Emergency Economic Powers Act from January 20, 2025 to July 1, 2025**

| Date | EO | | | |
|---|---|---|---|---|
| 4/2/205 | 14256 | Close de minimis exemption and to impose tariffs on postal shipments because "many shippers based in the People's Republic of China (PRC) . . . often avoid detection due to administration of the de minimis exemption". | Eliminated de minimis exemption from EO 14200. Applies tariff to Chinese goods sent through postal network. | |
| 4/2/2025 | 14257 | Threat posed by other countries' disparate tariff rates and non-tariff barriers, domestic economic policies, and the "large and persistent annual U.S. goods trade deficits" that result. | 10% tariff on all imports except Canada and Mexico with higher rates for certain countries listed in Annex I. China is 34% in Annex I. Other countries in Annex I include South Korea (25%), Zimbabwe (18%), Botswana (37%), Thailand (36%), and the | Exceptions: <br> - All goods listed in Annex II (including copper, pharmaceuticals, semiconductors, lumber articles, critical minerals, and energy and energy products) <br> - 50 USC 1702(b) <br> - Steel/aluminum and derivative articles subject to Section 232 duties <br> - Automobiles and automotive parts subject to Section 232 duties |

**Presidential Actions Taken Pursuant to the International Emergency Economic Powers Act from January 20, 2025 to July 1, 2025**

| Date | EO | Description | Rationale / Notes | Exceptions |
|---|---|---|---|---|
| July 1, 2025 | | European Union (20%) | | - All products which may become subject to Section 232 duties<br>- Goods from Canada/Mexico |
| 4/8/2025 | 14259 | Increases tariff on Chinese imports to 84% from 34% | Response to retaliatory tariff imposed by China in response to EO 14257. | Exceptions<br>- Same as EO 14257 |
| 4/9/2025 | 14266 | Increases tariff on Chinese imports to 125% from 84%<br><br>Lowers country-specific tariff rates in Annex I EO 14257 to 10% for a period of 90 days (except for China) | Chinese tariff increased in response to Chinese retaliation<br><br>Suspension of higher country specific tariffs for 90 days implemented to encourage countries to engage in direct negotiation with the administration. | Exceptions<br>- Same as EO 14257 |
| 4/29/2025 | 14289 | Attempts to clarify how multiple tariffs on the same good apply | Rationale is that stacking tariffs results in a cumulative tariff that exceeds what is "necessary to achieve the intended policy goals" | |

**Presidential Actions Taken Pursuant to the International Emergency Economic Powers Act from January 20, 2025 to July 1, 2025**

| 5/12/2025 | 14298 | Lowers China-specific tariff rate to 10% for a period of 90 days | The United States has entered into discussions with China, which marks a significant step by China toward remedying non-reciprocal trade arrangements and addressing the concerns of the United States relating to economic and national security matters |
|---|---|---|---|

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | No. 25-3493

I am the attorney or self-represented party.

**This brief contains** | 6,555 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Benjamin Powell | **Date** | 7/7/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 7, 2025, that all participants in the case are registered CM/EFC users and that service will be accomplished by the appellate CM/ECF system.

/s/ Benjamin Powell
BENJAMIN POWELL