No. 25-3493

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
————————

STATE OF CALIFORNIA, et al.,

Plaintiffs-Appellants,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants-Appellees.
————————

On Appeal from the United States District Court
for the Northern District of California
————————

### BRIEF FOR APPELLEES
————————

BRETT A. SHUMATE
*Assistant Attorney General*

CRAIG H. MISSAKIAN
*United States Attorney*

SARAH WELCH
*Counsel to the Assistant Attorney
General*

MARK R. FREEMAN
MICHAEL S. RAAB
BRAD HINSHELWOOD
DANIEL WINIK
SOPHIA SHAMS
*Attorneys, Appellate Staff*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3180*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..................................................................iii

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION ...................................... 4

STATEMENT OF ISSUE........................................................ 4

PERTINENT STATUTORY PROVISIONS.......................... 4

STATEMENT OF THE CASE................................................ 4

    A.    Statutory Background ................................................4

    B.    Factual Background ...................................................12

        1.    Trafficking-related tariffs................................12

        2.    Reciprocal tariffs..............................................15

        3.    Initial effects of tariffs....................................17

    C.    Litigation...................................................................18

SUMMARY OF ARGUMENT ............................................. 20

STANDARD OF REVIEW ................................................... 22

ARGUMENT......................................................................... 23

The District Court Lacked Jurisdiction .......................... 23

    A.    The CIT has jurisdiction because this case arises out of the HTSUS. ....................................................23

    B.    Even if this case arises only out of IEEPA, IEEPA provides for tariffs.........................................40

CONCLUSION ................................................................ 63

STATEMENT OF RELATED CASES .............................. 64

CERTIFICATE OF COMPLIANCE .............................. 65

ADDENDUM ................................................................ 66

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Al-Bihani v. Obama,*
  619 F.3d 1 (D.C. Cir. 2010) ................................................................ 53

*American Int'l Grp., Inc. v. Islamic Republic of Iran,*
  657 F.2d 430 (D.C. Cir. 1981) ........................................................... 49

*American Power & Light Co. v. SEC,*
  329 U.S. 90 (1946) .............................................................................. 59

*Arko Foods Int'l, Inc. v. United States,*
  654 F.3d 1361 (Fed. Cir. 2011) .......................................................... 24

*B-West Imports, Inc. v. United States,*
  75 F.3d 633 (Fed. Cir. 1996) .............................................................. 54

*Babb v. Wilkie,*
  589 U.S. 399 (2020) ............................................................................ 50

*Biden v. Nebraska,*
  600 U.S. 477 (2023) ....................................................................... 51, 52

*Board of Trs. of Univ. of Ill. v. United States,*
  289 U.S. 48 (1933) .............................................................................. 45

*Border Infrastructure Env't Litig., In re,*
  915 F.3d 1213 (9th Cir. 2019) ....................................................... 29, 30

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States,*
  63 F.4th 25 (Fed. Cir. 2023) .............................................................. 42

*BP P.L.C. v. Mayor & City Council of Balt.,*
  141 S. Ct. 1532 (2021) ........................................................................ 48

*Cargo of Brig Aurora v. United States,*
  11 U.S. (7 Cranch) 382 (1813) ...................................................... 54, 58

*Commodities Exp. Co. v. U.S. Customs Serv.,*
  957 F.2d 223 (6th Cir. 1992) .............................................................. 40

*Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*,
  18 F.3d 1581 (Fed. Cir. 1994) .......................................................... 28

*Cornet Stores v. Morton*,
  632 F.2d 96 (9th Cir. 1980) ...................................... 21, 23, 39, 48, 50

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ............................................... 9, 11, 43, 54

*Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
  601 U.S. 42 (2024) .......................................................................... 60

*Department of the Navy v. Egan*,
  484 U.S. 518 (1988) ........................................................................ 53

*Earth Island Inst. v. Brown*,
  28 F.3d 76 (9th Cir. 1994) .............................................................. 33

*Earth Island Inst. v. Christopher*,
  6 F.3d 648 (9th Cir. 1993) ....................................................... 23, 39

*Emily Ley Paper, Inc. v. Trump*,
  2025 WL 1482771 (N.D. Fla. May 20, 2025) ............................ 27, 28

*FCC v. Consumers' Rsch.*,
  2025 WL 1773630 (U.S. June 27, 2025) ................................... 53, 58

*Federal Energy Admin. v. Algonquin SNG, Inc.*,
  426 U.S. 548 (1976) ................................... 21-22, 42, 43, 58

*Florida v. HHS*,
  19 F.4th 1271 (11th Cir. 2021) ....................................................... 55

*Franchise Tax Bd. v. Construction Laborers Vacation Tr.*,
  463 U.S. 1 (1983) ............................................................................ 31

*Garcia v. Service Emps. Int'l Union*,
  993 F.3d 757 (9th Cir. 2021) .......................................................... 22

*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022) .................................................. 3, 21, 36, 38

iv

*Georgia v. Public.Resource.Org, Inc.*,
   590 U.S. 255 (2020) ............................................................ 44

*Gibbons v. Ogden*,
   22 U.S. (9 Wheat.) 1 (1824) ..................................... 22, 42

*Gundy v. United States*,
   588 U.S. 128 (2019) ............................................................ 58

*Haig v. Agee*,
   453 U.S. 280 (1981) ............................................................ 53

*Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*,
   586 U.S. 123 (2019) ..................................................... 44, 48

*Hertz Corp. v. Friend*,
   559 U.S. 77 (2010) ....................................................... 38, 39

*Holy Land Found. v. Ashcroft*,
   333 F.3d 156 (D.C. Cir. 2003) ........................................ 48

*International Lab. Rights Fund v. Bush*,
   357 F. Supp. 2d 204 (D.D.C. 2004) ...................... 29, 32, 33

*International Lab. Rights Educ. & Rsch. Fund v. Bush*,
   954 F.2d 745 (D.C. Cir. 1992) ........................................ 30

*J.W. Hampton, Jr., & Co. v. United States*
   276 U.S. 394 (1928) .................................................. 5, 58, 59

*Jennings v. Rodriguez*,
   583 U.S. 281 (2018) ............................................................ 56

*K Mart Corp. v. Cartier, Inc.*,
   485 U.S. 176 (1988) ................................................. 24, 30, 38

*Learning Res., Inc. v. Trump*,
   2025 WL 1525376 (D.D.C. May 29, 2025),
   *appeal pending*, No. 25-5202 (D.C. Cir.) ...................... 27, 43, 44, 56

*Lorillard v. Pons*,
   434 U.S. 575 (1978) ............................................................ 43

*Louisville & Nashville R.R. Co. v. Mottley*,
  211 U.S. 149 (1909) ............................................................... 31

*Marshall Field & Co. v. Clark*,
  143 U.S. 649 (1892) ........................................................... 5, 58

*Mayes v. Biden*,
  67 F.4th 921 (9th Cir.),
  *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023) ................. 51

*Miami Free Zone Corp. v. Foreign Trade Zones Bd.*,
  22 F.3d 1110 (D.C. Cir. 1994) ............................................. 40

*Michael Simon Design, Inc. v. United States*,
  609 F.3d 1335 (Fed. Cir. 2010) ..................................... 24, 36

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) ............................................................. 45

*Pentax Corp. v. Myhra*,
  72 F.3d 708 (9th Cir. 1995) .......................................... 21, 39

*PrimeSource Bldg. Prods., Inc. v. United States*,
  59 F.4th 1255 (Fed. Cir. 2023),
  *cert. denied*, 144 S. Ct. 345 .............................................. 36

*Regan v. Wald*,
  468 U.S. 222 (1984) ......................................................... 9, 49

*Roth v. Foris Ventures, LLC*,
  86 F.4th 832 (9th Cir. 2023) ......................................... 40-41

*Sale v. Haitian Ctrs. Council, Inc.*,
  509 U.S. 155 (1993) ....................................................... 53, 57

*Salinas v. United States*,
  522 U.S. 52 (1997) .............................................................. 62

*SCM Corp. v. U.S. ITC*,
  549 F.2d 812 (D.C. Cir. 1977) ............................................ 40

vi

*Seila Law LLC v. CFPB,*
  591 U.S. 197 (2020) ............................................................... 51

*Solar Energy Indus. Ass'n v. United States,*
  86 F.4th 885 (Fed. Cir. 2023),
  *modified on reh'g,* 111 F.4th 1349 (Fed. Cir. 2024) ........................ 36

*Transpacific Steel LLC v. United States,*
  4 F.4th 1306 (Fed. Cir. 2021) .............................................. 36

*United States v. California Stem Cell Treatment Ctr., Inc.,*
  117 F.4th 1213 (9th Cir. 2024) ............................................ 52

*United States v. Curtiss-Wright Export Corp.,*
  299 U.S. 304 (1936) ....................................................... 57

*United States v. Haggar Apparel Co.,*
  526 U.S. 380 (1999) ....................................................... 28

*United States v. Shih,*
  73 F.4th 1077 (9th Cir. 2023),
  *cert. denied,* 144 S. Ct. 820 (2024) ..................................... 55

*United States v. Spawr Optical Rsch., Inc.,*
  685 F.2d 1076 (9th Cir. 1982) .......................................... 47, 55

*United States v. Universal Fruits & Vegetables Corp.,*
  370 F.3d 829 (9th Cir. 2004) ........................................... 21, 39

*United States v. U.S. Shoe Corp,*
  523 U.S. 360 (1998) ....................................................... 62

*United States v. Yoshida Int'l, Inc.,*
  526 F.2d 560 (C.C.P.A. 1975) ............................. 3, 7, 22, 37, 43, 45,
                                                          46-47, 47, 50, 60, 61

*Utility Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ....................................................... 52

*V.O.S. Selections, Inc. v. United States,*
  772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025),
  *appeals pending,* Nos. 25-1812, -1813 (Fed. Cir.) ............. 3, 20, 26-27

*Wayman v. Southard*
23 U.S. (10 Wheat.) 1 (1825) .............................................................. 58

*Webber v. DHS*,
2025 WL 1207587 (D. Mont. Apr. 25, 2025),
*appeal pending*, No. 25-2717 (9th Cir.) ...................................... 27, 28

*West Virginia v. EPA*,
597 U.S. 697 (2022) .................................................................. 51, 54-55

*Yamashita v. LG Chem, Ltd.*,
62 F.4th 496 (9th Cir. 2023) ............................................................. 30

*Zemel v. Rusk*,
381 U.S. 1 (1965) ................................................................................ 57

**Statutes:**

Act of Mar. 2, 1799,
ch. 22, § 61, 1 Stat. 627 ......................................................................5

Act of May 28, 1926,
ch. 411, 44 Stat. 669 ..........................................................................28

Customs Administration Act of 1890,
ch. 407, 26 Stat. 131 ..........................................................................28

First War Powers Act,
ch. 593, tit. III, § 301, 55 Stat. 838, 839-840 (1941)...........................7

International Emergency Economic Powers Act (IEEPA),
Pub. L. No. 95-223, tit. II, 91 Stat. 1626 (1977)
(codified as amended at 50 U.S.C. § 1701 *et seq.*)........................... 1
    50 U.S.C. § 1701(a) ................................................ 1, 10, 56, 59
    50 U.S.C. § 1701(a)(1) ..................................................... 56
    50 U.S.C. § 1701(b) .......................................................... 59
    50 U.S.C. § 1702(a)(1)(A) ................................................... 9
    50 U.S.C. § 1702(a)(1)(B) ...... 1, 10, 21, 35, 41, 46, 47, 48, 52, 59
    50 U.S.C. § 1702(a)(1)(C) .............................................. 9-10

50 U.S.C. § 1702(b) ................................................................ 44, 59
50 U.S.C. § 1702(b)(1)-(4) ............................................................. 10
50 U.S.C. § 1702(b)(3) .................................................................. 10
50 U.S.C. § 1703 ........................................................................ 59
50 U.S.C. § 1703(a) ..................................................................... 10
50 U.S.C. § 1703(b)-(c) ................................................................. 10
50 U.S.C. § 1703(d) ..................................................................... 10

National Emergencies Act (NEA),
    Pub. L. No. 94-412, 90 Stat. 1255 (1976) .............................................8
    50 U.S.C. § 1621(a) .................................................................. 8
    50 U.S.C. § 1622(a)(1) ............................................................... 8
    50 U.S.C. § 1622(b) .................................................................. 9
    50 U.S.C. § 1622(c)(3) ............................................................... 9
    50 U.S.C. § 1622(d) .................................................................. 9

Reciprocal Trade Agreements Act of 1934,
    ch. 474, 48 Stat. 943, 943-945
    (codified as amended at 19 U.S.C. § 1351) ..........................................6

