No. 25-3493

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

THE STATE OF CALIFORNIA AND GOVERNOR GAVIN NEWSOM,
*Plaintiffs-Appellants*,

v.

DONALD J. TRUMP, *et al.*,
*Defendants-Appellees*.

———————————

## On Appeal from the United States District Court
## for the Northern District of California
No. 3:25-cv-03372-JSC
Hon. Jacqueline Scott Corley, District Judge

———————————

## APPELLANTS' REPLY BRIEF

———————————

ROB BONTA
  *Attorney General of California*
HELEN H. HONG
  *Acting Solicitor General*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*

JULIE VEROFF
DIANA L. KIM
  *Deputy Solicitors General*
LARA HADDAD
  *Supervising Deputy Attorney General*
SHIWON CHOE
ZELDA VASSAR
CAROLYN F. DOWNS
  *Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3369
Diana.Kim@doj.ca.gov
*Attorneys for Plaintiffs-Appellants*

August 18, 2025

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................ 1

Argument ..................................................................................................... 2

I.     This action "arises out of" IEEPA, not the HTSUS ..................................... 2

     A.    This action does not "arise out of" the HTSUS or its modifications .. 2

     B.    The executive orders purporting to modify the HTSUS were not "made … under authority of law" ...................................................... 8

II.    IEEPA does not provide for tariffs ............................................................ 16

     A.    The plain meaning of IEEPA's text does not include tariffs ........... 16

     B.    Congress did not ratify *Yoshida* ...................................................... 22

     C.    The major questions and nondelegation doctrines confirm that IEEPA does not provide for tariffs.................................................... 25

Conclusion ................................................................................................. 30

# TABLE OF AUTHORITIES

**Page**

CASES

*Bd. of Trs. of Univ. of Ill. v. United States*
  289 U.S. 48 (1933)......................................................................17

*Biden v. Nebraska*
  600 U.S. 477 (2023).....................................................................27

*Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling*
  581 U.S. 170 (2017).......................................................................9

*BP v. Mayor & City Council of Balt.*
  141 S. Ct. 1532 (2021)..................................................................23

*Brownback v. King*
  592 U.S. 209 (2021).......................................................................9

*Christianson v. Colt Indus. Operating Corp.*
  486 U.S. 800 (1988).......................................................................7

*Coal. to Pres. the Integrity of Am. Trademarks v. United States*
  790 F.2d 903 (D.C. Cir. 1986).....................................................16

*Cochise Consultancy v. United States ex rel. Hunt*
  587 U.S. 262 (2019).....................................................................19

*Commodities Exp. v. U.S. Customs Serv.*
  957 F.2d 223 (6th Cir. 1992) ......................................................15

*Cooper Indus. v. Aviall Servs.*
  543 U.S. 157 (2004).......................................................................9

*Cornet Stores v. Morton*
  632 F.2d 96 (9th Cir. 1980) ...................................................6, 11

*Dep't of Navy v. Egan*
  484 U.S. 518 (1988).....................................................................26

## TABLE OF AUTHORITIES
### (continued)

Page

*Dugan v. Rank*
372 U.S. 609 (1963)............................................................11

*Fed. Commc'n Comm'n v. Consumers' Rsch.*
145 S. Ct. 2482 (2025).................................................26, 28

*Fed. Energy Admin. v. Algonquin SNG*
426 U.S. 548 (1976)..........................................11, 20, 21

*Fritz v. United States*
535 F.2d 1192 (9th Cir. 1976) ......................................14

*Garland v. Aleman Gonzalez*
596 U.S. 543 (2022)......................................................9, 10

*Georgia v. President*
46 F.4th 1283 (11th Cir. 2022) .....................................25

*Gibbons v. Ogden*
22 U.S. (9 Wheat) 1 (1824)............................................17

*Gunn v. Minton*
568 U.S. 251 (2013).............................................................7

*Helsinn Healthcare v. Teva Pharmaceuticals*
586 U.S. 123 (2019)...........................................................23

*Int'l Lab. Rights Fund v. Bush*
357 F. Supp. 2d 204 (D.D.C. 2004)..................................4

*Jama v. Immigr. & Customs Enf't*
543 U.S. 335 (2005).....................................................22, 24

*K Mart v. Cartier*
485 U.S. 176 (1988)................................................5, 15, 16

*Kentucky v. Biden*
23 F.4th 585 (6th Cir. 2022) ..........................................25

iii

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Louisiana v. Biden*
    55 F.4th 1017 (5th Cir. 2022) ...........................................................25

*Mayes v. Biden*
    89 F.4th 1186 (9th Cir. 2023) ...........................................................26

*Michael Simon Design v. United States*
    609 F.3d 1335 (Fed. Cir. 2010) .......................................................10

*Nebraska v. Su*
    121 F.4th 1 (9th Cir. 2024) ..............................................................26

*Oklahoma v. Castro-Huerta*
    597 U.S. 629 (2022).........................................................................22

*Olympus v. United States*
    792 F.2d 315 (2d Cir. 1986) .............................................................16

*Pentax Corp. v. Myhra*
    72 F.3d 708 (9th Cir. 1995) ..................................................13, 14, 15

*SCM v. U.S. Int'l Trade Comm'n*
    549 F.2d 812 (D.C. Cir. 1977)..........................................................15

*Trayco, Inc. v. United States*
    994 F.2d 832 (Fed. Cir. 1993) .............................................................5

*United States v. Shih*
    73 F.4th 1077 (9th Cir. 2023) ...........................................................28

*United States v. Universal Fruits & Vegetables*
    370 F.3d 829 (9th Cir. 2004) ................................................13, 14, 15

*United States v. Yoshida Int'l*
    526 F.2d 560 (C.C.P.A. 1975)........................................11, 18, 22, 24, 29

*West Virginia v. Envtl. Prot. Agency*
    597 U.S. 697 (2022)....................................................................26, 27

# TABLE OF AUTHORITIES
## (continued)

Page

*Yamashita v. LG Chem*
  62 F.4th 496 (9th Cir. 2023) ................................................................7

*Ye v. INS*
  214 F.3d 1128 (9th Cir. 2000) ...........................................................9