Smoot-Hawley Tariff Act of 1930,
    ch. 497, § 338, 46 Stat. 590, 704-706
    (codified as amended at 19 U.S.C. § 1338) ..........................................6

Trade Act of 1974,
    Pub. L. No. 93-618, 88 Stat. 1978 (1975):
        Tit. II, 88 Stat. at 2011-2041
            (codified as amended at 19 U.S.C. § 2251 *et seq.*) .........................6
        Tit. III, 88 Stat. at 2041-2056
            (codified as amended at 19 U.S.C. § 2411 *et seq.*) .........................7

Trade Expansion Act of 1962,
    Pub. L. No. 87-794, 76 Stat. 872
    (codified as amended at 19 U.S.C. § 1862) ..........................................6
        19 U.S.C. § 1862 ................................................................ 42
        19 U.S.C. § 1862(c)(1)(A)(ii) ................................................... 6

Trading with the Enemy Act (TWEA),
    ch. 106, 40 Stat. 411 (1917) ................................................6
        § 11, 40 Stat. at 422-423 ..........................................7
            50 U.S.C. § 4302 ................................................ 9

Pub. L. No. 95-223, § 101(a),
    91 Stat. 1625 (1977) ................................................... 9

19 U.S.C. § 1202 ................................................................ 24

19 U.S.C. § 1338 ................................................................ 61

19 U.S.C. § 3004(c) .......................................... 18, 34, 35, 35-36

19 U.S.C. § 3004(c)(1) .................................................... 25

19 U.S.C. § 3004(c)(1)(C) ............................................ 2, 20

19 U.S.C. § 3007 .............................................................. 24

19 U.S.C. § 2132 .............................................................. 61

19 U.S.C. § 2483 .............................................................. 35

21 U.S.C. § 360bbb-2 ....................................................... 45

28 U.S.C. § 1291 ................................................................. 4

28 U.S.C. § 1337(c) ..........................................................23

28 U.S.C. § 1581 .............................................................. 23,

28 U.S.C. § 1581(i) ............................................................. 4

28 U.S.C. § 1581(i)(1) ................................ 2, 20, 24, 26, 29, 45

28 U.S.C. § 1581(i)(1)(B) ............................... 2, 20, 24, 25, 33

28 U.S.C. § 1581(i)(1)(D) ............................ 2, 20, 24, 25, 33-34

**Regulatory Materials:**

Exec. Order No. 12,543,
  51 Fed. Reg. 875 (Jan. 9, 1986) ......................................................... 11

Exec. Order No. 12,544,
  51 Fed. Reg. 1235 (Jan. 10, 1986) ..................................................... 11

Exec. Order No. 13,159,
  65 Fed. Reg. 39,279 (June 21, 2000) ................................................ 11

Exec. Order No. 13,222,
  66 Fed. Reg. 44,025 (Aug. 17, 2001) .......................................... 11-12

Exec. Order No. 14,105,
  88 Fed. Reg. 54,867 (Aug. 9, 2023) .................................................. 12

Exec. Order No. 14,144,
  90 Fed. Reg. 6755 (Jan. 16, 2025) .................................................... 12

Exec. Order No. 14,193,
  90 Fed. Reg. 9113 (Feb. 7, 2025) ..................................................... 13

Exec. Order No. 14,194,
  90 Fed. Reg. 9117 (Feb. 7, 2025) ..................................................... 13

Exec. Order No. 14,195,
  90 Fed. Reg. 9121 (Feb. 7, 2025) ....................................... 13, 14, 25

Exec. Order No. 14,228,
  90 Fed. Reg. 11,463 (Mar. 7, 2025) ................................................. 14

Exec. Order No. 14,256,
  90 Fed. Reg. 14,899 (Apr. 7, 2025) ...................................................15

Exec. Order No. 14,257,
  90 Fed. Reg. 15,041 (Apr. 7, 2025) .................................. 1, 15, 16, 25

Exec. Order No. 14,259,
  90 Fed. Reg. 15,509 (Apr. 14, 2025) ............................................... 16

Exec. Order No. 14,266,
    90 Fed. Reg. 15,625 (Apr. 15, 2025) .................................................... 16, 17, 25

Exec. Order No. 14,298,
    90 Fed. Reg. 21,831 (May 21, 2025) ................................................................ 17

Exec. Order No. 14,309,
    90 Fed. Reg. 26,419 (June 16, 2025) ............................................................... 17

Proclamation No. 4074,
    36 Fed. Reg. 15,724 (Aug. 17, 1971) ................................................................. 7

Proclamation No. 10,886,
    90 Fed. Reg. 8327 (Jan. 29, 2025) ................................................................... 13

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ....................................................................... 4

**Legislative Materials:**

Global Trade Accountability Act,
    S. 1060, 118th Cong., 1st sess. (2023) ..............................................................47

H.R. Rep. No. 95-459 (1977) ..................................................................7, 11

*National Emergencies Act: Hearings on H.R. 3884 Before the*
    *Subcomm. on Admin. Law & Gov't Relations of the S. Comm.*
    *on the Judiciary*, 94th Cong. 27 (1975) .............................................................8

Protecting Our Democracy Act,
    S. 2921, 117th Cong., 1st sess. (2021) ..............................................................47

Reclaiming Congressional Trade Authority Act of 2019,
    S. 899, 116th Cong., 1st sess. (2019) ...............................................................47

S. Rep. No. 96-466 (1979) ......................................................................28

**Other Authorities:**

89 Fed. Reg. 66,187 (Aug. 13, 2024) .................................................. 12

89 Fed. Reg. 87,761 (Nov. 4, 2024) ................................................... 11

89 Fed. Reg. 88,869 (Nov. 7, 2024) ................................................... 12

*Implementation of Additional Duties on Products of the People's*
  *Republic of China Pursuant to the President's February 1, 2025*
  *Executive Order Imposing Duties To Address the Synthetic Opioid*
  *Supply Chain in the People's Republic of China,*
  90 Fed. Reg. 9038 (Feb. 5, 2025) .................................................. 25

Joint Statement on U.S.-China Economic and Trade
  Meeting in Geneva (May 12, 2025),
  https://www.whitehouse.gov/briefings-statements/
  2025/05/joint-statement-on-u-s-china-economic-and-
  trade-meeting-in-geneva/ ...........................................................17

Joint Statement on Framework for United States-Indonesia
  Agreement on Reciprocal Trade (July 22, 2025),
  https://www.whitehouse.gov/briefings-statements/
  2025/07/joint-statement-on-framework-for-united-
  states-indonesia-agreement-on-reciprocal-trade/ ..............................17-18

*Notice of Implementation of Addressing Certain Tariffs on*
  *Imported Articles Pursuant to the President's Executive*
  *Order 14289,* 90 Fed. Reg. 21,487 (May 20, 2025) ......................................... 26

*Notice of Implementation of Additional Duties on Products of*
  *Canada Pursuant to the President's Executive Order 14193,*
  *Imposing Duties To Address the Flow of Illicit Drugs Across*
  *Our Northern Border,* 90 Fed. Reg. 11,423 (Mar. 6, 2025) ...................... 25-26

*Regulate*:
  Black's Law Dictionary (5th ed. 1979) .................................................. 41, 43
  Webster's Third New International Dictionary (1976) ...............................41

Antonin Scalia & Bryan A. Garner, *Reading Law:*
  *The Interpretation of Legal Texts* (2012) ............................................................46

Stay Order, *V.O.S. Selections, Inc. v. United States*,
  No. 1:25-cv-66 (Ct. Int'l Trade June 3, 2025), Dkt. 63 .......................... 27, 38

U.S. Int'l Trade Comm'n, *Harmonized Tariff Schedule*,
  https://hts.usitc.gov/ (last visited July 27, 2025) ......................................24

# INTRODUCTION

President Trump has found that America's exploding trade deficit, the implications of that deficit for our economy and national security, and a fentanyl importation crisis that has claimed thousands of American lives constitute national emergencies. To address those emergencies, the President invoked his authority under the International Emergency Economic Powers Act (IEEPA), which authorizes him to "regulate … importation" of foreign goods to "deal with any unusual and extraordinary threat" to "national security, foreign policy, or [the U.S.] economy." 50 U.S.C. §§ 1701(a), 1702(a)(1)(B); *see* Pub. L. No. 95-223, tit. II, 91 Stat. 1626 (1977) (codified as amended at 50 U.S.C. § 1701 *et seq.*). Under that authority, the President has imposed tariffs on Canada, Mexico, and the People's Republic of China (PRC) to stem the fentanyl crisis and imposed further reciprocal tariffs on imports from all trading partners to remedy "a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits," Exec. Order No. 14,257, 90 Fed. Reg. 15,041, 15,041 (Apr. 7, 2025).

Plaintiffs here challenge the imposition of these tariffs, contending that because of the President's actions, they and others will pay higher tariff rates than Congress has authorized. The district court properly declined to reach the merits of those claims, recognizing that such challenges fall within the exclusive jurisdiction of the Court of International Trade (CIT), a specialized Article III court of national jurisdiction that addresses disputes of this nature. Congress has given the CIT "exclusive jurisdiction" over "any civil action commenced against" the federal government "that arises out of any law of the United States providing for … tariffs" or for "administration and enforcement with respect to" such tariffs. 28 U.S.C. § 1581(i)(1), (B), (D).

This action plainly falls within the CIT's jurisdiction because plaintiffs challenge modifications to the Harmonized Tariff Schedule of the United States (HTSUS). The HTSUS is the substantive law that prescribes tariffs, and modifications to it are "considered to be statutory provisions of law for all purposes." 19 U.S.C. § 3004(c)(1)(C).

Shortly before the district court's ruling here, the CIT correctly concluded that it had exclusive jurisdiction over a virtually identical challenge because "a challenge to a presidential action that imposes tariffs, duties, or other import restrictions is one that arises from a 'law providing for' those

measures." *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1366 (Ct. Int'l Trade 2025) (per curiam), *appeals pending*, Nos. 25-1812, -1813 (Fed. Cir.). Just one district court has disagreed with that jurisdictional conclusion, in a decision that has been stayed pending the government's appeal. And this Court has repeatedly held that the CIT, not district courts, must resolve disputes over the scope of the CIT's exclusive jurisdiction.

Plaintiffs' contrary view—that the CIT has jurisdiction if IEEPA authorizes tariffs, but the district court has jurisdiction if IEEPA does not—violates the basic principle that courts should not read jurisdictional statutes in a way that "would make a court's jurisdiction … dependent upon the merits of the claim." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 554 (2022). But even if that were how § 1581(i) operated, jurisdiction would still be in the CIT, as IEEPA authorizes tariffs. The phrase "regulate … importation" plainly encompasses the power to impose tariffs, and the same language in IEEPA's predecessor statute was interpreted by the Federal Circuit's predecessor to include the power to impose tariffs—a holding Congress recognized in re-enacting precisely the same language in IEEPA. *See United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 575-576 (C.C.P.A. 1975).

## STATEMENT OF JURISDICTION

The district court correctly determined that it lacked jurisdiction because 28 U.S.C. § 1581(i) vests the CIT with exclusive jurisdiction over the case. The district court entered judgment dismissing the case on June 2, 2025, and California timely filed this appeal on the same day. ER-52–53; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUE

Whether the district court correctly concluded that it lacks jurisdiction because 28 U.S.C. § 1581(i) vests the CIT with exclusive jurisdiction over actions, like this one, arising out of a law providing for tariffs or administration and enforcement with respect to tariffs.

## PERTINENT STATUTORY PROVISIONS

Pertinent statutory provisions are reproduced in the addendum.

## STATEMENT OF THE CASE

### A. Statutory Background

1. The Constitution grants the President broad powers over foreign affairs and national security. Congress has long supplemented these powers by delegating to the President the authority to manage tariffs or duties on foreign imports in response to dynamic international conditions. In 1799, for

- 4 -

instance, Congress authorized the President to "establish[] fit and proper regulations for estimating the duties on goods, wares and merchandise imported into the United States, in respect to which the original cost shall be exhibited in a depreciated currency." Act of Mar. 2, 1799, ch. 22, § 61, 1 Stat. 627, 673.

The Supreme Court has repeatedly upheld presidential exercises of such authority. In *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), for example, the Court upheld the Tariff Act of 1890, which authorized the President to suspend an exemption for certain products from import duties "for such time as he shall deem just" when he determined that the exporting country was "impos[ing] duties or other exactions" on American products that he "deem[ed] to be reciprocally unequal and unreasonable," *id.* at 680 (quotation marks omitted). And in *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928), the Court upheld the Tariff Act of 1922, which empowered the President to raise import duties if he found that existing tariffs did not equalize the differences between foreign and domestic production costs, and to modify the tariffs "when he determine[d]" that "the differences in costs of production ha[d] changed," *id.* at 401-402.