**STATUTES**

15 U.S.C. § 78k(a)(2) ...........................................................................18

19 U.S.C.
  § 1202 ..........................................................................................1, 3
  § 1304(f) ........................................................................................14
  § 1592 ...........................................................................................15
  § 2461 ...........................................................................................12
  § 2483 ...............................................................................3, 12, 13
  § 3004(c)(1) ..................................................................................1, 3
  § 3004(c)(1)(C) ...........................................................1, 2, 8, 10, 12
  § 3005(a)(1) .....................................................................................3

19 U.S.C. § 1862(b) (1970) .................................................................20

21 U.S.C. § 360bbb-2(a) ......................................................................18

28 U.S.C.
  § 1331 .............................................................................................7
  § 1581(i) ..........................................................................................1
  § 1581(i)(1)(B) .......................................................................7, 8, 10
  § 1581(i)(1)(D) ................................................................................8
  § 1581(a) .........................................................................................6
  § 1631 ...........................................................................................13

28 U.S.C. § 1582 (1976) ..........................................................6, 11, 14

50 U.S.C.
  § 1701(a) .......................................................................................28
  § 1702(a)(1)(B) ..........................................................18, 19, 20, 21

## TABLE OF AUTHORITIES
### (continued)

**Page**

Tariff Act of 1930, Pub. L. No. 71-361, 46 Stat. 590 ............................................3, 6

Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (1975) ...............................24

Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 877 (1962) ..........20, 21

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I
  § 8, cl. 1 .................................................................................................26
  § 8, cl. 3 ...........................................................................................17, 26

**OTHER AUTHORITIES**

Appellant's Opening Brief, *V.O.S. Selections v. Trump*,
  No. 25-1812 (Fed. Cir.) .......................................................................28

H.R. Rep. No. 95-459 (1977).........................................................................23, 25

*Material Relating to the Proposal of the Administration Entitled the*
  *"Trade Reform Act of 1973,"* House Committee on Ways and
  Means, 93d Cong. 97 (Mar. 10, 1973)................................................12

# INTRODUCTION

Defendants agree that "a claim 'arises out of' the 'substantive law giving rise to' it." Answering Br. 29. And they concede this lawsuit "arises out of" IEEPA. *Id.* at 31. But they argue the lawsuit "*also* arises out of" the Harmonized Tariff Schedule of the United States (HTSUS) and the executive orders modifying it, so exclusive jurisdiction lies in the Court of International Trade. *Id.* That is wrong for two independent reasons: the HTSUS is not the substantive law from which plaintiffs' claims arise, and even if it were, the executive orders modifying it are not a "law of the United States providing for" tariffs under 28 U.S.C. § 1581(i) because they were not "made … under authority of law," 19 U.S.C. § 3004(c)(1).

The HTSUS sets out tables of tariff rates, making it easy to identify and update the tariffs for each good. *See* 19 U.S.C. § 1202. When tariffs are imposed or changed "under authority of law," modifications are made to the HTSUS to implement those changes. *Id.* § 3004(c)(1)(C). Such modifications are thus the downstream effects of other laws purportedly providing for tariffs. California does not challenge the authority to make technical updates to the HTSUS in response to tariff changes; it challenges the President's authority to impose the tariffs here in the first place. The HTSUS provides no substantive authority to impose those tariffs—that authority rises or falls on IEEPA alone.

1

IEEPA does not supply that authority because it does not provide for tariffs. As California explained, IEEPA's text, context, and legislative history make clear that it does not authorize the President to impose tariffs. Defendants' contrary interpretation views the word "regulate" in isolation and fails to focus on the relevant inquiry here—how the term should be interpreted in a statute delegating core legislative authority to the President. Congress clearly differentiates when it delegates the power to tax or tariff from when it delegates only the power to regulate. Defendants make no meaningful attempt to reconcile their contrary interpretation with the many statutes authorizing agencies like the FDA, SEC, and CFPB to "regulate" their respective industries, which have never been interpreted to empower those agencies to impose taxes. Accepting defendants' position would mark a dramatic and unprecedented expansion of Executive authority, with serious implications for the separation of powers.

## ARGUMENT

### I. THIS ACTION "ARISES OUT OF" IEEPA, NOT THE HTSUS

#### A. This Action Does Not "Arise Out of" the HTSUS or Its Modifications

1. Defendants concede that the phrase "arises out of" in Section 1581(i) requires "an inquiry about the claims the lawsuit asserts and the legal authority that it challenges." Answering Br. 29-30. That concession defeats their argument that this case arises out of the HTSUS.

The HTSUS is a compendium of tariff rates that importers and the U.S. Customs and Border Protection use to calculate, pay, and collect tariffs. Originally, tariff rates were set by Congress directly in statutes, but codifying tariff rates became unwieldy after Congress delegated authority to the President to negotiate trade agreements affecting tariffs. *See, e.g.*, Tariff Act of 1930, Pub. L. No. 71-361, 46 Stat. 590. Congress replaced the prior approach with a tariff schedule, which is deemed statutory law, 19 U.S.C. § 3004(c)(1), but is easier to update because it is not published in the U.S. Code, *id.* § 1202.

To keep the HTSUS current, modifications are made to reflect new tariffs or changes in existing tariff rates, as mandated by other laws. *See, e.g.*, 19 U.S.C. § 3004(c)(1)(C) ("modification or change made … under authority of law"); *id.* § 2483 (allowing President to "embody in the [HTSUS] the substance of the relevant provisions of this chapter, and of other Acts affecting import treatment"); *id.* § 3005(a)(1) (allowing modifications "to conform the [HTSUS] with amendments made to the [Harmonized System Convention]"). Such modifications are deemed statutory law if "made … under authority of law." *Id.* § 3004(c)(1)(C).

California does not challenge the lawfulness of the provisions allowing the HTSUS to be modified to conform to new tariffs imposed by the President. That process and the resulting modifications are just the technical implementation of the tariffs. California instead challenges the legal authority invoked to impose those

tariffs in the first place—that is, IEEPA. Only the latter is thus the "'substantive law giving rise to'" the claims in the case. Answering Br. 29 (adopting definition in *Int'l Lab. Rights Fund v. Bush*, 357 F. Supp. 2d 204, 208 (D.D.C. 2004)). The merits of California's claims "require an interpretation of the scope and application of" IEEPA, not the HTSUS. *Bush*, 357 F. Supp. 2d at 208. That is evident from the preliminary injunction briefs filed by both sides below, which "focuse[d] solely on" IEEPA, not the HTSUS. *Id.*; *see* Dist. Ct. Dkt. 15, at 8-20; Dist. Ct. Dkt. 55, at 11-23; *also* ER-49-51 (complaint's claims discussing IEEPA, not HTSUS).