Congress has since enacted many other statutes authorizing the President to impose or modify tariffs or duties on imports. They include:

- Section 338 of the Smoot-Hawley Tariff Act of 1930, ch. 497, § 338, 46 Stat. 590, 704-706 (codified as amended at 19 U.S.C. § 1338), which authorizes tariffs of up to 50% to combat certain forms of trade discrimination against the United States;

- the Reciprocal Trade Agreements Act of 1934, ch. 474, 48 Stat. 943, 943-945 (codified as amended at 19 U.S.C. § 1351), which authorizes the President to negotiate reductions to U.S. tariff rates through reciprocal trade agreements with other countries;

- Section 232 of the Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872, 877 (codified as amended at 19 U.S.C. § 1862), which authorizes the President to "adjust the imports" of articles and their derivatives to address threats to national security, 19 U.S.C. § 1862(c)(1)(A)(ii);

- Title II of the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978, 2011-2041 (1975) (codified as amended at 19 U.S.C. § 2251 *et seq.*), which authorizes the President to impose duties of up to 50%, for up to four years (with extensions to eight years), to safeguard domestic industries; and

- Title III of the Trade Act of 1974, 88 Stat. at 2041-2056 (codified as amended at 19 U.S.C. § 2411 *et seq.*), which authorizes the President to impose duties for up to four years (with indefinite extensions) in response to measures that violate trade agreements or that are unreasonable or discriminatory and burden or restrict U.S. commerce.

In particular, Congress has long delegated to the President authority to regulate importation during national emergencies. In 1917, it enacted the Trading with the Enemy Act (TWEA), ch. 106, 40 Stat. 411, which authorized

the President to specify foreign goods that may not be imported during wartime "except at such time or times, and under such regulations or orders … as the President shall prescribe." *Id.* § 11, 40 Stat. at 422-423. And in 1941, Congress extended that authority to peacetime, amending TWEA to allow the President to "regulate … importation" of foreign goods not just in wartime but "during any other period of national emergency" he declares. First War Powers Act, ch. 593, tit. III, § 301, 55 Stat. 838, 839-840 (1941).

In 1971, President Nixon imposed peacetime tariffs similar to those at issue here. *See* Proclamation No. 4074, 36 Fed. Reg. 15,724 (Aug. 17, 1971). Finding that a "prolonged decline in the international monetary reserves" of the United States over a number of years had seriously threatened its "international competitive position" and potentially impaired its ability to assure national security, *id.* at 15,724, President Nixon "declared a national emergency with respect to the balance-of-payments crisis and under that emergency imposed a surcharge on imports," H.R. Rep. No. 95-459, at 5 (1977) (IEEPA House Report). In *United States v. Yoshida International, Inc.*, 526 F.2d 560 (C.C.P.A. 1975), the Federal Circuit's predecessor held that TWEA authorized those tariffs. *Id.* at 575-576.

2.　　In 1976 and 1977, Congress modified TWEA through two new laws: the National Emergencies Act (NEA), Pub. L. No. 94-412, 90 Stat. 1255 (1976), and IEEPA.

The NEA "authorize[s]" "the President" "to declare [a] national emergency" "[w]ith respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. § 1621(a).  The NEA does not specify what sorts of conditions the President may declare to be an emergency, given the difficulty of "circumscrib[ing] with words what conditions a President might be confronted." *National Emergencies Act: Hearings on H.R. 3884 Before the Subcomm. on Admin. Law & Gov't Relations of the S. Comm. on the Judiciary*, 94th Cong. 27 (1975) (statement of Sen. Mathias); *see id.* at 31 ("[W]e didn't attempt to define it specifically because we were afraid we would circumscribe the President's constitutional powers."); *id.* at 27 (statement of Sen. Church) (similar).

But Congress retained for itself the power to "terminate[]" a declared emergency through "a joint resolution."  50 U.S.C. § 1622(a)(1).  The NEA provides that Congress is directed to consider exercising that oversight power by convening in each House "to consider a vote on a joint resolution" terminating an emergency "[n]ot later than six months after a national

- 8 -

emergency is declared, and not later than the end of each six-month period thereafter that such emergency continues." *Id.* § 1622(b). It provides a special fast-track procedure, directing that joint resolutions reported by committees be "voted upon within three calendar days." *Id.* § 1622(c)(3). And it provides that any emergency not terminated by joint resolution "shall terminate on the anniversary of the declaration of that emergency if" the President does not timely notify Congress that the emergency "continue[s]." *Id.* § 1622(d).

Congress also separated the President's authority to act in wartime and peacetime. It amended TWEA to remove the President's peacetime emergency powers under that Act. Pub. L. No. 95-223, § 101(a), 91 Stat. 1625, 1625 (1977); *see* 50 U.S.C. § 4302. It then re-enacted in IEEPA "essentially the same" peacetime powers previously supplied by TWEA. *See Regan v. Wald*, 468 U.S. 222, 227-228 (1984). Indeed, IEEPA's operative language was "directly drawn" from TWEA. *Dames & Moore v. Regan*, 453 U.S. 654, 671 (1981).

IEEPA affords the President numerous powers with respect to foreign assets—including, for example, the power to "regulate[] or prohibit" certain foreign monetary transactions, 50 U.S.C. § 1702(a)(1)(A), and to "confiscate" certain property during "armed hostilities" or following an "attack[]," *id.*

- 9 -

§ 1702(a)(1)(C). The provision of IEEPA most relevant here authorizes the President to "prevent or prohibit" or "regulate … any … importation … of … any property in which any foreign country or a national thereof has any interest." *Id.* § 1702(a)(1)(B).

IEEPA provides that "[a]ny authority granted to the President" by § 1702 "may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). There are narrow exceptions; for example, the President cannot "regulate or prohibit … the importation from any country … of any information or informational materials." *Id.* § 1702(b)(3). But none of those exceptions is implicated here. *See id.* § 1702(b)(1)-(4).

Congress gave itself oversight authority over exercises of IEEPA powers beyond that afforded by the NEA. *See id.* § 1703(d). For example, IEEPA directs the President to "consult regularly with the Congress so long as [IEEPA] authorities are exercised." *Id.* § 1703(a). The President also is directed to "immediately transmit to the Congress a report" on the national emergency, to be updated every six months. *Id.* § 1703(b)-(c). Even so, the

Congress that enacted IEEPA recognized that its "new authorities should be sufficiently broad and flexible to enable the President to respond as appropriate and necessary to unforeseen contingencies." IEEPA House Report 10. For instance, Congress rejected a proposal "that it place a definite time limit on the duration of any state of national emergency." *Id.*

Presidents have invoked IEEPA's authorities many times over the years. President Carter, for example, seized Iranian assets in response to the hostage crisis at the American Embassy in Tehran. *See Dames & Moore*, 453 U.S. at 662. That order has been renewed continuously since 1979. *See* 89 Fed. Reg. 87,761 (Nov. 4, 2024) (most recent renewal). President Reagan issued executive orders prohibiting commerce with Libya and freezing Libyan assets. Exec. Order No. 12,543, 51 Fed. Reg. 875 (Jan. 9, 1986); Exec. Order No. 12,544, 51 Fed. Reg. 1235 (Jan. 10, 1986). President Clinton blocked Russian assets related to the implementation of an agreement for the disposition of highly enriched uranium extracted from nuclear weapons. Exec. Order No. 13,159, 65 Fed. Reg. 39,279 (June 21, 2000). President George W. Bush invoked IEEPA to maintain the export control system previously established under a different statute; that order, too, has been maintained since its initial promulgation. *See* Exec. Order No. 13,222, 66 Fed. Reg. 44,025 (Aug. 17,

2001); 89 Fed. Reg. 66,187 (Aug. 13, 2024) (most recent renewal). And President Biden took numerous actions under IEEPA, on topics ranging from cybersecurity, Exec. Order No. 14,144, 90 Fed. Reg. 6755 (Jan. 16, 2025); to sensitive military- and intelligence-related technologies, Exec. Order No. 14,105, 88 Fed. Reg. 54,867 (Aug. 9, 2023); to securities investments financing PRC companies, 89 Fed. Reg. 88,869 (Nov. 7, 2024).

## B. Factual Background

Since taking office, President Trump has declared national emergencies and imposed tariffs to address those emergencies. The tariffs challenged here address two types of emergencies identified by the President: the influx of contraband drugs into the United States from Mexico, Canada, and the PRC, and conditions resulting from the exploding U.S. trade deficit and the lack of reciprocity in the United States's trading relationships. No one disputes that President Trump has followed the procedural requirements of the NEA and IEEPA to declare these emergencies or to issue the challenged orders.

### 1. Trafficking-related tariffs

a. *Mexico and Canada.* In January 2025, the President declared the flow of contraband drugs like fentanyl through illicit distribution networks,

and the public-health consequences, to be a national emergency. Proclamation No. 10,886, 90 Fed. Reg. 8327 (Jan. 29, 2025). The President then "expand[ed] the scope of the national emergency declared in that [p]roclamation to cover" certain conduct by the governments of Canada and Mexico that, in the President's judgment, had contributed to the crisis. Exec. Order No. 14,193, 90 Fed. Reg. 9113, 9114 (Feb. 7, 2025); Exec. Order No. 14,194, 90 Fed. Reg. 9117, 9118 (Feb. 7, 2025). Based on that determination, the President invoked IEEPA to impose tariffs on certain imports of Canadian and Mexican products, concluding "that action under other authority to impose tariffs [was] inadequate to address this unusual and extraordinary threat." 90 Fed. Reg. at 9114; 90 Fed. Reg. at 9118.

b. *China*. The President further "expand[ed] the scope of the national emergency declared in" the initial proclamation to include conduct by the PRC government. Exec. Order No. 14,195, 90 Fed. Reg. 9121, 9122 (Feb. 7, 2025). The President determined that the PRC government "has subsidized and otherwise incentivized PRC chemical companies to export fentanyl and related precursor chemicals that are used to produce synthetic opioids sold illicitly in the United States"; that "the PRC provides support to and safe haven for PRC-origin transnational criminal organizations (TCOs) that

- 13 -

launder the revenues from the production, shipment, and sale of illicit synthetic opioids"; that "[m]any PRC-based chemical companies … go to great lengths to evade law enforcement and hide illicit substances in the flow of legitimate commerce"; and that "[t]he flow of contraband drugs like fentanyl to the United States through illicit distribution networks has created a national emergency, including a public health crisis in the United States." *Id.* at 9121.

As with Canada and Mexico, the President determined that the PRC's conduct "constitutes an unusual and extraordinary threat, which has its source in substantial part outside the United States, to the national security, foreign policy, and economy of the United States." 90 Fed. Reg. at 9122. He accordingly invoked his power under IEEPA to impose an additional 10% *ad valorem* duty on most PRC products. *Id*. at 9122-9123. The President subsequently increased the additional duty rate to 20% on the grounds that "the PRC has not taken adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions[] and that the crisis described in Executive Order 14195 has not abated." Exec. Order. No. 14,228, 90 Fed. Reg. 11,463, 11,463 (Mar. 7, 2025). And the President suspended the de minimis duty exemption for covered low-value imports from the PRC, concluding that

many PRC-based shippers "hide illicit substances and conceal the true contents of shipments sent to the United States through deceptive shipping practices" and may "avoid detection" if low-value shipments are exempt from tariffs. Exec. Order No. 14,256, 90 Fed. Reg. 14,899, 14,899 (Apr. 7, 2025).

### 2. Reciprocal tariffs

The President declared an additional emergency in early April, determining that "a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States" with "its source in whole or substantial part outside the United States." 90 Fed. Reg. at 15,041. In declaring the emergency, the President explained his judgment that "[l]arge and persistent annual U.S. goods trade deficits have led to the hollowing out of our manufacturing base; inhibited our ability to scale advanced domestic manufacturing capacity; undermined critical supply chains; and rendered our defense-industrial base dependent on foreign adversaries." *Id.* These deficits, the President determined, "are

caused in substantial part by a lack of reciprocity in our bilateral trade relationships." *Id.*

The President accordingly acted "to rebalance global trade flows" and to strengthen the United States' domestic manufacturing and defense industrial base by imposing an additional 10% tariff "on all imports from all trading partners," with certain exceptions enumerated in the executive order, which took effect on April 5. 90 Fed. Reg. at 15,045. The President also imposed additional country-specific tariffs, which were set to take effect April 9, on numerous countries. *Id.*

The President has also taken subsequent actions that he determined were necessary and appropriate to address this national emergency. On April 9, he suspended most country-specific tariffs for 90 days, because many trading partners had taken significant steps "toward remedying non-reciprocal trade arrangements and aligning sufficiently with the United States on economic and national security matters." Exec. Order No. 14,266, 90 Fed. Reg. 15,625, 15,626 (Apr. 15, 2025). But he raised the reciprocal tariff rate for imports from the PRC, concluding that doing so was necessary to respond to retaliation by the PRC. *Id.*; *see* Exec. Order No. 14,259, 90 Fed. Reg. 15,509 (Apr. 14, 2025). More recently, the President suspended the

additional PRC reciprocal tariffs for 90 days "[i]n recognition of the intentions of the PRC to facilitate addressing the national emergency."  Exec. Order No. 14,298, 90 Fed. Reg. 21,831, 21,832 (May 21, 2025).