In contrast, defendants do not locate the legal authority justifying the tariffs in the HTSUS or contend that anything in the case turns on the HTSUS. They argue only that complete relief for plaintiffs would require enjoining the modifications to the HTSUS. Answering Br. 25. But that is because modifications to the HTSUS follow after actions taken under other purported tariff authority. The scope of relief required to redress the State's harm does not change the nature of California's claims or the legal authority challenged.

Accepting defendants' faulty reasoning would render Section 1581(i) impermissibly broad. If an action arises out of the HTSUS whenever relief could affect the tariff schedule, any case that even relates to tariffs would be limited to the Court of International Trade. For example, if the President tried to impose tariffs under a statute like the Securities and Exchange Act, which plainly does not

4

provide for tariffs or fall within the Court of International Trade's expertise, defendants' argument would deprive district courts of jurisdiction simply because enjoining the tariffs would require updating the HTSUS.

But the Supreme Court in *K Mart v. Cartier* rejected a similarly expansive reading. 485 U.S. 176, 188-189 (1988) (refusing to read "embargo" to encompass all "importation prohibitions"). The Court held that "Congress did not commit to the Court of International Trade's exclusive jurisdiction *every* suit against the Government challenging customs-related laws and regulations." *Id.* at 188. "Had Congress wished to do so it could have expressed such an intent much more clearly and simply," *e.g.*, by granting jurisdiction over actions "'directly affecting imports.'" *Id*. Instead, Congress "delineat[ed] precisely the particular customs-related matters" in Section 1581. *Id*.

Likewise, had Congress intended to send all actions involving tariffs to the Court of International Trade, it could have done so "much more clearly and simply," *id.*, by granting jurisdiction over actions "arising out of a tariff rate embodied in the HTSUS" or "directly affecting tariffs." But Congress did not do so, and courts cannot "depart from the words Congress chose." *Id.* at 189; *see Trayco, Inc. v. United States*, 994 F.2d 832, 836 (Fed. Cir. 1993) ("if Congress had intended all import-related matters to come within the exclusive jurisdiction of the Court of International Trade it would have specifically said so").

5

2. Defendants' remaining arguments for relying on the HTSUS lack merit.

a. Defendants (at 23) invoke *Cornet Stores v. Morton*, 632 F.2d 96 (9th Cir. 1980), but that case provides them no support. This Court held that the Customs Court had exclusive jurisdiction over claims challenging tariffs imposed under IEEPA's predecessor statute TWEA, but in doing so, the Court relied on a distinct jurisdictional ground not at issue here. *Id.* at 100 (citing what was then 28 U.S.C. § 1582). Importers who paid the tariffs sued to recover their payments, *id.* at 97, and then-Section 1582(a) granted the Customs Court jurisdiction over actions by plaintiffs "whose protest pursuant to the Tariff Act of 1930 … has been denied," 28 U.S.C. § 1582 (1976). That jurisdictional ground is now embodied in Section 1581(a). 28 U.S.C. § 1581(a) (Current). In contrast, no equivalent of the ground defendants assert here—Section 1581(i)—existed under the prior jurisdictional statute, so the Court had no occasion to decide whether the claims arose out of TWEA or whether TWEA provided for tariffs.

Defendants' argument that Section 1581 retained and added to the jurisdiction in former Section 1582 (at 23) is likewise irrelevant. All that means is that, today, importers who protested the tariffs they paid and want to contest the denial of those protests will be sent to the Court of International Trade under Section 1581(a), as they were in *Cornet Stores* under then-Section 1582(a). California is not in that category, so Section 1581(i) requires a distinct analysis.

b. Defendants' analogy to personal jurisdiction (at 30) highlights the flaws in their reasoning. That requirement governs courts' power over the parties before them, so courts ask whether the action "'arise[s] out of or relate[s] to *the defendant's contacts with the forum*.'" *Yamashita v. LG Chem*, 62 F.4th 496, 503 (9th Cir. 2023) (emphasis added). Section 1581's text, in contrast, requires the action to "arise[ ] out of any *law of the United States* providing for … tariffs." 28 U.S.C. § 1581(i)(1)(B) (emphasis added). The comparison is thus inapt because personal jurisdiction focuses on the factual circumstances, not "the claims the lawsuit asserts and the legal authority that it challenges." Answering Br. 29-30.

If anything, federal question jurisdiction is more instructive. Section 1331 grants district courts jurisdiction over actions "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. In that context, the Supreme Court held that an action "arises under" a law if that law either creates the cause of action or presents an issue that is "necessarily raised," "actually disputed," "substantial," and "capable of resolution in federal court" without disrupting the balance of federalism. *Gunn v. Minton*, 568 U.S. 251, 258 (2013); *see Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 807-808 (1988) (under related Section 1338, plaintiff must "at least make it appear that some right or privilege will be defeated by one construction, or sustained by the opposite

construction," of the relevant law).  No issue concerning the construction of the HTSUS is raised or disputed here, let alone a substantial one.

c.  Finally, defendants' passing reference (at 33-34) to Section 1581(i)(1)(D) is beside the point.  It matters not if subsection (D) is broader than (B) because the issue is not whether the HTSUS is a law providing for (B) "tariffs" or (D) "administration and enforcement" of tariffs.  28 U.S.C. § 1581(i)(1)(B), (D). Either way, the Court of International Trade has jurisdiction only if the action "arises out of" that law—and that is where defendants' argument fails.

## B.  The Executive Orders Purporting to Modify the HTSUS Were Not "Made … Under Authority of Law"

Even if this lawsuit arose from the modifications to the HTSUS, jurisdiction would not lie in the Court of International Trade for the independent reason that the modifications are not a "law of the United States providing for … tariffs."  28 U.S.C. § 1581(i)(1)(B).  The HTSUS only treats as statutory law a "modification or change made … *under authority of law*."  19 U.S.C. § 3004(c)(1)(C) (emphasis added).  As California explained (Opening Br. 21-22), the modifications here were not made under authority of any law because they were imposed under IEEPA, which provides no authority for tariffs.