### 3.  Initial effects of tariffs

The tariffs have prompted discussions with trading partners to facilitate solutions to economic and national-security crises found by the President.  According to Executive Order 14,266, many "foreign trading partners … have approached the United States to address the lack of trade reciprocity in our economic relationships and our resulting national and economic security concerns."  90 Fed. Reg. at 15,626.  These negotiations have, for example, produced the general terms of a historic trade deal with the United Kingdom and frameworks to implement deals with China and Indonesia. *See* Exec. Order No. 14,309, 90 Fed. Reg. 26,419 (June 16, 2025) (starting to implement terms of UK deal); Joint Statement on U.S.-China Economic and Trade Meeting in Geneva (May 12, 2025), https://www.whitehouse.gov/briefings-statements/2025/05/joint-statement-on-u-s-china-economic-and-trade-meeting-in-geneva/; Joint Statement on Framework for United States-Indonesia Agreement on Reciprocal Trade (July 22, 2025), https://www.whitehouse.gov/briefings-statements/2025/07/joint-

statement-on-framework-for-united-states-indonesia-agreement-on-recip-

rocal-trade/.

### C.    Litigation

Appellants are the State of California and California Governor Gavin

Newsom.  They brought this suit to challenge the trafficking-related tariffs

on Mexico, Canada, and China, as well as the reciprocal tariffs, and sought

a declaration that the challenged tariffs are unlawful and an injunction bar-

ring the agency defendants from implementing or enforcing the challenged

tariffs.  ER-51; SER-4–5.  The government moved to transfer the case to the

CIT because the CIT possesses exclusive jurisdiction.  Plaintiffs later moved

for a preliminary injunction.

The district court concluded that it lacked jurisdiction over plaintiffs'

claims and dismissed the case without prejudice for lack of jurisdiction.  ER-

4.  The court explained that this lawsuit "arises out of President Trump's

executive orders imposing tariffs" because it "originates from, grows out of,

and flows from" those orders.  ER-10.  And those orders are "laws of the

United States," the court determined, because they modify or direct the

modification of the HTSUS, the contents of which are "provisions of law for

all purposes."   ER-6 (quoting 19 U.S.C. § 3004(c)); ER-10.   The court

accordingly concluded that the lawsuit "arises out of laws providing for tariffs" and "falls within the CIT's exclusive jurisdiction." ER-5–6.

The district court further explained that although § 3004(c) provides that HTSUS modifications made by the President "under authority of law" are statutory provisions, that language does not suggest that "courts should conduct a threshold review to decide whether the President's modification to the Harmonized Tariff Schedule is lawful." ER-12. Doing so, the court noted, "would require [it] to decide whether IEEPA permits the tariffs President Trump imposed"—the ultimate merits question. ER-12.

Finally, the district court explained that exercising jurisdiction here would conflict "with Congressional intent" to place "international trade" cases in the CIT, as well as with the CIT's own determinations in the several similar challenges it was entertaining and with the determinations of other district courts regarding the same jurisdictional question. ER-13–14.

Plaintiffs asked the district court to dismiss their case (presumably to enable this appeal) rather than transferring the case to the CIT if the court concluded it lacked jurisdiction. The district court accordingly dismissed this case without prejudice. ER-15–18.

## SUMMARY OF ARGUMENT

A.    The district court correctly concluded that it lacked jurisdiction, so this Court should affirm.  The CIT's exclusive jurisdiction encompasses all "civil actions" against the government that "arise[] out of any law of the United States providing for … tariffs" or "for … administration and enforcement with respect to" tariffs.  28 U.S.C. § 1581(i)(1), (B), (D).  This is such a case because plaintiffs challenge executive orders modifying the HTSUS, and both the HTSUS and modifications to it are "considered to be statutory provisions of law for all purposes."  19 U.S.C. § 3004(c)(1)(C).  The CIT has accordingly concluded that it has exclusive jurisdiction over a materially identical suit, *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1366 (Ct. Int'l Trade 2025) (per curiam), *appeals pending*, Nos. 25-1812, -1813 (Fed. Cir.), and the district courts are virtually unanimous that challenges to these tariffs fall within the CIT's exclusive jurisdiction.

Plaintiffs argue that their claims arise exclusively out of IEEPA, but that argument relies on an atextual narrowing of the jurisdictional statute and lacks support in precedent.  The statute looks to the laws from which the lawsuit arises, not just the law on which the executive action was premised.  Even if plaintiffs' claims arise out of IEEPA, they also arise out of the

law that directly injures plaintiffs: the HTSUS and modifications. Plaintiffs'
view has little to recommend it. It would make jurisdiction rise and fall with
the merits of plaintiffs' claim that IEEPA does not authorize tariffs, under-
mining Congress's deliberate routing of such matters to a single forum and
ignoring the principle that jurisdictional statutes typically do not "make a
court's jurisdiction … dependent upon the merits of the claim." *Garland v.
Aleman Gonzalez*, 596 U.S. 543, 554 (2022). It would also ignore this Court's
repeated cautions that district courts should allow the CIT to determine its
own jurisdiction. *United States v. Universal Fruits & Vegetables Corp.*, 370 F.3d
829, 836 (9th Cir. 2004); *Pentax Corp. v. Myhra*, 72 F.3d 708, 711 (9th Cir. 1995);
*Cornet Stores v. Morton*, 632 F.2d 96, 98 (9th Cir. 1980).

B. Even if plaintiffs were right that jurisdiction depends on whether
IEEPA authorizes the President to impose the challenged tariffs, the Court
should remand for the district court to consider that question in the first in-
stance, or affirm. IEEPA authorizes the President to "regulate … importa-
tion" of certain property. 50 U.S.C. § 1702(a)(1)(B). Tariffs are a way of con-
trolling or adjusting imports and thus a way of "regulat[ing]" them, accord-
ing to the plain meaning of that word. Supreme Court precedents bolster
that conclusion. *See Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S.

548, 561 (1976); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 202 (1824). The Federal Circuit's predecessor interpreted TWEA's identical language to include the power to "impos[e] an import duty surcharge." *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 576 (C.C.P.A. 1975). And Congress, knowing of that interpretation, ratified it by later incorporating in IEEPA exactly the language construed broadly in *Yoshida*. IEEPA's text, history, and precedent thus all support the conclusion that it authorizes tariffs.

Plaintiffs invoke extrastatutory doctrines to put a thumb on the textual scale. But the major-questions doctrine is inapplicable here, both because IEEPA delegates power directly to the President and because there is no basis for skepticism that Congress meant for IEEPA to allow the challenged tariffs. Ordinary nondelegation principles are likewise inapplicable in this foreign-affairs context, and to the extent the ordinary standard is applicable, IEEPA easily satisfies it. And there is no basis to construe IEEPA's emergency authorities narrowly on the ground that Congress has elsewhere supplied the President with certain non-emergency tariff authorities.

## STANDARD OF REVIEW

The Court "review[s] the existence of subject matter jurisdiction de novo." *Garcia v. Service Emps. Int'l Union*, 993 F.3d 757, 762 (9th Cir. 2021).

# ARGUMENT

## THE DISTRICT COURT LACKED JURISDICTION

### A.  The CIT has jurisdiction because this case arises out of the HTSUS.

This Court should affirm the district court's ruling that it lacks jurisdiction because plaintiffs' claims "arise[] out of" the HTSUS and the President's modifications to it in the challenged orders.  That conclusion accords with circuit precedent holding that the CIT's predecessor court had exclusive jurisdiction over tariffs imposed under IEEPA's predecessor statute.  *Cornet Stores v. Morton*, 632 F.2d 96, 97, 99-100 (9th Cir. 1980).  Intervening changes in the CIT's jurisdiction have only strengthened that conclusion:  The CIT "retain[ed] the jurisdiction of the prior Customs Court," and the addition of § 1581(i) further "expanded the jurisdiction of the CIT beyond that of the earlier Customs Court."  *Earth Island Inst. v. Christopher*, 6 F.3d 648, 651 (9th Cir. 1993).  And the district court correctly construed § 1581(i) to grant the CIT exclusive jurisdiction over this action.

1.  Congress has granted the CIT exclusive jurisdiction over a host of different types of suits addressing international-trade matters.  28 U.S.C. § 1581.  District courts lack jurisdiction over such matters.  *See id.* § 1337(c);

- 23 -

*K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 182-183 (1988).  As relevant here, the CIT's exclusive jurisdiction encompasses "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for … tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue" or "any law of the United States providing for … administration and enforcement with respect to" such tariffs.  28 U.S.C. § 1581(i)(1), (B), (D).

Plaintiffs' challenge here "arises out of" a "law of the United States providing for … tariffs" or for their "administration and enforcement"—specifically, the HTSUS and the President's modifications to it in the challenged executive orders.

a.     The HTSUS establishes the tariff rates for most merchandise imported into the United States.  *See* 19 U.S.C. § 1202; *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1336 (Fed. Cir. 2010).[1]  The statute establishing the HTSUS specifies that "[e]ach modification or change made to the

---

[1] Although it is "codified at 19 U.S.C. § 1202," *Arko Foods Int'l, Inc. v. United States*, 654 F.3d 1361, 1363 (Fed. Cir. 2011), the HTSUS is not published in the U.S. Code; it is instead separately published by the International Trade Commission.  *See* 19 U.S.C. § 3007; Int'l Trade Comm'n, *Harmonized Tariff Schedule*, https://hts.usitc.gov/ (last visited July 27, 2025).

Harmonized Tariff Schedule by the President under authority of law," as well as "[t]he provisions of the Harmonized Tariff Schedule … enacted by" Congress, "shall be considered to be statutory provisions of law for all purposes." 19 U.S.C. § 3004(c)(1). The HTSUS, and modifications to it, are therefore both "law[s] of the United States providing for … tariffs" and "law[s] of the United States providing for … administration and enforcement with respect to" tariffs, 28 U.S.C. § 1581(i)(1)(B), (D).

The challenged executive orders modified the HTSUS—for example, by "inserting … new headings" providing for specific tariff rates applicable to goods from each country, 90 Fed. Reg. at 15,090, by "modifying the HTSUS to temporarily suspend" certain tariffs, 90 Fed. Reg. at 15,626, or by directing the Secretary of Homeland Security to alter the HTSUS to effectuate the orders, 90 Fed. Reg. at 9123. That is why plaintiffs ask for relief from actions "implementing or enforcing" the orders—which includes the publication of notices modifying the HTSUS. ER-50–51; *see, e.g.*, *Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9038 (Feb. 5, 2025); *Notice of Implementation of Additional Duties on Products of*

*Canada Pursuant to the President's Executive Order 14193, Imposing Duties To Address The Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11,423 (March 6, 2025); *Notice of Implementation of Addressing Certain Tariffs on Imported Articles Pursuant to the President's Executive Order 14289*, 90 Fed. Reg. 21,487 (May 20, 2025).

This case thus plainly "arises out of," 28 U.S.C. § 1581(i)(1), the HTSUS and the executive orders modifying it, as laws providing for tariffs and for the implementation and enforcement of tariffs. The crux of plaintiffs' claims is that the imposition of higher tariff rates will harm California and its residents. *See, e.g.*, SER-18–23. Those higher tariff rates are imposed by the executive orders and the modifications to the HTSUS that the executive orders effectuate or direct. The district court thus correctly concluded that this suit "originates from, grows out of, and flows from the executive orders through which the President imposed tariffs," which "modify, or instruct the Department of Homeland Security to modify," the HTSUS. ER-10.