1.  Defendants' primary argument is that reading Section 3004 to mean what it says would require courts "to treat the merits of plaintiffs' claim and the jurisdictional inquiry as a single inquiry."  Answering Br. 36.  But, in ultra vires

cases, that is what the phrase "under authority of law" requires. Defendants'
argument reads those words out of the statute—something courts "are loath to do."
*Cooper Indus. v. Aviall Servs.*, 543 U.S. 157, 166 (2004) (rejecting reading that
"render[s] part of the statute entirely superfluous").

Regardless, defendants' argument has the "basic principle" backwards.
Answering Br. 3. As even the authority defendants cite recognizes, "it is common
for jurisdictional inquiries and the merits to overlap." *Garland v. Aleman
Gonzalez*, 596 U.S. 543, 554 n.5 (2022). The Supreme Court has embraced such
overlap—even complete overlap—in various contexts. For example, under the
Foreign Sovereign Immunities Act, jurisdiction and the merits are often
"intertwined" because jurisdiction depends on whether property was taken "in
violation of international law." *Bolivarian Republic of Venez. v. Helmerich &
Payne Int'l Drilling*, 581 U.S. 170, 178 (2017). The Court held that, even when
that is the "only serious" merits issue in the case, "the court must still answer the
jurisdictional question." *Id.* "If to do so, it must inevitably decide some, or all, of
the merits issues, so be it." *Id.*; *see also Brownback v. King*, 592 U.S. 209, 218
(2021) (merits and jurisdiction "entirely overlap" under Federal Tort Claims Act);
*Ye v. INS*, 214 F.3d 1128, 1131 (9th Cir. 2000) (jurisdiction and merits "collapse
into one" under Illegal Immigration Reform and Immigrant Responsibility Act).

Neither case defendants cite (at 36) establishes the kind of inflexible rule defendants advance. Those courts applied text-based statutory interpretation, concluding that the words of the statutes before them did not call for merits analysis. *See Aleman Gonzalez*, 596 U.S. at 552 (ordinary meaning of "operation" did not distinguish between lawful and unlawful operation); *Michael Simon Design v. United States*, 609 F.3d 1335, 1341 (Fed. Cir. 2010) (interpreting "recommendations by the Commission under Section 3005"). The statutory text here yields the opposite conclusion by expressly requiring that modifications be "made … under *authority of law*" to have legal effect. 19 U.S.C. § 3004(c)(1)(C) (emphasis added). As explained above, the ordinary meaning—indeed, the only meaning—of that phrase requires the President to act within his lawful authority.

Defendants' concerns about purported consequences (at 36-37) are overblown. In the typical case where a plaintiff claims that tariffs violate a tariff statute (*e.g.*, for exceeding caps or statutory limitations), there is no doubt that the tariff statute "provid[es] for … tariffs." 28 U.S.C. § 1581(i)(1)(B). The only question is whether the challenged tariff complies with that statute. The Court of International Trade thus has jurisdiction regardless of how it decides the merits. Jurisdiction only overlaps with the merits in the rare case involving an ultra vires claim that the President imposed tariffs under a statute that does not authorize

10

tariffs at all.  *See Dugan v. Rank*, 372 U.S. 609, 622-623 (1963) (distinguishing

merely unlawful actions from those "'not within the officer's statutory powers'").[1]

Finally, defendants' reliance on the absence of examples of similar ultra vires

cases in district court (at 35) proves little.  *But see Fed. Energy Admin. v.*

*Algonquin SNG*, 426 U.S. 548, 556 (1976) (license fee challenge in district court).

It is difficult to find examples of ultra vires tariff cases in district court not because

such challenges belong in the Court of International Trade, but because such

challenges are rare in the first place.  Until the tariffs here, Presidents generally did

not impose tariffs under statutes that do not provide for them.  Opening Br. 4-5.  It

is thus the President's actions, not California's arguments, that are unprecedented.

2.  Defendants (at 34-35) make a cursory alternative argument, not raised

below, that the HTSUS modifications here are "under authority" of a separate law,

Section 604 of the Trade Act of 1974.  They claim this obviates the need to

consider whether IEEPA authorizes tariffs, but Section 604 creates no such

loophole.  It states:  "The President shall from time to time, as appropriate, embody

in the [HTSUS] the substance of the relevant provisions of this chapter, and of

other Acts affecting import treatment, and actions thereunder, including removal,

---

[1] Defendants' comparison to *Yoshida* (at 37) is misplaced.  Like *Cornet Stores*, *Yoshida* predated Section 1581(i), and the earlier jurisdictional statute did not ask whether the action arose out of a law providing for tariffs.  *See supra* p. 6; *United States v. Yoshida Int'l*, 526 F.2d 560 (C.C.P.A. 1975); 28 U.S.C. § 1582 (1976).

modification, continuance, or imposition of any rate of duty or other import restriction." 19 U.S.C. § 2483. When tariff laws or "actions thereunder" change tariff rates, this provision allows the President to update the HTSUS to "reflect and be consistent with current law." *Material Relating to the Proposal of the Administration Entitled the "Trade Reform Act of 1973,"* House Committee on Ways and Means, 93d Cong. 97 (Mar. 10, 1973).

Modifications under Section 604 thus still require the tariffs to be authorized by substantive law. *See id.* at 97-98 (providing, as examples, modifications "resulting from actions taken under section 405 (suspension of import barriers to restrain inflation) or section 401 (balance of payments authority)" or reflecting "tariff preferences for developing countries," *see, e.g.*, 19 U.S.C § 2461). Section 604 provides no independent authority to impose tariffs, so whether a President can lawfully use Section 604 to modify the HTSUS turns on the same question defendants seek to avoid—whether IEEPA authorizes tariffs.

Defendants argue, however, that Section 604 allows the President to modify the HTSUS to reflect tariffs imposed under any statute "'affecting import treatment,'" even if that statute does not provide for tariffs but only for other import-affecting actions like embargoes. Answering Br. 35. Defendants' reading would allow an obviously illegal tariff to be added into the HTSUS and deem that a modification "under authority of law" for purposes of Section 3004(c)(1)(C).