The CIT has accordingly explained that it has exclusive jurisdiction over challenges to these tariffs. The CIT observed that the challenged executive orders "made amendments to the HTSUS," which "is the law of the United States setting tariffs." *V.O.S. Selections*, 772 F. Supp. 3d at 1366. And

after the district court's decision here, the CIT reiterated (in a ruling address-ing the government's motions to stay the injunction the CIT had issued) that it had jurisdiction because the challenged executive orders "effect changes to the [HTSUS]" and are thus "laws" within the meaning of § 1581(i)(1), in that they "they modify a statute" and "bind Customs to collect duties at the rates they prescribe." *V.O.S. Selections, Inc. v. United States*, No. 25-cv-66, Dkt. 63, at 3 (Ct. Int'l Trade June 3, 2025) (*V.O.S.* Stay Order). Two other district courts facing challenges to the same tariffs have likewise recognized that suits of this type belong exclusively in the CIT. *See Webber v. DHS*, 2025 WL 1207587 (D. Mont. Apr. 25, 2025), *appeal pending*, No. 25-2717 (9th Cir.); *Emily Ley Paper, Inc. v. Trump*, 2025 WL 1482771 (N.D. Fla. May 20, 2025). A third district court reached a different conclusion, *Learning Res., Inc. v. Trump*, 2025 WL 1525376 (D.D.C. May 29, 2025), *appeal pending*, No. 25-5202 (D.C. Cir.), in a decision that has been stayed pending the government's ap-peal of that ruling.

b. Congress's choice to consolidate tariff challenges in the CIT, with appellate review in the Federal Circuit, reflects its longstanding view of the importance of judicial uniformity in this specialized domain. For more than a century, Congress has vested a single national court with exclusive

jurisdiction over tariff cases, *see* Customs Administration Act of 1890, ch. 407, 26 Stat. 131 (establishing Board of Appraisers); Act of May 28, 1926, ch. 411, 44 Stat. 669 (establishing Customs Court), ensuring "uniformity and consistency" by designating a single forum with "expertise in international trade and tariff matters," *Conoco, Inc. v. U.S. Foreign-Trade Zones Bd.*, 18 F.3d 1581, 1586 (Fed. Cir. 1994); *see, e.g.*, *United States v. Haggar Apparel Co.*, 526 U.S. 380, 394 (1999) (CIT's "expertise … guides it in making complex determinations in a specialized area of the law"); *Webber*, 2025 WL 1207587, at *7; *Emily Ley Paper*, 2025 WL 1482771, at *8.  That choice reflects the importance, in the international-trade arena, of "eliminat[ing] the possibility of conflicting decision[s]" from different courts and ensuring "expeditious decisions in matters which are important both to our country and to our trading partners."  S. Rep. No. 96-466, at 3-4 (1979).

2. Plaintiffs contend that their claims "arise[]" solely "out of" IEEPA, not out of the executive orders or HTSUS.  That argument lacks a basis in text or precedent and does not accurately characterize their claims.  More than one substantive law can and does give rise to plaintiffs' action—not just IEEPA, but also the orders and HTSUS provisions imposing the tariffs that plaintiffs challenge.

a.   Plaintiffs agree with the government and the district court that a claim "arises out of" the "'substantive law giving rise to'" it.  Br. 15-16 (quoting *International Lab. Rights Fund v. Bush*, 357 F. Supp. 2d 204, 208 (D.D.C. 2004)).  They likewise apparently agree that a lawsuit arises out of a law when the lawsuit "originates or stems from" the law.  *In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1220 (9th Cir. 2019); Br. 18 (quoting this passage).  Plaintiffs differ by arguing that a lawsuit arises *only* out of "the substantive law pursuant to which the executive branch took the challenged action"—here, in their view, IEEPA.  Br. 16.

That requirement cannot be squared with the text of § 1581(i).  Section 1581(i) focuses on the legal authority implicated by the "civil action," 28 U.S.C. § 1581(i)(1), without limiting the jurisdictional inquiry solely to the law on which the Executive Branch's action was premised, Br. 16.  (Indeed, § 1581(i)(1)(B) does not mention any Executive Branch action imposing tariffs; nor does jurisdiction under that provision turn on whether tariffs are imposed through an Executive Branch action.  The provision would readily give the CIT jurisdiction over an action challenging a statute that imposed tariffs without any Executive Branch involvement.)  The statute's text naturally directs an inquiry about the claims the lawsuit asserts and the legal

- 29 -

authority that it challenges.  *See K Mart*, 485 U.S. at 188 (recognizing that "Congress granted the [CIT] exclusive jurisdiction over suits relating to "tariffs, duties, fees," and the like); *International Lab. Rights Educ. & Rsch. Fund v. Bush*, 954 F.2d 745, 747 (D.C. Cir. 1992) (Henderson, J., concurring) (action fell "squarely within" CIT's jurisdiction "because the claims raised … 'relate to' duties").  Here, as explained, plaintiffs' claims challenge the lawfulness of the imposition of tariffs via modifications of the HTSUS.

Plaintiffs' attempt to narrow the statute cannot be squared with precedent, either.  The Court has confronted similar questions in the personal-jurisdiction context, where it asks whether a lawsuit "arises out of" the defendant's forum contacts.  The Court has "long understood" that a lawsuit "arises out of" any forum contacts that are a "'but-for caus[e]'" of the injury for which the plaintiff seeks a remedy.  *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 504, 506 (9th Cir. 2023).  Here too, the "arising out of" inquiry focuses on the laws that are but-for causes of the lawsuit—including the laws from which the plaintiff's legal injury "originates" or "stems."  Br. 18 (quoting *In re Border Infrastructure Env't Litig.*, 915 F.3d at 1220).  Adopting a different rule would leave the CIT's jurisdiction vulnerable to manipulation by the sort of artful pleading that courts have long rejected in other jurisdictional

contexts. *See, e.g.*, *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149 (1909) (well-pleaded complaint rule); *Franchise Tax Bd. v. Construction Laborers Vacation Tr.*, 463 U.S. 1 (1983) (artful-pleading rule).

In this case, as explained, the substantive law causing plaintiffs' alleged injuries, and thus a substantive law from which their claims arise, is not just IEEPA, but also the executive orders and modifications to the HTSUS imposing the tariffs that (they say) cause their injuries. The orders and HTSUS modifications caused plaintiffs' alleged injuries and precipitated plaintiffs' lawsuit, so they cannot deny that their action originates from, grows out of, and flows from the orders and modifications at least as much as it originates from IEEPA. *See* ER-10. That the lawsuit *also* arises out of IEEPA, which conferred the authority for the orders and modifications, does not change that the orders and HTSUS modifications are the legal authority that directly imposes the obligations that allegedly injure plaintiffs, that plaintiffs seek to invalidate those orders and modifications, or that those orders and modifications are "statutory provisions of law for all purposes." ER-11. Indeed, if plaintiffs did *not* seek to invalidate the HTSUS provisions imposing the tariffs, the HTSUS provisions would remain in effect, and a

decision that addressed only IEEPA would amount to an advisory opinion that would leave plaintiffs' alleged injuries unredressed.

The cases plaintiffs cite unsurprisingly do not support their theory that their lawsuit arises only out of IEEPA as "the substantive law pursuant to which the executive branch took the challenged action." Br. 16. *International Labor Rights Fund*, the district court decision on which they primarily rely, considered a challenge to executive branch *inaction*, so it could hardly have announced the rule plaintiffs attribute to it about the basis for a challenged executive branch *action*. *Id.* Nor did it purport to announce such a rule. The court concluded only that a plaintiff cannot evade the jurisdiction of the CIT over a trade-sanctions matter by arguing that its claims "arise[] out of" the Administrative Procedure Act, which supplied its cause of action, instead of the underlying substantive trade statute, which was the only relevant source of substantive law. *International Labor Rights Fund*, 357 F. Supp. 2d at 208. The district court's rejection of that dodge said nothing about whether a challenge can arise out of more than one law or whether a challenge to tariffs arises out of modifications to the HTSUS or executive orders directing them. And here, there is more than one relevant source of substantive law giving rise to plaintiffs' action—not just IEEPA, but also the orders and HTSUS

provisions imposing the tariffs that plaintiffs challenge. Moreover, the court emphasized that "the CIT ha[d] previously exercised jurisdiction over" similar cases and that "uniformity" was important—considerations that, as discussed, cut sharply against plaintiffs here. *Id.* at 209.

*Earth Island Institute v. Brown*, 28 F.3d 76 (9th Cir. 1994), is even farther afield. There too, the plaintiffs challenged the executive branch's refusal to act, so the Court never suggested (as plaintiffs claim) that a case "arises out of" only the substantive law giving rise to the challenged executive branch action. *Id.* at 77. And the parties did not dispute the law from which the claims arose. The dispute instead centered on whether the "import ban" that the statute contemplated amounted to an "embargo" for purposes of jurisdiction. *Id.* at 77-78. Resolving that question did not require the Court to determine the law from which the case arose or to evaluate the underlying merits.

Even if plaintiffs were right that IEEPA is the only relevant substantive law "providing for … tariffs," 28 U.S.C. § 1581(i)(1)(B), that would still be no answer to the argument that the HTSUS modifications, at a minimum, provide for "administration and enforcement with respect to" tariffs, *id.* § 1581(i)(1)(D); *see Miami Free Zone Corp. v. Foreign Trade Zones Bd.*, 22 F.3d

- 33 -

1110, 1112 (D.C. Cir. 1994) (holding that "with respect to matters" in § 1581(i)(1)(D) "is more expansive" than the preceding paragraphs). They do so by identifying the products subject to the tariffs announced pursuant to IEEPA in the President's executive orders and ensuring that customs agents collect the relevant payments. Plaintiffs' focus on the substantive basis for the imposition of the tariffs fails to undercut this independent basis for jurisdiction under § 1581(i).

b.    That leaves plaintiffs' argument that the modifications and orders are not laws because "a modification is considered a 'statutory provision[] of law' only if a President's modifications" to the HTSUS are themselves lawful—another attempt to make jurisdiction turn on the underlying merits. Br. 21 (quoting 19 U.S.C. § 3004(c)). That argument fails, too. Section 3004(c) provides for maintenance of the HTSUS through updates by the President to reflect currently effective tariffs. It specifies that the President's updates to the HTSUS "shall be considered to be statutory provisions of law" if the updates are "made … under authority of law (including Section 604 of the Trade Act of 1974)." 19 U.S.C. § 3004(c).

Section 604 authorized the modifications of the HTSUS at issue here—without requiring an inquiry into whether IEEPA provides tariff authority—

so the modifications were "made … under authority of law" for the purposes of § 3004(c). 19 U.S.C. § 3004(c). Section 604, codified at 19 U.S.C. § 2483, provides the President with legal authority to update the HTSUS to reflect "the substance of" laws "affecting import treatment" any "actions thereunder." IEEPA is plainly a law "affecting import treatment," regardless of whether it provides tariff authority: No one disputes that it gives the President various powers over imports, such as the power to impose embargoes. *See* 50 U.S.C. § 1702(a)(1)(B) ("prevent or prohibit … importation"). Nor can there be a dispute that the challenged executive orders are "actions" taken under IEEPA. 19 U.S.C. § 2483. That is all the inquiry that Section 604 requires. And because Section 604 authorizes the modifications to the HTSUS, the modifications were "made … under authority of law" for purposes of 19 U.S.C. § 3004(c). *See* ER-12 (observing that "section 3004 does not say 'under authority of valid law'").

c. Plaintiffs' challenge to the lawfulness of tariffs in the HTSUS is in the heartland of the CIT's exclusive jurisdiction. Plaintiffs have identified *no* case in which a district court has entertained a challenge from a party asserting that it is being subject to unlawful tariffs set forth in the HTSUS, and we are aware of none. The CIT and the Federal Circuit, by contrast, hear

such challenges routinely. *See, e.g.*, *Solar Energy Indus. Ass'n v. United States*, 86 F.4th 885 (Fed. Cir. 2023), *modified on reh'g*, 111 F.4th 1349 (Fed. Cir. 2024); *PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255 (Fed. Cir. 2023); *Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021).

Plaintiffs' argument would require district courts to treat the merits of plaintiffs' claim and the jurisdictional issue as a single inquiry. But the Supreme Court has cautioned against reading jurisdictional statutes in a way that "would make a court's jurisdiction … dependent upon the merits of the claim." *Aleman Gonzalez*, 596 U.S. at 554. For good reason: Where Congress has provided for review of a class of cases in a particular court, "it would be nonsensical to say that the jurisdiction of the reviewing body is limited to instances in which the underlying decision construes and applies the statute correctly." *Michael Simon Design*, 609 F.3d at 1341. The CIT's exclusive jurisdiction thus cannot be evaded simply by asserting that a particular statute does not authorize tariffs. Otherwise, any plaintiff could thwart Congress's goal of consolidating tariff matters in a specialized court by artful pleading, and any district court could eliminate the benefits of a specialized national court of exclusive jurisdiction by simply declaring that the CIT lacked jurisdiction and issuing a contrary ruling. The CIT, by contrast, would have

jurisdiction to grant judgment in the government's favor but would be required to dismiss for lack of jurisdiction without granting relief whenever it concluded that tariffs were in fact not authorized by the relevant statute. In either instance, Congress's goal of national uniformity in the administration of tariff matters would be thwarted.