12

That broad reading makes no sense in the context of a provision that, defendants agree, serves merely to "update" the HTSUS. *Id.* The phrase "other Acts affecting import treatment" follows "the relevant provisions of this chapter," and in that context, captures laws outside the chapter that authorize changes to tariff rates. 19 U.S.C. § 2483. It does not encompass statutes that authorize other import restrictions like embargoes, but do *not* provide for tariffs. Defendants' reading ignores that the HTSUS embodies tariffs, not embargoes—it would mean either that the President may add to the HTSUS something that is not a tariff or may add to the HTSUS a tariff purportedly imposed under a law that does not provide for tariffs. Neither makes sense. Regardless, even if Section 604 could bear such an absurd interpretation, it would not apply here: the challenged tariffs are not actions under IEEPA because IEEPA does not authorize them. *See infra* pp. 16-29.

3. Finally, defendants' fallback request that this Court defer the jurisdictional question to the Court of International Trade (at 38-40) is contrary to the text of the transfer statute and this Court's precedents. As the district court correctly recognized (ER-16), 28 U.S.C. § 1631 permits transfer only when the court "finds that there is a want of jurisdiction." That finding is a prerequisite for transfer, and mere "doubt" is insufficient. *Contra* Answering Br. 39.

This Court's precedents are consistent with that plain text and do not create any contrary "deferential" rule (Answering Br. 38). In *Pentax* and *Universal*

13

*Fruits*, the Court did not transfer based on uncertainty; it conclusively held that the district court lacked jurisdiction. *Pentax Corp. v. Myhra*, 72 F.3d 708, 710-711 (9th Cir. 1995) (assessing whether Section 1581(i) applied and holding that jurisdiction "lies exclusively in the CIT" because the action "arises under 19 U.S.C. § 1304(f), which is a law providing for a duty"); *United States v. Universal Fruits & Vegetables*, 370 F.3d 829, 833-836 (9th Cir. 2004) (assessing whether Section 1582(3) applied and holding that it did, so "we must conclude that the district court in this case lacked subject matter jurisdiction"). Both courts initially ordered outright dismissal for lack of jurisdiction and only amended the opinions to direct transfer after plaintiffs filed rehearing petitions seeking transfer. *Pentax*, 72 F.3d at 709; *Universal Fruits*, 370 F.3d at 830-831.

By ignoring the holdings and context, defendants misread the language they quote. Where the cases require courts to "'uphold[ ] the exclusivity'" of the Court of International Trade (Answering Br. 38), they mean that *when* that court has jurisdiction, it displaces other jurisdictional statutes that would otherwise overlap. *Universal Fruits*, 370 F.3d at 833, 836. That language originates from *Fritz v. United States*, which held that, where an action fell within the text of both Section 1582 and the Tucker Act, Section 1582's exclusivity trumped the Tucker Act. 535 F.2d 1192, 1194 (9th Cir. 1976). But courts must still decide the antecedent question whether the Court of International Trade has jurisdiction in the first place.

14

And where the Court suggested that "'the prudent thing to do' is to 'transfer the case to the CIT so that the CIT can determine the question of its own jurisdiction'" (Answering Br. 39), the Court was not referring to the question whether Section 1581 placed exclusive jurisdiction in the Court of International Trade. *See Pentax*, 72 F.3d at 709; *Universal Fruits*, 370 F.3d at 830-831.[2] Rather, it was referring to other jurisdictional issues it had not reached, such as whether review was available at all for the kinds of claims plaintiffs asserted. *See Pentax*, 72 F.3d at 710-711 (not reaching "whether preenforcement review is available under the statutory scheme of 19 U.S.C. § 1592"); *Universal Fruits*, 370 F.3d at 836 n.13 (not reaching whether Court of International Trade could hear government's reverse False Claims Act claims). The Court did not decide those issues because it held first that, "if judicial review is available at all, that review is available only in the Court of International Trade." *Pentax*, 72 F.3d at 710.[3]

---

[2] As explained above, that language was added—after rehearing petitions were filed—to explain why transfer, rather than dismissal, was appropriate. *Pentax*, 72 F.3d at 709; *Universal Fruits*, 370 F.3d at 830-831.

[3] This Court is bound by *Pentax*, *Universal Fruits*, and *K Mart*, not the out-of-circuit decisions defendants cite (at 39-40). Regardless, those decisions address distinct circumstances and do not create the "prudential" rule defendants invoke. Answering Br. 40; *see Commodities Exp. v. U.S. Customs Serv.*, 957 F.2d 223, 225 (6th Cir. 1992) (applying res judicata to Court of International Trade's holding because "[b]oth actions involve the same parties and a common set of facts"); *SCM v. U.S. Int'l Trade Comm'n*, 549 F.2d 812, 818-821 (D.C. Cir. 1977) (expressing uncertainty as to complicated issue of available remedies).

This Court has the ability and responsibility to decide whether jurisdiction lies in district court or the Court of International Trade.  That the Court of International Trade exercised jurisdiction over some other cases challenging these tariffs does not relieve this Court of its responsibility.  *Contra* Answering Br. 27.  *K Mart* is illustrative:  even though the Federal Circuit first held that the Customs Court had exclusive jurisdiction, the Second and D.C. Circuits conducted their own analysis and disagreed.  *Coal. to Pres. the Integrity of Am. Trademarks v. United States*, 790 F.2d 903, 906 (D.C. Cir. 1986); *Olympus v. United States*, 792 F.2d 315, 318-319 (2d Cir. 1986).  The Supreme Court resolved the conflict in favor of the district courts and made no suggestion that the regional circuits should have deferred to the Federal Circuit's earlier (and erroneous) decision.  *See K Mart*, 485 U.S. at 182; *also id.* at 188-189 (rejecting uniformity argument like defendants' argument here).

## II.   IEEPA DOES NOT PROVIDE FOR TARIFFS

### A.   The Plain Meaning of IEEPA's Text Does Not Include Tariffs

Because this action arises out of IEEPA, and IEEPA does not provide for tariffs, the Court of International Trade has no jurisdiction under Section 1581(i).  Defendants attempt to squeeze tariff authority into the words "regulate … importation" (Answering Br. 41-44), but their textual arguments are unmoored from the relevant statutory context and fail to focus on the right inquiry.  California

16

does not dispute that tariffs can sometimes be used for other purposes in addition to raising revenue (*id.* at 44), but that misses the point. The question is not what the word "regulate" might mean in the abstract. The question is whether "regulate," when used in a statute like IEEPA, delegates Congress's constitutional power to impose tariffs to the President. It does not.