The CIT's jurisdiction has never been treated in this nonsensical fashion. The CIT's predecessor, for example, granted judgment to plaintiffs on the merits after concluding that tariffs imposed under TWEA were not authorized by statute, before being reversed by the Federal Circuit's predecessor. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975). The CIT thus quite properly emphasized, in the parallel challenge to the tariffs at issue here, that its jurisdiction "does not hinge on whether IEEPA authorizes tariffs as a categorical matter." *V.O.S.* Stay Order at 3. Otherwise, the CIT observed, it would "have exclusive jurisdiction to hear only *un*successful claims of *ultra vires* presidential tariff orders," which "would accomplish the opposite of 'remedy[ing] the confusion over the division of jurisdiction between … the [CIT] … and the district courts and … ensur[ing] uniformity in the judicial decisionmaking process.'" *Id.* at 3 n.2 (quoting *K Mart*, 485 U.S. at 188).

The CIT's approach is consistent with the Supreme Court's refusal to read a jurisdictional statute to mean that, "if [a] court ultimately rejected the claim on the merits, that holding would mean that the court never had jurisdiction." *Aleman Gonzalez*, 596 U.S. at 554. And it has the "administrative simplicity" that the Supreme Court treats as "a major virtue in a jurisdictional statute." *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010). Requiring the parties to litigate the merits in order to determine jurisdiction would "invite[] greater litigation," "eating up time and money as the parties litigate" over jurisdiction. *Id.* And depriving the CIT of jurisdiction over meritorious challenges to statutory authority, while making it the only court that can decide faulty challenges to statutory authority, is the sort of "strange result[]," defying the parties' need for jurisdictional "certainty and predictability," that the Supreme Court discourages in this context. *Id.* (quotation marks omitted).

Plaintiffs' cavalier approach to rejecting the CIT's jurisdiction is all the more remarkable because it disregards this Court's deferential approach to the CIT's (and the Federal Circuit's) determination of jurisdiction over such cases. This Court has tasked district courts with "upholding the exclusivity of the Customs Court jurisdiction." *Cornet*, 632 F.2d at 98 (quotation marks

omitted) (affirming district court's jurisdictional dismissal of a case challenging President Nixon's TWEA tariffs); *see Earth Island Inst.*, 6 F.3d at 651 (affirming jurisdictional dismissal of challenge to embargo provision). To the extent that a court has any doubt about the correctness of the CIT's prior jurisdictional ruling, "the prudent thing to do" is to "transfer the case to the CIT so that the CIT can determine the question of its own jurisdiction," rather than introducing uncertainty into this area through conflicting rulings. *Pentax Corp. v. Myhra*, 72 F.3d 708, 711 (9th Cir. 1995); *see United States v. Universal Fruits & Vegetables Corp.*, 370 F.3d 829, 836 (9th Cir. 2004) (remanding with instructions to transfer to CIT because "the CIT may be able to hear this case" (alteration and quotation marks omitted)).

Other courts sensibly take the same approach. *See Miami Free Zone*, 22 F.3d at 1113 (deferring to the Federal Circuit's conclusion that the CIT possessed exclusive jurisdiction over a challenge to the creation of a foreign trade zone, despite "some support" for a contrary conclusion); *SCM Corp. v. U.S. ITC*, 549 F.2d 812, 821 (D.C. Cir. 1977) (concluding "that the Customs Court itself should be given the opportunity to … determine whether or not it has jurisdiction" despite "far from frivolous doubts concerning" its jurisdiction); *Commodities Exp. Co. v. U.S. Customs Serv.*, 957 F.2d 223, 227 (6th Cir.

1992) (granting preclusive effect to CIT's determination of its own jurisdiction because "the CIT has the power to decide its own jurisdiction"). Plaintiffs' arguments give no consideration to the prudential course this Court and its sister circuits have established to respect Congress's allocation of exclusive jurisdiction to the CIT.

### B. Even if this case arises only out of IEEPA, IEEPA provides for tariffs.

If the Court were to conclude that jurisdiction turns on the merits, it should remand for the district court to evaluate the merits in the first instance. That treatment would accord with the Court's position as "a court of review, not first view." *Roth v. Foris Ventures, LLC*, 86 F.4th 832, 838 (9th Cir. 2023) (quotation marks omitted) (remanding for district court to rule on a "potentially dispositive issue in the first instance"). But if the Court decides to reach the question in the first instance itself, it should still affirm. IEEPA's text, history, and precedent confirm that it clearly empowers the President to impose tariffs to address declared emergencies. Thus, even if the district court's jurisdiction turned on whether IEEPA authorizes the challenged tariffs, the district court would still lack jurisdiction.

1.      IEEPA authorizes the President to "regulate … any … importation … of … any property in which any foreign country or a national thereof has any interest."  50 U.S.C. § 1702(a)(1)(B).  The authority to "regulate" imports includes the power to impose tariffs on imports.

That follows from the ordinary meaning of "regulate": to "fix, establish or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws."  *Regulate*, Black's Law Dictionary 1156 (5th ed. 1979); *see, e.g.*, *Regulate*, Webster's Third New International Dictionary 1913 (1976) ("to govern or direct according to rule"; "to bring under the control of law or constituted authority").  Imposing tariffs on imports is clearly a way of "control[ling]" imports (*Black's*); "govern[ing] or direct[ing]" them "according to rule" (*Webster's*); "adjust[ing]" them "by rule, method, or established mode" (*Black's*); or, more generally, "subject[ing]" them "to governing principles or laws" (*Black's*).

Precedent bolsters that conclusion.  As far back as *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824), Chief Justice Marshall referred to "[t]he right to regulate commerce … by the imposition of duties."  *Id.* at 202; *see id.* (duties "often are[] imposed … with a view to the regulation of commerce").  More recently, the Supreme Court has held that a statute authorizing the President

- 41 -

"'to adjust the imports'" of a product allowed not just "quantitative methods" for determining import quantities—that is, "quotas"—but also "monetary methods," such as "license fees," for "effecting such adjustments." *Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 561 (1976) (interpreting 19 U.S.C. § 1862). Such fees, the Court explained, have an "initial and direct impact on imports" "as much as a quota" would. *Id.* at 571. Exactly the same is true of *ad valorem* tariffs like those challenged here (that is, tariffs proportional to the value of the imports in question). Like the license fees in *Algonquin*—a fee for each barrel of oil imported—these tariffs are a "monetary method" for "adjusting" imports, and thus a means of "regulating" imports. *See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25, 34 (Fed. Cir. 2023) (holding that "quotas" and "duties" are alternative means of "'adjust[ing] imports'" (quoting *Algonquin*, 426 U.S. at 561)); *Regulate*, Black's Law Dictionary, *supra* ("to adjust by rule, method, or established mode").

A year before *Algonquin*, moreover, the Federal Circuit's predecessor reached the same conclusion, as to the very statutory language at issue here, in *Yoshida*. It construed the President's power "to 'regulate importation'"

under TWEA as encompassing the power to "impos[e] an import duty surcharge." 526 F.2d at 576; *see id.* at 575.

Finally, if any doubt remained on this point, it would be eliminated by Congress's choice to "draw[]" IEEPA's language "directly" from TWEA, *Dames & Moore*, 453 U.S. at 671, after *Yoshida* had interpreted it to authorize tariffs. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute[.]" *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). Here, there is not just a presumption but direct evidence that Congress knew of *Yoshida*: The House Report on IEEPA cited *Yoshida* and approvingly discussed its holding. IEEPA House Report 5. Congress's awareness of *Yoshida* is unsurprising: The tariffs upheld in *Yoshida* were a matter of sufficiently widespread public attention that they became "known as the 'Nixon shock.'" *Learning Res.*, 2025 WL 1525376, at *11. And "when Congress 'adopt[s] the language used in [an] earlier act,'" courts "presume that Congress 'adopted also the construction given'" to that language. *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 270 (2020). That is especially true when the court interpreting the language has exclusive appellate jurisdiction in tariff challenges, as the *Yoshida* court did. *See Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 586 U.S. 123, 131 (2019) (finding significant for ratification that the

interpretation was by a court with "'exclusive jurisdiction'").  Here, while Congress knew that TWEA had been interpreted to allow the imposition of tariffs, Congress chose to use the same language that conferred that authority in IEEPA.  Congress created certain exceptions to the President's authority under IEEPA, but none of those exceptions removes tariffs from the scope of the President's power.  *See* 50 U.S.C. § 1702(b).

2.      Plaintiffs' contrary arguments lack merit.

a.      Plaintiffs' contrary reading of IEEPA's text is unpersuasive. They first argue that "'[t]o regulate is to establish rules governing conduct,'" whereas "'to tariff is to raise revenue through taxes on imports or exports.'" Br. 24 (quoting *Learning Res.*, 2025 WL 1525376, at *8).  But that is a false dichotomy.   The jurisdictional statute specifically distinguishes between "law[s] … providing for … revenue from imports" and those providing for "tariffs … for reasons other than the raising of revenue," 28 U.S.C. § 1581(i)(1), recognizing that tariffs routinely are imposed, as here, "for reasons other than the raising of revenue," *id.*  And more generally, tariffs and taxes are routinely used not just to raise revenue but to influence conduct. *See, e.g.*, *NFIB v. Sebelius*, 567 U.S. 519, 567 (2012) ("Some of our earliest federal taxes sought to deter the purchase of imported manufactured goods in

order to foster the growth of domestic industry.").  The Supreme Court has recognized that although "the taxing power is a distinct power and embraces the power to lay duties, it does not follow that duties may not be imposed in the exercise of the power to regulate commerce."  *Board of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 58 (1933); *accord, e.g.*, *Yoshida*, 526 F.2d at 575 n.20 ("it is well established that" the power to "lay duties upon imports" "can be employed in the exercise" of "the power to regulate commerce" (collecting cases)).  The fact that agencies cannot use their standard regulatory powers to raise revenue is far afield.  Plaintiffs' understanding (Br. 28) that the Food and Drug Administration cannot impose taxes under its authority to "regulate" a "drug, biological product, device, or … combination product," 21 U.S.C. § 360bbb-2(a), says little about whether the power to "regulate … importation" includes the power to impose tariffs, a standard tool for adjusting or restricting imports.

Plaintiffs fare no better by relying upon the *noscitur a sociis* canon to conclude that the meaning of "regulate" is narrowed by neighboring verbs: "investigate, block … , direct and compel, nullify, void, prevent or prohibit." 50 U.S.C. § 1702(a)(1)(B).  The *noscitur* canon helps to identify which meaning of an ambiguous word applies in a given context—for example, to

- 45 -

discern that Shakespeare meant a spear rather than a type of fish when he listed "pike" alongside "sword," "knife," and "gun."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012) (quotation marks omitted).  But here, the fact that none of the other verbs in § 1702(a)(1)(B) involves revenue-raising measures does not mean the word "regulate" should be understood to exclude tariffs.  It is hardly surprising for Congress to have given the President, in the same provision, multiple types of power over imports—both the power to "block" or "prevent" them and the power to impose tariffs on them.  After all, the IEEPA power must be "broad and extensive" in order for the President "to have, within constitutional boundaries, the flexibility required to meet problems surrounding a national emergency with the success desired by Congress."  *Yoshida*, 526 F.2d at 573; *accord United States v. Spawr Optical Rsch., Inc.*, 685 F.2d 1076, 1080 (9th Cir. 1982) (IEEPA sought to provide "broad and flexible" authority needed for "unforeseen contingencies").  And even if the canon did imply that "regulate" should be understood not to authorize tariffs for the purpose of raising revenue, that is not the only purpose for which tariffs are imposed, and it is not the purpose for the tariffs challenged here.  Nor is the power to impose tariffs an unlikely emergency power for Congress to have given the

President, as tariffs can "be quickly imposed and removed" and are "administratively less complex" than some other sanctions. *Yoshida*, 526 F.2d at 580. Understanding that IEEPA authorizes the President to impose tariffs in an emergency, Congress has repeatedly considered and decided not to revoke the President's tariff power under IEEPA. *See, e.g.*, Global Trade Accountability Act, S. 1060, 118th Cong., 1st sess. (2023); Protecting Our Democracy Act, S. 2921, 117th Cong., 1st sess. (2021); Reclaiming Congressional Trade Authority Act of 2019, S. 899, 116th Cong., 1st sess. (2019).

Construing "regulate" to authorize tariffs also would not contradict the § 1702 authority's limitation to "any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B). That tariffs may be assessed after U.S.-based importers have taken legal possession of imported goods does not mean they are not a way of regulating "property in which any foreign country or a national thereof has any interest." *Id.* The statutory reference to "'any interest'" broadly extends beyond possessory legal interests. *Holy Land Found. v. Ashcroft*, 333 F.3d 156, 162-163 (D.C. Cir. 2003). Thus, IEEPA allowed the government to block the assets of an organization that raised funds for Hamas, even though Hamas had no "legally protected" interest in the funds. *Id.* at 163. Foreign nationals who

sell property to domestic importers likewise have an "interest" in the property regardless of whether they own it when tariffs are collected.