1. Defendants (at 41, 45) rely on cases discussing the scope of Congress's power to "regulate Commerce" under the Constitution. U.S. Const. art. I, § 8, cl. 3. Those cases firstly recognize that the power to tax and tariff "is distinct from the power to regulate commerce." *Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 58 (1933); *see Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 201 (1824). But they permit Congress, in some contexts, to impose duties under its Commerce Clause power, as well as its Taxing Clause power. *Bd. of Trs.*, 289 U.S. at 58.

That "regulate" can be construed broadly when used in the Constitution to define Congress's legislative power, though, does not mean that the word carries the same scope when used by Congress in a statute delegating its legislative power to the President. The former establishes the Constitution's balance of authority to each branch under the separation of powers, while the latter is a limited delegation from one branch to another altering that balance. It would make no sense for a statutory delegation to transfer to the Executive Branch the full reach of Congress's commerce power merely because the statute used the word "regulate."

17

Such a broad reading would render other terms in IEEPA superfluous, as Congress's power to "regulate" commerce also enables it, *e.g.*, to "block," "prevent," and "direct and compel." 50 U.S.C. § 1702(a)(1)(B). Interpreting regulatory statutes and the Commerce Clause coextensively also poses serious constitutional concerns. *See infra* pp. 27-29. Even *Yoshida* recognized that TWEA's delegation "could not constitutionally have been of 'the full and all-inclusive power to regulate foreign commerce." *United States v. Yoshida Int'l*, 526 F.2d 560, 574 (C.C.P.A. 1975).

Overlooking this critical distinction, defendants ignore how "regulate" is used in statutes delegating regulatory authority. As California explained (Opening Br. 28), Congress has granted agencies the power to "regulate" numerous and diverse areas, and those statutes have never been interpreted to include the power to tax or tariff. *See, e.g.*, 15 U.S.C. § 78k(a)(2) (SEC); 21 U.S.C. § 360bbb-2(a) (FDA). And conversely, Congress is explicit when it delegates the power to tax or tariff in addition to the power to regulate. *See* Opening Br. 27-29 (collecting examples).

Defendants make no attempt to reconcile this statutory background with their interpretation of IEEPA, which would render the statute an outlier. They do not contend that any other regulatory statute uses "regulate" to encompass taxes or tariffs. They instead claim that other statutes are "far afield" from IEEPA because regulating "importation" is somehow unique. Answering Br. 45. But they fail to

explain why.  As defendants argue, taxes are "routinely" used to "influence conduct."  *Id.* at 44.  If taxation is a "standard tool" for regulating imports (*id.* at 45), it is equally so for regulating conduct in other areas, *e.g.*, from health insurance to alcohol sales.  And in those contexts, Congress either exercises that authority itself or expressly specifies when a delegation includes that authority.

Defendants' contrary reading has far-reaching implications.  IEEPA allows the President to regulate "any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving" property in which a foreign national has an interest.  50 U.S.C. § 1702(a)(1)(B); *see* Opening Br. 30-31.  If "regulate" includes the power to impose duties, the President could also tax the mere holding, transfer, or acquisition of property, like a home jointly owned by a U.S. citizen and her non-citizen mother.  *See Cochise Consultancy v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019) ("a single use of a statutory phrase must have a fixed meaning").  And beyond IEEPA, because defendants claim their reading "follows from the ordinary meaning of 'regulate'" (Answering Br. 41), that reasoning implicates other regulatory statutes using that term and would grant agencies like the SEC, FDA, and CFPB newfound taxing power.  This dramatic expansion of IEEPA and other regulatory schemes would be unprecedented, untenable, and likely unconstitutional.

2. Defendants (at 41-42) rely on *Federal Energy Administration v. Algonquin SNG*, 426 U.S. 548 (1976), but that decision supports California. The differences between IEEPA and the statute in *Algonquin* highlight what is missing from IEEPA. *Algonquin* addressed Section 232(b) of the Trade Expansion Act of 1962, a law codified in Title 19, which covers "Custom Duties." *See* Pub. L. No. 87-794, 76 Stat. 877 (1962). Section 232(b) authorized the President to "'take such action, and for such time, as he deems necessary to *adjust* the imports of (the) article'" to protect national security. *Algonquin*, 426 U.S. at 550 (quoting 19 U.S.C. § 1862(b) (1970)) (emphasis added). Although that provision itself did not use the terms "tariffs" or "duties," those terms were repeatedly used throughout the Trade Expansion Act of 1962, including in Section 232 itself (subsection (a)) and the sections surrounding it. *See, e.g.*, 76 Stat. 872, 874-877, 879-883.

The Court held that Section 232(b) allows the President to impose import license fees, but its holding was based on statutory context and legislative history, not on the plain meaning of the phrase "adjust … imports." *Algonquin*, 426 U.S. at 561-571. The Court noted that Section 232(b)'s prefatory language ("'take such action … as he deems necessary'") granted the President broad discretion. *Id.* at 561. IEEPA contains no such prefatory language and instead delineates the specific actions it authorizes, listing eight powers that apply to twelve property-related activities. 50 U.S.C. § 1702(a)(1)(B); *see* Opening Br. 30-31.

The *Algonquin* Court also gave "substantial weight" to the Trade Expansion Act's legislative history, which was replete with references to duties and tariffs. 426 U.S. at 562-570. Express statements from Members of both Houses and the Executive Branch made clear that Section 232(b) "[ ]includ[es] the use of[ ] tariffs, quotas, import taxes or other methods of import restriction." *Id.* at 564; *see id.* at 567. In contrast, nowhere in the legislative history of IEEPA or its predecessor TWEA is there any mention of duties or tariffs. *See* Opening Br. 35-39. Applying the same interpretive tools from *Algonquin* to IEEPA thus yields the opposite conclusion—IEEPA does not provide for tariffs.

3. Defendants' cursory responses to California's other textual arguments are unpersuasive: IEEPA applies only to property in which a foreign national "has any interest." 50 U.S.C. § 1702(a)(1)(B); Opening Br. 33-34 n.13. Unlike Hamas's interest in funds raised *for it*, defendants fail to explain how foreign nationals have any interest—possessory, legal, or otherwise—in property after they have sold it. *See* Answering Br. 47-48.