Plaintiffs also fail to persuasively minimize the importance of Congress's decision to incorporate in IEEPA the same language that the Federal Circuit's predecessor had construed broadly in *Yoshida*. Br. 44. They brush *Yoshida* aside as a "single lower-court opinion" that did not establish "judicial consensus" on the tariff authority granted by TWEA. *Id.* (quoting *BP P.L.C. v. Mayor & City Council of Balt.*, 141 S. Ct. 1532, 1541 (2021)). But *Yoshida* was a precedential decision issued by the appellate court with exclusive nationwide jurisdiction over international-trade issues, and other courts accordingly acknowledged that they lacked jurisdiction to pass on the question. *See Cornet*, 632 F.2d at 98-100; *Helsinn*, 586 U.S. at 131 (finding significant for ratification that the interpretation was by a court with "'exclusive jurisdiction'").

Nor is there reason to think that Congress meant to narrow the powers conferred in TWEA when it enacted IEEPA. To the extent Congress limited the President's authority in IEEPA, it did so by enumerating exceptions to the President's power in § 1702(b), not by restricting the general grant of authority in § 1702(a), which uses the same language as TWEA. That is why

the Supreme Court recognized that IEEPA supplies "essentially the same" peacetime powers previously supplied by TWEA. *Regan v. Wald*, 468 U.S. 222, 227-228 (1984); *see American Int'l Grp., Inc. v. Islamic Republic of Iran*, 657 F.2d 430, 440 (D.C. Cir. 1981) ("The House Report accompanying [IEEPA] states that the language in question 'basically parallels' section 5(b) of [TWEA]." (citing IEEPA House Report 14-15)); Br. 6 (agreeing that IEEPA powers "are largely drawn from Section 5(b) of [TWEA]"), 37 (similar).

Plaintiffs criticize *Yoshida*'s approach to statutory interpretation, concluding it conflicts with "how courts approach statutory interpretation" today. Br. 43 (quotation marks omitted). Whether or not that is true, it is irrelevant: What matters is that Congress, fully aware of *Yoshida*, chose to incorporate in IEEPA the same language construed in *Yoshida*. The implication of that choice does not depend on whether *Yoshida* was persuasive. For the same reason, it is irrelevant that President Nixon did not expressly cite TWEA in his proclamation imposing tariffs. *See* Br. 7 & n.3, 38 & n.14. As *Yoshida* explained, "TWEA was not cited in Proclamation 4074 by name … because it would be inappropriate in a proclamation affecting 'friendly' or 'neutral' nations," and it was impliedly "incorporated" as an authority for the proclamation because the proclamation invoked statutory powers "'not

limited to'" those that it expressly cited. 526 F.2d at 575 n.22. And in any event, *Yoshida* plainly relied on TWEA as authority for the Nixon tariffs, and Congress knew of *Yoshida*'s settled interpretation of TWEA—as the sole court with jurisdiction over the issue, *see Cornet*, 632 F.2d at 98-100—when it incorporated the same language in IEEPA.

b.  Plaintiffs also rely on various extrastatutory principles of interpretation. Those rationales are no more compelling. As an initial matter, such considerations cannot overcome a statute's plain text: "where, as here, the words of [a] statute are unambiguous, the judicial inquiry is complete." *Babb v. Wilkie*, 589 U.S. 399, 413 (2020) (quotation marks omitted). For the reasons discussed above, there is no genuine ambiguity as to whether IEEPA's plain text authorizes the imposition of tariffs. Any further analysis is therefore inappropriate. And even if relevant, plaintiffs' extrastatutory rationales are unpersuasive.

i.  Plaintiffs briefly reference the major-questions doctrine, citing *Biden v. Nebraska*, 600 U.S. 477, 506 (2023), for the proposition that Congress would have needed to speak more clearly to authorize the President to impose tariffs under IEEPA. *See* Br. 31-32. But that doctrine addresses the "particular and recurring problem" of "*agencies* asserting highly consequential

power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (emphasis added). Those concerns dissipate when, as here, Congress delegates authority directly to the President—"the most democratic and politically accountable official in Government," *Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020). *See, e.g.*, *Mayes v. Biden*, 67 F.4th 921, 933 (9th Cir.), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023).

In any event, the concerns animating the doctrine are inapplicable here. The doctrine reflects a "presum[ption] that 'Congress intends to make major policy decisions itself'" rather than "'leav[ing] those decisions to agencies.'" *West Virginia*, 597 U.S. at 723. It therefore counsels judicial "skepticism" where "an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), particularly where there is an apparent "'mismatch[]'" between the breadth of the asserted power and the "narrow[ness]" of the statute in which the agency claims to have discovered it, *Nebraska*, 600 U.S. at 517-518 (Barrett, J., concurring), and where the asserted power falls outside the agency's "wheelhouse," *id.* at 518-519. Those are the sorts of cases in which it seems most

unlikely that Congress actually meant for the agency to make the relevant type of decision. None of those grounds for skepticism is present here.

First, the President's power over international trade under IEEPA is not some "unheralded" invocation of an apparently "narrow" statute. Quite the opposite: IEEPA, in its "key provisions," *United States v. California Stem Cell Treatment Ctr., Inc.*, 117 F.4th 1213, 1221 (9th Cir. 2024), expressly authorizes actions to address national emergencies, including actions (like "prohibit[ing]" imports from certain countries, 50 U.S.C. § 1702(a)(1)(B)) that are far more significant than the ones at issue here. In other words, IEEPA is on its face *all about* giving the President major powers to address major concerns. It would be perverse to apply the major-questions doctrine to curtail Congress's conscious efforts to give the President broad and flexible tools to address the most major of questions.

Second, it is particularly inappropriate to construe narrowly a delegation of power in the arena of foreign affairs and national security—areas that implicate the President's expertise and independent constitutional authority, *see, e.g.*, *Department of the Navy v. Egan*, 484 U.S. 518, 529-530 (1988); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993). Exactly the opposite is true: "[U]nless Congress specifically has provided otherwise, courts

traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Egan*, 484 U.S. at 530; *see, e.g.*, *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *FCC v. Consumers' Rsch.*, 2025 WL 1773630, at *23 (U.S. June 27, 2025) (Kavanaugh, J., concurring) (noting that "the major questions canon has not been applied by [the Supreme] Court in the national security or foreign policy contexts, because … the usual understanding is that Congress intends to give the President substantial authority and flexibility"); *Al-Bihani v. Obama*, 619 F.3d 1, 38-39 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the denial of rehearing en banc) (discussing the "deeply rooted tradition of judicial restraint when the President is executing national security or foreign affairs statutes pursuant to a broad congressional authorization"); *B-West Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996) (courts "broadly construe[]" "statutes granting the President authority to act in matters touching on foreign affairs").

Finally, the President's imposition of tariffs in the exercise of broad authority delegated by Congress is nothing novel and certainly nothing outside the "wheelhouse" of the Nation's Chief Executive. Trade measures, of which

tariffs are an essential component, have long been used in international diplomacy and even warfare, in episodes ranging from the Non-Intercourse Act, designed in part to punish Britain and France, *see Cargo of Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382, 384 (1813), to the freezing of Iranian assets in response to the seizing of American hostages at the American Embassy in Tehran, *see Dames & Moore*, 453 U.S. at 662. As discussed above, Presidents have exercised such powers since the Founding, and courts have repeatedly and consistently upheld them.

In any event, even if the major-questions doctrine were applicable, it would be immaterial to the analysis because IEEPA provides "clear congressional authorization for the power" exercised here, *West Virginia*, 597 U.S. at 723. The major-questions doctrine does not require "an 'unequivocal declaration' from Congress authorizing the *precise* agency action under review." *Nebraska*, 600 U.S. at 511 (Barrett, J., concurring); *see Florida v. HHS*, 19 F.4th 1271, 1288 (11th Cir. 2021) ("a broad grant of authority" that "plainly encompasses" the action in question "does not require an indication that specific activities are permitted"). IEEPA's text and history and the relevant precedents make clear that IEEPA authorizes the President to impose the challenged tariffs to address a declared national emergency. As explained, "[t]he

unambiguous wording of [IEEPA] clearly shows that the President's actions were in accordance with the power Congress delegated." *Spawr*, 685 F.2d at 1081 n.10.

    ii.    Plaintiffs' argument that IEEPA does not authorize imposition of tariffs because it lacks the limits found in other delegations of tariff authority is likewise mistaken. *See* Br. 34. Every court of appeals to have considered a nondelegation challenge to IEEPA, including this Court, has upheld IEEPA. *See United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) (collecting four other circuit-court decisions), *cert. denied*, 144 S. Ct. 820 (2024). Plaintiffs' challenge likewise fails.

    To start, IEEPA does include "procedural, substantive, and temporal limits." *Learning Res.*, 2025 WL 1525376, at *9. Section 1702 applies only "[a]t the times and to the extent specified in" § 1701. 50 U.S.C. § 1702(a)(1). Section 1701, in turn, specifies that the § 1702 power "may be exercised" only "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." *Id.* § 1701(a). And the NEA

itself imposes "procedural" and "temporal limits" (Br. 34) on emergency declarations.

In any event, plaintiffs do not explain why the supposed absence of "limits" on the President's power under § 1702 would mean that provision does not authorize tariffs. To the extent plaintiffs refer to the nondelegation doctrine as a potential basis for a limiting construction of § 1702, that is incorrect—both because the constitutional-avoidance canon "'comes into play only when, after the application of ordinary textual analysis,'" a statute is "'susceptible of more than one construction,'" which is not the case here, and because IEEPA raises no "'serious'" nondelegation concern. *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). It also emphasizes the backwards nature of plaintiffs' view of jurisdiction, asking the Court to weigh a *constitutional* question in order to determine whether it has jurisdiction in the first place.

The Supreme Court has recognized that when Congress delegates "authority over matters of foreign affairs," it "must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). That is because "the President has unique responsibility" in the field of "foreign … affairs," *Haitian Ctrs. Council*, 509 U.S. at 188, such that when Congress enacts "legislation which is to be made

- 56 -

effective through negotiation and inquiry within the international field," it must afford the President "a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved," *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936).

The Supreme Court observed nearly a century ago that "[p]ractically every volume of the United States Statutes contains one or more acts or joint resolutions of Congress authorizing action by the President in respect of subjects affecting foreign relations, which either leave the exercise of the power to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs." *Curtiss-Wright*, 299 U.S. at 324. And the Court has long approved such broad delegations to the President—particularly delegations of authority to regulate international trade, including through tariffs. *E.g.*, *Algonquin*, 426 U.S. at 558-560; *J.W. Hampton,* 276 U. S. at 406, 409; *Marshall Field*, 143 U.S. at 680; *Brig Aurora*, 11 U.S. at 384-388; *see Gundy v. United States*, 588 U.S. 128, 158-159 (2019) (Gorsuch, J., dissenting). Thus, Justice Kavanaugh recently observed that "in the national security and foreign policy realms, the nondelegation doctrine (whatever its scope with respect to domestic

legislation) appropriately has played an even more limited role in light of the President's constitutional responsibilities and independent Article II authority." *Consumers' Rsch.*, 2025 WL 1773630, at *22 (Kavanaugh, J., concurring). That is so despite courts' limited ability to review executive judgments on matters of national security and foreign policy.

In any event, even if the nondelegation doctrine in its ordinary form were applicable to this foreign-affairs context, IEEPA would pass muster. Congress of course cannot delegate legislative power to another branch or grant an agency unbounded discretion to regulate private parties. But Congress "may commit something to the discretion" of the Executive, *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 46 (1825), as long as it sets forth "an intelligible principle to which the person or body authorized to [act] is directed to conform," *J.W. Hampton*, 276 U.S. at 409. That is not a toothless requirement: Congress must delineate both "the general policy" and "the boundaries of th[e] delegated authority." *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). But IEEPA easily satisfies it.