Defendants also fail to reconcile their interpretation of "regulate" with its application to "exportation." Answering Br. 61-62; *see* Opening Br. 32-33. They do not dispute that at least some, and indeed most, tariffs on exports are unconstitutional. They ask the Court to leave that problem for another day, but

there is no basis for adopting an interpretation that creates a constitutional problem when California's interpretation eliminates that problem.

### B. Congress Did Not Ratify *Yoshida*

Defendants also rely on *Yoshida*, but they make no attempt to defend the merits of *Yoshida*'s analysis. As California explained (Opening Br. 42-44) and defendants do not dispute (Answering Br. 49), *Yoshida* contravenes modern principles of statutory interpretation. It relies on "the intent of Congress" and "the broad purposes of the Act" instead of the statutory text. *Yoshida*, 526 F.2d at 583. It also infers broad delegation of tariff authority based on "silen[ce]" in the legislative history, contrary to modern developments in the major questions and nondelegation doctrines. *Id.* at 574.

Defendants insist that it is "irrelevant" that *Yoshida*'s reasoning is unpersuasive. Answering Br. 49. Instead, they argue (at 43-44, 48-50) that *Yoshida* was ratified in IEEPA. But the ratification canon has no place here for multiple reasons. *See Oklahoma v. Castro-Huerta*, 597 U.S. 629, 644 (2022) ("the reenactment canon does not override clear statutory language").

First, ratification applies only when the prior statutory text has a "'settled construction" adopted by a "judicial consensus so broad and unquestioned that [the Court] must presume Congress knew of and endorsed it." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 349 (2005). As the Supreme Court warned, it is

"most unlikely" that "a smattering of lower court opinions could ever represent" such a broad consensus—let alone a single lower court opinion. *BP v. Mayor & City Council of Balt.*, 141 S. Ct. 1532, 1541 (2021).

Defendants (at 48) attempt to avoid this requirement by claiming that the *Yoshida* court had exclusive jurisdiction over this issue, but that argument is circular. It assumes the answer to the jurisdictional question now before this Court. Regardless, even if true, defendants' assertion does not help them. Defendants cite no decision in which the Supreme Court endorsed ratification based on a single lower court decision, even from a court with exclusive jurisdiction. In *Helsinn Healthcare v. Teva Pharmaceuticals*, the Court relied first on its own precedents and then looked to Federal Circuit decisions only to "ma[k]e explicit what was implicit in our precedents." 586 U.S. 123, 130-131 (2019).

Defendants' reliance on legislative history is similarly unavailing. IEEPA's House Report did not "approvingly discuss[ ]" *Yoshida*. *Contra* Answering Br. 43. It briefly mentioned the decision in the "Background" section summarizing past uses of TWEA. H.R. Rep. No. 95-459, at 5 (1977). But it emphasized that IEEPA's purpose was to "assure improved future uses," "not to judge the past," so IEEPA's provisions—even those that "'grandfather[ed]' existing uses"—were enacted "without either endorsing or disclaiming them." *Id.* at 10-11. The

23

legislative history thus reflects that, while Congress may have been aware of *Yoshida*, it cannot be deemed to have "endorsed it." *Jama*, 543 U.S. at 349.

Second, even if a single lower court opinion could theoretically constitute a broad consensus, *Yoshida* falls far short of the clarity needed to establish a "settled construction." *Jama*, 543 U.S. at 349. *Yoshida* was closely cabined and applied only retroactively. *See* 526 F.2d at 577 (making clear its holding did not "approve in advance any future surcharge of a different nature"). *Yoshida*'s reasoning relied on the absence of a specific statute governing tariffs addressed at a balance-of-payments problem. *Id.* at 578. As California explained (Opening Br. 43-44), that changed when Congress passed Section 122 of the Trade Act of 1974 to address precisely this situation. Pub. L. No. 93-618, 88 Stat. 1978, 1987 (1975). *Yoshida* declined to address how Section 122 would affect its analysis, but it observed that any future tariffs of this kind "must, of course, comply with the statute now governing such action." 526 F.2d at 582 n.33. This restriction on prospective application of the decision casts doubt on whether there was anything in *Yoshida* for Congress to ratify in a post-Section 122 world.

Finally, the ratification canon applies only when Congress reenacts a provision "without change." *Jama*, 543 U.S. at 349. But Congress's very purpose in enacting IEEPA was to change TWEA's overly broad delegation of authority, which had been expanded "through usage, into something quite different from

what was envisioned." H.R. Rep. No. 95-459, at 8-9. Some of IEEPA's changes, to be sure, included new procedural requirements and exceptions (Answering Br. 48), but Congress nowhere suggested that those were the only changes limiting the President's power. To the contrary, IEEPA's legislative history reflects that the authorities it granted "are *both* more limited in scope than those of [TWEA] section 5(b) *and* subject to various procedural limitations." H.R. Rep. No. 95-459, at 2 (emphasis added). And beyond the changes in IEEPA itself, the statutory backdrop against which IEEPA was enacted had also changed with the enactment of Section 122 of the Trade Act of 1974.

### C. The Major Questions and Nondelegation Doctrines Confirm That IEEPA Does Not Provide for Tariffs

IEEPA's text, context, and legislative history make clear that it does not provide for tariffs, and this Court can uphold jurisdiction here on that basis alone. But if the Court has any doubts, the major questions and nondelegation doctrines reinforce that interpretation. Opening Br. 39-41.

1. Defendants argue (at 50-53) that the major questions doctrine does not apply to the President or to foreign affairs, but the Supreme Court has never approved such categorical limits. Three circuits have applied the doctrine to the President, and defendants cite no valid precedent to the contrary. *Louisiana v. Biden*, 55 F.4th 1017, 1031 n.40 (5th Cir. 2022); *Kentucky v. Biden*, 23 F.4th 585, 606-608 (6th Cir. 2022); *Georgia v. President*, 46 F.4th 1283, 1295-1297 (11th

25

Cir. 2022). The decision defendants rely on was vacated and is not the law of this

Circuit. *Mayes v. Biden*, 89 F.4th 1186, 1188 (9th Cir. 2023); *see Nebraska v. Su*,

121 F.4th 1, 9 n.2 (9th Cir. 2024). Nor is its logic persuasive. *See Su*, 121 F.4th at

18-20 (Nelson, J., concurring). The major questions doctrine is not based solely on

political accountability. *Id.* at 20. It protects "separation of powers principles,"

which are implicated by congressional delegations to the President and agencies

alike. *West Virginia v. Envtl. Prot. Agency*, 597 U.S. 697, 723 (2022); *see id.* at

739 (Gorsuch, J., concurring) (referring to "Executive Branch" and "President").