IEEPA's general policy is obvious: "to deal with any unusual and extraordinary [foreign] threat … to the national security, foreign policy, or economy of the United States" during a "national emergency" by

authorizing the President to, among other things, "regulate … importation" of property. 50 U.S.C. §§ 1701(a), 1702(a)(1)(B). And its boundaries are likewise plain: The President cannot invoke IEEPA "for any … purpose" "other" than the one described above, *id.* § 1701(b), and cannot "regulate or prohibit, directly or indirectly," the items set forth in a list of exceptions to his power, *id.* § 1702(b). Moreover, Congress oversees both the President's exercise of his IEEPA powers, *id.* § 1703, and his declaration of national emergencies as a predicate to invoking IEEPA, *see supra* pp. 8-9.

iii. The existence of non-emergency tariff authorities with different limits is no basis for a narrow construction of IEEPA's emergency authorities. Br. 34. IEEPA, and the other provisions plaintiffs identify, provide independent sources of authority to impose tariffs. The President's choice to exercise his authority under one does not compel him to comply with the terms of the others. Courts "approach federal statutes touching on the same topic with a 'strong presumption' they can coexist harmoniously. Only by carrying a 'heavy burden' can a party" establish "that one statute 'displaces' a second." *Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024). And here, IEEPA's emergency powers are "merely complementary," *id.*, to the powers in other statutes, which are broader in some

respects (not limited to declared emergencies) and narrower in others (addressing only certain types of concerns).

It is unsurprising that Congress would provide the President with certain limited authorities to address specific harms in non-emergency contexts, while also supplying broader authorities, in IEEPA, when those harms become severe enough to constitute an emergency. Indeed, *Yoshida* expressly adopted that understanding of the relationship between IEEPA's predecessor and non-emergency provisions. There, the court explained that "Congress has said what may be done with respect to *foreseeable* events" in a range of statutes, including "the Trade Act of 1974," "and has said what may be done with respect to *unforeseeable* events in the TWEA." 526 F.2d at 578 (emphases added). The court expressly rejected the view that when "delegating broad powers to the President for periodic use during national emergencies," Congress nonetheless "intend[ed] that the President, when faced with such an emergency, must follow limiting procedures prescribed in other acts designed for continuing use during normal times." *Id.*

And more generally, it is common for Congress to enact overlapping tariff authorities. For example, one provision allows the President to impose "new or additional duties" against products from countries that

- 60 -

discriminate against U.S. goods. 19 U.S.C. § 1338. Discriminatory trade practices of that nature could be the root cause of "balance-of-payments" concerns, which provide a basis to impose tariffs under Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132, but no one thinks that Section 122 displaces the provision for tariffs in response to discriminatory trade practices, or vice versa. The provisions coexist.

iv. Finally, plaintiffs are mistaken in their argument that construing "regulate" to allow tariffs could render IEEPA unconstitutional. Br. 32-33. Plaintiffs reason that IEEPA authorizes the President to "regulate … exportation" as well as "importation," and "the Constitution expressly bars tariffs on exports." *Id.* at 32. But that argument, at most, would mean that the constitutional bar against duties on exports in excess of constitutionally permissible "user fees," *United States v. U.S. Shoe Corp*, 523 U.S. 360, 363 (1998), leaves available only some of the President's statutory powers to "regulate" as to exports. More broadly, the Court should not reach out to evaluate the hypothetical constitutional questions that could arise if the statute did convey the power to impose tariffs on exports from States and a president attempted to exercise that power—especially at the present stage, where the Court is solely evaluating whether it has jurisdiction to hear plaintiff's merits

arguments at all. *See, e.g., Salinas v. United States*, 522 U.S. 52, 61 (1997) (reserving potential constitutional concerns not material to the statute's application in that case). Passing on potential constitutional issues with certain applications of a *different* authority that has not been invoked here would set the constitutional-avoidance principle on its head by increasing rather than decreasing the number of constitutional questions the Court must decide.

# CONCLUSION

The Court should affirm the district court's judgment.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

CRAIG H. MISSAKIAN
  *United States Attorney*

*/s/ Sarah Welch*

SARAH WELCH
  *Counsel to the Assistant Attorney*
  *General*

MARK R. FREEMAN
MICHAEL S. RAAB
BRAD HINSHELWOOD
DANIEL WINIK
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3180*
  *sarah.e.welch@usdoj.gov*

## STATEMENT OF RELATED CASES

Appellees are aware of no related cases not identified as related in Appellants' brief.

*/s/ Sarah Welch*
Sarah Welch

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)** <u>No. 25-3493</u>

    I am the attorney or self-represented party.

    **This brief contains** <u>12,966</u> **words,** excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

    I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** <u>/s/ Sarah Welch</u>      **Date** <u>July 28, 2025</u>

- 65 -

**ADDENDUM**

## TABLE OF CONTENTS

19 U.S.C. § 2483 ................................................................................ A1

19 U.S.C. § 3004 ................................................................................ A1

28 U.S.C. § 1581 ................................................................................ A1

50 U.S.C. § 1621 ................................................................................ A2

50 U.S.C. § 1622 ................................................................................ A3

50 U.S.C. § 1701 ................................................................................ A5

50 U.S.C. § 1702 ................................................................................ A6

50 U.S.C. § 1703 ................................................................................ A8

**19 U.S.C. § 2483**

**§ 2483.  Consequential changes in Tariff Schedules of the United States**

The President shall from time to time, as appropriate, embody in the Harmonized Tariff Schedule of the United States the substance of the relevant provisions of this chapter, and of other Acts affecting import treatment, and actions thereunder, including removal, modification, continuance, or imposition of any rate of duty or other import restriction.

**19 U.S.C. § 3004**

**§ 3004.  Enactment of Harmonized Tariff Schedule**

…

(c) Status of Harmonized Tariff Schedule

(1) The following shall be considered to be statutory provisions of law for all purposes:

(A)  The provisions of the Harmonized Tariff Schedule as enacted by this chapter.

(B) Each statutory amendment to the Harmonized Tariff Schedule.

(C) Each modification or change made to the Harmonized Tariff Schedule by the President under authority of law (including section 604 of the Trade Act of 1974 [19 U.S.C. § 2483]).

**28 U.S.C. § 1581**

**§ 1581. Civil actions against the United States and agencies and officers thereof**

…

(i)(1) In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)-(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United

A1

States, its agencies, or its officers, that arises out of any law of the United States providing for--

    (A) revenue from imports or tonnage;

    (B) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;

    (C) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or

    (D) administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)-(h) of this section.

…

## 50 U.S.C. § 1621

### § 1621. Declaration of national emergency by President; publication in Federal Register; effect on other laws; superseding legislation

(a) With respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power, the President is authorized to declare such national emergency. Such proclamation shall immediately be transmitted to the Congress and published in the Federal Register.

(b) Any provisions of law conferring powers and authorities to be exercised during a national emergency shall be effective and remain in effect (1) only when the President (in accordance with subsection (a) of this section), specifically declares a national emergency, and (2) only in accordance with this chapter. No law enacted after September 14, 1976, shall supersede this subchapter unless it does so in specific terms, referring to this subchapter, and declaring that the new law supersedes the provisions of this subchapter.

**50 U.S.C. § 1622**

**§ 1622. National emergencies**

(a) Termination methods

Any national emergency declared by the President in accordance with this subchapter shall terminate if—

(1) there is enacted into law a joint resolution terminating the emergency; or

(2) the President issues a proclamation terminating the emergency.

Any national emergency declared by the President shall be terminated on the date specified in any joint resolution referred to in clause (1) or on the date specified in a proclamation by the President terminating the emergency as provided in clause (2) of this subsection, whichever date is earlier, and any powers or authorities exercised by reason of said emergency shall cease to be exercised after such specified date, except that such termination shall not affect—

(A) any action taken or proceeding pending not finally concluded or determined on such date;

(B) any action or proceeding based on any act committed prior to such date; or

(C) any rights or duties that matured or penalties that were incurred prior to such date.

(b) Termination review of national emergencies by Congress

Not later than six months after a national emergency is declared, and not later than the end of each six-month period thereafter that such emergency continues, each House of Congress shall meet to consider a vote on a joint resolution to determine whether that emergency shall be terminated.

(c) Joint resolution; referral to Congressional committees; conference committee in event of disagreement; filing of report; termination procedure deemed part of rules of House and Senate

(1) A joint resolution to terminate a national emergency declared by the President shall be referred to the appropriate committee of the House of Representatives or the Senate, as the case may be. One such joint resolution

A3

shall be reported out by such committee together with its recommendations within fifteen calendar days after the day on which such resolution is referred to such committee, unless such House shall otherwise determine by the yeas and nays.

(2) Any joint resolution so reported shall become the pending business of the House in question (in the case of the Senate the time for debate shall be equally divided between the proponents and the opponents) and shall be voted on within three calendar days after the day on which such resolution is reported, unless such House shall otherwise determine by yeas and nays.

(3) Such a joint resolution passed by one House shall be referred to the appropriate committee of the other House and shall be reported out by such committee together with its recommendations within fifteen calendar days after the day on which such resolution is referred to such committee and shall thereupon become the pending business of such House and shall be voted upon within three calendar days after the day on which such resolution is reported, unless such House shall otherwise determine by yeas and nays.

(4) In the case of any disagreement between the two Houses of Congress with respect to a joint resolution passed by both Houses, conferees shall be promptly appointed and the committee of conference shall make and file a report with respect to such joint resolution within six calendar days after the day on which managers on the part of the Senate and the House have been appointed. Notwithstanding any rule in either House concerning the printing of conference reports or concerning any delay in the consideration of such reports, such report shall be acted on by both Houses not later than six calendar days after the conference report is filed in the House in which such report is filed first. In the event the conferees are unable to agree within forty-eight hours, they shall report back to their respective Houses in disagreement.

(5) Paragraphs (1)-(4) of this subsection, subsection (b) of this section, and section 1651(b) of this title are enacted by Congress--

(A) as an exercise of the rulemaking power of the Senate and the House of Representatives, respectively, and as such they are deemed a part of the rules of each House, respectively, but applicable only with respect to

A4

the procedure to be followed in the House in the case of resolutions described by this subsection; and they supersede other rules only to the extent that they are inconsistent therewith; and

      (B) with full recognition of the constitutional right of either House to change the rules (so far as relating to the procedure of that House) at any time, in the same manner, and to the same extent as in the case of any other rule of that House.

    (d) Automatic termination of national emergency; continuation notice from President to Congress; publication in Federal Register

Any national emergency declared by the President in accordance with this subchapter, and not otherwise previously terminated, shall terminate on the anniversary of the declaration of that emergency if, within the ninety-day period prior to each anniversary date, the President does not publish in the Federal Register and transmit to the Congress a notice stating that such emergency is to continue in effect after such anniversary.

**50 U.S.C. § 1701**

**§ 1701. Unusual and extraordinary threat; declaration of national emergency; exercise of Presidential authorities**

    (a) Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

    (b) The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.

**50 U.S.C. § 1702**

**§ 1702. Presidential authorities**

(a) In general

(1) At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit—

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and

(C) when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such

A6

designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.

(2) In exercising the authorities granted by paragraph (1), the President may require any person to keep a full record of, and to furnish under oath, in the form of reports or otherwise, complete information relative to any act or transaction referred to in paragraph (1) either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or as may be otherwise necessary to enforce the provisions of such paragraph. In any case in which a report by a person could be required under this paragraph, the President may require the production of any books of account, records, contracts, letters, memoranda, or other papers, in the custody or control of such person.

(3) Compliance with any regulation, instruction, or direction issued under this chapter shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same. No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter.

(b) Exceptions to grant of authority

The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly—

(1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value;

(2) donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of this title, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances; or

A7

(3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. The exports exempted from regulation or prohibition by this paragraph do not include those which are otherwise controlled for export under section 46043 of this title, or under section 46053 of this title to the extent that such controls promote the nonproliferation or antiterrorism policies of the United States, or with respect to which acts are prohibited by chapter 37 of Title 18;

(4) any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.

(c) Classified information.—In any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section 1(a) of the Classified Information Procedures Act) such information may be submitted to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review.

## 50 U.S.C. § 1703

### § 1703. Consultation and reports

(a) Consultation with Congress

The President, in every possible instance, shall consult with the Congress before exercising any of the authorities granted by this chapter and shall consult regularly with the Congress so long as such authorities are exercised.

(b) Report to Congress upon exercise of Presidential authorities

Whenever the President exercises any of the authorities granted by this chapter, he shall immediately transmit to the Congress a report specifying—

(1) the circumstances which necessitate such exercise of authority;

(2) why the President believes those circumstances constitute an unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States;

(3) the authorities to be exercised and the actions to be taken in the exercise of those authorities to deal with those circumstances;

(4) why the President believes such actions are necessary to deal with those circumstances; and

(5) any foreign countries with respect to which such actions are to be taken and why such actions are to be taken with respect to those countries.

(c) Periodic follow-up reports

At least once during each succeeding six-month period after transmitting a report pursuant to subsection (b) with respect to an exercise of authorities under this chapter, the President shall report to the Congress with respect to the actions taken, since the last such report, in the exercise of such authorities, and with respect to any changes which have occurred concerning any information previously furnished pursuant to paragraphs (1) through (5) of subsection (b).

(d) Supplemental requirements

The requirements of this section are supplemental to those contained in title IV of the National Emergencies Act.