Defendants' purported foreign-affairs exception (at 52-53) fares no better.

Defendants invoke a concurrence by Justice Kavanaugh, which has not been

adopted by the Court. *Fed. Commc'n Comm'n v. Consumers' Rsch.*, 145 S. Ct.

2482, 2516 (2025) (Kavanaugh, J., concurring). Even under his view, it is doubtful

that Justice Kavanaugh would apply any exception for foreign affairs to tariffs. He

suggested that the major questions doctrine has not been applied in foreign affairs

contexts because, "in those areas, the President possesses at least some

independent constitutional power to act even without congressional authorization."

*Id.* But the President possesses no independent power to impose tariffs or regulate

foreign commerce, which are core legislative powers under Article I. U.S. Const.

art. I, § 8, cls. 1, 3; *compare Dep't of Navy v. Egan*, 484 U.S. 518, 529-530 (1988)

(deference to President's "Art. II duties," such as "military and national security

affairs"). Nor can tariffs be considered solely matters of foreign policy, as the taxes are paid, and the burdens are borne, primarily by the American people.[4]

Defendants' remaining case-specific arguments likewise fail. Defendants do not dispute that the tariffs' "'economic and political significance'" is "staggering," as they control "'a significant portion of the American economy.'" *Biden v. Nebraska*, 600 U.S. 477, 502-503 (2023). Defendants argue instead that such breadth is not "'unheralded.'" Answering Br. 52. *But see Biden*, 600 U.S. at 521 (Barrett, J., concurring) (not all indicators are required for doctrine to apply).

That is incorrect. Defendants ignore the fact that no President has ever used IEEPA to impose tariffs in the almost-fifty years since its enactment. They claim instead that IEEPA has been used for other significant actions like embargoes (Answering Br. 52), but that is irrelevant. The power to tariff is not lesser included in the power to embargo. They are different in kind because tariffs invoke the distinct power of taxation, which implicates the raising of revenue. IEEPA's "vague statutory grant is not close to the sort of clear authorization required" to encompass this distinct power. *West Virginia*, 597 U.S. at 732.

2. Defendants' interpretation would also pose serious constitutional problems under the nondelegation doctrine. Prior decisions upholding IEEPA against

---

[4] Defendants' foreign affairs argument against nondelegation (at 56-57) fails for the same reason.

nondelegation challenges are inapposite because they considered the scope and limits of IEEPA when it was properly construed. *See United States v. Shih*, 73 F.4th 1077, 1090 (9th Cir. 2023) (license and reporting requirement). None considered the unbounded tariff authority exercised here because no President has ever before exercised such authority under IEEPA. California does not contend that IEEPA, properly interpreted, is an unconstitutional delegation—only that defendants' erroneous and unprecedented interpretation would render it so.

The purported limitations defendants invoke to establish an "intelligible principle" (at 58-59) are illusory. Defendants point to purported limits on the President's ability to declare a national emergency, but, as the tariffs here reveal, they have interpreted those limits so broadly as to be meaningless. Trade deficits that are, in the President's words, "persistent" and "annual" (ER-8) cannot be the kind of "unusual and extraordinary" emergency required by IEEPA. 50 U.S.C. § 1701(a). Yet defendants have taken the position that the President's declaration of an emergency is "not susceptible to meaningful judicial review." Appellants' Opening Br., *V.O.S. Selections v. Trump*, No. 25-1812 (Fed. Cir.), at 59. Unreviewable discretion does not satisfy the doctrine's requirement of enabling "'*the courts* and the public to ascertain whether [the Executive Branch]' has followed the law." *Consumers' Rsch.*, 145 S. Ct. at 2497 (emphasis added).

Once an unreviewable emergency is declared, defendants do not contend that there are any limits on the amount or duration of tariffs the President can impose. *See* Answering Br. 58-59. In defendants' view, then, IEEPA delegates to the President the power to impose tariffs indefinitely on nearly all goods at whatever levels he chooses. *See* ER-27 (tariffs reaching 145%). *Compare Yoshida*, 526 F.2d at 577-578 (surcharges were temporary, limited to articles "subject [to] prior tariff concessions," and not exceeding "congressionally established rates").

This unbounded power is in stark contrast to the other delegations of tariff authority defendants cite (at 6, 57). As defendants' examples illustrate, other tariff statutes place careful limits on the amount and duration of tariffs. Allowing unbounded tariffs under IEEPA creates a loophole for circumventing these limits. Defendants' only response (at 59-61) is that emergency and non-emergency powers are complementary. While that is possible in theory, it is not true under defendants' view of IEEPA because they would allow no meaningful review of what constitutes an emergency. IEEPA's so-called emergency powers thus swallow the rest of Congress's statutory scheme for tariffs. And, as exemplified by the challenged tariffs in this case, there would be no reason for a President to comply with the other tariff statutes' stricter requirements if he can simply impose any tariffs he wishes under the guise of an emergency.

## CONCLUSION

The judgment of the district court should be reversed.

Dated:  August 18, 2025          Respectfully submitted,

*s/ Diana L. Kim*
_____

ROB BONTA
  *Attorney General of California*
HELEN H. HONG
  *Acting Solicitor General*
THOMAS S. PATTERSON
  *Senior Assistant Attorney General*
JULIE VEROFF
DIANA L. KIM
  *Deputy Solicitors General*
LARA HADDAD
  *Supervising Deputy Attorney General*
SHIWON CHOE
ZELDA VASSAR
CAROLYN F. DOWNS
  *Deputy Attorneys General*

*Attorneys for Plaintiffs-Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-3493

I am the attorney or self-represented party.

**This brief contains** 6,999 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Diana L. Kim **Date** August 18, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*